# EXHIBIT J

# FILED

San Francisco County Superior Court

FEB - 9 2005

GORDON PARK-LI, Clerk

BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO, UNLIMITED CIVIL JURISDICTION

MICHAEL DIPIRRO,

        Plaintiff,

    v.

J.C. PENNEY COMPANY, INC.; AND
DOES 1 through 150, inclusive

        Defendants.

---

MICHAEL DIPIRRO,

        Plaintiff,

    v.

MACY'S; AND DOES 1 through 150,

        Defendants.

Case No. 407150
(Consolidated with Case No. 407458)

Honorable A. James Robertson

TRIAL DEPT: 503

[PROPOSED] STATEMENT OF
DECISION Liability Phase
(California Rule Of Court 232)

35019687.2

[PROPOSED] STATEMENT OF DECISION

ORIGINAL

1

## STATEMENT OF THE CASE

2    I.     DESCRIPTION OF TRIAL

3         On July 28, 2003, trial in the above-entitled matter commenced before the

4 Honorable A. James Robertson II, sitting without a jury. Gregory M. Sheffer, Esq. and

5 Clifford A. Chanler of Sheffer & Chanler LLP appeared for Plaintiff Michael DiPirro, and

6 Jeffrey B. Margulies, Esq. and Rachel D. Stanger, Esq. of Parker, Milliken, Clark, O'Hara

7 & Samuelian appeared for Defendants J.C. Penney Company, Inc. (hereafter "J.C.

8 Penney") and Macy's West, Inc. (hereinafter "Macy's West"). Mary Harokopus, Esq.

9 appeared pro hac vice for J.C. Penney. On September 8, 2003, Ann M. McGrath, Esq. of

10 Parker, Milliken, Clark, O'Hara & Samuelian also appeared on behalf of Defendants.

11         The court trial lasted for 72 days. Opening statements were given on July 30,

12 2003. Presentation of Plaintiff's evidence was given on July 31 - August 21, 2003.

13 Presentation of Defendants' evidence was given on August 26, September 8 - November

14 13, 2003. Plaintiff presented rebuttal evidence and closing arguments were made in court

15 starting on November 18 through December 2, 2003. Thereafter, the parties submitted

16 further written and oral argument at the Court's request by telephone on December 11 and

17 18, 2003. Further briefs and proposed statements of decision were submitted by the

18 parties pursuant to a schedule established by the Court. The Court required written

19 comments by each party directed to the submissions of the other party. The Court held a

20 number of telephonic conference hearings concerning these matters in which there were

21 further arguments. The matter was submitted for decision on April 28, 2004. A total of

22 twenty-three witnesses testified at trial between July 31, 2003 and November 10, 2003.

23 The Plaintiff presented eight witnesses during trial, which included two investigators,[1] one

24 laboratory technician,[2] three experts,[3] one glassware manufacturer representative[4] and in-

25 house counsel for J.C. Penney, Mary Harokopus.

26

27    ———————————————

   [1]  Russell Brimer, Dea Services investigator and Bernice Dea, owner of Dea Services.

28    [2]  Hugh Dennis Dougherty, laboratory technician for Curtis & Tompkins laboratory.

DOCUMENT PREPARED
ON RECYCLED PAPER

1    The Defendants presented sixteen witnesses, which included five buyers,[5] one

2    glassware manufacturing representative,[6] one testing witness,[7] one cosmetic usage

3    witness,[8] three in-house counsel witnesses,[9] four experts,[10] and the Plaintiff, Michael

4    DiPirro.

5    In addition, during the course of trial, both Plaintiff and Defendants each brought a

6    Motion For Judgment under C.C.P. 631.8.  The Court declined to rule on both motions

7    until submission of the case.  Plaintiff also brought three motions to exclude witnesses

8    Richard Brinkman, Christine Parker, Owen Jones and other percipient witnesses of each

9    Defendant and two motions for sanctions based upon Defendants alleged failure to

10    provide information regarding "knowledge" and failure to identify products.  All such

11    motions were denied due to a failure to demonstrate knowing violation of a prior court

12    order.  In addition, Plaintiff served trial discovery on Defendants in the form of special

13    interrogatories and requests for production.  Defendants objected to the discovery as

14    untimely and improper.  On July 30, 2003, the Court considered the objections and ruled

15    that Defendants were only required to answer select, modified special interrogatories and

16    requests for production.

17    During the trial, Plaintiff introduced 209 exhibits and Defendants introduced 218

18    exhibits.

19

20

21    [3]  Dr. David Robert Brown, toxicology expert; Michael Mazis, advertising and marketing expert; Dr. Barbara
Callahan, toxicology expert.

22    [4]  Soleiman Gabay, President of Gibson Overseas, Inc.

23    [5]  Elizabeth Morello, Senior Vice President and General Merchandise Manager, Fragrances and Cosmetics for
Macy's West; Jill Barr, buyer of cosmetics for Macy's West; Judy Strother, administrative assistant in the Tabletop
division of J.C. Penney; Richard Brinkman, former Senior Buyer in the Tabletop Division of J.C. Penney; Christine

24    Parker, Senior Buyer of cosmetics for J.C. Penney.

      [6]  Wayne Zitkus, manager of international business development for Libbey, Inc., manufacturer of painted glassware.

25    [7]  Owen Jones, former Product Safety Coordinator for the Retail Testing Laboratory at J.C. Penney.

      [8]  John Voda, Director of Research at Pragmatic Research responsible for the CTFA study regarding cosmetic usage.

26    [9]  Christine Brandt, in-house counsel for Macy's West; Mary Harokopus, in-house counsel for J.C. Penney; Susan
Witt, paralegal for J.C. Penney.

27    [10]  Dr. Carla Kagel, analytical chemistry expert; Dr. Michael Lakin, toxicology expert; Dr. James Embree, toxicology
expert; Dr. Wayne Stewart, false advertising expert.

28

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2                                  - 2 -
                            [PROPOSED] STATEMENT OF DECISION

1    The parties stipulated and agreed that, should it be necessary to decide any issues

2    concerning remedy, those issues would be bifurcated for separate trial after a decision is

3    reached on the liability phase of the case.  Pursuant to this stipulation, the Court ordered

4    the case bifurcated.

5    II.    SUMMARY OF STATEMENT OF DECISION

6        For the reasons set forth in this tentative decision, the Court finds as follows:

7        1.    Plaintiff has proved that J.C. Penney and Macy's West caused exposures to

8    lead (a chemical listed pursuant to the Health and Safety Code) through their sale of

9    cosmetic products and further finds that J.C. Penney caused exposure to lead through their

10    sale of painted glassware.

11        2.    With respect to the sale of the cosmetic products, the Court finds that J.C.

12    Penney and Macy's West did not knowingly cause any exposure to lead in cosmetics with

13    the sale of such product because they were unaware such products contained lead.

14    Accordingly, the Court finds J.C. Penney and Macy's West have no liability for the sale of

15    such products under the Health and Safety Code.  In connection with this finding of no

16    liability, the Court did determine that the notice issued by Plaintiff gave Plaintiff standing

17    so that the Court could make its finding of non-liability.  The Court further concluded that

18    the doctrine of estoppel does not foreclose Plaintiff for asserting claims as to cosmetic

19    products.

20        3.    With respect to painted glassware, the Court finds that J.C. Penney

21    knowingly caused an exposure to lead by selling glassware painted with lead paint

22    because J.C. Penney was aware the paint on the exterior of the glasses contained lead and

23    J.C. Penney was aware customers would touch the lead paint in the normal course of

24    drinking from the glasses.  Accordingly Plaintiff has established liability for a knowing

25    exposure.  Since the glassware was intentionally sold and not accidentally distributed, the

26    Court finds that J.C. Penney acted intentionally in exposing customers to the lead in the

27    glassware.  Therefore, J.C. Penney is liable for any sale of such glassware as may have

28    occurred.  In making this finding, the Court concludes Plaintiff's notice was sufficient to

1    confer standing and Plaintiff was not estopped because of failure to identify the glassware

2    products at issue.

3        4.    Regarding the affirmative defense of exemption, the Court finds that in the

4    case of the sale of cosmetics both J.C. Penney and Macy's West have sustained their

5    burden and have established that the amount of exposure to lead fell below the allowable

6    exemption level.

7        5.    With respect to the painted glassware, the Court finds that J.C. Penney

8    failed in its attempt to show that the exposure from the glassware fell below the

9    exemption level because, inter alia, J.C. Penney did not show by competent evidence the

10   amount of lead which would be transferred into a customer's mouth through the normal

11   use of the glassware.

12       6.    The Court concludes that Plaintiff has failed to establish any liability on the

13   part of Macy's West or J.C. Penney for false advertising under Business and Professions

14   Code § 17500 for cosmetic products or painted glassware because their actions in

15   advertising or selling the products were not false or misleading.

16   III.    STATEMENT OF FACTS

17       A.    Statement of Facts Concerning Plaintiff and Testing

18           1.    Plaintiff Michael DiPirro's Complaints in this Consolidated Action

19       Plaintiff Michael DiPirro initiated this consolidated action with the service of three

20   separate 60-Day Notices of Violation pursuant to Proposition 65. On October 11, 2000,

21   DiPirro served Defendant J.C. Penney with a 60-Day Notice of Violation for J.C.

22   Penney's sale of cosmetic kits containing lead and/or lead compounds. (See, Trial Ex.

23   92). On November 20, 2001, DiPirro served Defendant Macy's West with a 60-Day

24   Notice of Violation for Macy's West's sale of cosmetic kits containing lead and/or lead

25   compounds. (See, Trial Ex. 91). On December 31, 2001, DiPirro served J.C. Penney with

26   a second 60-Day Notice for J.C. Penney's sale of painted glassware (with paint containing

27   lead). (See, Trial Ex. 92).

