1  required." 22 Cal. Code Regs. § 12102(n), formerly § 12201(d).  There is no requirement

2  that the Defendant "know" that the "exposure" presented a significant risk, that the

3  Defendant "know" the "exposure" was occurring without warning, or that the Defendant

4  "know" that an "exposure" probably would occur.  FSOR for 22 CCR § 12201 at 21,

5  February 16, 1998.

6      The regulations do not define the term "intentionally," which is included in the

7  warning provision of § 25249.6 but not the discharge prohibition of § 25249.5.  Health &

8  Safety Code § 25249.10 provides several exemptions from the warning requirement of

9  § 25249.6, including "(c) An exposure for which the person responsible can show . . . that

10  the exposure will have no observable effect assuming exposure at one thousand (1000)

11  times the level in question for substances known to the state to cause reproductive

12  toxicity."  The Defendant bears the burden in an enforcement action of demonstrating this

13  "no observable effect" defense.  *Id.*  The Proposition 65 implementing regulations

14  (California Code of Regulations, Title 22, Chapter 3, Article 8) provide guidance on how

15  the no observable effect defense may be scientifically established.  Under 22 Cal. Code

16  Regs § 12801(a), this determination "shall be based on evidence and standards of

17  comparable scientific validity to the evidence and standards which form the scientific

18  basis for the listing of a chemical as known to the state to cause reproductive toxicity."

19  Article 8 sets forth both general principles and a "safe harbor" approach, described in

20  further detail in §§ 12801-21; exposure assessments performed under safe harbor methods

21  "shall be deemed to have no observable effect" (§ 12801(b)), but determinations may be

22  made by any method that is "scientifically valid." See Final Statement of Reasons for

23  Article 8, at 67.

24      Proposition 65 allows for a private enforcement action if, 60 days after the private

25  party gives "notice" of the alleged violation to public prosecutors, no public prosecutor

26  has commenced and is diligently prosecuting the alleged violation.  Health & Safety Code

27  § 25249.7(d).  The notice must comply with the requirements of 22 Cal. Code Regs.

28  § 12903.  For consumer products exposures, the notice must provide "sufficient specificity

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2                                    - 76 -

1     to inform the recipients of the nature of the items allegedly sold in violation of the law and

2     to distinguish those products or services from others sold or offered by the alleged violator

3     for which no violation is alleged." 22 Cal. Code Regs. § 12903(b)(2)(D).

4          Proposition 65 provides for two primary remedies:  civil penalties and injunctive

5     relief.  "Any person violating or threatening to violate Section 25249.5 or Section 25249.6

6     may be enjoined in any court of competent jurisdiction." Health & Safety Code

7     § 25249.7(a).  "Any person who has violated Section 25249.5 or Section 25249.6 shall be

8     liable for a civil penalty not to exceed $2500 per day for each such violation in addition to

9     any other penalty established by law.  Such civil penalty may be assessed and recovered in

10     a civil action brought in any court of competent jurisdiction." Health & Safety Code

11     § 25249.7(b)(1).

12         B.     The Unfair Competition Law

13          Business & Professions Code § 17204 allows any private person "in the public

14     interest" to enjoin unfair, illegal, or deceptive business practices, as defined in § 17200.

15     Such private UCL action "borrows" violations of other statutes (such as Proposition 65 or

16     § 17500) to establish predicate "unlawful" (§ 17200) business activity.  *Farmers*

17     *Insurance Exchange v. Superior Court*, 2 Cal.4th 377, 383 (1992).

18         C.     The False Advertising Law

19          Under Business & Professions Code § 17500, a person is liable for false

20     advertising claim if he makes a statement that is untrue or misleading, and he knew or

21     should have known that the statement was untrue or misleading.  Liability for failure to

22     disclose facts may be imposed under § 17500 where the Defendant has made a true

23     statement that is "couched in such a manner that it is likely to mislead or deceive the

24     consumer, such as by failure to disclose other relevant information ...." *Day v. AT&T*

25     *Corp.*, 63 Cal.App.4th 325, 332-33 (1998); *Committee on Children's Television, Inc. v.*

26     *General Foods Corp.*, 35 Cal.3d 197, 307 (1983).  The Plaintiff bears the burden of

27     producing evidence that the challenged advertising claim is false or misleading.  *National*

28     *Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.*, 107 Cal.App.4th

1336, 1342 (2003). Section 17500 does not provide its own independent standing to
proceed in a representative capacity, but can be the basis of a claim under § 17200.

Whether a statement is misleading turns on whether it is likely to deceive members
of the public. *Committee on Children's Television, Inc. v. General Foods Corp.,* 35
Cal.3d 197, 211 (1983), and the statement "is judged by the effect it would have on a
reasonable consumer." *Lavie v. Procter & Gamble Co.,* 105 Cal.App.4th 496, 507 (2003).
The reasonable consumer standard requires a Plaintiff to show not only that the statements
"could mislead the public, but that they were likely to mislead the public." *Haskell v.
Time, Inc.,* 965 F. Supp. 1398, 1406-07 (E.D. Cal. 1997) (citation omitted).

Liability for failure to disclose the presence of lead in the products may not be
imposed under § 17500 when California and federal agencies that regulate exposure to
lead from the products do not require such disclosure, pursuant to the "safe harbor"
doctrine articulated by the Supreme Court in *Cel-Tech Communications, Inc. v. Los
Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 182 (1999) (conduct that is affirmatively
permitted by the government may not form the basis of a claim of unfair competition
under § 17200).

II.    RELEVANT CODE SECTIONS

**Health & Safety Code § 25249.6** Required warning before exposure to chemicals
known to cause cancer or reproductive toxicity

"No person in the course of doing business shall knowingly and intentionally
expose any individual to a chemical known to the state to cause cancer or reproductive
toxicity without first giving clear and reasonable warning to such individual, except as
provided in Section 25249.10."

**Health & Safety Code § 25249.7** Enforcement (as effective at the time of the 60-
day notices served by Plaintiff)

"(d) Actions pursuant to this section may be brought by any person in the public
interest if both of the following requirements are met:

1       (1) The private action is commenced more than 60 days from the date that the

2   person has given notice of an alleged violation of Section 25249.5 or 25249.6 that is the

3   subject of the private action to the Attorney General and the district attorney, city

4   attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and

5   to the alleged violator.

6       (2) Neither the Attorney General, any district attorney, any city attorney, nor any

7   prosecutor has commenced and is diligently prosecuting an action against the violation."

8   **Health & Safety Code § 25249.8**  List of chemicals known to cause cancer or

9   reproductive toxicity

10       (a) On or before March 1, 1987, the Governor shall cause to be published a list of

11   those chemicals known to the state to cause cancer or reproductive toxicity within the

12   meaning of this chapter, and he shall cause such list to be revised and republished in light

13   of additional knowledge at least once per year thereafter.  Such list shall include at a

14   minimum those substances identified by reference in Labor Code Section 6382(b)(1) and

15   those substances identified additionally by reference in Labor Code Section 6382(d).

16       (c) On or before January 1, 1989, and at least once per year thereafter, the

17   Governor shall cause to be published a separate list of those chemicals that at the time of

18   publication are required by state or federal law to have been tested for potential to cause

19   cancer or reproductive toxicity but that the state's qualified experts have not found to have

20   been adequately tested as required.

21   **Health & Safety Code § 25249.10**  Exemptions from Warning Requirement

22   Section 25249.6 shall not apply to any of the following:

23       (c) An exposure for which the person responsible can show that the exposure poses

24   no significant risk assuming lifetime exposure at the level in question for substances

25   known to the state to cause cancer, and that the exposure will have no observable effect

26   assuming exposure at one thousand (1000) times the level in question for substances

27   known to the state to cause reproductive toxicity, based on evidence and standards of

28   comparable scientific validity to the evidence and standards which form the scientific

1    basis for the listing of such chemical pursuant to subdivision (a) of Section 25249.8. In

2    any action brought to enforce Section 25249.6, the burden of showing that an exposure

3    meets the criteria of this subdivision shall be on the Defendant.

