1   at 10.) In keeping with OEHHA's direction that there only need be "some description" of

2   the products, OEHHA remarks that, "clearly, it would [also] be sufficient simply to say

3   'aerosol spray paint', 'car wax' or 'paint thinner'." (Exh. 203, FSOR 22 CCR §12903 at

4   10.) OEHHA identifies these product descriptions as sufficient to identify the category or

5   type of product at issue and allow the public agency and noticed entities sufficient

6   information to "investigate" the allegations. (Exh. 203, FSOR 22 CCR §12903 at 10.)

7       In specific response to a request for deletion of the language requiring description

8   only of the product "type" sufficient to inform the recipient "of the nature" of the item at

9   issue, OEHAA rejected the request and kept the language to "assure the regulation is not

10  interpreted to require identification of the precise terms, e.g., the individual cans of paint."

11  (Exh. 203, FSOR 22 CCR § 12903 at 13.) OEHHA balanced the broad remedial purpose

12  of the statute with Defendants' pleas for greater specificity by encouraging descriptions

13  like, "'aerosol spray paint', 'typewriter correction fluid' or 'paint stripper' without

14  requiring an unnecessarily particular identification of the product." (Exh. 203, FSOR 22

15  CCR § 12903 at 14.)

16      In the same context, OEHHA has been careful to also be equally clear with regard

17  to what is *not* required for an adequate description of the violation. OEHHA clarified that

18  a citizen enforcer need not utilize product identification numbers in describing the noticed

19  products or even describe products such as offensive paints by their shade. (Exh. 203,

20  FSOR 22 CCR § 12903 at 10.) OEHHA takes this position to avoid the potential that a

21  requirement for "[i]dentification of specific codes and product numbers would simply

22  increase the possibility that products that clearly fall within a description of the products

23  in question would be excluded from the action." (Exh. 203, FSOR 22 CCR § 12903 at

24  16.) In fact, OEHHA went to further lengths to unequivocally identify that other

25  information such as "UPS number, SKU number, model or design number or stock

26  number or more specific identification" of consumer product need not be in an adequate

27  Notice. OEHHA rejected a specific request the inclusion of model numbers in a

28  consumer product Notice because, though it "may be material in some cases", it would

1    risk the exclusion from the action of slightly different model numbers "due to a failure to

2    reference them in the notice." (Exh. 203, FSOR 22 CCR § 12903 at 17.) OEHHA

3    excluded all of this information on their finding that it is not necessary to comply with the

4    statute and because they anticipated that such clarification would eliminate disputes over

5    the notice provisions. (Exh. 203, FSOR 22 CCR § 12903 at 16.) OEHHA summed up its

6    position by declaring that the notice requirements are "not intended to require that highly

7    technical information be provided, ... or to otherwise turn the notice requirement into a

8    trap for the unwary." (Exh. 203, FSOR 22 CCR § 12903 at 15.)

9        An illustration of the broad scope of a single "category of products" can be seen in

10    the context of the identification of multiple violators in a single Notice. As OEHHA

11    states, "a single notice may contain as many as 50 or 100 alleged violators. This format

12    may be convenient when the different violators have committed *basically the same type*

13    *of violation* which can be described in a single notice." (Exh. 203, FSOR 22 CCR § 12903

14    at 8, emphasis supplied.) OEHHA thus expressly recognizes that the scope of a single

15    Notice, and thus a single "category of products" or "type of violation", is understood to

16    include many different specific products of the same "type" or "category".

17        The multiple examples of adequate descriptions are contrasted with the example of

18    the overbroad and unacceptable product type descriptions of "'various aerosol, paint,

19    adhesive and/or automotive products, including but not limited to...' or 'various chemical

20    products, sold in bulk or as finished products.'" (Exh. 203, FSOR 22 CCR § 12903 at 10.)

21    The latter descriptions are only unacceptable because "they would appear to encompass

22    virtually any product."

23        C.    Mr. DiPirro's December 31, 2001 Notice of Defendant J.C. Penney in This

24              Case Gave DiPirro Standing to Enforce All Proposition 65 Violations from

25              Defendant's Sales of the "Painted Glassware" Category or Type of

26              Products.

27        In addition to Mr. DiPirro's compliant Notices giving him standing as to the

28    "painted glassware" category of products as a matter of law, J.C. Penney's preexisting

1   familiarity with this product category also ensures that Plaintiff has standing as a matter of

2   law.  As J.C. Penney argues, a Notice must provide a Defendant with enough information

3   to appreciate the nature of the product type and be able to bring itself into compliance.