28

1    On April 25, 2002, DiPirro filed and served his Complaint against Defendant J.C.

2    Penney.  The J.C. Penney Complaint included three causes of action:  (1) for J.C.

3    Penney's alleged past and continuing violation of Proposition 65 by its knowing and

4    intentional sale, without a clear and reasonable warning, of cosmetic kits with components

5    containing the toxin, lead, and of externally painted glassware with paint containing lead

6    (the normal and reasonably foreseeable use of each of which caused unlawful consumer

7    exposures to lead); (2) for J.C. Penney's alleged past and continuing violations of

8    Business and Professions (B&P) Code § 17200 by engaging in the unfair business practice

9    of selling cosmetic kits and painted glassware in violation of Proposition 65; and (3) for

10   J.C. Penney's alleged past and continuing violation of B&P Code § 17500 from its

11   creation, approval and/or dissemination of a deceptive and misleading marketing scheme

12   for cosmetic kits and painted glassware consequent to the failure to either identify the

13   presence of the toxin, lead, or include the required clear and reasonable warning of

14   reproductive toxicity from the products' lead content.

15   On May 2, 2002, DiPirro filed his Complaint against Defendant Macy's West and

16   served it upon Macy's West on May 10, 2002.  The Macy's West Complaint contained the

17   same three legal causes of action as in the J.C. Penney Complaint but *only* in relation to

18   Macy's West's alleged sale, without a Proposition 65 warning or identification of the

19   presence of lead, of cosmetic kits with components containing the toxin, lead.

20            2.       Background of Plaintiff Michael DiPirro

21   Plaintiff Michael DiPirro is a citizen enforcer of the California Health and Safety

22   Code § 25249.7(d) ("Proposition 65"), who is concerned with consumer exposures to lead

23   and other hazardous substances.  Mr. DiPirro has a history of successful enforcement of

24   Proposition 65 and the Business & Professions Code (§§17200, 17500) against retailers

25   and manufacturers of a wide spectrum of consumer products.  Mr. DiPirro waives his own

26   right to monetary civil penalties in exchange for enhanced injunctive relief such as

27   product reformulation or improved warning commitments.

28

DOCUMENT PREPARED
ON RECYCLED PAPER      35019687.2

[PROPOSED] STATEMENT OF DECISION

1          3.    Testing Methodologies Utilized

2          Lead is a metal in its simplest form and may combine with other chemicals to form

3   lead compounds. Lead and lead compounds, all of which serve no beneficial purpose for

4   the human body, are known to be reproductive toxicants. Lead and lead compounds can

5   be found in the air, water and soil of our environment as well as in certain consumer

6   products. Lead is added to some consumer products to enhance the brightness and tone of

7   colors or pigments found in the product, such as the painted decoration on glassware.

8          Lead can be identified in consumer products by digesting portions of the product

9   itself (EPA 3050, 21 CFR 1303), digesting approved wiping materials that pick up the

10  available lead from the surface of consumer products (NIOSH 9100) or bathing the

11  product in a mild acid solution that will collect the lead that leaches to the surface of

12  products (ASTM C 927, ASTM C 738). Each of these methods is generally referred to as

13  being a "method of preparation" of the product sample. All three types of lead collection

14  result in the lead being contained in a liquid solution, a portion (aliquot) of which is then

15  analyzed for the concentration of lead collected from the product. The concentration is

16  generally reported in units of micrograms of lead. The method of analysis of the liquid

17  samples can be performed by either atomic absorption spectrometry (AES) or mass

18  spectrometry (MS) – both performed using inductively coupled plasma (ICP) to break

19  down the sample into its elemental form.

20         The ICP-AES method utilized in this trial is detailed by **EPA Method 6010**. ICP-

21  AES technology has been in use since the 1970s and is currently an important method of

22  analyzing samples for their elemental properties. ICP-AES technology involves an

23  aliquot of the subject solution being pumped into a machine that nebulizes the solution

24  into an aerosol, pushing the solution up a quartz chamber until the solution comes into

25  contact with a plasma torch. A stream of argon that has been superheated to 10,000

26  degrees centigrade breaks down the constituents in the solution into their elemental form,

27  promotes the atoms into high energy levels and then allows the machine to read the light

28  emitted from electron fields as they "calm" back down to their lower levels. The

1  wavelength and intensity of the light discharged from the manipulated atoms will allow

2  their elemental identification.

3       The ICP-MS method presented in this trial is detailed by **EPA Method 6020**. ICP-

4  MS technology is similar to the AES method of analysis except it uses the ICP as an ion

5  source. With ICP-MS, the solution is bombarded with an electron beam to fragment the

6  molecule. The positive fragments are bent by magnetic forces and sorted on the basis of

7  mass-to-charge ratio. This ratio and its intensity are analyzed to produce the equivalent of

8  the molecular weight of the fragment and its elemental identity.

9       The specific method of sample preparation used in this trial to digest cosmetic and

10  paint chip samples is **EPA Method 3050B**. This method involves the acid digestion of

11  materials containing lead (or other chemicals) for analysis by either ICP-AES or ICP-MS.

12  Generally, the preparation includes a 1 to 2 gram portion of the sample being dissolved

13  using a combination of hydrogen peroxide, nitric acid, hydrochloric acid and heat to

14  identify elements that could become "environmentally available". By definition, it is not

15  a total digestion of all elements and will not break down elements bound within silicate

16  structures.[11] Any resulting concentration analysis is reported in units of milligrams of

17  lead per kilograms of sample (mg/kg) or the equivalent measure of micrograms per gram

18  ($\mu$g/g). The concentration is calculated relative to the total weight of the sample

19  introduced into the digestion process, not the portion of such sample ultimately digested.

20  (Dougherty Test. 8/11.) The EPA Method 3050 was identified by Mr. Dougherty as the

21  standard test adopted/accepted by the Federal government to test for the presence of lead

22  in solids. (Dougherty Test. 8/11.)

23       EPA Method 3050B does not distinguish among elemental lead, organic lead, and

24  inorganic lead, as the superheated acid digestion reduces all lead compounds that are

25  environmentally available to elemental lead atoms. The conditions under which the

26

27

---

28  [11] EPA Method 3052 is recommended if a complete, total identification of lead content is desired or required.

1    3050B acid digestion of cosmetic samples occurs are not similar to the conditions on the

2    skin or in the stomach of the users.

3        Testimony of J.C. Penney witnesses and their documents also referenced a direct

4    paint digestion procedure implemented by J.C. Penney (and its vendors) under ASTM

5    D3335-85a (1999) for compliance with **16 CFR 1303**. This procedure digests actual chip

6    samples of lead-containing paint by acid and heat digestion for analysis by ICP-AES.

7    This procedure is similar to the EPA 3050B/6010 method of preparation and analysis for

8    lead content. Under this method, the concentration of lead, and lead compounds, in paint

9    is analyzed by the weight of dissolved elemental lead compared to the weight of the paint

10    from which it was dissolved. Under the Federal mandate of 16 CFR 1303, the

11    concentration of lead in paint on products falling within the scope of the regulation may

12    be no more than .06% of the paint or it will be considered a banned hazardous substance

13    on a national basis. On April 9, 2002, the CPSC responded to a FOIA request from

14    Plaintiff's attorneys and attached a draft procedure for testing consumer products

15    suspected of containing lead. Both the CPSC's draft providing for this test and the

16    CPSC's proposed test for testing lead content of children's products provide for testing

17    lead on decorated glassware products by scraping the decoration off and digesting it. (Ex.

18    136.) This method was also utilized by Mr. Wise, an evaluator of glassware products for

19    JC Penney's Research Testing Laboratory to digest lead-containing paint chips taken

20    directly from some of its glassware. (Exs. 51-57.) Mr. Wise expressed the results in a

21    percentage concentration factor. He then compared the results to either the .06% standard

22    for National sales or a .01% standard for California Proposition 65 requirements.

23        One specific method of sample preparation utilized to identify the amount of lead

24    on the surface of the glassware products was the **NIOSH 9100** wipe procedure. (*See,*

25    Trial Ex. 179 (NIOSH Publication No 98-112, p. 2).) This method involves the removal

26    of lead from the surface of an object - a painted glassware surface in this case – by wiping

27    the surface with a moistened cellulose esther filter paper. The glassware surface is wiped

28    in a vertical s-pattern, the exposed filter is folded and the glassware surface is wiped in a

1    horizontal s-pattern and then the filter is folded one more time and the vertical s-pattern

2    wiping is repeated. The exposed filter is then placed into a beaker and dissolved, using a

3    combination of heat, hydrogen peroxide and hydrochloric acid. The resulting solution is

4    then analyzed by ICP-AES/EPA 6010B for lead content and the result is reported in total

5    micrograms of lead per wipe sample.

6        The **NIOSH 9100** wipe method of analysis is used to identify lead on the surface

7    of an object. (Ex. 104, Ex. 179.) In draft CPSC regulations for testing lead exposure to

8    consumer products, the wipe method is adopted for the specific purpose of analyzing the

9    "available lead on the surface" of decorated glassware products. (Ex. 136). The test is

10   utilized extensively for surface lead identification and analysis at State and Federal waste

11   cleanup sites. (Brown and Callahan Test.) Dr. Brown relied upon this test as the basis for

12   performing lead analysis for both the State of Connecticut and the ASTDR. (*See*, Brown

13   Test. 8/7). The CPSC also used a wipe test for analysis of available lead or other toxins

14   on the surfaces of materials in connection with the PVC toys, miniblinds and copper

15   chromated arsenic treated playground equipment studies. (Ex. 135, pg. 4.) Further,

16   defense expert Dr. Embree and industry representative Wayne Zitkus have both employed

17   the wipe method.