4        **Health & Safety Code § 25249.11**  Definitions

5        For purposes of this chapter:

6        (c) "Significant amount" means any detectable amount except an amount which

7    would meet the exemption test in subdivision (c) of Section 25249.10 if an individual

8    were exposed to such an amount in drinking water.

9        (f) "Warning" within the meaning of Section 25249.6 need not be provided

10   separately to each exposed individual and may be provided by general methods such as

11   labels on consumer products, inclusion of notices in mailings to water customers, posting

12   of notices, placing notices in public news media, and the like, provided that the warning

13   accomplished is clear and reasonable. In order to minimize the burden on retail sellers of

14   consumer products including foods, regulations implementing Section 25249.6 shall to the

15   extent practicable place the obligation to provide any warning materials such as labels on

16   the producer or packager rather than on the retail seller, except where the retail seller itself

17   is responsible for introducing a chemical known to the state to cause cancer or

18   reproductive toxicity into the consumer product in question.

19       **Health & Safety Code § 25249.12**  Implementation

20       (a) The Governor shall designate a lead agency and other agencies that may be

21   required to implement this chapter, including this section. Each agency so designated

22   may adopt and modify regulations, standards, and permits as necessary to conform with

23   and implement this chapter and to further its purposes.

24       **Final Statement of Reasons, 22 Cal. Code Regs. § 12601 (clear and reasonable**

25   **warnings)**

26       The apparent purpose of section 25249.11(f) is to encourage the origination of

27   warning materials such as labels with the persons in the chain of distribution most likely

28   to know the chemical properties of products intended for retail sale to consumers.

1    "...The Act, however, requires warnings only where there is a knowing and

2    intentional exposure to a listed chemical. Nothing requires that each business conduct a

3    scientific analysis of all its products. Unless a business has reason to know the the (sic.)

4    **product** contains a listed chemical, no testing is needed and no warning is necessary."

5    (FSOR at 32) (emphasis added).

6        **Health & Safety Code § 25249.13.** Preservation Of Existing Rights, Obligations,

7    And Penalties.

8        Nothing in this chapter shall alter or diminish any legal obligation otherwise

9    required in common law or by statute or regulation, and nothing in this chapter shall

10    create or enlarge any defense in any action to enforce such legal obligation. Penalties and

11    sanctions imposed under this chapter shall be in addition to any penalties or sanctions

12    otherwise prescribed by law.

13        **22 Cal. Code Regs. § 12102(n) (former 12201())**

14        "Knowingly" refers only to knowledge of the fact that a discharge of, release of, or

15    exposure to a chemical listed pursuant to Health and Safety Code Section 25249.8(a) is

16    occurring. No knowledge that the discharge, release or exposure is unlawful is required.

17    However, a person in the course of doing business who, through misfortune or accident

18    and without evil design, intention or negligence, commits an act or omits to do something

19    which results in a discharge, release or exposure has not violated Health and Safety Code

20    Sections 25249.5 or 25249.6.

21        **Ballot Argument in Favor of Proposition 65**

22        "Proposition 65's new civil offenses focus only on chemicals that are *known to the*

23    *state* to cause cancer or reproductive disorders. Chemicals that are only suspect are not

24    included."

25        "These new laws will not take anyone by surprise. They apply only to businesses

26    that *know* they are putting one of the chemicals out into the environment, and that *know*

27    the chemical is actually on the Governor's list." Ballot Argument in Favor of

28    Proposition 65 (emphasis in original).

1    **Final Statement of Reasons for 22 Cal. Code Regs § 12201(e)** (defining expose)

2        The ballot arguments in support of Proposition 65 specifically describe the

3    knowledge which §§ 25249.5 and 25249.6 require. *Id.* at 21.

4        **22 Cal. Code Regs. § 12102(i) (former 12201(f))**

5        The term "expose" means to ingest, inhale, contact via body surfaces or otherwise

6    come into contact with a chemical. An individual may come into contact with a chemical

7    through water, air, food, consumer products and any other environmental exposure as well

8    as occupational or workplace exposures.

9        **22 Cal. Code Regs § 12801**

10       (a) "The determination of whether a level of exposure to a chemical known to the

11    state to cause reproductive toxicity has no observable effect for purposes of Health and

12    Safety Code Section 25249.10(c) shall be based on evidence and standards of comparable

13    scientific validity to the evidence and standards which form the scientific basis for the

14    listing of a chemical as known to the state to cause reproductive toxicity."

15       (b) A level of exposure to a listed chemical shall be deemed to have no observable

16    effect, assuming exposure at one thousand times that level, provided that the level is

17    determined.

18       (1)    By means of an assessment that meets the standards described in

19    section 12803 to determine the maximum does level having no observable effect, and

20    dividing that level by one thousand (1,000) to arrive at the maximum allowable dose

21    level; or

22       (2) By application of a specific regulatory level for the chemical in question as

23    provided in Section 12805.

24       (c) For purposes of this article, "NOEL" shall mean that no observable effect level,

25    which is the maximum dose level at which a chemical has no observable reproductive

26    effect.

27       **22 Cal. Code Regs § 12821**  Level of Exposure to Chemicals Causing

28    Reproductive Toxicity

1       (b) For purposes of Section 25249.10(c) of the Act, the level of exposure to a

2  chemical listed as causing reproductive toxicity shall be determined by multiplying the

3  level in question (stated in terms of a concentration of a chemical in a given medium)

4  times the reasonably anticipated rate of exposure for an individual to a given medium.

5  The reasonably anticipated rate of exposure shall be based on the pattern and duration of

6  exposure that is relevant to the reproductive effect which provided the basis for the

7  determination that a chemical is known to the state to cause reproductive toxicity.  (For

8  example, an exposure of short duration is appropriate for a teratogenic chemical, whereas

9  a chronic or protracted exposure is appropriate for one that retards fetal growth.)

10       (c) The following assumptions shall be used to calculate the reasonably anticipated

11  rate of exposure to a chemical listed as causing reproductive; toxicity, unless more

12  specific and scientifically appropriate data are available:

13       (1) The assumptions set forth in subsection (d) of Section 12721 shall be used to

14  calculate the reasonably anticipated rate of exposure to a chemical listed as causing

15  reproductive toxicity, unless more specific and scientifically appropriate data are

16  available.

17       (2) For exposures to consumer products, the level of; exposure shall be calculated

18  using the reasonably anticipated rate of intake or exposure for average users of the

19  consumer product, and not on a per capita basis for the general population.  The rate of

20  intake or exposure shall be based on data for use of a general category or categories of

21  consumer products, such as the United States Department of Agriculture Home Economic

22  Research Report, Foods Commonly Eaten by Individuals:  Amount Per Day and Per

23  Eating Occasion, where such data are available.

24      **Final Statement of Reasons for Title 22 of the California Code of Regulations,**

25  **Chapter 3, Article 8**

26      "Subsection (a) also provides that nothing in Article 8 is intended to preclude the

27  use of evidence, standards, assessment methodologies, principles, assumptions or levels

28  not described in the article to establish that an exposure would have no observable effect.

1    Therefore, the methodologies, data, principles, assumptions and levels described in the

2    sections following section 12801 are not exclusive and do not prevent a Plaintiff or

3    Defendant in an enforcement action from establishing 'no observable effect' by other

4    means. However, such a showing must be based upon data, standards, methodologies,

5    principles and assumptions which are scientifically valid ...."