4   The evidence in this case demonstrates J.C. Penney not only knew exactly which of its

5   painted glassware contained lead, but was already involved in its own program to test

6   such products for compliance with *Federal* consumer protection standards *for lead.*

7          Mr. DiPirro's Notices to J.C. Penney, by J.C. Penney's own admissions, provided

8   plenty of information to understand which products were at issue and which products

9   were the subject of the litigation.  Early in the litigation, at the March 13, 2003, deposition

10   of Mr. Brinkman (Senior Buyer, J.C. Penney, Tabletops Division), Mr. Brinkman

11   provided clear testimony that he knew the "painted glassware" category of products to

12   include numerous products beyond just the Dansk products.  In fact, "painted glassware"

13   was product description terminology that Mr. Brinkman, himself, used long before

14   Mr. DiPirro's 60-Day Notice of Violation.  At his deposition, Mr. Brinkman understood

15   painted glassware to include the Dansk *collection* Syratech goblets (not sold because of up

16   to 58% lead in the paint), Home Essentials & Beyond *series* of assorted wine glasses

17   (Floral Wine, Flamingo Wine, Fruit and Vintage Wine), two Block China Holiday

18   glassware patterns (Festive Ribbon and Splendor series), and the Certified International

19   Flora, Sunrise and Midnight Christmas glasses.  (Exh. 26, Brinkman Depo., 104:6-22).  At

20   trial, Mr. Brinkman expanded his testimony regarding what J.C. Penney products

21   qualified as "painted glassware", adding Gibson Overseas Crazy Daisies and Tropical

22   Delight, Libbey Orchard Fruit, J.C. Penney's own Stripes collection, Block/Salton's Jonal

23   Hudson Valley, Lennox Butterfly Meadows, as well as J.C. Penney's directly imported

24   glass ice tea and spheres collection of glasses.

25          The list of "painted glassware" products was not difficult to procure from J.C.

26   Penney as Defendant already had in place a testing program to ensure that products of this

27   type – painted glassware with lead – complied with Federal consumer protection

28   requirements.  J.C. Penney either tested the products themselves or required confirmation

DOCUMENT PREPARED
ON RECYCLED PAPER

1    from the vendor that the product met the Federal lead and paint requirements, *e.g.* Lennox

2    Butterfly Meadow.  Moreover, according to J.C. Penney, Defendant even knew that most

3    of these products required Proposition 65 warnings from the time J.C. Penney first carried

4    them and, in some cases, well before Mr. DiPirro's Notice was received.  In fact,

5    Mr. Brinkman testified that each of Home Essentials models of painted glassware and the

6    Holiday patterns of the Block/Salton painted glass were supposed to have Proposition 65

7    warnings from the time they were first sold by J.C. Penney.  (Exh. 26 at 105-106).

8    Further, J.C. Penney documents from representatives of their RTL testing facility

9    repeatedly commented that all glasses of this type (i.e., externally decorated with paint)

10   must be tested for lead leach.

11        Even J.C. Penney's internal documents confirm that Defendant understood all of

12   the identified "painted glassware" products to be part of Mr. DiPirro's Notice.  In

13   communications discussing the Federal testing program for the painted glassware with

14   lead paint, J.C. Penney, itself, acknowledges that all different brands, in addition to

15   Dansk, are all the same *type* of product.  (Exh. 100-1238, "any and all *type* of these

16   glasses".)

17        D.    Mr. DiPirro's Notice to J.C. Penney of "Cosmetic Kits" as the *Type* or

18              *Category* of Products at Issue Provided Sufficient Information to Allow

19              Defendants to Understand which Products Were the Subject of the Lawsuit

20              and Accordingly the Notices Confers Standing but not Knowledge.

21        J.C. Penney's buyers admitted they understood the significance of "cosmetic kits"

22   sufficiently to distinguish them from any other product sold by J.C. Penney.  On two

23   separate days of her trial testimony, October 20 and 22, 2003, Christine Parker admitted

24   she understood the term cosmetic kit to include any collection of cosmetic color

25   components in a reusable case, similar to the Markwins' Wings of Beauty.  (Parker Test.

26   10/20).  In fact, Ms. Parker explained that the "cosmetic kits" unlike the individually sold

27   cosmetic color components, were all manufactured in China and supplied in limited runs

28   or orders.  (Parker Test. 10/20).  This was very different from the domestically

1    manufactured individual cosmetics both in terms of price and the immediate availability

2    of the domestic separate components. (Parker Test. 10/20).