18       Similarly, lead on the painted surface of the glassware was also measured by a 24

19   hour leaching test under the **ASTM C927** method of preparation. The ASTM C927 test

20   calls for placing the glassware upside down in a beaker to which a mild acid solution is

21   added. Dr. Brown testified that the level of acidity of the weak acid solution is similar to

22   products such as Coke, coffee or wine. (Brown Test 8/7.) The beaker is covered and the

23   glass is left to sit in the bath for a 24 hour period, though most of the transfer of lead

24   occurs during the first few hours. (*See*, Brown Test. 8/7; *See also*, Dougherty Test. 8/11.)

25   At the end of this period, an aliquot of the solution is withdrawn and analyzed, by ICP-

26   AES/EPA 6010B, for the amount of lead that leached into the solution from the glass.

27   The resulting concentration of lead recovered is reported in terms of parts per million.

28   This particular test (C927) was designed by the glassware industry and later 'endorsed' by

1    the FDA as a voluntary Federal "quality control program to ensure adequate protection of

2    consumers from exposure to lead from decorated glassware." This method is a "severe

3    test that is unlikely to be matched under the actual condition of use" of glassware. (Exh.

4    C, §1.) However, "[e]ven though the amount of lead and cadmium extracted by this test

5    method is in no way representative of the amount of metals extracted by actual lip contact,

6    the relative magnitude of the metals extracted from one test specimen in relation to

7    another test specimen provides an effective tool for discrimination." (Exh C. §5.) J.C.

8    Penney, itself, agrees that, "[a]ny and all types of these glasses should be reviewed

9    towards ASTM C927 Lip and Rim for assurance towards conformity and not assumed."

10    (Trial Ex. 100, p. 1212, 1238.)

4.    Lead Content in the Products

12    Plaintiff proved there is lead in each of the products tested. Dennis Dougherty, an

13    analytical chemist for the last twenty years, specifically tested certain of Defendants'

14    glassware and cosmetic products for the presence of lead and achieved results

15    demonstrating the presence of metallic lead in each of the samples submitted by Plaintiff.

16    Mr. Dougherty performed the chemical analyses at Curtis & Tompkins ("C&T"), a

17    scientific laboratory where he has worked as an analytical chemist for the last seventeen

18    years. C&T, in business since 1878 and the second oldest independent lab in the U.S., has

19    achieved both State and Federal certification as an analytical laboratory in the methods

20    and equipment used in the testing for Plaintiff. Accredited specifically by both the United

21    States Navy and the United States Army Corp of Engineers, C&T is the primary quality

22    assurance/quality control (QAQC) lab for the Army Corp of Engineers. C&T enjoys

23    extensive experience analyzing materials for lead as well as utilizing each of the test

24    methods employed by Plaintiff in this case. Based upon his performance of the analytical

25    chemistry, identified above, on the products at issue, Mr. Dougherty testified that the tests

26    he performed identified available lead removed from the glassware. He not only testified

27    that lead was "detectable" in the painted glassware and cosmetic products at issue, he also

28    confirmed it was actually detected in samples of glassware and cosmetic kit components

1   that he tested. Mr. Dougherty did not utilize a test capable of speciating the specific lead

2   compounds, if any, from which the detected lead resulted.

3        Mr. Dougherty testified that, based upon the chain of custody and preparation

4   procedures he personally directed or observed, there was no identified potential for

5   contamination, with lead from any other source, for any of the products tested at the lab

6   with lead from any other source. Mr. Dougherty also testified that other methods of

7   preparation existed for the analysis of the lead content of cosmetics. He identified that a

8   microwave digestion procedure, under EPA 3052, would have been more aggressive than

9   the 3050 method and would have yielded a cosmetic lead concentration figure more

10   closely representing the actual concentration, potentially including some lead that was not

11   "environmentally available".

12        Bernice Dea testified that Plaintiff's counsel were responsible for how the samples

13   were collected, products were tested, and results were interpreted. Counsel directed

14   Ms. Dea and her investigators to purchase particular pre-selected cosmetic and painted

15   glassware products. There was no sampling plan for any of the products that were tested,

16   and no expert oversight over the collection of products for testing or the manner in which

17   they would be tested. Counsel directed Ms. Dea to send certain samples to the laboratory

18   for testing. Counsel chose which tests would be performed and how those tests would be

19   modified. Counsel's paralegal transmitted the samples and testing instructions to the lab,

20   under Ms. Dea's direction. Counsel then told Ms. Dea which test results to send to Drs.

21   Brown and Callahan for their review.

22              a.    J.C. Penney's Painted Glassware Products

23        Plaintiff purchased painted glassware products sold by J.C. Penney and tested

24   samples of each product purchased for lead. Plaintiff conducted several series of tests

25   using the NIOSH 9100 wipe test, the ASTM C927 Lip & Rim Test, the NIOSH 3050

26   digest test and the NIOSH 9100 wash-wait-wipe test.

27        Between November 20, 2002 and December 13, 2002, Plaintiff conducted a series

28   of tests using the NIOSH 9100 wipe test. The NIOSH 9100 wipe test is the equivalent of

1    a single consumer contact with the product. It is not the equivalent of repeated contacts

2    with the product surface. During this series of tests, Plaintiff tested Certified International

3    products including the Sunrise Goblet with test results of 9.1 µg of lead per wipe, the

4    Flora Goblet with test results of 8.5 µg of lead and Midnight Christmas with test results of

5    9 µg of lead. In all of the NIOSH 9100 wipe tests conducted by Plaintiff before trial, the

6    glasses were not washed before they were wiped.

7         On April 24, 2003, April 29, 2003 and April 30, 2003, Plaintiff conducted three

8    series of tests using the ASTM C927 Lip & Rim test. The ASTM C927 test provides

9    results in µg of lead per milliliter of solution, total µg of lead and parts per million (ppm)

10   relative to the internal volume of the glass.

11        During this series of Lip & Rim tests, at a submerge depth of 76 mm, Plaintiff

12   tested Gibson Overseas Crazy Daisy glassware and received test results of 75 and 137.9

13   ppm of lead. Also at a submerge depth of 76 mm, Plaintiff tested Gibson Overseas

14   Tropical Delight glassware and received test results of 155.2 and 198.3 ppm of lead.

15        Plaintiff performed a C927 test on JC Penney Home Collection Glass Ice Tea

16   (Granco) glassware, at a submerge depth of 38 mm, and received results of 210 and 308

17   ppm of lead.

18        Plaintiff tested Home Essentials & Beyond glassware, at a submerge depth of 50

19   mm, and achieved results of 33.3 and 57.8 ppm of lead for Country Garden and results of

20   306.2 and 366.7 ppm of lead for Golden Orchard. Plaintiff also tested Home Essentials &

21   Beyond glassware at a submerge depth of 63 mm, and achieved results of 83.3 and 114.8

22   ppm of lead for Flamingo Wine and results of 195.6 ppm of lead for Vintage Wine.

23        Plaintiff tested Libbey's Orchard Fruit, at a submerge depth of 50 mm, resulting in

24   .1 to .3 ppm of lead.

25        During this series of tests, at a submerge depth of 20 mm, Plaintiff also tested

26   Block/Salton's Jonal Hudson Valley glassware with results ranging from 80 to 118.9 ppm

27   of lead.

28

1    Finally, Plaintiff tested Certified International glassware, at a submerge depth of 20

2    mm, and achieved results of 6.3, 13, 15.8 and 23 ppm of lead for the Flora Goblet and

3    results of 11.4, 15, 16.25, 16.9, 29.9 and 52.3 ppm of lead for the Sunrise Goblet.

4    On April 25, 2003, Plaintiff performed a second series of NIOSH 9100 wipe tests.

5    During this series of tests, Plaintiff tested Block/Salton's Jonal Hudson Valley glassware

6    and received results of 0.7 µg, 1.1 µg, 5.2 µg and 5.6 µg of lead. Plaintiff also tested

7    Gibson's Crazy Daisy glassware in this series and received test results ranging from 5.7 to

8    27 µg of lead. Testing Gibson's Elite Tropical Delight glassware, Plaintiff received test

9    results from 4.6 to 12 µg of lead. Plaintiff tested JCP Home Collection Glass Ice Tea

10   (Granco) glassware and received results of 4.2 and 5.2 µg of lead. Plaintiff also tested

11   Home Essentials & Beyond products, including Flamingo Wine glassware with test results

12   of 2.0 and 2.7 µg of lead and Golden Orchard glassware with results of 3 and 3.4 µg of

13   lead. During this series of tests, Plaintiff also tested Libbey's Orchard Fruit glassware and

14   received results of 1 and 1.9 µg of lead.

15   On July 14, 2003, and August 14, 2003, Plaintiff conducted a series of EPA 3050

16   digest tests. These tests demonstrate the concentration of lead in the paint itself. The

17   results are reported in parts per million (or µg/gram or mg/kg).

18   In this series, Plaintiff tested Certified International glassware products, including

19   Midnight Christmas glass with results of 130,000 mg/kg (13%) and Floral Tapestry with

20   results of 340,000 mg/kg (34%) of lead. Plaintiff tested Block/ Salton's Jonal Hudson

21   Valley glassware and received results of 570,000 mg/kg (57%) of lead. Plaintiff tested

22   Gibson's Crazy Daisy glassware and received results of 390,000 mg/kg (39%) of lead.

23   Plaintiff tested JCP Home Collection Glass Ice Tea (Granco) and received results of

24   250,000 mg/kg (25%) of lead. Plaintiff tested Home Essential & Beyond's Country

25   Garden and received results of 360,000 mg/kg (36%) of lead. Lastly, in this series of

26   tests, Plaintiff tested Libbey's Orchard Fruit and received results of 450,000 mg/kg (45%)

27   of lead.