6        "'Safe harbor' levels and methodologies deemed to have no observable effect

7    within the meaning of the Act are provided. However, a person is permitted to use any

8    data, standards or assessment methodology, or apply any assumptions or principles

9    desired to show that an exposure would produce no observable effect assuming exposure

10   at one thousand times the level in question. Where a 'safe harbor' level or methodology is

11   not used, it remains a question of fact in any enforcement action whether the exposure

12   poses [sic] would produce no observable effect within the meaning of the Act." FSR at

13   67.

14       "If a chemical, such as ... lead ... was listed under the Act based upon its prior

15   listing as a known human reproductive toxicant within the scope of the federal Hazard

16   Communication Standard (HCS), then the reproductive effects for which it was listed

17   under the Act are the same as the effects which brought it within the scope of the HCS. A

18   more specific understanding of the reproductive effect of concern could be obtained

19   through a review of the federal register to determine the basis for the HCS reference." *Id.*

20   at 74. "Absent studies demonstrating a relationship between different routes of

21   administration and differences in reproductive response by these routes, it is more

22   appropriate to assume that a chemical that produces an an [sic] observable adverse

23   reproductive effect by one route, such as ingestion, is also toxic to reproductive functions

24   by other routes, such as inhalation, and vice versa."

25       "Absorption studies may reveal that a chemical administered by a particular route

26   will be poorly absorbed. If according to generally accepted principles data obtained from

27   such an exposure route are irrelevant to exposures by other routes, this assumption may

28   yield and a different data set may be more appropriate. However, when scientifically

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2

1  based interpretations of these data are able to allow predictions of exposure by other
2  routes, the assumption should apply and the data ought to be utilized." FSR at 76.

3        "The purpose of [section 12805] is to set forth 'no observable effect' levels
4  established for purposes of the Act in order to provide a 'safe harbor' for those who might
5  have difficulty identify such levels if left to their own devices."

6        "Subsection (b) provides levels for two chemicals known to the state to cause
7  reproductive toxicity: ethylene oxide and lead. Both chemicals are identified by the
8  federal Occupational Safety and Health Administration (OSHA) as known human
9  reproductive toxicants based upon evidence of their effects on humans, and this resulted in
10  their inclusion on the Governor's initial list pursuant to section 25249.8 of the Act." *Id.* at
11  77.

12        "Two commentators objected that the 'safe harbor' lead level is based upon
13  inhalation, not ingestion, since the lead PEL which the Agency divided by one thousand is
14  an ambient air standard. These commentators observed that lead absorption into the
15  bloodstream from air inhaled into the lungs approaches 50 percent, while absorption from
16  ingestion is only 10 percent. (See U.S. EPA, Air Quality Criteria For Lead, EPA/600/8-
17  83/-28bf (June 1986).) Therefore, they objected that different levels were not provided
18  for different routes of exposure. (Exh. 6, p. 8; C-40, p. 12.)

19        "It does not appear necessary to adopt a separate number for each possible route of
20  exposure. If there is scientifically valid absorption data showing that a chemical is
21  absorbed to a lesser extent by one route than another, then a person may utilize that data to
22  show that exposure by the route of poor absorption would produce no observable effect."
23  FSR at 80.

24        "The exemption test of section 25249.10(c) is based upon exposure. It is the
25  'exposure' which must produce no observable effect 'at the level in question.
26  Accordingly, [§ 12821(b)] defines 'exposure' for purposes of this exemption to mean the
27  'reasonably anticipated rate of exposure for an individual to a given medium."

28

1    "The reasonably anticipated rate of exposure will vary from case to case.... What

2    rate of exposure is reasonably anticipated from a given medium, such as a certain type of

3    food or a consumer product, will depend upon the medium, its anticipated use and other

4    circumstances."

5    "The level of exposure which must produce no observable effect assuming

6    exposure at one thousand times the level in question is the product of the concentration of

7    the chemical in the medium and the reasonably anticipated rate of exposure to individuals

8    to that medium." FSR at 83.

9    "Data on the rate of intake should be based on the data available for general

10    categories of products, such as the U.S. Department of Agriculture Home Economic

11    Research Report on Foods Commonly Eaten by Individuals:  Amount Per Day and

12    Amount Per Eating Occasion, where available." FSR at 84.

13    "On commentator recommended that the regulation provide a means of dealing

14    with variability and fluctuation of the `rate of exposure' term used to calculate the level of

15    exposure, since some persons have a higher rate of exposure than others, though setting

16    the anticipated rate at the highest rate may require a warning to all users of a product on

17    the basis of occasional high use. (C-20, p. 11.) The Agency has attempted to provide a

18    means of dealing with these variables in consumer products.  Exposure assessment need

19    only be based upon the reasonably anticipated rate of exposures.  To further clarify the

20    Agency's intent, the March 29 proposal provided that it is the reasonably anticipated rate

21    of exposure for 'average' users which must be assessed.  Therefore, it appears that this

22    concern has been resolved." FSR at 84-85.

23    "[A]veraging the exposure or intake to yield a daily exposure over lifetime may not

24    be appropriate for reproductive toxins.  Since some reproductive effects, such as

25    teratogenic responses or birth defects, may reflect an acute response during a brief period

26    of intrauterine exposure, exposure to chemicals producing such effects should be assessed

27    on the basis of short term exposure."

28

1    "Therefore, when one evaluates such a reproductive toxin, one needs to view the

2    exposure as the one that may cause the acute effect...."

3         If it is scientifically more appropriate to evaluate a reproductive toxin for chronic

4    toxicity, this section does permit it."

5         "Under paragraph (c)(3), for long term exposures affecting the developing young,

6    the level of exposure is to be based on the reasonably anticipated rate of exposure for the

7    mother during the nine-month gestation period, since maternal intake would be the means

8    by which the intrauterine exposure would occur.  Thus, if the amount of the chemical

9    from a source of exposure during the entire gestation period exceeds one one-thousandth

10   of the level which produces no observable effect.  the exemption does not apply, and a

11   warning must be provided." FSR at 85.

12        **Final Statement of Reasons for 22 Cal. Code Regs. § 12903** (standards for 60-

13   day notices):

14        "Subparagraph (b)(2)(C) specifies that all notices alleging a violation of Health and

15   Safety Code section 25249.6, the warning requirement, identify the route of exposure

16   involved -- i.e., dermal contact, inhalation, or ingestion.  Because the human body's

17   ability to absorb different chemicals varies substantially by route of exposure, this is

18   important information in investigating the potential merit of any claim." *Id.* at 9.

19        **Final Statement of Reasons for 22 Cal. Code Regs § 12201(e)** (defining expose)

20        "Under the Act, a business may defend itself by showing that its exposure poses no

21   significant risk, or is at a level which is one one-thousandth of the no observable effect

22   level.  One way to make such a showing may be to establish a lack of absorption or effect

23   by the route in question." *Id.* at 29.

24        **22 Cal. Code Regs. § 12903 (60-day notices)**

25        (a) For purposes of Health and Safety Code section 25249.7(d).  "notice of the

26   violation which is the subject of the action" (hereinafter "notice" or "sixty-day notice")

27   shall mean a notice meeting all requirements of this section.  No person shall commence

28   an action to enforce the provisions of the Act "in the public interest" pursuant to Health

1    and Safety Code section 25249.7(d) except in compliance with all requirements of this

2    section.

3         (b) Contents of Notice.

4         (2) Description of Violation.  A notice shall provide adequate information from

5    which to allow the recipient to assess the nature of the alleged violation, as set forth in this

6    paragraph.  The provisions of this paragraph shall not be interpreted to require more than

7    reasonably clear information, expressed in terms of common usage and understanding, on

8    each of the indicated topics.

9              (A) For all notices, the notice shall identify.