3         Moreover, despite the Notice identifying only a limited example of the Markwins

4    kits, Ms. Parker admitted being aware of other Markwins "cosmetic kits" also sold by J.C.

5    Penney – including the Color Reflections and Color Blockbuster kit. (Parker Test. 10/20).

6    Ms. Parker also readily admitted familiarity with two Riviera Professional "cosmetic kits"

7    from two different Holiday Seasons. (Exhs. 7D and 7E, Parker Test. 10/20). Ms. Parker

8    also testified as to her understanding that the Luxurious Traincase, IMS Coolbag and Liz

9    Taylor Holiday Blockbuster were also all "cosmetic kits" designed and marketed as such

10   for special seasonal promotions. (Parker Test. 10/20).

11        Another J.C. Penney buyer, Christine Bokar, also acknowledged her familiarity

12   with the term "cosmetic kits" and that she believed the term encompassed the Riviera

13   Private Portfolio series of holiday kits. (Exh. 27 (Bokar Depo.) at 25:8-18). Riviera

14   offered holiday kits for both Christmas and Mother's Day. (Exh. 27 (Bokar Depo.) at

15   25:19-27:13).

16        Having an understanding of the significance of "cosmetic kits", Mr. DiPirro's

17   Notice gives standing for Plaintiff but does not impart knowledge for the reasons set forth

18   at pages 95 – 100 of this tentative decision.

19        E.    Mr. DiPirro's Notice to Macy's West of "Cosmetic Kits" as the *Type* or

20              *Category* of Products at Issue Provided Sufficient Information to Allow

21              Defendants to Understand Which Products Were the Subject of the Lawsuit

22              and Accordingly Confers Standing but not Knowledge.

23        Ms. Morello testified as the senior-most buyer of Macy's West's cosmetic

24   products. Though she professed to be ignorant of the meaning of "cosmetic kits", she

25   pointedly acknowledged (in response to questions by the Court) her specific familiarity

26   with the "kit" terminology as being a collection of products packaged together for sale,

27   such as a "shaving kit". (Morello Test., 9/8/03). Though Ms. Morello and Ms. Barr each

28   claimed to reference the products at issue as "blockbusters" or "Purchases/Gifts with

1   Purchase", they also both acknowledged an understanding that, for color products, the

2   products identified by Plaintiff qualified as cosmetic kits.

3       Ms. Brandt sent tender letters to all of her cosmetic vendors, further supporting her

4   understanding that the notice involved cosmetic kits in addition to the Markwins kit.

5   Ms. Brandt also testified to contacting Plaintiff's counsel with regard to the Notice.  It is

6   significant that her inquiry of Plaintiff's counsel was not *whether* there were other

7   cosmetic kits, besides Markwins, at issue, but simply a further identification of which

8   specific other products were also at issue.

9       Under the totality of this evidence, Macy's West could distinguish the cosmetic

10  kits from the other cosmetic color products that were not sold in "kit" form.  Accordingly

11  Mr. DiPirro's Notice creates standing for him to sue for enforcement of all "cosmetic kits"

12  sold by Macy's West.

13  IV.    PLAINTIFF IS NOT ESTOPPED FROM SEEKING RELIEF IN THIS ACTION

14      Defendant's assertions that estoppel (whether equitable or judicial) must foreclose

15  Plaintiff's claims are without any foundation in fact that Plaintiff was aware of sufficient

16  information to disclose specific products models or numbers to Defendant and that

17  Defendant was ignorant of that same information.  For purposes of equitable estoppel,

18  four elements must be present and it is Defendant's burden to prove each of them:

19          (1) the party to be estopped ( DiPirro) must be apprised of the
            facts; (2) he must intend that his conduct shall be acted upon,
20          or must so act that the party asserting the estoppel had a right
            to believe it was so intended; (3) the other party (Macy's and
21          JC Penney) must be ignorant of the true state of facts; and
            (4) JCP and Macy's must rely upon the conduct to their injury.
22

23  *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297 at 305.