28

1    On August 22, 2003, Plaintiff conducted a series of NIOSH 9100 wash-wait-wipe

2  tests. During this series of tests, the glassware products were first washed according to

3  the guidelines set forth in C927 Lip and Rim tests. The products were allowed to dry and

4  then one half of the exterior of the glassware would be wiped at varying periods of

5  recorded time (e.g. 0 hours, 24 hours, 48 hours or 96 hours). At each of the times

6  recorded, Plaintiff performed the NIOSH 9100 wipe method of sampling using only 3

7  strokes.

8    In this series of tests, Plaintiff tested Block/Salton's Jonal Hudson Valley

9  glassware with test results of 9.2 and 16 µg when wiped at 0 hours, 4.8 µg at 24 hours,

10  between 30 and 81 µg at 48 hours, and from 6.8 to 160 µg at 96 hours. Plaintiff also

11  tested Certified International products including Floral Goblet and Floral Tapestry. The

12  test results for the Floral Goblet were 1.9 and 5.8 µg when wiped at 0 hours, 38 µg at 24

13  hours, from 9.7 to 32 µg at 48 hours, and from 150 to 320 µg at 96 hours. The test results

14  for the Floral Tapestry Goblet were .89 and 2.9 µg when wiped at 0 hours, 40 µg at 24

15  hours, from 7.3 to 67 µg at 48 hours, and from 120 to 150 µg at 96 hours. Plaintiff tested

16  Gibson's Crazy Daisy glassware and received test results of 1.9 and 2.6 µg when wiped at

17  0 hours, 53 µg at 24 hours, from 53 to 77 µg at 48 hours, and from 21 to 47 µg at 96

18  hours. Plaintiff tested JCP Home Collection Glass Ice Tea (Granco) glassware and

19  received test results of 4.4 and 4.9 µg when wiped at 0 hours, 32 µg at 24 hours, from 26

20  to 71 µg at 48 hours, and from 200 to 230 µg at 96 hours. Plaintiff tested Home

21  Essentials & Beyond Country Garden glassware and received test results of 3.5 and 4.3 µg

22  when wiped at 0 hours, 22 µg at 24 hours, from 19 to 63 µg at 48 hours, and from 13 to 18

23  µg at 96 hours. Lastly, in this series of tests, Plaintiff tested Libbey Orchard Fruit

24  glassware and received test results of 2.5 and 7.2 µg when wiped at 0 hours, 15 µg at 24

25  hours, from 24 to 120 µg at 48 hours, and from 43 to 61 µg at 96 hours.

26    b.    J.C. Penney's Cosmetic Products

27    Plaintiff purchased cosmetic kits products sold by J.C. Penney and tested *select*

28  components of each for lead through a series of the EPA 3050B digests test described

1    above. (*See*, **Exhibit B**, attached, for a table of all test results.) Mr. Dougherty testified

2    that these digest tests did not achieve a complete digestion of the sample. Mr. Dougherty

3    testified that some of the sample remained undigested after the digest test was completed

4    and, accordingly, did not reflect the concentration of actual lead in the sample. Plaintiff

5    also did not test each component in the cosmetic kit.

6         On December 31, 2001, Plaintiff tested two components in Private Portfolio's

7    Riviera Professional Holiday Blockbuster and received results totaling 2.97 µg of lead in

8    the cosmetic kit: .47 µg in the lipstick and 2.5 µg in the eyeliner. On April 11, 2002,

9    Plaintiff tested four (4) components in Private Portfolio's Riviera Professional Holiday

10   Blockbuster and received results totaling 8.78 µg of lead in the cosmetic kit: .29 µg in the

11   lipstick, 4.1 µg in the eye shadow, 4 µg in the eyeliner, and .39 µg in the blush.

12        On October 30, 2002, Plaintiff tested one component of lip color in the JCP Home

13   Collection (IMS) Luxurious Traincase cosmetic kit and received results of .3 µg of lead.

14        On December 2, 2002, Plaintiff tested one component of lipstick from Elizabeth

15   Arden's Elizabeth Taylor Holiday Collection and received results of 1.1 µg of lead.

16        On February 28, 2003, Plaintiff tested six components from Elizabeth Arden's

17   Elizabeth Taylor Holiday Collection, which results totaled as much as 13.9 µg of lead for

18   the two components in the cosmetic kit: 4.6 and 5.2 µg in blush powder, and 4.6 µg, 6 µg,

19   6.1 µg and 8.7 µg of lead in eye shadow. Also in this series of digests test, Plaintiff tested

20   six components from Elizabeth Arden's Sheer Halston Holiday cosmetic kits and received

21   results totaling as much as 13.9 µg of lead for the cosmetic kit: 1.2 to 1.4 µg in lipstick,

22   3.3 to 4.2 µg in powder shimmer, and 2.1 to 8.3 µg in eye shadow. In this series, Plaintiff

23   also tested the lead content in lipstick from Intercon's Cool Bag and received results of

24   .39 and .53 µg. Lastly, in this series of digest tests, Plaintiff tested four components in

25   JCP Home Collection's (IMS) Luxurious Traincase with results totaling as much as 1.52

26   µg of lead, and as low as not detectable, including results of .39 and 1.2 µg of lead in

27   lipstick/lip color and .32 µg of lead in eyeliner.

28

35019687.2

- 15 -

[PROPOSED] STATEMENT OF DECISION

1                          c.    Macy's West Cosmetic Products

2            Plaintiff purchased cosmetic kits products sold by Macy's West and tested select

3    components of each for lead through a series of EPA 3050B digest tests as described

4    above.  As with the tests on selected JC Penney cosmetic components, Mr. Dougherty

5    testified that these digest tests did not achieve a complete digestion of the sample itself.

6    Mr. Dougherty testified that some of the sample remained undigested after the test was

7    completed and, accordingly, did not reflect the concentration of actual lead in the sample.

8    Plaintiff also did not test each component in the cosmetic kit.

9            On April 11, 2002, Plaintiff tested one component of lipstick from Fashion Fair

10   Glitter N' Go and received results of .2 µg of lead.

11           On January 2, 2003, Plaintiff tested four components from Fashion Fair Beauty On

12   The Go II and received results totaling as much as 3.2 µg of lead:  0.4 to 0.6 µg in lipstick,

13   1.1 µg in powder shimmer and 1.5 µg in eye shadow.

14           On January 2, 2003 and January 9, 2003, Plaintiff tested four lipsticks from

15   Fashion Fair Glitter N' Go and received results of .6 µg, .8 µg, 1.1 µg and 1.7 µg of lead

16   respectively.

17           On January 15, 2003, Plaintiff tested lipstick in Christian Dior Esprit De Bruns

18   cosmetic kit and received results of 1.2 µg of lead.

19           On February 28, 2003, Plaintiff tested three components from Christian Dior Esprit

20   De Bruns cosmetic kit and received results totaling as much as 11.5 µg of lead: 7.8 µg in

21   eyeliner pencil, and 2.1 and 2.5 µg in eye shadow.  In this series of digest tests, Plaintiff

22   also tested five components from Fashion Fair Glitter N' Go cosmetic kit and received

23   results totaling as much as 4.8 µg of lead: 0.77 to 0.94 µg in powder shimmer, .81 µg in

24   lipstick, and 3.0 and 3.1 µg in eye shadow.

25

26

27

28

B.     Statement of Facts Concerning Defendants and Their Products

         1.     Defendants' Purchase of the Products and Agreements with the Vendors

At trial, witnesses for J.C. Penney and Macy's West testified as to the buying programs and vendor agreements in place for the purchase of cosmetics and, as to J.C. Penney, only painted glassware. Both Macy's West and J.C. Penney require the manufacturers/ vendors to ensure that their products comply with Proposition 65. While J.C. Penney and Macy's West did not produce every Trading Partner Agreement ("TPA") or purchase order for the vendors identified by Plaintiff at trial, Defendants did provide the relevant terms and conditions to which vendors were generally liable. As detailed more fully below, the buyers from J.C. Penney and Macy's West understood that all of the vendors agreed to the same terms and conditions in the TPA and purchase orders. In part in light of the vendor obligations inherent in the purchase agreements, but also because Plaintiff did not identify any products beyond those named in the 60-day notices, J.C. Penney and Macy's West admittedly never discontinued sales of the painted glassware and cosmetics they sold after receipt of Plaintiffs 60-Day Notices. Similarly, with respect to cosmetics and all of the painted glassware with the singular exception for J.C. Penney's Home Collection stripes pattern in the later periods and Home Essentials & Beyond in 2003 . . . ." (Brimer trial testimony, Ex.s 2-F, 2-P and 2-W.), Defendants did not provide Proposition 65 warnings to consumers regarding the presence of lead in the products.

                 a.     Macy's West's Sale of Cosmetic Kits

Macy's West, Inc. is a wholly owned subsidiary of Federated Department Stores, Inc. The corporate headquarters are located in San Francisco, California. Macy's West operates approximately 80 stores in California. Macy's West corporate philosophy highly values consumer choice and aspires to have open and hones communication with their customers. (Exh. 191, p. 2.) Macy's West sells a vast array of products, including cosmetics manufactured by Fashion Fair, Christian Dior and Elizabeth Arden.