10             3.    the approximate time period during which the violation is

11   alleged to have occurred; and

12             (C)    For all notices of violation of Health and Safety Code section

13   25249.6, the route of exposure by which exposure is alleged to occur (e.g., by inhalation,

14   ingestion, dermal contact);

15             (D)    For notices of violation of Health and Safety Code section 25249.6

16   involving consumer product exposures, the name of the consumer product or service, or

17   the specific type of consumer product or services, that cause violation, with sufficient

18   specificity to inform the recipients of the nature of the items allegedly sold in violation of

19   the law and to distinguish those products or services from others sold or offered by the

20   alleged violator for which no violation is alleged.  The identification of a chemical

21   pursuant to subsection (b)(2)(A)4 must be provided for each product or service identified

22   in the notice.

23             (4) A notice is not required to contain the following information:

24             (A) The specific retail outlet or time or date at which any product allegedly

25   violating the Act was purchased;

26             (B)    The level of exposure to the chemical in question;

27             (C)    The specific admissible evidence by which the person providing the

28   notice will attempt to prove the violation;

1        (D)   For products, the UPC number, SKU number, model or design

2    number or stock number or other more specific identification of products;

3        (E)   For geographic areas, the lot, block, or other legal description of the

4    property in question.

5        **Final Statement of Reasons for 22 Cal. Code Regs. § 12903** (standards for 60-

6    day notices):

7        "Subparagraph (b)(2)(C) specifies that all notices alleging a violation of Health and

8    Safety Code section 25249.6, the warning requirement, identify the route of exposure

9    involved -- i.e., dermal contact, inhalation, or ingestion. Because the human body's

10   ability to absorb different chemicals varies substantially by route of exposure, this is

11   important information in investigating the potential merit of any claim." *Id.* at 9.

12                   **DISCUSSIONS OF THE ISSUES**

13   I.    PLAINTIFF'S PROOF OF *PROPOSITION 65* "EXPOSURE"

14       A.    "Exposure" Defined

15       A "consumer products exposure" is defined as an "exposure" that results from a

16   person's acquisition, purchase, storage, consumption, or other reasonably foreseeable use

17   of a consumer good, or any exposure that results from receiving a consumer service. 22

18   CCR 12601(b). Under Proposition 65, "expose" means "to cause to ingest, inhale, contact

19   via body surfaces or otherwise come into contact with a listed chemical. An individual

20   may come into contact with a listed chemical through water, air, food [or] consumer

21   products...." 22 CCR 12102(i). "[T]he Health and Welfare Agency has broadly defined

22   the term 'expose' to include **all anticipated means** of bringing individuals into **contact**

23   with chemicals. Examples of these means are provided to further clarify that the Act

24   prohibits all means of ***directly bringing individuals into contact*** with chemicals known to

25   the state to cause cancer or reproductive toxicity without clear and reasonable prior

26   warning." *Consumer Cause, Inc. v. Weider Nutrition Internat., Inc.* (2001) 92

27   Cal.App.4th 363, 368, citing FSOR, 22 CCR at 29 (emphasis added). "'Contact' occurs at

28

1    the first point at which the body connects with a chemical from outside the body."

2    *Consumer Cause, Inc. v. Weider Nutrition Internat., Inc.* (2001) 92 Cal.App.4th 363, 369.

3    Defining contact in this manner also harmonizes the Act with both California and

4    Federal EPA, both of which have defined "exposure" as any chemical contact with the

5    outer boundary of the human body.[15] As such, Plaintiff's burden as to exposure is to show

6    that a listed chemical has contacted the human body, at which point the burden shifts to

7    the Defendant to make any argument that the contact proven by Plaintiff will not exceed

8    the level that requires a warning.

9    Plaintiff's burden of demonstrating exposure can be satisfied by proof that the

10   listed chemical is "detectable" in the product in question, without even actually detecting

11   it. FSOR 22 CCR §12901(g) at 15. The difference between Plaintiff's burden of showing

12   only that the chemical was "detectable", by any evidence sufficient to carry the burden of

13   proof, and Defendant's burden of actually testing the product for detection, under the

14   testing hierarchy of § 12901, is the policy of the statute in shifting the burden of proving

15   the significance of the *level* of chemical detected to the Defendant. There is no limit on

16   how a Plaintiff proves that a chemical is "detectable" in the medium in question. Indeed,

17   "the fact that a detectable amount of a listed chemical was involved in a[n] ... exposure

18   can be proven by *any evidence sufficient to carry the burden of proof.*" FSOR 22 CCR

19   § 12901, at 15.

20   Plaintiff also does not need to prove any "level of exposure." Any higher standard

21   of proof for Plaintiff, other than a mere showing the chemical is "detectable", would

22   assign to him, or her, the statutorily mandated burden on Defendants of showing the actual

23   level of the detected chemical is present in "no significant amount". *Mateel v. Gray,*

24   *supra,* 04 C.D.O.S. 569, Amicus Brief at 9. The statute specifically contemplates that

25   there are many circumstances or situations where Plaintiff's "actual detection" proof of an

---

[15] California's EPA defines exposure as the "concentrations of contaminants in air, water, food, and soil at the point of contact between the human and the respective medium." (*See,* Trial Ex. VVV, p. 5-1.) The US EPA similarly defines exposure as chemical contact with the imaginary outer boundary of the human body, including skin, eyes, mouth and nose. (*See,* Trial Ex. 106, p. 1-11, 1-13; Trial Ex. 111, p. 16-19.)

1  exposure may either not be necessary (because there are independent records or other

2  evidence of it) or may not be possible due to the passage of time. *Id.* at 13. Any other

3  interpretation would permit a Defendant who had done no testing itself to dismiss a

4  Plaintiff's scientifically valid evidence because it may not have happened to be the

5  absolute best test method under the statutory hierarchy for Defendants. *Id.*

6        B.    Proof of Exposures by Plaintiff

7        Plaintiff has demonstrated, by competent scientific evidence, that each of the

8  painted glassware and cosmetic kit products at issue in this case causes an exposure to

9  lead. According to the undisputed testimony of both Drs. Brown and Callahan, an

10  exposure is established by demonstrating the availability of the chemical in the medium in

11  question and a completed exposure pathway from the medium to the consumer in

12  question. A detectable, and detected, concentration of lead was identified in each of the

13  products for which test results were offered into evidence by either a digest test (EPA

14  3050B), a leach test (ASTM C9279) and/or a wipe test (NIOSH 9100)." The exposure

15  pathway is provided by consideration of human factors evidence, inspection and analysis

16  of the products and consultation with other experts versed in one or both areas.

17        Though Plaintiff submits his proof of chemical detectability or detection does not

18  need to comply with § 12901, his testing did, in fact, comply. The ASTM C927 Lip &

19  Rim test was created and adopted by the glassware decorating industry and the FDA.

20  (Exh. 100: 1251-1257). The FDA has specifically approved the test ("although *they do*

21  *not formally regulate lip and rim area leaching*") and the industry has adopted it as their

22  voluntary National compliance standard. (Exh. DDD.) Indeed, the EPA, FDA and CPSC

23  endorse lip/rim as program to "ensure the public is not presented with any significant

24  health risk due to lead and cadmium that may leach". (Exh. DDD, Exh 136.) Of course,

25  J.C. Penney, itself, has adopted the C927 test to determine compliance with the industries

26  voluntary, minimum, National standards. (Exhs. 50, 63, 65, 66, 100:1212, 100:1222,

27  100:1238, Brown Test.).

28

1    The NIOSH 9100 is not only a test generated by the Federal Government

2  (Exh. 197), but one that is adopted and accepted by the EPA and CPSC for identification

3  of lead on surface areas.  (Dr. Brown, Exhs. 135, 136).  The CPSC utilized wipe testing to

4  assess consumer risk by identifying the amount of lead and other toxins available on a

5  product's surface.  CPSC does not specifically require the use of NIOSH 9100, but

6  follows the same basic protocol for securing a wipe sample.  (Exhs. 135 and 136).  "One

7  stroke of the filter paper [is] equivalent to 1 stroke by a child's hand" (Exh. 135 at 10).