24      None of these factors have been proven by Defendants.  Defendants have never

25  shown that Plaintiff had completed the purchase, investigation, testing and expert analysis

26  of each of the *model* or *stock* numbers of the relevant *product type* sufficient to apprise

27  Plaintiff of the facts that Defendants claim were withheld.

28

1   Moreover, the doctrine of equitable estoppel is not appropriate when estoppel

2   would "nullify a strong rule of policy, adopted for the benefit of the public". *In re*

3   *Marriage of Comer* (1996) 14 Cal.4th 504. Here, there is a very strong rule of policy in

4   broadly interpreting Proposition 65 in light of its stated goal of protecting consumers from

5   harmful exposures to toxic chemicals. There is a stated policy of only requiring the

6   identification and disclosure of product types or categories so that other versions of the

7   same type of product are not improperly excluded. Therefore, the doctrine of estoppel

8   does not apply.

9   V.    DEFENDANTS' PROOF OF PROPOSITION 65 WARNING EXEMPTION

10        A.    Defendants Have Established that Their Sale of Cosmetics is Exempt from

11              Proposition 65's Warning Requirement

12   Defendants have demonstrated that the exposure to lead from cosmetic products do

13   not require a warning under Proposition 65. Health & Safety Code § 25249.10 provides

14   that: "Section 25249.6 shall not apply to any of the following: ... (c) An exposure for

15   which the person responsible can show ... that the exposure will have no observable effect

16   assuming exposure at one thousand (1000) times the level in question for substances

17   known to the state to cause reproductive toxicity . . . . In any action brought to enforce

18   Section 25249.6, burden of showing that an exposure meets the criteria of this subdivision

19   shall be on the Defendant." The exemption test is based upon the Plaintiff's showing that

20   an "exposure" has occurred, so the nature of the Defendant's showing is in response to the

21   exposure identified by Plaintiff. *See*, e.g., Regs. § 12821(a) ("For purposes of the Act,

22   'level in question' means the chemical concentration of a listed chemical *for the exposure*

23   *in question*") (emphasis added).

24   The Proposition 65 implementing regulations, specifically Title 22 of the

25   California Code of Regulations, Chapter 3, Article 8, provide guidance on how the no

26   observable effect defense may be scientifically established. 22 Cal. Code Regs.

27   § 12801(a) provides the basic framework of analysis: "The determination of whether a

28   level of exposure to a chemical known to the state to cause reproductive toxicity has no

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2

- 113 -

1    observable effect for purposes of Health and Safety Code Section 25249.10(c) shall be

2    based on evidence and standards of comparable scientific validity to the evidence and

3    standards which form the scientific basis for the listing of a chemical as known to the state

4    to cause reproductive toxicity."

5         Article 8 sets forth both general principles and a "safe harbor" approach, described

6    in further detail in §§ 12801-21, under which compliance is guaranteed.  The regulation

7    sets forth a "safe harbor" of methods by which an exposure "shall be deemed to have no

8    observable effect" (§ 12801(b)), but states that "Nothing in this article shall preclude a

9    person from using evidence, standards, assessment methodologies, principles,

10   assumptions or levels not described in this article to establish that a level of exposure has

11   no observable effect at one thousand (1,000) times the level in question." § 12801(a); see

12   also Final Statement of Reasons for Article 8, at 67.[17]

13        Under the safe harbor of § 12821(b), the question whether the level of exposure

14   creates no observable effect involves a determination of "the level in question (stated in

15   terms of a concentration of a chemical in a given medium) times the reasonably

16   anticipated rate of exposure for an individual to a given medium."  "The reasonably

17   anticipated rate of exposure shall be based on the pattern and duration of exposure that is

18   relevant to the reproductive effect which provided the basis for the determination that a

19   chemical is known to the state to cause reproductive toxicity.  (For example, an exposure

20   of short duration is appropriate for a teratogenic chemical, whereas a chronic or protracted

21   exposure is appropriate for one that retards fetal growth)" § 12821(b).

22        Dr. Lakin's TUBE analysis assessed the potential magnitude of alleged exposure

23   met the safe harbor approach of § 12821, by comparing the reasonably anticipated rate of

24

25   [17] "[T]he methodologies, data, principles, assumptions and levels described in the sections following section 12801 are not exclusive and do not prevent a plaintiff or defendant in an enforcement action from establishing 'no

26   observable effect' by other means.  However, such a showing must be based upon data, standards, methodologies, principles and assumptions which are scientifically valid . . . ."  "A person is permitted to use any data, standards or

27   assessment methodology, or apply any assumptions or principles desired to show that an exposure would produce no observable effect assuming exposure at one thousand times the level in question.  Where a 'safe harbor' level or methodology is not used, it remains a question of fact in any enforcement action whether the exposure poses [sic]

28   would produce no observable effect within the meaning of the Act."  Id.