1        Elizabeth Morello ("Morello"), Senior Vice President and General Merchandise

2    Manager for Fragrances and Cosmetics at Macy's West, testified regarding the purchase

3    of cosmetic products by Macy's West. (Morello Trial Testimony 9/8/03.)  Morello

4    testified that nine buyers report to her through two Vice Presidents, Cindy Harper

5    (Cosmetics) and Carye Campbell (Fragrances).  The role of the buyer is to purchase

6    products from the vendors and plan advertising, financial and promotional activities

7    surrounding the products.  Specifically, Ms. Morello and her buyers work in conjunction

8    with Macy's West's own advertising department, and that of the vendor, to come up with

9    the budgets, concepts and themes, secure approvals and make edits to any of the cosmetic

10   advertising or store displays disseminated by Macy's West. (Morello Testimony, 10/6/03,

11   Morello deposition at 67:20-21.)  Morello testified that she is responsible for Sharon

12   Pittman (Markwins products), Jill Barr (Fashion Fair), Maggie Rogers (Christian Dior)

13   and additional buyers for Estee Lauder, Origins, Lancome, and Clinique. (Morello Trial

14   Testimony 9/8/03.)

15       Morello testified that Macy's West carries tens of thousands of different cosmetic

16   stock keeping units ("SKUs"). (Morello Trial Testimony 9/8/03.)  Morello also testified

17   that during key selling periods, every cosmetic brand would offer approximately three to

18   four cosmetic "sets" for sale, which amounts to six to twelve "sets" a year for each of the

19   25 cosmetic vendors.  In addition, each vendor might have approximately eight "gifts with

20   purchases" ("GWPs") or "purchases with purchase" ("PWPs") offered as well. (Morello

21   Trial Testimony 9/8/03.)

22       Morello understood that lead was listed as a toxic chemical by the State of

23   California and believed that customers might want to be notified of the presence of lead in

24   cosmetics. (Morello Testimony 09/08/03; Morello deposition at 87:20-22.)  However,

25   Morello did not know that lead was a component of any cosmetic product sold by Macy's

26   West. (Morello testimony 10/06/03.)  Morello testified that the cosmetic vendors are

27   responsible for health and safety warnings.  These requirements are set forth in the

28   Purchase Order, which Morello believed is the same for all products and is used by all

1    Macy's West buyers, though Morello did not inspect every Purchase Order. (Morello

2    Trial Testimony 9/8/03; Exhibit AA.) Pursuant to the Purchase Order, each vendor's

3    products are required to comply with all applicable laws, and the vendor is specifically

4    required to provide any required Proposition 65 warnings. Specifically, the terms and

5    conditions state that "Vendor covenants, represents, warrants and guarantees that...A. it

6    has and shall comply with all federal, state and local laws, ordinances and codes, together

7    with all rules, regulations and guides promulgated thereunder or pursuant thereto...B. The

8    Goods were manufactured and conveyed by Vendor in compliance with Applicable Law,

9    including any that regulate or otherwise concern contents...and that neither Purchaser's

10   acquisition nor sales thereof shall violate Applicable Law...C. The Goods shall comply

11   and be accompanied by such materials for them and/or Purchaser to comply with

12   Applicable Law...G. In the event and to the extent that this Purchase Order relates to

13   Goods that may require a consumer warning under the California Law commonly known

14   as 'Proposition 65', Vendor shall so advise Purchaser, in writing, before proceeding to

15   accept or otherwise process the order. If Purchaser, after receipt of Vendor's written

16   information concerning the applicability of Proposition 65, advises Vendor that it wishes

17   to confirm the order and proceed, Vendor shall place warnings directly on such Goods as

18   may be offered for sale by Purchaser in California that comply with California law,

19   regardless of how such Goods are to be offered for sale, whether by mail, electronic

20   media, or in retail outlets." (Exhibit AA.) Macy's West employees are trained on an

21   annual basis regarding the Purchase Order rules and regulations. (Morello Trial

22   Testimony 9/8/03.) Before receipt of the 60-Day Notice, Macy's West had no knowledge

23   of lead in cosmetics. In fact, no evidence exists to indicate that Macy's West was aware

24   of any lead in any product other than Markwins before receiving Fashion Fair test results

25   in March, 2003, after Plaintiff identified a Fashion Fair product as containing lead.

26   (Morello Trial Testimony 9/8/03.)

27        Jill Barr ("Barr"), cosmetics buyer at Macy's West for Fashion Fair products since

28   1998, testified that she reports to Cindy Harper, Divisional Merchandise Manager, who

1   reports to Morello. (Barr Trial Testimony 9/10/03.) Barr was responsible for the Fashion

2   Fair line of cosmetics, a line marketed particularly to women of color. Barr and Macy's

3   West provide input into the marketing and advertising of Fashion Fair products in that

4   Barr was responsible for reviewing, selecting, and approving any advertising suggested by

5   Fashion Fair. (Barr Trial Testimony 9/30/03.) Barr testified at trial that Fashion Fair

6   makes proposals to Barr regarding the products for sale during specific seasons through a

7   marketing book and Barr places an order based upon her knowledge of prior sales and

8   other factors. (Barr Trial Testimony 9/10/03.) As Barr testified, Fashion Fair accounts

9   for approximately 0.3% of total sales volume for cosmetics at Macy's West, generating

10   annual revenue of approximately two million dollars. (Barr Trial Testimony 9/10/03.)

11   Fashion Fair creates the advertising for its products and Barr reviews it. (Barr Trial

12   Testimony 9/10/03.) Macy's West offered both the Fashion Fair Beauty on the Go II and

13   the Fashion Fair Glitter N' Go II cosmetics kits for sale. (Barr Trial Testimony 9/10/03.)

14   Barr testified that her training lead to her understanding that for each order, a Purchase

15   Order is transmitted electronically to the vendor, which sets forth the terms and

16   conditions. While Barr did not see the particular terms and conditions forwarded to the

17   vendors, she understood that all vendors received substantially similar terms and

18   conditions. (Barr Trial Testimony 9/10/03.)

19          Barr understood that lead was listed as a toxic chemical by the state of California,

20   but she did not know lead was a component of any cosmetic product that Macy's West

21   sold. (Barr Trial Testimony 9/10/03.) Macy's West does not have any employees

22   responsible for compliance with Proposition 65 for products made by its vendors, and

23   relies upon its counsel to work with the vendors to ensure that the products comply. (Barr

24   Trial Testimony 9/10/03, Morello Trial Testimony 9/8/03.)

25                     b.      J.C. Penney's Sale of Cosmetic Kits

26          There are over 1000 J.C. Penney department stores throughout the United States,

27   with over one hundred stores in California. J.C. Penney Company is headquartered in

28   Plano, Texas.

1    Among the many products sold by J.C. Penney are cosmetics. With respect to

2  cosmetics, J.C. Penney maintains a "Cosmetic Testing Program" for private label and

3  national brands. One requirement of the program is to maintain Material Safety Data

4  Sheets ("MSDS") for the purpose of determining whether flammability labels are required

5  for certain products. (Exhibit 100; Jones Trial Testimony 11/05/03.) J.C. Penney

6  routinely maintains MSDS for potentially flammable cosmetic products such as nail

7  polishes, but there was no testimony to support that J.C. Penney routinely maintained

8  MSDS for any other cosmetic products. (Jones Trial Testimony 11/05/03.)

9    Christine Parker ("Parker"), senior buyer for cosmetics at J.C. Penney, testified

10  regarding the sale of cosmetics at J.C. Penney stores. Parker testified that she started as

11  an assistant buyer in women's accessories, a department which includes cosmetics, in

12  2000. (Parker Trial Testimony 10/20/03.) At that time, there were two buyers of

13  cosmetics, Nancy Hillis and Darcy Hall. Parker was the assistant to Darcy Hall and had

14  responsibility for color kits. (Parker Trial Testimony 10/20/03.) Parker testified that there

15  are four selling seasons, each with a start sale date and an out of stock date by which the

16  stores strive to have all of the product sold. The holiday season typically ran from

17  September through February of the next year. (Parker Trial Testimony 10/20/03.) Parker

18  testified that before mid-2003, all J.C. Penney stores were to use discounting means to

19  ensure that the least amount of stock remained for seasonal cosmetic items. As such, J.C.

20  Penney would implement deep discounts for any remaining stock with the goal of having

21  all items removed from inventory by way of customer sale. (Parker Trial Testimony

22  10/20/03.)

23    Parker testified that J.C. Penney sold the Markwins Wings of Beauty kit, the

24  Private Portfolio/Riviera Professionals Blockbuster cosmetic kit, the IMS Cool Bag, the

25  Sheer Halston cosmetic kit the Luxurious Traincase, and Elizabeth Taylor's Passion kit.

26  (Parker Trial Testimony 10/20/03.) J.C. Penney also produced documents that indicated

27  that J.C. Penney sold other cosmetic kits by other vendors, such as Fashion Fair, IMS,

28  Color Me Beautiful, Iman, Flori Roberts and Galisa Overseas. (Exhibit 100.) Parker

1   testified that the term "blockbuster" is typically used in the industry to describe the

2   cosmetic kits at issue in this case. She further explained that a blockbuster is a collection

3   of makeup sold together in a boxed form, often with some type of carrying case. (Parker

4   Trial Testimony 10/20/03) Parker testified that her general understanding was that

5   individual cosmetic products which need to be replenished quickly are manufactured

6   domestically; whereas seasonal cosmetic kits, which are ordered significantly in advance

7   for a one-to two time shipment, are manufactured in the Far East to reduce labor costs.

8   (Parker Trial Testimony 10/22/03) Parker testified that, as part of her duties as a buyer of

9   cosmetics, she reviewed advertising. (Parker Trial Testimony 10/20/03)

10          Parker testified that the Trading Partner Agreement ("TPA") signed by the vendors

11  requires that all vendors comply with all laws. The TPA must be signed before any

12  supplier can do business with J.C. Penney. As Parker testified, the TPA standardizes

13  expectations. (Parker Trial Testimony 10/20/03; Trial Exhibit 7Fs.) Parker testified that

14  the TPA is the same form used for all vendors, of which there are approximately 3000 at

15  any given time, throughout J.C. Penney, including cosmetic vendors. (Parker Trial

16  Testimony 10/20/03.) As part of her training in 1999, Parker reviewed the TPA

17  requirements and learned that the buyer is responsible for completing the TPA form with

18  the new vendor. Parker believed that TPA has been available electronically on the J.C.