8    EPA method 3050B is the standard test adopted/accepted by the Federal

9  government to test for the presence of lead in solids.  (Test Method, Dougherty Test.

10  8/11.)  Both Dr. Lakin and Dr. Kagel testified as to their familiarity with this method for

11  testing solids, including cosmetics.

12    Using these methods, Plaintiff demonstrated that there is detectable lead in each of

13  the products he tested.  Dr. Brown combined the fact that the test results demonstrated a

14  significant amount of available lead on a painted glass surface, with the fact that a

15  consumer regularly and repeatedly contacts that painted surface, to complete his exposure

16  pathway.  Dr. Brown identified extensive consumer contact with lead at the external

17  boundary of the body, including, primarily, the mouth and hands.  The pathway of

18  exposure can vary from direct mouth contact with the available lead, to hand contact from

19  using the glass, to hand-to-mouth contact and even to hand to rim of glass and then

20  directly back to mouth.  Lead exposure from the normal use of painted glassware, while

21  either eating, smoking or doing a wide variety of different activities is extensive.  Typical

22  consumer behavior includes prolonged holding of the glass, rubbing the texture of the

23  raised, painted surface directly, rubbing it indirectly while wiping the moisture from the

24  glass, etc.  Available lead has been demonstrated to exist at different levels, both before

25  and after a glass is washed.

26    The principle of exposure to the cosmetic kits is no different.  These kits are sold in

27  such a way that complimentary shades and components will be maintained together and

28  used together.  The consumer may become exposed to the lead in the cosmetics during the

1    application, when the cosmetic comes in contact with the outer boundary of the skin,

2    mouth, nose and eyes.  Additionally, the consumer might be exposed to the cosmetic

3    through glands around the eye that act like drains (naso-lacrimal gland), through exposed

4    vascular tissue with a complete absence of a "protective" lipid layer (the conjunctiva or

5    inner eyelid), through direct ingestion from lipstick entering the mouth, from inhalation of

6    any respirable cosmetic product or even from hand to mouth activities after touching any

7    of these areas to which the cosmetic has been applied or smoking, eating, drinking, etc.

8         In opposition to Plaintiff's argument that its testing of products has established

9    exposure, Defendants have made several counterarguments.  First, Defendant argues that

10   since the Plaintiff's testing does not show whether the lead in its product was inorganic,

11   Plaintiff has not established exposure to a listed chemical because the OSHA standard

12   does not include all forms of lead, but excludes organic lead.  The Court agrees with

13   Plaintiff that "lead" means all lead compounds.  The breakdown of compounds is not

14   specified in the regulation.  Moreover, Defendant did no testing and has advanced no

15   evidence showing the products contained organic lead.  In addition, Dr. Embree did not

16   offer any scientific testimony whatsoever regarding whether the paint on all of the

17   glassware – even only the two samples h e looked at – contained organic versus inorganic

18   lead or whether it would even make a difference.

19        Second, Defendant argues that although the test methods utilized by Plaintiff show

20   the products contain lead, they do not show that exposure will result from the reasonable

21   and foreseeable use of the products.  Specifically, Defendant argues that the testing

22   methods don't actually show lead was touched, ingested or inhaled because Plaintiff

23   hasn't shown how the lead could escape the "matrix" in which it is contained, i.e. the

24   cosmetics or the paint.  Dr. Embree never provided any testimony regarding a 'matrix' nor

25   lead being trapped in paint.

26        These arguments are not persuasive because as previously noted, in the Court's

27   view, all that needs to be shown to establish exposure is contact with a consumer product

28   containing lead.  Moreover, the testing by Plaintiff on the cosmetics showed that the lead

1    will indeed leave the cosmetics. The testing on the glassware through wipe tests showed

2    lead leached out of the paint. Defendant criticized such testimony saying they are

3    inappropriate, but Defendant has done no testing itself showing that the lead will not leave

4    the "matrix" of the cosmetics or that the lead will not leach out of the paint. In the

5    absence of such evidence, the Court accepts the Plaintiff's evidence.

6         Defendant also argues that the testimony of Plaintiff's experts does not establish

7    exposure to lead because they did not accurately testify that the cosmetics or glassware

8    didn't cause exposure to lead. Plaintiff's experts only testified it was possible or likely

9    that such exposure occurred. Defendant seems to suggest it would be necessary to have

10   someone ingest the cosmetics or paint and then have the person's blood tested to establish

11   an exposure to lead. The Court disagrees and finds Plaintiff's expert testimony and test

12   results sufficient to establish an exposure to lead. Specifically, Dr. Brown testified that

13   his risk assessment involved determining (1) if the toxin, lead, was in or on the product,

14   (2) if there was an actual exposure pathway from the product of an individual (by looking

15   specifically at (a) how the product is used, (b) what the product is used for, (c) how much

16   of the toxin is on or in the product, (d) and where in or on the product the toxin exists), (3)

17   whether there was a likelihood of the toxin on or in the product actually causing an

18   exposure and (4) whether the exposure is a public health concern. Dr. Brown followed all

19   of these steps for the painted glassware products and Dr. Brown concluded that actual

20   exposure did in fact occur every time someone touched the glassware decorated with lead

21   paint that J.C. Penney sold. In addition, Dr. Embree also provide consumers of J.C.

22   Penney painted glassware were actually exposed to lead by demonstrating the transfer of

23   lead from the decorated glassware to an individual's fingers and even from an individual's

24   fingers back to glass after handling.

25   II.     KNOWING AND INTENTIONAL EXPOSURE TO LEAD

26           A.     Knowing

27         When a term is not defined within an initiative statute, "'it can be assumed to refer

28   not to any special term of, but rather to a meaning that would be commonly understood by

1  the electorate.'...To determine the common meaning, a court typically looks to

2  dictionaries." *Consumer Advocacy Group v. Exxon Mobil Corp.,* 104 Cal.App.4th 438,

3  444 (2002) (quoting *People ex rel. Lungren v. Superior Court (American Standard),* 14

4  Cal.4th 294, 301-02 (1996)). "Knowingly" has been defined in the dictionary as

5  "possessing knowledge, Information, or understanding. See Synonyms at

6  Intelligent...Deliberate; conscious: a knowing attempt to defraud." The American

7  Heritage® Dictionary of the English Language, Fourth Edition (Houghton Mifflin

8  Company 2000). Another dictionary defines the term as follows: "With knowledge; in a

9  knowing manner; intelligently; consciously..." Webster's Revised Unabridged Dictionary

10  (1996, 1998).

11      The ballot arguments in favor of Proposition 65 disclose the intent that the

12  knowledge requirement is one of actual, not constructive, knowledge of the exposure:

13          "Proposition 65's new civil offenses focus only on chemicals

14          that are *known to the state* to cause cancer or reproductive
        disorders. Chemicals that are only suspect are not included.

15          "These new laws will not take anyone by surprise. They apply

16          only to businesses that *know* they are putting one of the
        chemicals out into the environment, and that *know* the

17          chemical is actually on the Governor's list." Ballot Argument
        in Favor of Proposition .65 (emphasis in original).

18      Under Proposition 65, businesses must provide a "clear and reasonable" warning

19  prior to "knowingly and intentionally" exposing any individual to a listed chemical. 22

20  Cal. Code Regs. § 12601. "If a person in the course of doing business knows that a listed

21  chemical is present in a product or part of a product, that there is no means of proving that

22  the amount poses no significant risk, then some kind of warning or information is

23  required." FSOR, 22 Cal. Code Regs. § 12601 at 31. Such person need not know that the

24  "exposure" presented a significant risk, "know" the "exposure" was occurring without

25  warning, or "know" that an "exposure" probably would occur. FSOR, 22 CCR § 12201 at

26  21.