1    intake or exposure to the MADL of 0.5 µg/day.  Dr. Lakin properly applied toxicological

2    exposure assessment principles and relied upon appropriate usage data from CTFA, the

3    EU, and the EPA Exposure Factors Handbook to conclude that the amount of lead placed

4    on the skin of the user for any individual product within a cosmetic kit, and for a worst-

5    case use of all tested products in any cosmetic kit,[18] did not exceed 0.5 µg/day, whether

6    the user was an average user, or in the upper 90th percentile of all users.

7         Moreover, Dr. Lakin appropriately assessed the absorption of lead through the skin

8    and stomach, consistent with standard toxicological exposure assessment principles, as

9    well as Proposition 65's implementing regulations as described in the "pattern and

10   duration of exposure" in § 12821 and with guidance in the Final Statement of Reasons

11   that indicated it was appropriate for absorption to be considered in determining whether

12   an exposure posed no observable effect within the meaning of Proposition 65.  The court

13   rejects as unscientific and contrary to § 12801(a) Plaintiff's contention that it was

14   inappropriate to apply absorption to different routes of exposure to lead when using the

15   0.5 µg/day MADL; as that MADL had been developed based on inhalation data only.  The

16   experts agreed (consistent with the ATSDR Toxicological Profile for Lead) that inorganic

17   lead is absorbed very poorly, if at all, by dermal contact, and at ranges of 6-10% by

18   ingestion under average conditions, compared with very efficient absorption of lead when

19   inhaled.  When Dr. Lakin included the standard absorption factors used by Cal/EPA and

20   federal EPA, the amount of lead exposure he calculated from the cosmetics was at least

21   1000 times below the MADL for all products within a kit.

22        Defendants were not required to perform independent testing of the cosmetic kits at

23   issue.  As the Plaintiff's test results were orders of magnitude below the warning level,

24   there was no reason to believe that further testing would result in significantly elevated

25

26   _____

27   [18] Because providing warnings for a "kit" that contains the same products that would not require a warning
     individually would be an illogical result and would not further Proposition 65's purpose of "informing" consumers
     about exposures, the proper analysis is whether any component of the "kit" creates an exposure or requires a warning,

28   not whether the "kit," as a whole, does.  However, even if dermal exposure for an entire kit is considered at
     reasonably foreseeable levels of usage defendant have still proved the exposure is less than the exemption level.

1   exposures. Moreover, Plaintiff's counsel's assertion that the 3050B digestion tests were

2   not a proper basis for quantification was unsupported by expert testimony or other

3   evidence, and would require the court to assume that Curtis & Tompkins produced

4   fraudulent documents by omitting important information from its laboratory reports and

5   case narratives.

6          Moreover, Dr. Lakin appropriately relied upon the CTFA, EU, and Exposure

7   Factors Handbook usage data, because they provided the average daily use of cosmetics,

8   and there was no basis to conclude that a one-day exposure to lead posed a risk of harm.

9   The 0.5 µg/day MADL was established as a daily exposure level for chronic (every day)

10  exposure, and Dr. Callahan testified that the shortest duration of exposure to lead that had

11  been associated in the literature with reproductive effects was ten days.

12         The court finds that Dr. Callahan's opinions about quantification of exposure were

13  not credible. Contrary to Dr. Lakin's years of experience, her only professional

14  experience in Proposition 65 has been as an expert for Plaintiff's counsel. She was

15  unfamiliar with many of the concepts included in Article 8 and the Final Statement of

16  Reasons, and her testimony that she "forgot" having read this important guidance

17  document was not believable (she testified on the stand reading not from her own copy of

18  the document, but from Plaintiff's counsel's copy, that was marked up with his own notes

19  interpreting the document). In order to reach a level of exposure that required a warning,

20  she assumed that consumers would use each and every one of the components of the

21  cosmetic kits in 2-3 days at the same time and at a rate that would use them at a usage rate

22  that is drastically inconsistent with the available research studies, as well as with common

23  sense. Dr. Callahan's only explanation, that women in California use more makeup ("the

24  entertainment capital of the world"), was implausible in light of these data. Her reliance

25  upon her own "measurements," and refusal to use the data because they were not specific

26  to women of childbearing age in California was unsupported by any scientific basis to

27  conclude that such women used makeup differently than did other women (Dr. Callahan

28  noted that she required a statistically significant difference to conclude as a scientist that

1   there was a difference, and that there were no data showing a statistically significant

2   difference).