19  Penney website since 2002, but a hard copy could always be obtained from any

20  department or the records department in Salt Lake City, as it is a standard form. (Parker

21  Trial Testimony 10/20/03) Specifically, the TPA fully incorporates J.C. Penney's

22  Purchase Order language, which states: "Seller represents and warrants to Penney, in

23  addition to all warranties implied by law, that each item of merchandise described on the

24  face hereof, whether produced in whole or in part by Seller or a third party, together with

25  all related packaging, labeling and other printed matter and all related advertisements

26  furnished or authorized by Seller ("Merchandise") shall (a) be free from defects in design,

27  workmanship or materials including, without limitation, such defects as could cause

28  personal injury or create a hazard to life or damage to property; (b) be fit for its particular

1    purpose and be suitable for use, be manufactured, be packaged for shipment, be properly

2    labeled, including marked with the country of origin, where applicable, and be registered

3    as required, all in accordance with and under all applicable laws, ordinances, regulations,

4    rulings, orders, decrees, resolutions, norms, standards, requirements, policies, or directives

5    of any governmental authority of or within the United States of America." As Parker

6    testified, the TPA standardizes expectations and obligations of both parties. (Parker Trial

7    Testimony 10/20/03; Trial Exhibit 7Fs.) Parker understood that even with the vendor

8    responsibilities in the TPA, J.C. Penney was still obligated to follow State and Federal

9    law. (Parker Trial Testimony 10/22/03.)

10      Parker testified that in October of 2000, she received and read Plaintiff's 60-day

11   notice, which specifically mentioned the Markwins Wings of Beauty product. Thereafter,

12   she contacted a Markwins representative. The Markwins representative, Tom Wood, was

13   surprised and advised Parker that he thought the matter had been taken care of previously.

14   Parker asked Mr. Wood if J.C. Penney was in violation of the statute set forth in the 60

15   day notice and if anything needed to be taken care of by J.C. Penney and Mr. Wood stated

16   "no." Mr. Wood never mentioned lead in cosmetics and Parker believed that there was no

17   lead in cosmetics. Parker also reviewed the ingredient list for the Markwins Wings of

18   Beauty product, which did not indicate the product contained lead, and asked around the

19   office regarding knowledge of lead in cosmetics. No other cosmetic employees or vendor

20   representatives indicated that they had knowledge of lead in cosmetics. (Parker Trial

21   Testimony 10/20/03). Parker performed no further investigation into the allegation of

22   lead in cosmetics.

23      It was not until trial that Parker learned the names of the specific cosmetic kits

24   involved in the case other than the Markwins Wings of Beauty kit set forth in Plaintiff's

25   60 day notice. (Parker Trial Testimony 10/20/03) There is no evidence of J.C. Penney's

26   knowledge of lead in any cosmetics before receipt of the 60-Day Notice. Further, there is

27   no evidence of J.C. Penney's knowledge of lead in any cosmetics other than the lead test

28   results produced by Plaintiff in discovery in March, 2003.

1    Catherine Bokar was the J.C. Penney buyer for Riviera/Private Portfolio cosmetics.

2    Bokar was involved with the vendor in designing and approving advertisements and

3    marketing plans. (Bokar deposition at 38:10-39:2). Bokar did not contact the vendor to

4    determine whether the Riviera/Private Portfolio cosmetics contained any lead. (Bokar

5    deposition at 31:12-32:16).

6    The J.C. Penney Retail Testing Laboratory ("RTL") located in Texas performs

7    product testing. It did not test for lead in cosmetics sold by J.C. Penney. (Owen Jones

8    Trial Testimony, 11/5/03.) Parker testified that the cosmetic supplier is responsible for

9    submitting an ingredient list and microbial report, wherein the RTL verifies the spelling of

10   the ingredients. (Parker Trial Testimony 10/20/03) Parker testified that the RTL never

11   supplied any information to indicate that cosmetics contained lead. (Parker Trial

12   Testimony 10/20/03) Upon request, the RTL informed Parker that they did not test

13   cosmetics for the presence of lead. (Parker Trial Testimony 10/21/03).

14                      c.    J.C. Penney Sale of Painted Glassware

15   Richard Brinkman ("Brinkman"), former senior buyer in the tabletop division at

16   J.C. Penney until January of 2003, testified at trial that he was responsible for sales and

17   profit, development of products, marketing and negotiation with vendors for all tabletop

18   lines, including painted glassware. The tabletop division includes dinnerware, informal

19   and formal glassware, crystal, linens, utensils, and painted glassware. (Brinkman Trial

20   Testimony 9/16/03.) As senior buyer, Brinkman oversaw four assistant buyers, two

21   secretaries and two distribution coordinators. (Brinkman Trial Testimony 9/16/03.)

22   Brinkman was located at the J.C. Penney headquarters in Texas.

23   Brinkman testified that it was the responsibility of vendors to notify J.C. Penney

24   which products required a Proposition 65 warning. (Brinkman Trial Testimony 9/16/03.)

25   The TPA signed by the vendors required that all vendors test their products and comply

26   with all laws. (Brinkman Trial Testimony 9/16/03; Exhibit 4Bs.) Although he never saw

27   a TPA signed by a vendor at issue, Brinkman believed that all of the suppliers at issue had

28

1    signed the TPA because he understood that all J.C. Penney vendors were required to sign
2    the same TPA.

3        Testimony established that J.C. Penney determined that certain vendors were
4    exempt from testing at the Research Testing Laboratory ("RTL") and all other vendors
5    were not exempt from such testing.  There was a list for such exempt vendors.  "Exempt"
6    National Brand suppliers are relieved from J.C. Penney QC inspections and RTL testing
7    (except as directed by RTL).  Those suppliers identified as "exempt" are typically long-
8    standing J.C. Penney suppliers with favorable quality control history that produce their
9    own (national brand) products.  The "Exempt List" does not impose any additional
10   obligations on the part of J.C. Penney nor does it specify any obligations with regard to
11   suppliers and/or brands that are not listed.

12       Judy Strother ("Strother"), assistant buyer to Brinkman in the tabletop division at
13   J.C. Penney in Plano, Texas, testified at trial that she assisted Brinkman in purchasing
14   tabletop products for J.C. Penney, including painted glassware.  (Strother Trial Testimony
15   9/11/03.)  At the direction of Brinkman, Strother collected data from Brinkman and her
16   buying team in order to identify each product that would be placed in the catalog and/or
17   retail merchandise assortment plans.  Strother created product listings for each retail
18   season, and each catalog, and systematically communicated these listings to all glassware
19   vendors, asking them to identify for J.C. Penney which of their products require a
20   Proposition 65 warning label.  (Strother Trial Testimony 9/11/03.)  After obtaining the list
21   of suppliers and products from Brinkman, Strother sent the list of products to the suppliers
22   and asked them to advise as to which products required Proposition 65 warnings.  Strother
23   testified that the vendors were responsible for notifying J.C. Penney of any products that
24   required a Proposition 65 warning.  (Strother Trial Testimony 9/11/03.)  No vendor of
25   painted glassware identified a product that required a Proposition 65 warning.  J.C.
26   Penney did not itself attempt to determine whether tabletop products complied with
27   Proposition 65.  (Strother Trial Testimony 9/11/03; Brinkman Trial Testimony 10/3/03.)
28   In the rare case that J.C. Penney did not receive any affirmative declaration from vendors

1  as to Proposition 65 compliance, Strother testified that J.C. Penney would require a

2  warning if there was any doubt. (Strother Trial Testimony). However, in March of 1998,

3  J.C. Penney requested Certified International confirm its ceramic ware products complied

4  with Proposition 65. Despite receiving no response indicating compliance with glassware

5  products, J.C. Penney never warned for these products. (Ex. DD.)

6         Brinkman testified that, in the past, J.C. Penney tested all tabletop products at the

7  J.C. Penney lab even though the suppliers were also testing their own products. J.C.

8  Penney's RTL laboratory performed testing to determine product compliance, for all

9  consumer safety purposes, on all decorated glassware products supplied by Home

10  Essentials & Beyond, Gibson, Certified, Granco, and Block/Salton. (Ex. 5-K, Jones

11  testimony, Brinkman testimony.) After the development of the TPA in approximately

12  1996/1997, J.C. Penney generally tested only non-exempt supplier products. Those

13  national brand suppliers that were placed on the exempt list guaranteed that their products

14  complied with all laws and regulations through the TPA and J.C. Penney did not

15  independently test those products. (Brinkman Trial Testimony 9/16/03) Suppliers were

16  placed on the exempt list after they had proven themselves to be a reliable supplier

17  without quality problems. (Brinkman Trial Testimony 10/03/03.)

18         Brinkman became aware of Proposition 65 in approximately 1992/1993 as a result

19  of a consent judgment involving leaded crystal and food use ceramic products. In

20  response to the consent judgment, Brinkman contacted suppliers to find out which

21  products required Proposition 65 warnings, made Proposition 65 triangles and signs for

22  the stores and advised the California stores regarding the action to be taken with respect to

23  the warnings for those products identified by the suppliers. (Brinkman Trial Testimony

24  9/16/03 and Defendants' Trial Exhibit WWW) Thereafter, Brinkman and the tabletop

25  division obtained information from the suppliers regarding Proposition 65 warnings and

26  informed the stores accordingly every six months. (Brinkman Trial Testimony 9/17/03)

27         With regard to painted decoration on the outside of glassware, Brinkman

28  understood that industry standards and FDA required that lead paint not be within the top

1   20 millimeter (mm) of glassware (the lip and rim area), and testified that he required the

2   vendors of painted glassware to keep the paint out of the lip and rim area. (Brinkman

3   Trial Testimony 9/16/03.) After receipt of the 60-Day Notice, Brinkman testified that he

4   instructed all vendors that if the lip and rim was clean, but there was a question of lead in

5   the paint below the 20 mm area, then a Proposition 65 warning must be placed on the

6   product. (Brinkman Trial Testimony 9/16/03). While Brinkman believed that painted

7   glassware complied with Proposition 65 if the paint was not within 20 mm of the lip and

8   rim, he instructed vendors to apply a Proposition 65 warning if the paint contained lead

9   regardless of the lip and rim requirements. (Brinkman Trial Testimony 10/3/03.)