27      For purposes of Proposition 65, the term "knowingly" refers only to knowledge of

28  the fact that a discharge or, release of, or exposure to a chemical listed pursuant to section

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2

[PROPOSED] STATEMENT OF DECISION

1  25249.8(a) of the Health & Safety Code is occurring.  No knowledge that the discharge,

2  release, or exposure is unlawful is required.  22 Cal. Code Reg. § 12102(n); *Consumer*

3  *Cause, Inc. v. SmileCare* (2001) 91 Cal. App. 4th 454, 463.  The knowledge requirement

4  under Proposition 65 is meant to exclude primarily accidental releases or exposures.  For

5  example, a person in the course of doing business who, through misfortune or accident

6  and without evil design, intention, or negligence, commits an act or omits to perform an

7  act that results in a discharge, release or, exposure has not violated Health & Safety Code

8  §§ 25249.5 or 25249.6.  *See, e.g., Nicole-Wagner v. Deukmejian* (1991) 230 Cal. App. 3d

9  652, 659 (stating that the phrase "knowingly and intentionally expose" suggests some

10  degree of human activity which results in toxins being added to the environment).

11       Health and Safety Code § 25249.11(f) states in pertinent pat as follows:

12              In order to minimize the burden on retail sellers of consumer
                products including foods, regulations implementing Section
13              25249.6 shall to the extent practicable place the obligation to
                provide any warning materials such as labels on the producer
14              or packager rather than on the retail seller, except where the
                retail seller itself is responsible for introducing a chemical
15              known to the state to cause cancer or reproductive toxicity into
                the consumer product in question.
16

17  In light of the applicable authorities, knowledge that a notice states there was lead in a

18  specifically identified product does not establish that the retailer has the requisite

19  knowledge that other similar products may contain lead particularly where the retailer

20  makes unsuccessful attempts to determine from the party issuing the notice that other

21  similar products do contain lead and where the retailer has a procedure for requiring its

22  suppliers to advise it appropriately concerning Proposition 65.  A retailer who does not

23  know that lead or other listed chemical is contained in a product lacks the requisite

24  knowledge to be required to place a warning on the product under Proposition 65.

25                1.    Macy's West

26       It was undisputed that, before receiving Plaintiff's 60-day notice, no one at Macy's

27  West had ever heard of lead in cosmetics.  Plaintiff did not introduce any evidence to

28  support an inference that the notice itself would have led a retailer in Macy's West's

1  position to know of lead exposure from products other than Markwins products. Plaintiff

2  asserts that the filing of the lawsuit and the Markwins settlement put Macy's West on

3  notice that other products exposed users to lead, and that Macy's West's "investigation"

4  into Plaintiff's claims was insufficient under the circumstances. However, Plaintiff did

5  not introduce evidence that supported an inference that his nonspecific allegations created

6  constructive knowledge of exposure; much less that it provided actual notice to Macy's

7  West.

8      Macy's West relies upon the terms and conditions of its Purchase Order, under

9  which each vendor's products are required to comply with all applicable laws, and the

10  vendor is specifically required to provide any required Proposition 65 warnings. Plaintiff

11  contends that Macy's West was unreasonable in relying on the terms of the Purchase

12  Order, primarily because Plaintiff filed an enforcement action after settling with the only

13  manufacturer whose products were identified in the 60-day notice. Even assuming

14  Plaintiff's constructive knowledge theory was sufficient, the facts do not support a finding

15  of constructive knowledge.

16      Because Plaintiff's counsel declined to identify any "cosmetic kits" other than

17  Markwins, Macy's West sent correspondence to all of its cosmetic vendors (including the

18  vendors whose products were ultimately identified by Plaintiff) to inform them of the

19  litigation, and the fact that Macy's West did not know which products allegedly contained

20  lead and were at issue in the litigation. Macy's West asked the vendors to represent that

21  their products complied with Proposition 65 or, alternatively, to inform Macy's West of

22  those products that were not in compliance. No vendor indicated that its products

23  contained lead or were not compliant with Proposition 65.

24      Moreover, Plaintiff, a prolific enforcer of Proposition 65,[16] refused to identify any

25  violative products in his original and supplemental discovery responses, leaving Macy's

26

27  _____

[16] Plaintiff has served over 650 notices of violation since 1997, and has personally collected tens of thousands of dollars since 2000 as a private enforcer, in addition to the millions of dollars of attorney's fees that have been

28  awarded in his name.

1   West to guess as to what products it was being sued over.  It was not until after Plaintiff

2   specifically identified Fashion Fair products in early 2003 (after the summary judgment

3   motion, and nearly a year after the complaint was filed), that Macy's West obtained test

4   results from that vendor indicating the presence of lead in some of the components of the

5   Beauty on the Go and Glitter 'N Go products.  The only other cosmetic kit identified by

6   Plaintiff was a single cosmetic kit manufactured by Dior, which was not identified by

7   Plaintiff until shortly before trial.

8       Plaintiff's reliance upon his settlement with Markwins is unavailing.  The express

9   terms of that settlement establish that it is not an admission of anything.  Plaintiff did not

10  introduce any evidence that would support an inference that, based on the fact or terms of

11  the settlement, Macy's West should have known anything about any other products.

12  Construing a vendor's settlement that admits no liability or facts as knowledge to a retailer

13  about other products would not only improperly establish liability contrary to Evidence

14  Code § 1152, it would provide a strong disincentive for manufacturers to settle, contrary

15  to the strong policy favoring settlement of disputes.  *Neary v. Regents of the University of*

16  *California*, 3 Cal.4th 273 (1992).

17      Plaintiff argues that Macy's West should have undertaken more stringent follow-up

18  with its vendors, and the fact that Fashion Fair provided lead test data demonstrates that

19  Macy's West would have learned of the lead content in the cosmetics had it done so.

20  Plaintiff's argument is misplaced.  First, constructive knowledge is insufficient to

21  establish liability.  Second, other than the specific tests received from Fashion Fair for a

22  product Macy's West had not sold in over a year, Plaintiff s argument posits an inference

23  upon an inference upon an inference:  Macy's West could have learned of the presence of

24  lead in the products by asking their vendors or testing the products, which would then put

25  them on notice of the claim that the products expose users to lead, which would then

26  support an inference that they "knew" of that exposure.  But, even as to Fashion Fair, the

27  lead testing was not forthcoming until Macy's West wrote to the vendor and specifically

28  informed it that Plaintiff had identified the products as allegedly exposing users to lead.

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2                                    - 98 -

1    An inference does not flow from the nonexistence of a fact, and cannot be based upon

2    speculation or conjecture. *Traxler v. Thompson*, 4 Cal.App.3d 278 (1970).  An inference

3    upon an inference should be rejected if it is too remote and speculative. *Walton v.*

4    *Anderson*, 6 Cal.App.3d 1003 (1970); *People v. Warner*, 270 Cal.App. 2d 900 (1969).

5         Plaintiff cannot bootstrap his charging allegations into constructive knowledge of a

6    substantive element of his claim.  The only reasonable inference under the circumstances

7    is that Macy's West's vendors would undertake lead testing and provide requested

8    assistance to Macy's West in order to respond to Plaintiff's allegations, not that Macy's

9    West's actions in attempting to find out what Plaintiff was suing it over somehow meant it

10   was now "knowingly" exposing consumers to lead for every product that Plaintiff

11   ultimately identified in his discovery responses.