3          B.     Defendant's Have Failed to Establish that the Sale of Painted Glassware are

4                 Exempt from Proposition 65 Warning Requirement

5          Dr. Embree failed to demonstrate any exemption from a warning requirement for

6   glassware due to his failure to identify or analyze either the "level in question" or

7   concentration of lead in the glassware paint and his failure to perform a scientific analysis

8   of the reasonably anticipated rate of exposure to paint on glassware a consumer is likely to

9   suffer. (Embree Test. 10/7.)  Nonetheless, Dr. Embree admitted that an appropriate

10  exposure analysis must include knowledge of what the concentration of the chemical in

11  question is in the medium of concern.  (Embree Test. 10/7.)  To cover for his failed

12  appreciation of the concentration of lead in the paint, Dr. Embree offered his erroneous

13  speculations that the "medium" in question might be saliva or blood.  This stretch of

14  credibility is directly contradicted by an unambiguous statutory explanation that defines,

15  for consumer products, that the medium in question is the consumer product itself.

16  (Exh. G at 82 ["... a given medium, such as a certain type of food or a *consumer product,*"

17  "some may have considerably more *exposure to a product*..."]).

18         Dr. Embree also failed to consider any glassware except for the Certified

19  International Flora and Sunrise Goblets.  He neither inspected them visually nor identified

20  their lead concentration nor analyzed their reasonable rate of use by consumers.

21  Dr. Embree admitted he had no information whatsoever to make any opinions regarding

22  the nature, style, shape, amount of paint, etc. on any of these other glasses.  In fact,

23  having failed to test and compare several samples of even the same pattern, Dr. Embree

24  necessarily failed to consider or appreciate the differences of lead content or lead surface

25  availability among glassware of the same exact pattern based simply upon production

26  inconsistencies, the effects of the manufacturing processes, and the variability of a hand-

27  applied decoration.  In and of itself, that is an admission that Defendant has not and

28

1  cannot prove an entitlement to a warning exemption for every other glassware type at

2  issue.[19]

3       Under Proposition 65, a consumer's "reasonably anticipated rate of exposure" to a

4  product must be based upon a determination of the nature of the product itself, its

5  anticipated use and "other circumstances." (Exh. G at 83.) In contradiction of the specific

6  mandate of the statute, Dr. Embree admitted that he did not have any competent opinions

7  on the "rate of exposure" or the nature or extent to which a consumer handles any of the

8  glassware in question in a reasonably anticipated manner. (Embree Test. 10/7.)

9       Dr. Embree neither found existing information nor independently surveyed or

10  studied foreseeable users to determine how many times they would handle any of the

11  glassware at issue during use. (Embree Test. 10/7.) He made no inquiry and had no

12  opinion on how long they would handle it, how long they would hold it during the

13  handling process, how many times they would refill the glass prior to terminating use,

14  where they would hold the glass, in what settings was the glass used, what other activities

15  were occurring during use of the glass, whether the users smoked, ate, bit their nails,

16  licked their fingers, applied cosmetics or otherwise engaged in hand-to-mouth activities

17  during use, what types of liquids were put in the glass, the temperature of the glassware

18  contents, the ages and sexes of the people using the glassware, whether users rubbed or

19  "smudged" the decorated design, whether mouth or lip/tongue contact was typical on the

20  decoration, etc. (Embree Test. 10/7.)

21       The Agency acknowledges that such "rate of exposure" to any product will vary

22  not only from one exposure analysis to another but will also show variation within any

23  one particular analysis. (Exh. G at 84.) The Agency thus cautions and reminds exposure

24  assessors that, when no default exposure rate values are provided (water ingested, air

25  breathed), the assessor must recognize that, "[s]ome [individuals] may have considerably

26

---

[19] Dr. Embree admitted that he did not even have any idea where the glasses he tested had come from. They were not
27  stored in any manner that would prevent contamination and there was no chain of custody delineating the history of
such glasses. In fact, Dr. Embree did not even know whether the glasses were hand painted, machine painted or
28  otherwise.

1    more exposure to a product than others." (Exh. G at 83.) Of course, Dr. Embree did not

2    consider, much less scientifically analyze any of these issues. Indeed, Dr. Embree

3    specifically acknowledged that the results of his investigation and testing are not capable

4    of or competent to support any assessment of any actual level of exposure in this case.