10  Brinkman believed that the firing of the glassware in a kiln reduced the lead and sealed

11  the paint, and did not understand that a user could be exposed to lead by handling a non-

12  food contact surface. (Brinkman Trial Testimony 10/3/03.) Brinkman was not aware of

13  any Proposition 65 'standard' for ceramic ware or crystal, but he was aware of the testing

14  levels created through a lawsuit against the manufacturers of those products. Proposition

15  65 does not set standards for consumer products other than the safe harbor levels above

16  which no exposure can occur without a clear and reasonable warning. There never were,

17  nor are there now any actual 'standards' set by Proposition 65 for lead exposure from

18  crystal or ceramic ware other than the .5µg MADL. Accordingly, Brinkman was not

19  aware of any specific 'standards' set by Proposition 65 for crystal ceramic ware or painted

20  glassware. However, Brinkman was aware that Proposition 65 requirements for

21  California sales of leaded crystal and ceramic ware were generally more strict than the

22  relevant FDA levels for national sales of those products. (Brinkman Trial Testimony

23  9/16/03 and 10/3/03). Brinkman was not aware of any California or FDA requirements

24  that applied to non-food contact surfaces.

25      J.C. Penney began selling painted glassware in 1995 with the sale of PGM

26  Romania painted glasses (Brinkman Trial Testimony 9/16/03 and 10/03/03.)

27  Mr. Brinkman's experience with painted glassware began with the PGM Romania hand

28  painted glassware in 1995. (Brinkman Trial Testimony 9/17/03). Because Mr. Brinkman

1  was concerned about leaded crystal, he specifically inquired about any lead in the

2  Romania glassware paint. (Brinkman Trial Testimony 9/17/03). At the time of the 1995

3  product development, he specifically confirmed with the vendor that all Romania painted

4  glassware was lead free. (Brinkman Trial Testimony 9/17/03).

5      In October 2001, Brinkman was developing a new glassware product with a vendor

6  named Syratech. (Brinkman Trial Testimony 10/3/03.) Owen Jones, Product Safety

7  Coordinator for RTL, testified at trial that Kasey Wise, an evaluator at RTL, first tested

8  the Syratech painted glassware in October of 2001 utilizing the incorrectly applied 16

9  C.F.R. §1303 chip test. (Jones Trial Testimony 11/5/03; Exhibit 52.) Mr. Wise was

10  formerly responsible for testing toys, where the chip test was utilized for painted surfaces

11  that could be scraped off. (Jones Trial Testimony 11/5/03.) The chip testing revealed that

12  there was lead in the paint. (Exhibit 52.) Wise concluded that the lead in the paint

13  exceeded the limits of the CPSC's regulations. (Exhibit 52.) Brinkman testified that he

14  cancelled the order due to Syratech's failure to keep the paint out of the lip and rim.

15  (Brinkman Trial Testimony 10/3/03.) An email dated October 19, 2001, from C. Wise to

16  Brinkman provides as follows: "...there are requirements for decorative glassware with

17  painted surfaces within the 20 mm in which the Lip and Rim would be tested for leachable

18  lead. However, 16 CFR 1303 is for painted surfaces in which consumers have direct

19  access to the painted surface in which your glassware has. The paint used contains lead

20  levels exceeding that limit extensively. Therefore, it should be considered a banned

21  hazardous product as a result of high lead. As you know the government knows that lead

22  has to be used to gain color properties, bond/adhesion characteristics and among other

23  things. They ask that the lead be controlled and that consumers are not put at risk of high

24  lead poisoning." An email dated October 19, 2001, from Brinkman to Alan Kanter of

25  Syratech states as follows: "The JCPenney Company will not allow knowingly that we

26  expose our customer to lethal materials. The law does allow 20 mm from the top on

27  decorative glass however Kasey Wise has spelt out the legal issues with drinkware verses

28  decorative glass. I am sorry, our position will be the orders are canceled. Product does

1  not meet JCPenney testing no legal compliance." Brinkman replaced Syratech with Home

2  Essentials in order to provide the painted glassware product he wanted. (Brinkman Trial

3  Testimony 10/3/03.) Jones, who had the authority to determine the appropriate testing to

4  be used at RTL, was provided a copy of the emails discussing the testing, but not involved

5  because the product was not actually sold. (Jones Trial Testimony 11/5/03.)

6  　　　In December of 2001, Brinkman received a copy of Plaintiff's 60-day notice

7  regarding painted glassware. (Brinkman Trial Testimony 9/16/03.) In January and

8  February 2002, Wise tested the Home Essentials Floral glassware, again utilizing the 1303

9  chip test and several lip and rim tests. The tests revealed paint within the top 20 mm of

10  the glass. (Exhibits 53, 54, 56, 57, 63, 65, 66, 166.) Jones was then brought in to resolve

11  potential product safety issues. (Jones Trial Testimony 11/5/03.) After investigation by

12  Jones and others at RTL, and in accordance with guidance from the Society of Glassware

13  and Ceramic Decorators ("SGCD"), J.C. Penney determined that the lip and rim test was

14  the correct test for such glassware and that the 1303 chip test was not applicable to painted

15  glassware. (Jones Trial Testimony 11/5/03; Exhibits 50, 4As.) Jones consulted with

16  Brinkman, and verified that the Home Essentials products were not yet in the stores, and

17  concluded that the lip and rim testing performed before February 15, 2002 was not

18  performed on actual production glasses, but rather on pre-production samples from the

19  buyers' sample room. (Jones Trial Testimony 11/15/03; Exhibit 54.) Home Essentials

20  production glassware found at the Vista Ridge store on February 15, 2002 passed the lip

21  and rim test and on February 11, Home Essentials assured J.C. Penney that it will keep

22  paint out of the lip and rim area. (Jones Trial Testimony 11/5/03; Brinkman Trial

23  Testimony 9/16/03; Exhibits 50, 4As, 7Ls.)

24  　　　The J.C. Penney Lemon Iced Tea and Stripe products passed the lip and rim tests

25  prior to sale. (Exhibit 100, pages 1226 and 1212.) Certified International Flora and

26  Sunrise painted glassware also passed the lip and rim test prior to sale. (Exhibit 7C's.

27  Exhibit 100, pp. 1229 and 1236-37.) Gibson painted glassware initially failed the lip and

28  rim test, but were reworked so that the products complied with the lip and rim test prior to

35019687.2

- 29 -

[PROPOSED] STATEMENT OF DECISION

1    sale. (Soleiman Gabay Testimony, Exhibit 100, p. 1233.) There was no evidence of

2    testing of any other glassware products produced by J.C. Penney.

3        The TPA signed by the vendors required that all vendors test their products and

4    comply with all laws. (Brinkman Trial Testimony 9/16/03; Exhibit 4Bs.) Brinkman

5    understood that all J.C. Penney vendors were required to sign the same TPA. In 2002,

6    Brinkman testified that as a proactive measure and in response to Plaintiff's 60-day notice,

7    he also advised the suppliers of painted glassware, specifically Home Essentials, Salton

8    and Gibson, to place Proposition 65 warning labels on the boxes as well as keeping the

9    paint out of the lip and rim area. (Brinkman Trial Testimony 9/25/03 and 10/03/03).

10    Mr. Brinkman did not verify whether Gibson, Block/Salton or Home Essentials did put

11    Proposition 65 warning triangles on the boxes containing painted glassware products per

12    his advice. (Brinkman Trial Testimony 09/25/03). To the best of Mr. Brinkman's

13    knowledge, Home Essentials placed warnings on the boxes from the time of first sale to

14    the present (Brinkman Deposition at 105:15-20; Exhibit 26.)

15    IV.    DESCRIPTION OF EXPERT TESTIMONY

16        A.    Plaintiff's Experts

17            1.    Lead as a Listed Chemical

18        Lead, due primarily to its prevalence in our society from man-made products, is

19    one of the mostly highly studied toxicants in the world. "Lead" was officially listed as a

20    chemical known to the State of California to cause reproductive harm on February 27,

21    1987. "Lead" was expressly identified as causing developmental reproductive toxicity in

22    both males and females. Proposition 65 does not identify any Chemical Abstracts Service

23    ("CAS") number for "Lead". Proposition 65's chemicals list expressly identifies that "no

24    CAS number is given when several substances are presented as a single listing."

25        All experts, including those of Defendants, agree that lead – in any amount – serves

26    absolutely no beneficial purpose for the human body. All of the experts further agree that

27    lead is a reproductive toxicant that causes birth defects and other reproductive harm.

28

1           2.    No Safe Level

2           Dr. Callahan and Dr. Brown testified that there is no known level of human

3   exposure to lead that is safe and free from risk of reproductive or other toxicity.  The

4   Court took judicial notice of documents that relate to this opinion.  The FDA specifically

5   states that there are "no levels of lead exposure for children or adults at which it may be

6   considered that no adverse effect occurs."  (*See*, Trial Ex. F, p. 19.)  Similarly, "safe levels

7   of lead exposure have not been identified."  (*See*, Trial Ex. F, p. 22.)  California's EPA,

8   through the California Lead Spread exposure model, also specifically cautions that, "a

9   clear no-observed-effect concentration has not been established for such Pb-related

10  endpoints as birth weight, gestation period, heme synthesis, neurobehavioral development

11  in children and fetuses..."  (Trial Ex. 151.)