12        This result is compelled by the direction in the initiative to "minimize the burden"

13   on retailers who are not responsible for introducing a listed chemical into a consumer

14   product.  Plaintiff's construction of the statute would also lead to absurd results.  Under

15   Plaintiff's reasoning, a retailer would always "knowingly" expose individuals to listed

16   chemicals once it receives a 60-day notice, since it must always investigate every potential

17   product that might cause an exposure, even if it is not identified in the notice.  While a

18   company that receives a 60-day notice may not simply ignore information before it (such

19   as information pertaining to the very product that is specifically described in the notice),

20   creating a duty to investigate nondescribed products is inconsistent with the plain meaning

21   of the phrase "knowingly and intentionally."

22            2.    J.C. Penney

23                 a.    Cosmetics.

24        The evidence regarding J.C. Penney's knowledge of lead exposure in cosmetics is

25   similar to Macy's West's.  It was also undisputed that, before receiving Plaintiff's 60-day

26   notice, no one at J.C. Penney had ever heard of lead in cosmetics.  No one at J.C. Penney

27   ever received any lead test results, other than those produced by Plaintiff shortly before

28

1   trial. The 60-Day Notice referenced only one product; a product that the vendor assured

2   J.C. Penney did not contain lead.

3        As with Macy's West, it was also undisputed that J.C. Penney relies upon the terms

4   of its Trading Partner Agreement, which requires that all vendors comply with all laws.

5   Again, Plaintiff asserts that the filing of the lawsuit and the Markwins settlement put J.C.

6   Penney on notice that other products exposed users to lead, and that J.C. Penney's

7   "investigation" into Plaintiff's claims was insufficient under the circumstances.

8        After receipt of the complaint, on June 12, 2002, and because Plaintiff's counsel

9   declined to identify any "cosmetic kits" other than Markwins J.C. Penney sent

10   correspondence to vendors of the cosmetic products identified in the notice, tendering the

11   defense and indemnity of J.C. Penney for the lawsuit. No vendor indicated that its

12   products did not comply with Proposition 65, or that its products exposed consumers to

13   lead.

14        As with Macy's West, Plaintiff refused to identify any violative products in his

15   original and supplemental discovery responses, leaving J.C. Penney to guess as to what

16   products it was being sued over. The products that he contended exposed users to lead

17   were not identified by him until after the motion for summary judgment was filed (and

18   some not until April and May 2003), and he produced summary lead testing results for the

19   first time in April, 2003, shortly before trial.

20        As with Macy's West, Plaintiff has failed to demonstrate that J.C. Penney actually

21   knew that cosmetics exposed users to lead, and has not demonstrated that J.C. Penney had

22   constructive knowledge of such exposure to all of the products that he identified at trial,

23   none of which were identified in the 60-day notice.

24                 b.    Glassware

25        Compliance with the federal lip and rim standard, agreed to by the FDA and the

26   glassware industry, does not qualify for compliance with Proposition 65. The relevance

27   of J.C. Penney's knowledge of the FDA standard is in proving the extent of J.C. Penney's

28   understanding that there is lead in the exterior paint of each of the painted glassware it

1   sold (with the special exception of the PGM Romania pattern). Proposition 65 is

2   concerned with a consumer product such as painted glassware causing a consumer to

3   come in contact with lead at any point. While J.C. Penney's implementation of an

4   extensive testing program for the FDA lip and rim standards demonstrates their

5   knowledge of lead on the outside of the painted glassware and consequent lead contact,

6   compliance with those FDA standards does not absolve J.C. Penney of its additional

7   Proposition 65 requirements or its "knowledge" that such exposures are occurring.

8        J.C. Penney knew that human contact with paint in the top 20mm of a glass would

9   cause an exposure to lead and also knew that the same paint below this imaginary 20mm

10  line would cause an exposure on contact. This was known by Mr. Brinkman, Owen

11  Jones, Dianne Carpenter (J.C. Penney legal), Stephen Graves (RTL), Micaela Miramontez

12  (RTL) and Kasey Wise. Specifically, in October of 2001, Mr. Wise informed each of

13  these people that painted glassware allows, "consumers [to] have direct access to the

14  painted surface of the glass and that the paint to which consumers have access contains

15  high levels of lead". (Exh. 52). Mr. Brinkman demonstrated his appreciation for this

16  exposure when, also in October of 2001, he specifically cancelled the Syratech glassware

17  order because he did not want to "expose our customer to lethal materials" even when

18  they were below the external 20mm below the rim area. This discussion arose in the

19  context of 16 CFR 1303 lead paint standards, but regardless of whether their application

20  was removed, J.C. Penney's appreciation of, or "knowledge" of lead exposures occurring

21  below the lip and rim was never removed. Indeed, Mr. Wise notified J.C. Penney

22  employees that "Prop 65 labeling is required for all items containing lead", not just ones

23  with lead in the paint in the lip and rim, but ones with leaded paint where the consumers

24  have direct access. (Exh. 52 – 0067).

25       Mr. Brinkman and J.C. Penney also had other direct evidence that compliance with

26  the FDA lip and rim had no significance to the requirement to label the Products with a

27  warning under Proposition 65. In the Syratech documents, the discussion prior to

28  cancellation of the order was for J.C. Penney to simply place a Proposition 65 warning

1   with the product. Discussions with Syratech contained specific suggestions that, "since

2   the product passes FDA requirement and the handpainting is 20 mm below the rim ...you

3   may want to put warning labels on those products that will be shipped to your California

4   stores." (Exh. 52 – 0064). Moreover, J.C. Penney sold the Lennox Butterfly Meadow

5   painted glass with a Proposition 65 warning even though there was no indication that its

6   painted decoration encroached upon the lip and rim. Similarly the Dansk glasses, before

7   reformulation, would have required a warning though they had no paint within the lip.

8   Moreover, despite the fact that all Home Essentials and Beyond and Block/Salton patterns

9   were directed to, and allegedly only did have paint below the lip and rim, Mr. Brinkman

10  testified that these painted glasses were sold or supposed to be sold with a Proposition 65

11  warning by J.C. Penney. The mere fact that J.C. Penney allegedly told its vendors to keep

12  the paint out of the lip and rim area demonstrates J.C. Penney had a complete

13  understanding that the external paint on its glassware caused exposure to lead on contact.

14  Finally, and most illustrative, is the fact that even the two models of painted glassware

15  directly designed and imported for the J.C. Penney Home Collection brand were sold with

16  a pre-printed Proposition 65 warning on the box despite there having no paint within the

17  lip and rim area.

18       The Court finds Mr. Brinkman's claim that he believed that the lead in painted

19  glassware was removed by the firing process not credible. Such belief makes no sense in

20  light of his cancellation of the Syratech order because of 58% lead in the paint. Nor does

21  it make sense in light of the fact that Mr. Brinkman was testing all of these products for

22  lead compliance under the FDA standard. Certainly if there was no more lead, no more

23  testing for lead – under any standard – would be required. Moreover, J.C. Penney

24  specifically tested its painted glassware products to verify whether this theory of lead

25  removal in firing was true. Mr. Brinkman, Kelly Chow, Norah Hudson, Micaela

26  Miramontez, Stephen Graves and other J.C. Penney employees were specifically advised,

27  also in October of 2001, that "the RTL has confirmed that the lead limits are the same

28

1   after the firing/curing process" and that the fired paint continued to have extremely high

2   lead content.  (Exh. 52 – 0065.)

3       Mr. Brinkman did not rely on Home Essentials & Beyond, Granco, Gibson,

4   Libbey, Certified International or Block/Salton to comply with Proposition 65 by virtue of

5   their trading partner agreement.  By Mr. Brinkman's and Mr. Jones' own admission, these

6   vendors were not "exempt" from the J.C. Penney in-house testing programs specifically

7   designed to assure compliance with consumer protection standards.  For each of these

8   vendors, and each model of painted glassware supplied to J.C. Penney by them, J.C.