5    (Embree re-direct examination 10/9). Embree did not attempt to simulate the unfounded

6    and *assumed* range of consumer use scenarios to appreciate the spectrum of exposure

7    rates, including the rate for those who have "considerably more exposure" to the

8    glassware than others. (Embree Test. 10/7.)

9        Dr. Embree did not employ any methods of analysis that satisfy 22 CCR §12901.

10   The "method of analysis" for a Defendant's determination of the presence of and

11   concentration of a listed chemical in a consumer product as well as the method and

12   procedures for gathering test samples, identifying the number of products sampled, the

13   frequency of sampling and the site of sampling. (Exh. 143 at 5, 7.) Thus, the requirement

14   of specified scientific validity looks at the total exposure analysis process, from test

15   design to the interpretation of the results. (Exh. 143 at 11.) Dr. Embree's only tests, on

16   only two patterns of products, called for either glassware handling in some non-described

17   (and unknown to Dr. Embree) "ordinary manner" or a prescribed, but non-representative

18   handling by a mechanical touch and rotate method that, at most, lasted only a few

19   minutes. Dr. Embree admitted the results of his handling/wipe test were not indicative of

20   any exposure level and not helpful in quantifying either the concentration or the rate of

21   reasonably anticipated exposures. (Embree Test. 10/7.) As such, J.C. Penney cannot

22   demonstrate that the experiment was conducted "under the same or similar conditions" as

23   those relating to the incident at issue (reasonably anticipated decorated glassware use for

24   each product), therefore the results of such experiment are not persuasive. *People v.*

25   *Bonin*, 47 Cal.3d 808, 846-48 (1999).

26       Dr. Embree's only opinion regarding exposure, wholly outside of the construct of

27   §12821, was a "professional judgment" hand-to-mouth transfer factor that he

28   acknowledged had no scientific basis that he was aware of, much less a scientific validity

1    commensurate with the technical requirements of § 12901. Dr. Embree acknowledged his

2    5% transfer rate was, in fact, not based upon any empirical evidence of any quality.

3    Indeed, his exposure factor was directly contradictory to the only other two factors of

4    which he was aware - the 43% and 50% hand to mouth factors specifically used by the

5    Consumer Products Safety Commission in assessing human exposure to toxic chemicals

6    from hand-to-mouth behavior. (Exhs. 135, 136 & 137.) Dr. Embree neither conducted

7    nor directed any studies or analysis to actually measure the range of the amount of hand-

8    to-mouth lead transfer that could occur during the reasonably anticipated use of the

9    glassware by consumers and his assumption of facts contrary to the proof destroys his

10    "opinion" on hand-to-mouth transfer rates. *Id.*

11          Significantly eroding even his incompetent hand-to-mouth exposure calculations,

12    Dr. Embree failed to measure the rim to any decoration to determine if Flora or Sunrise

13    were within 20 mm area and could thus cause direct exposure. (Embree Test. 10/8.)

14    Instead, Dr. Embree assumed that all decorations – both on other Flora and Sunrise hand

15    paints as well as all other glassware at issue – were below the 20 mm lip and rim area

16    despite having failed to measure the distance between the rim and any design on any

17    glass. (Embree Test. 10/8.) Thus, Dr. Embree also failed to even consider (or opine) on

18    the extent of any exposure, or contribution to exposure, that might result from direct

19    contact of the mouth, lip or tongue to a colored decoration. (Embree Test. 10/8.) The

20    resulting, ultimate exposure analyses based upon this incorrect assumption should also

21    fail. *Hyatt, supra,* 79 Cal.App.3d 325.

22          Based upon all of these factors and failures, J.C. Penney had a statutory obligation

23    to provide a Proposition 65 warning for every such painted glassware *unless and until* J.C.

24    Penney could prove, under the guidelines of 22 CCR § 12901, that the level of a resulting

25    exposure to such painted glassware was either below the statutory MADL or 1,000 times

26    less than the NOEL. Under the framework of §12901, J.C. Penney's failure to provide the

27    requisite proof of an exemption results in the outcome that they "knowingly" exposed

28    individuals to lead from glassware.