12          Both Drs. Callahan and Brown testified at length about the historical and current

13  pattern of science and medicine to identify continuously lower levels of exposure to lead

14  at which it is known that lead is unsafe.  (Callahan Test. 12:3-5.)  Both Drs. Callahan and

15  Brown testified that it was their understanding that the most advanced and most current

16  research suggests that the most significant human IQ decrements caused from lead

17  exposure seem to occur below $10\mu g/dL$ - a level previously identified by the Centers For

18  Disease Control ("CDC") as a National "level of concern", but still not considered by the

19  CDC as a safe level of exposure.  (*See*, Callahan Test. 8/12-8/13, 12:10-13:6, 14:9-15:9.)

20  Dr. Callahan testified abut attending a conference recently at which a topic of discussion

21  was CDC's intent to change the "level of concern" for lead.  Dr. Callahan testified that her

22  understanding of this conference topic was that, because of the ever growing body of

23  medical and scientific evidence regarding adverse health effects from lower levels of lead

24  exposure, the CDC is currently attempting to identify yet another, lower blood lead level

25  as the "level of concern" for significant adverse health effects from lead exposure.

26  (Callahan Trial Test., 181).

27          All experts, including Defendants' toxicologists identified that humans are exposed

28  unwittingly to lead through many environmental and other sources beyond their control.

1  Lead is found in drinking water and in the air from prior industrial discharges.  Humans

2  are further exposed to lead from animal food products, such as fish, that bioaccumulate

3  lead in their flesh from independent air, water and soil contaminations.  As all experts

4  discussed, lead from all of these sources is accumulated and stored not only in the blood,

5  but also in the bone and soft tissue of humans.  Lead is released from these areas, back

6  into the human bloodstream, in response to many human factors, especially pregnancy.

7  As with most any health effect, humans all have individual and different susceptibilities to

8  the harm caused by exposure to lead.

9              3.      NOEL vs. LOEL

10        Toxicology is designed to perform risk assessments by exposing either animal or

11  human subjects to various doses of chemical in an attempt to discover both the dose at

12  which adverse effects are observed and that level at which they are not observed

13  (regardless of whether it is safe or not).  By conducting and analyzing continuously

14  refined studies, toxicologists endeavor to identify one or both of two particularly major

15  exposure levels of significance — the NOEL and/or LOEL.  The highest level of an

16  exposure at which no adverse health effects are observed is the "no observed effect level"

17  or "NOEL" and the lowest level of exposure at which actual adverse effects are observed

18  is the "lowest observed effect level" or the "LOEL".  Proposition 65 utilizes these levels,

19  adjusted with safety factors, to identify the daily (or other) human exposure to a chemical,

20  if any, that is acceptable under the statutory consumer warning scheme.  Under

21  Proposition 65, such maximum allowable daily exposure level, or "MADL", is either

22  1,000 times less than the NOEL or 10,000 times less than the LOEL.[12]

23

24

25

26

27

---

[12]  Under Proposition 65, if only the LOEL is known, then it is to be divided by ten (10) to obtain a functional
equivalent NOEL.

28

1          4.    Exposure

2                a.    Dr. Brown

3          Dr. Brown was provided with photographs and samples of all the glassware

4    products at issue, as well as the test results of leach and wipe testing performed on a

5    variety of examples of such glassware. (*See*, Brown Test. 8/7.) Dr. Brown used

6    principles of exposure assessment, the laboratory results of C&T, and several complete

7    exposure pathways to come to the opinion that a reasonable consumer of the J.C. Penney

8    painted glassware would suffer a significant oral exposure to lead from his or her

9    reasonable use of such glassware. (*See*, Trial Ex. 1014, 156:12-25.)

10         Dr. Brown is a public health toxicologist and health researcher. (*See*, Brown Test.

11   8/7.) Dr. Brown has extensive professional experience as a toxicologist, specializing in

12   heavy metals, for industry (Stauffer Chemical, American Cyanamid), teaching graduate

13   students (Northeastern University) and running State (Connecticut Environmental

14   Epidemiology and Occupational Health division) as well as Federal (Agency For Toxic

15   Substance Disease Registry) toxicity evaluation and characterization programs. (*See*,

16   Brown Test. 8/7.) Dr. Brown has researched, published and is considered an expert on the

17   effect of heavy metals on the nervous and other human systems. (*See*, Brown Test. 8/7.)

18   In fact, while with the State of Connecticut, Dr. Brown was routinely consulted by the

19   CPSC for guidance on health risk and evaluation of consumer products containing lead.

20         To identify consumer exposures to lead from Defendant's painted glassware,

21   Dr. Brown analyzed the presence of available lead on the glassware surface and

22   completed an exposure pathway from the glassware surface to the consumer. Dr. Brown

23   relied on both the NIOSH 9100 and ASTM C927 tests to demonstrate the availability of

24   lead for exposure on the glassware, and then traced the pathway of the transfer of that lead

25   from the glass to the consumer during product use. (*See*, Trial Ex. 1014, 157:1-11, 18-23

26   and 165:3-11.) Dr. Brown expressed the opinion that such lead comes from the pigments

27   of the paints on the glass. (*See*, Trial Ex. 1014, 175:5-8.) Dr. Brown looked at exposure

28   to lead as the lead that came through the mouth during ingestion. (*See*, Brown Test. 8/7.)

1    Dr. Brown did not look at exposure as the entry of lead into the blood. (*See*, Brown Test.

2    8/7.)

3    Dr. Brown testified that it was his opinion that the C927 test demonstrated the

4    "availability on the article of lead for exposure". (Ex. 1014, 157:9-12.) Dr. Brown opined

5    that, based upon his own testing, the normal principles of repeated collection of minute,

6    acidic condensation on the glass surface were replicating the mild acid leach of C927

7    during normal use. (*See*, Brown Test. 8/7.) Dr. Brown further opined that this minute

8    condensation – or "monolayer" of water - formed as the room, in which a glass is present,

9    heats and cools. The monolayer of water then absorbs carbon dioxide and becomes

10   acidic. (*See*, Brown Test. 8/7; *see also*, Trial Ex. 1014, 182:6-23.) Dr. Brown opined

11   that, as the moisture evaporated, the acid concentration increased on the glassware surface

12   and caused an increase in the amount of lead freed from the painted glass surface. (Trial

13   Ex. 1014, 184:9-17). Dr. Brown has specifically and scientifically confirmed this

14   principle of lead leach by minute condensation. (*See*, Trial Ex. 1014, 182:24-183:9,

15   184:18-185:1).

16   Once lead has leached to the surface of the glassware, Dr. Brown opined that

17   exposure then results from direct lip or tongue contact, beverage collection and contact

18   with the lead and then direct consumer lip/tongue contact with contaminated beverage.

19   Though Dr. Brown agrees that the simple contact of a consumer's lips to the painted

20   decoration will not cause the same amount of lead leach as the C927 immersion, he stated

21   that the inevitable continuous condensation process will allow the lip and other body

22   surfaces to contact similar – and perhaps greater – amounts of available lead as leached by

23   the C927 process. (*See*, Brown Test. 8/7; *see also*, Trial Ex. 1014, 161:5-163:5 and

24   181:19-182:1). Dr. Brown gave the opinion that a significant amount of exposure could

25   further result from repeated handling of the leaded surface and subsequent hand-to-mouth

26   activity during the natural dining process (whether directly or through hand contact with

27   other items, such as food, which items are subsequently ingested or brought into direct

28   contact with the lip or tongue). (Trial Ex. 1014, 163:17-164:9.)

1    Dr. Brown similarly confirmed the NIOSH 9100 wipe test is adopted to and does

2  demonstrate "the fact that there is lead on the surface" of the glasses tested. (Trial Ex.

3  1014, 172:17-173:4, 173:16-17.) Further, the 9100 test is semi-quantitative insofar as it

4  identifies an actual amount of lead per surface wiped. (Trial Ex. 1014, 175:13-25.)

5  Dr. Brown opined that since the foreseeable use of glassware involves repeated incidents

6  of contact with the surface lead and transfer of that lead from the glass directly to the

7  mouth as well as indirectly to the mouth through the significant hand to mouth activity

8  experienced by adults, that the exposure pathway was completed in a similar manner as

9  with the lead from the C927 test. (Trial Ex. 1014, 173:10-22.) Dr. Brown opined that a

10  single wipe test of the glassware under NIOSH 9100 is equivalent to one human exposure

11  from a single handling of a glass. The CPSC specifically uses the same technique and

12  assumes that, "[o]ne stroke of the filter paper being equivalent to 1 stroke by a child's

13  hand." (Trial Ex. 135, p. 10.) This correlation was used by the CPSC in their studies on

14  both children's toys and playground equipment. Dr. Brown opined that the actual

15  glassware exposure is much higher than any wipe result because of the multiple times an

16  individual handles a glass during the course of a party or meal or regular day. Dr. Brown,

17  also referencing the CPSC, opined that an adult hand-to-mouth transfer factor of lead from

18  decorated glassware during a single episode of drinking one beverage from the glass

19  would be in the range of 50% of a single wipe test result (Brown Depo., 203, 204).

20  Dr. Brown referenced the CPSC report on lead exposures from PVC and the fact that the

21  CPSC used, as a "conservative assumption", a 50% hand-to-mouth transfer factor for

22  dislodgeable lead. (Brown Test. 7/2/03, 96:20-97:1, 98:15-20). Dr. Brown further opined

23  that a consumer's direct exposure from the lip and rim area equaled one percent (1%) of

24  the total lead leached by the C927 immersion test. (Brown Depo., 202-203).

25    Dr. Brown opined that, "if one is attempting to demonstrate exposure to lead by

26  ingestion", that one could test the blood, bile or feces to demonstrate the exposure by the

27  presence of lead in those substances. (Brown Depo., 152:18-19, 152, 153).

28