9   Penney specifically obligated itself to perform all of the consumer protection standard

10  testing, including the FDA lip and rim test and the 16 CFR 1303 test.  Again, it is not the

11  application of the standard that matters, but the rationale and result thereof.  None of these

12  tests would ever have been performed had J.C. Penney known that the painted glassware

13  products did not contain lead.  Instead, the tests were repeatedly performed and each time

14  paint on the glassware was analyzed for lead, the results came back positive.  J.C. Penney

15  relied on itself for testing painted glassware for consumer safety compliance for lead

16  exposures.  From the time J.C. Penney started the painted glassware program with

17  Syratech glassware, these tests repeatedly provided J.C. Penney with the "knowledge" that

18  lead was in the paint and consumers had direct exposure access to that lead.

19      To "knowingly" expose a consumer to lead, J.C. Penney only need know that they

20  are putting the chemical out there and that it is on the governor's list.  FSOR for 22 CCR

21  § 12201 at 21.  In direct contrast to J.C. Penney's argument, they don't even have

22  "knowledge that the discharge, release or exposure is unlawful." 22 CCR § 12102(n).

23  Moreover, a "knowing exposure" does not require proof of knowledge that (1) the

24  "exposure" in question presents a significant risk to the consumer, (2) the "exposure" was

25  occurring without warning, or even (3) that the "exposure" probably would occur.  FSOR

26  for 22 CCR § 12201 at 21.  Under evidence in this case, J.C. Penney knowingly exposed

27  consumers to lead from the first sale of Home Essentials and Beyond painted glassware

28  and through the sale of other glassware proven to be painted with lead containing paint

1   sold at J.C. Penney stores.  In addition, the glassware products, that were proven to

2   demonstrate detectable and detected lead are consumer products that were actually

3   purchased from J.C. Penney stores in the same manner as an ordinary consumer would

4   have purchased them.

5       It should be specifically noted that Defendant did not produce any evidence of any

6   lead contamination of any of the glassware products between their removal from J.C.

7   Penney stores and their testing at the Curtis & Tompkins lab.  Dr. Brown specifically

8   testified that the variation and range of test results was direct evidence of a lack of lead

9   from contamination (which would present as uniform levels on the glassware surface).

10  (Brown 8/7/03 trial testimony.)  Further proof that lead was coming from the paint on the

11  glassware and not any contamination was presented through Dr. Brown's testimony about

12  the ability of a monolayer of moisture on the surface of glassware to turn into carbonic

13  acid through the evaporative process and, in turn, accelerate the rate of lead leaching from

14  the glassware surface.  Dr. Brown's experience with this phenomenon was duplicated by

15  Curtis & Tompkins testing that washed, wiped, waited and then wiped again different

16  painted glassware samples.  This test demonstrated the continuing, and even accelerated

17  leaching of lead to the surface of J.C. Penney painted glassware, just from sitting in

18  ambient room air.  (Dr. Brown 8/7/03 trial testimony, Exs. 146.)

19      B.    Intentional

20      The Court interprets the word "intentionally" in the Health and Safety Code

21  § 25249.6 to mean that the activity which results in the exposure are activities that are not

22  accidental.  This Court finds persuasive authority in non Proposition 65 cases which hold

23  it is not necessary to act "with the specific intent, purpose or design" to cause the actual

24  injury complained of.  *See Korea Supply, supra,* 29 Cal.4th at 1156-1157, *accord,* 1-800

25  *Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 586.  Application of this

26  precedent to the case before us means Defendant need not have had any specific intent to

27  expose consumers to a toxic chemical, only that their intended actions of selling a product

28  containing such chemicals is intentional activity within the meaning of the statute.  In the

1    case of cosmetics, there is no liability, because Macy's West and J.C. Penney did not act

2    with knowledge that the cosmetics contained lead.

3    III.    STANDING

4        A.    22 CCR § 12903 Mandates That 60-Day Notices Including Some

5            Description of a Consumer Product Type or Category Will Cause All

6            Reasonably Inferred Variations of Such Type or Category to Be Included in

7            the Scope of the Notice.

8        Proposition 65 allows private persons, such as Mr. DiPirro, to file a civil action to

9    enforce its provisions if such person gives "notice of the violation which is the subject of

10    the action" and sixty days pass without the Attorney General or City/District Attorney

11    commencing an action upon that Notice. (Exh. 203, FSOR 22 CCR § 12903 at 2.) To

12    provide such "notice of the violation which is the subject of the action", the violation must

13    be described in the Notice "in some way". (Exh. 203, FSOR 22 CCR § 12903 at 2.)

14        For consumer products, the notice must include "the name of the consumer product

15    or service, or the *specific type of consumer product* or services that cause the violation,

16    with sufficient specificity to inform the recipients of the nature of the items allegedly sold

17    in violation of the law and to distinguish those products or services from others sold or

18    offered by the alleged violator for which no violation is alleged." 22 CCR

19    §12903(b)(2)(D) (emphasis added).

20        To avoid substantial controversies over the scope of the standing created by the

21    Notice description of the violation, OEHHA adopted and explained 22 CCR § 12903.

22    (Exh. 203, FSOR 22 CCR § 12903 at 2, 3.) OEHHA established description of violation

23    requirements "to ensure that notices provide adequate information necessary for the

24    recipients to evaluate the nature and scope of the alleged violation". However, OEHHA

25    also specifically cautioned that "[t]he provisions of [§12903] **shall not** be interpreted to

26    require more than reasonably clear information, expressed in terms of common usage and

27    understanding". (Exh. 203, FSOR 22 CCR § 12903 at 8 (emphasis added)) Indeed, in the

28    specific context of the scope of a Notice of Violation, OEHHA further acknowledged its

1   intent that such scope not be unreasonably limited, but include all those types of violations

2   that "one would reasonably infer from the notice." (Exh. 203, FSOR 22 CCR § 12903 at

3   8.)

4        This approach is consistent with the overall purpose of Proposition 65.

5   "Proposition 65 [is] a remedial statute intended to protect the public... [and it must be

6   construed] broadly to accomplish that protective purpose." *People ex rel. Lungren v.*

7   *Superior Court* (1996) 14 Cal.4th 294, 314. Accordingly, the notice requirements should

8   not be given an overly restrictive interpretation. *Amador Valley Joint Union High School*

9   *Dist. v. State Board of Equalization* (1978) 22 Cal.3d 208, 245-246. OEHHA recognizes

10  that the protection of the public health and the environment is so fundamental to the

11  statute that it has designed this level of Notice description to not only to halt existing

12  violations and produce ultimate compliance by Defendants, but designed to do so quickly.

13  (Exh. 203, FSOR 22 CCR § 12903 at 11.) By necessity, the notice requirements in

14  § 12903 delineate the level of detailed information in a 60-Day Notice that is sufficient to

15  "assure that such notices actually further [these] purposes." (Exh. 203, FSOR 22 CCR

16  §12903 at 4.)

17       B.    A Notice Describing a Type or Category of Products Provides Notice and

18             Standing to Sue for All Consumer Products of That Type Without Requiring

19             Any Further Specificity That Might Unnecessarily Exclude a Model or

20             Version of Such Product or Category.

21       OEHHA recognized that identification of the product at issue from a Notice "has

22  been one of the most problematic in evaluating notices." (Exh. 203, FSOR 22 CCR

23  § 12903 at 10.) For this reason, OEHHA went to great lengths explaining the rule that a

24  sufficient product description only need identify the product type or category and nothing

25  further. (Exh. 203, FSOR 22 CCR § 12903 at 10.)

26       OEHHA begins its entire discourse on the difference between a valid product

27  description and one that is too broad by offering that "ceramic dishes" or "spray paint" are

28  each an adequate and valid product *type* description. (Exh. 203, FSOR 22 CCR § 12903