DOCUMENT PREPARED
ON RECYCLED PAPER

35019687.2

[PROPOSED] STATEMENT OF DECISION

VI.    PLAINTIFF HAS NOT DEMONSTRATED A VIOLATION OF THE FALSE
       ADVERTISING LAW

Under Business & Professions Code § 17500, a false advertising claim requires a "statement" made "with intent directly or indirectly to dispose of real or personal property or to perform services . . . concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading." Plaintiff has not identified any statement that Defendants have made concerning the products that is either untrue or misleading because Defendants did not disclose the alleged presence of lead. Plaintiff also offered no evidence that the Defendants knew or should have known that the statement was untrue or misleading.

"[A] plaintiff in a false advertising or unlawful competition action has the burden of producing evidence that the challenged advertising claim is false or misleading." *National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.,* 107 Cal.App.4th 1336, 1342 (2003) (citation omitted). Thus, unlike Proposition 65, Plaintiff bears the burden of proof on all elements of his false advertising claim. 107 Cal.App.4th at 1348.

Plaintiff's expert, Dr. Mazis, testified that, in the absence of a "statement" by Defendants, merely selling a product with lead is misleading because Defendants did not disclose the presence of lead. This testimony is inconsistent with the terms of § 17500, because it alters the law to remove the term "statement." As defined in Webster's Revised Unabridged Dictionary (1998), a "statement" is "That which is stated; a formal embodiment in language of facts or opinions; a narrative; a recital." The usual and ordinary meaning of the term "statement" simply does not include Plaintiff's theory that liability can be imposed due to no statement. Liability for the failure to disclose facts has been imposed under § 17500 only where the Defendant has made a true statement that is "couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information . . . ." *Day v. AT&T Corp.,* 63 Cal.App.4th

1    325, 332-33 (1998); *Committee on Children's Television, Inc. v. General Foods Corp.*, 35

2    Cal.3d 197, 307 (1983).

3    Moreover, an advertisement "is judged by the effect it would have on a reasonable

4    consumer." *Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, 507 (2003). "Under

5    the reasonable consumer standard, Plaintiff is required to show not simply that the

6    Defendants' bulletins *could* mislead the public, but that they were *likely* to mislead the

7    public." *Haskell v. Time, Inc.*, 965 F. Supp. 1398, 1406-07 (ED. Cal. 1997) (citation

8    omitted; emphasis added). No such statement was made by either Defendant.

9    Dr. Mazis's opinion was based on the assumption that consumers "want to know"

10   about hazardous chemicals in products in general and that the failure to disclose the

11   presence of lead is misleading under all circumstances and a material omission. Yet, as

12   Dr. Stewart pointed out, market research supports the conclusion that consumers want to

13   know about toxic substances when experts agree that those substances can harm them.

14   And it is difficult to see where liability could be based on this vague expectation, in light

15   of the holding in *Klein v. Earth Elements, Inc.*, 59 Cal.App.4th 965 (1997), where the

16   court held that there was "nothing misleading" about a statement that "'You can feed

17   Nature's Recipe ... with confidence that you are doing something good for your dog,'"

18   even though the dog food was contaminated, where the Defendant "did nothing to cause

19   the consuming public to accept the contaminated food as uncontaminated." 59

20   Cal.App.4th at 970. Plaintiff did not show that the Defendants did anything to cause the

21   public to believe that they would not be exposed to lead from the products.

22   Further, Plaintiff did not introduce any evidence to support the concept that the

23   glassware or cosmetics actually could harm users, choosing instead to rely upon the claim

24   that there is no proven safe level of lead. If that were sufficient to support a false

25   advertising claim, the fact that lead is present in virtually everything that consumers come

26   into contact with would mean that virtually everything would require a disclosure, and

27   consumers would be deluged with useless warnings that were unrelated to actual or

28   potential harm posed by a product. As Dr. Stewart noted, the potential adverse impacts

1    from this approach include drowning out other important warnings and causing consumers

2    to forego benefits of products (or even benefits of lead in products) without any increase

3    in safety.

4    VII.    CONCLUSION (*Liability Phase*) *all*

5        For the foregoing reasons, the Court finds no violation of Proposition 65 for both

6    Defendants for their sale of cosmetic products and no violation for both Defendants for

7    false advertising.  The Court does not find J.C. Penney to have violated Proposition 65 for

8    any sales of painted glassware which may have occurred.

9    ~~In any event, Defendants' counsel shall prepare, serve, and submit within~~

10   ~~twenty(20) days a proposed Judgment pursuant to the terms of this Tentative Decision.~~

11

12   DATED: *Feb 9, 2005*

13                                        A. James Robertson, II
                                          Judge of the Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28