# EXHIBIT K

1 of 13 DOCUMENTS

**FRANK KUTZLER, Plaintiff, vs. THOR INDUSTRIES INC., Defendants.**

No. 03 C 2389

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 11886; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141*

**July 11, 2003, Decided
July 14, 2003, Docketed**

**DISPOSITION:**    [*1] Thor's motion to dismiss portions of Count I granted as to Paragraph 13bb and otherwise denied, motion to strike portions of Count I and for more definite statement of allegations in Count I denied; Defendant's motion to dismiss Counts II and III granted.

**COUNSEL:** For FRANK KUTZLER, plaintiff: Adam Jacob Krohn, Gregory Howard Moss, Scott Michael Cohen, Krohn & Moss, Ltd., Chicago, IL.

For THOR INDUSTRIES, INC., defendant: Paul E. Wojcicki, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, IL.

**JUDGES:** SIDNEY I. SCHENKIER, United States Magistrate Judge.

**OPINION BY:** SIDNEY I. SCHENKIER

**OPINION**

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Frank Kutzler ("Kutzler"), has brought a three count complaint against Thor Industries Inc. ("Thor") under the Magnuson-Moss Warranty Act, *15 U.S.C. § 2301, et seq.* ("Act" or "MMWA"). In Counts I and II, Mr. Kutzler claims breach of the manufacturer's limited written warranty, and the implied warranty of merchantability. In Count III, Mr. Kutzler seeks revocation of acceptance pursuant to *Section 2310(d) of the Act*.

Presently before the Court are two motions filed by Thor. *First*, Thor has [*2] moved, pursuant to *Fed. R. Civ. P. 12(b)(6)*, to dismiss Count I in part, and Counts II and III in their entirety (doc. # 6). Thor also has moved, pursuant to *Rule 12(f)*, to strike certain allegations in Count I and, pursuant to *Rule 12(e)*, for a more definite statement of certain allegations in Count I that Thor does not seek to dismiss or strike (doc. # 5). Pursuant to the consent of the parties and *28 U.S.C. § 636(c)*, the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. # # 8-10). For the reasons that follow, the motion to dismiss is denied in part and granted in part as to Count I; the motion to strike and for more definite statement as to Count I is denied; and the motion to dismiss is granted as to Counts II and III.

I.

The purpose of a motion to dismiss under *Fed. R. Civ. P. Rule 12(b)(6)* is to test the sufficiency of the complaint, and not to decide the case on the merits. *See Weiler v. Household Fin. Corp., 101 F.3d 519, 524 n. 1 (7th Cir. 1996)*. For purposes of reviewing the motion, we must take all the plaintiff's well-pled allegations as true. *Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992)*. [*3] The court must also view the plaintiff's allegations in the light most favorable to the plaintiff, the plaintiff is entitled to all reasonable inferences that can be drawn therefrom. *Ellsworth v. Racine, 774 F.2d 182, 184 (7th Cir. 1985), cert. denied, 475 U.S. 1047, 89 L. Ed. 2d 574, 106 S. Ct. 1265 (1986)*. "The issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Triad Assocs. v. Chicago Housing Auth., 892 F.2d 583, 586*

2003 U.S. Dist. LEXIS 11886, *3; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141

*(7th Cir. 1990)*. The relevant allegations of the complaint, which we take as true for purposes of ruling on this motion, are as follows.

## II.

On August 28, 2002 Mr. Kutzler purchased from Bernard Chevrolet ("Bernard") a motor home (the "Fun Mover") manufactured by Thor. The total cost of the Fun Mover, including registration charges, documentation fees, sales tax and other collateral charges, such as bank and finance charges, totaled more than $ 402,264.80 (Compl. P 6). At the time of the purchase, Mr. Kutzler was provided with a 24 month / 24,000 mile, limited written warranty issued by Thor for the Fun Mover (Compl. P 8). [*4] The Thor limited written warranty expressly disclaimed coverage for certain items covered by other warranties: (a) the automotive chassis, including the engine, tires, batteries and optional automotive equipment and, (b) components such as the range, oven, refrigerator, furnace, air conditioner, water heater, television, VCR, radio, awning and generator (*see* Thor's Mem., Ex. 2). [1]

> 1    The plaintiff does not attach the Thor limited written warranty to the complaint, but does refer to that warranty and claims that it has been breached (*see, e.g.,* Compl. PP 8, 10, 15, 24, 28-32). Thus, we properly may consider the copy of that warranty submitted by Thor with its brief, without converting the motion to dismiss to a motion for summary judgment. *Venture Assoc. Corp. v. Zenith Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)* ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim").

[*5] Shortly after the purchase, Mr. Kutzler began to notice a variety of defects in the Fun Mover:

a) Defective electrical system

b) Defective interior trim

c) Defective exterior trim

d) Defective brakes

e) Defective auxiliary battery box

f) Defective license plate

g) Defective rear clearance light

h) Defective hood

i) Defective wiring and driving lights

j) Defective step

k) Defective seatbelt

l) Defective back up camera

m) Defective filler panel

n) Defective harness

o) Defective water tank

p) Defective front hub cap

q) Defective steering/suspension

r) Defective water pump

s) Defective shower

t) Defective plumbing

u) Defective furnace

v) Defective generator

w) Defective door

x) Defective bumper

y) Defective kitchen sink

z) Defective engine

aa) Defective transmission.

Mr. Kutzler alleges that he took the Fun Mover to one of the Thor's authorized dealerships on numerous occasions for repair, and that Thor -- through his authorized dealerships -- failed to cure the defects despite having sufficient opportunities to do so (Compl. P 14). According to Mr. Kutzler, the failure to cure the defects has caused him to lose confidence in the safety and reliability [*6] of the Fun Mover, and has substantially impaired its value (Compl. P 16).

On March 13, 2003, Mr. Kutzler sent a letter to Thor revoking acceptance of the Fun Mover (Compl. P 18 and

Case 1:07-cv-06509   Document 35-9   Filed 03/18/2008   Page 4 of 28

Page 3

2003 U.S. Dist. LEXIS 11886, *6; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141

Ex. B). Thor refused the Mr. Kutzler's demand for revocation of acceptance (Compl. P 20). Mr. Kutzler is currently in possession of the Fun Mover and claims that it remains in a defective and unmerchantable condition that substantially impairs its use and value (Compl. P 21).

### III.

We begin with Thor's three-part attack on Count I, the written warranty claim. *First*, Thor moves to dismiss Count I insofar as it asserts breaches of warranty based on the defects alleged in Paragraphs 13d, e, f, h, i, l, p, q, r, u, v, x, z, aa, and bb of the complaint. *Second*, Thor moves to strike those same allegations. *Third*, Thor moves for a more definite statement of the defects alleged in Paragraphs 13a, c, g, k, m, n, o, which are not the target of either the motion to dismiss or to strike. We address Thor's three challenges in Count I in turn. [2]

> 2  We note that Thor does not challenge in any way Count I insofar as it is based on the defects alleged in Paragraphs 13 b, j, s, t, w, and y.

[*7] **A.**

Thor argues that Count I fails to state a claim insofar as it is based on the existence of alleged defects in parts that, in any event, and not covered under Thor's limited written warranty: specifically, Paragraphs 13d, e, f, h, i, l, p, q, r, u, v, x, z, aa, and bb. Thor's claim is that the parts at issue in these allegations are excluded from coverage because they are chassis components or components covered by separate manufacturer's warranties.

The complaint, of course, alleges that the defects enumerated in Paragraph 13 "violate [Thor's] warranty" (Compl. P 10), and thus that the parts afflicted with those defects are not excluded from coverage. On a motion to dismiss, we must accept that allegation as true, *Lucien, 967 F.2d at 1168* -- unless a document attached to the complaint (or, as here, that the plaintiff relies on in the complaint and that the defendant then supplies on motion to dismiss) undermines that allegation. *See, e.g., Thompson v. Illinois Dept. of Prof'l Regulation, 300 F.3d 750, 758 (7th Cir. 2002)*. That is what Thor argues here.

"Since express warranties are contractual in nature, the language of the warranty itself [*8] is what controls and dictates the obligations and rights of the various parties." *Hasek v. DaimlerChrysler Corp., 319 Ill. App. 3d 780, 745 N.E.2d 627, 634, 253 Ill. Dec. 504 (Ill. App.*

*Ct. 1st Dist. 2001)*. Plainly, Thor's limited written warranty does not cover everything that can go wrong with the Fun Mover. However, laying the allegations side by side with the limited written warranty does not allow the Court to tell whether the defects attached in the motion to dismiss fall inside or outside of the provisions of that warranty. We will allow the parties to sort out through the discovery process matters such as the precise nature of the defects, and the existence *vel non* of "separate manufacturer's warranties" referred to in Thor's limited written warranty. Accordingly, the Court denies the motion to dismiss Count I as to the allegations in Paragraphs 13d, e, f, h, i, l, p, q, r, u, v, x, z, and aa.

The allegations in Paragraph 13bb presents a different matter. That paragraph does not allege a defect, but rather declares an intent to seek to amend the complaint to add allegations of further defects if any came to light. Because that allegation does not allege [*9] a defect, it cannot be the basis of a breach of warranty claim. Thus, we grant Thor's motion to dismiss Count I insofar as it purports to be based on Paragraph 13bb -- and we accordingly strike that allegation from Counts II and III, which incorporate it by reference (*see* Compl. PP 34, 43). [3]

> 3  In light of our resolution of the motion to dismiss Count I, the Court does not address the argument raised by Mr. Kutzler that the warranty "disclaimers are ineffective for lack of disclosure" (Kutzler Mem. at 5).

**B.**

We now turn to Thor's motion to strike. When considering a motion to strike, the Court must consider the allegations in the complaint to be true, and must view the allegations -- along with reasonable inferences to be drawn from them -- in the light most favorable to the plaintiff. *Safe Bed Technologies Co. v. KCI USA, Inc., 2003 U.S. Dist. LEXIS 8514, No. 02 C 0097, 2003 WL 21183948, at *2 (N.D. Ill. May 20, 2003)*. Generally, motions to strike are disfavored, *Tatum v. Davis, 1996 U.S. Dist. LEXIS 9547, 1996 WL 388405 at *1 (N.D. Ill. July 9, 1996)* [*10] , and are infrequently granted. *Credit General Ins. Co. v. Midwest Indem. Corp. 916 F. Supp. 766, 771 (N.D. Ill. 1996)* (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1380 (2d ed. 1990)). "A motion to strike must state with particularity the grounds therefor and set forth the nature of relief or type of order

Case 1:07-cv-06509     Document 35-9     Filed 03/18/2008     Page 5 of 28

Page 4

2003 U.S. Dist. LEXIS 11886, *10; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141

sought." *Id.* Typically, unnecessary evidentiary details in a pleading will not be stricken. *Credit General, 916 F. Supp. 771.* In moving to strike matters as irrelevant, a movant must clearly show that the matter is outside the issues in the case and is prejudicial. *Id. Cumis Ins. Soc'y Inc. v. Peters, 983 F. Supp. 787, 798 (N.D. Ill. 1997)*; *Trust Mark Life Ins. Co. v. Univ. of Chicago Hosps.,* 1996 U.S. Dist. LEXIS 1614, No. 94 C 4692, 1996 WL 68009 at *1 (N.D. Ill. Feb. 14, 1996).

Thor's motion to strike challenges the very same allegations that Thor challenges in the motion to dismiss: Paragraphs 13d, c, f, h, i, l, p, q, r, u, v, x, z, aa, and bb. Given that we granted Thor's motion to dismiss as to Paragraph 13bb, the motion to strike is moot. As to the other subparts [*11] of Paragraph 13 that Thor seeks to strike, Thor's only argument is to reassert the same argument that Thor raised in support of its motion to dismiss these allegations from Count I. That argument was not successful as a basis to dismiss those allegations from Count I, and fares no better when reasserted as a basis to strike these allegations. Accordingly, the Court denies Thor's motion to strike.

## C.

Finally, as to some -- but not all -- of the allegations in Paragraph 13, Thor seeks a more definite statement. Under *Fed. R. Civ. P. 8(a)(2)*, complaints need not plead facts. The purpose of *Rule 8(a)* is to give the defendant fair notice of the plaintiff's claim and the grounds on which it rests. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)*. "The development of legal theories and the correlation of facts to theory come later in the process." *Int'l Marketing, Ltd. v. Archer Daniels Midland Co., Inc., 192 F.3d 724, 733 (7th Cir. 1999)*.

When a complaint is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, courts can [*12] order a more definite statement. Under *Fed. R. Civ. P. 12(e), Bowers v. Crystal Valley, R. V.,* 1996 U.S. Dist. LEXIS 4423, No. 95 C 7527, 1996 WL 169415, at *1 (N.D. ILL. 1996). However, *Rule 12(e)* motions are generally disfavored, and are not intended to substitute for discovery. *U.S. For the Use of Argyle Cut Stone Co., Inc. v. Paschen Contractors, Inc., 664 F. Supp. 298, 303 (N.D. Ill. 1987)*. Under *Rule 12(e)* the standard for granting a motion for a more definite statement is whether the complaint is so

vague that a party cannot reasonably be required to frame a responsive pleading. *McDougall v. Donovan, 552 F. Supp. 1206, 1208 (N.D. Ill. 1982)*. "The class of pleadings that are appropriate subjects for a motion under *Rule 12(e)* is quite small - the pleading must be sufficiently intelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed, but it must be so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself." WRIGHT & MILLER, *Supra,* § 1376 at 577-78.

This case does not fit into that "small class of pleadings" [*13] where granting a *Rule 12(e)* motion is appropriate. It is clear that Mr. Kutzler is bringing a written warranty claim against one defendant Thor. It is also clear what written warranty Mr. Kutzler has placed in issue -- indeed, Thor was able to identify that warranty and submit a copy with the motions it has filed. We believe Mr. Kutzler has alleged the defects with enough specificity to give Thor notice of the claims against it, and to allow Thor to frame an answer. Like the court in *Paschen,* we "do not want to conduct discovery via the pleading stage." *664 F. Supp. at 303; see also Gelco Corp. v. Duval Motors, Inc.,* 2002 U.S. Dist. LEXIS 24651, No. 02 C 5613, 2002 WL 31875537 at *8 (N.D. Ill. Dec. 24, 2002) (a motion for a more definite statement should not be used "as a substitute for the discovery and deposition procedures made available by the Federal Rules of Civil Procedure") (citations omitted). [4] The motion for a more definite statement is denied.

> 4    The only case Thor cited in support of its motion for a more definite statement is *Bowers v. Crystal Valley, R. V.,* 1996 U.S. Dist. LEXIS 4423, No. 95 C 7527, 1996 WL 169415 (N.D. Ill. Apr. 9, 1996). In that case, the district judge held that a more definite statement was required where the complaint failed to clarify which of the several defendants was responsible for specific alleged defects, or which warranties applied to certain defects. By contrast, in this case there is one defendant and one written warranty involving that defendant.

[*14] **IV.**

In Count II, Mr. Kutzler seeks to recover damages for Thor's alleged breach of an implied warranty of

Case 1:07-cv-06509     Document 35-9     Filed 03/18/2008     Page 6 of 28

Page 5

2003 U.S. Dist. LEXIS 11886, *14; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141

merchantability under the Act. *See 15 U.S.C. § 2310(d)* (authorizing a prevailing plaintiff to recover damages, as well as reasonable attorneys' fees and costs, for the "failure . . . to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract . . ."). Thor seeks to dismiss the implied warranty claim on the ground that there is no privity of contract between Mr. Kutzler and Thor, since Mr. Kutzler bought the Fun Mover directly from Bernard and not from Thor, which was the manufacturer but not the retailer. Mr. Kutzler urges that privity is not required for his implied warranty claim, and that even if it is, he has sufficiently alleged a basis for it.

Under the Act, an implied warranty is defined as "an implied warranty arising under State law (as modified by *sections 2308 and 2304(a)* of this title) in connection with the sale by a supplier of a consumer product." *15 U.S.C. § 2301(7)*. The parties here agree that the relevant state law is that of Illinois, and so at [*15] the threshold we look to what is necessary to create an implied warranty under Illinois law. The parties also agree that the answer to this question may be found in the Illinois Supreme Court decisions in *Rothe v. Maloney Cadillac, Inc., 119 Ill. 2d 288, 518 N.E.2d 1028, 116 Ill. Dec. 207 (Ill. 1988)*, and *Szajna v. General Motors Corp., 115 Ill. 2d 294, 503 N.E.2d 760, 104 Ill. Dec. 898 (Ill. 1986)* -- but disagree as to what portions of those decisions supply the correct answer.

In *Szajna*, the court considered a complaint for economic loss damages brought by the purchaser of an automobile against a manufacturer which was not the direct seller of the vehicle. The plaintiff asserted, among other things, claims of breach of implied warranty under Illinois law and under the Act. After extended discussion, the court reaffirmed the applicability of the "privity requirement in implied-warranty economic-loss cases." *503 N.E.2d at 767*. The Illinois Supreme Court reaffirmed that holding two years later in *Rothe*, holding that an implied warranty claim for economic loss failed to state a claim under Illinois law where there was no buyer-seller [*16] relationship between the plaintiff who had purchased the vehicle and the defendant who had manufactured it. *518 N.E.2d at 1029-30*.

Thor focuses its argument on these portions of *Szajna* and *Rothe*, and with good reason. Without more, these holdings in *Szajna* and *Rothe* would appear to make it plain that privity is required for Mr. Kutzler to state a

claim for breach of implied warranty claim under the Act: the Act says that "implied warranty" is defined by state law, and the Illinois Supreme Court has squarely held that privity is required for an implied warranty in an economic loss case. However, what somewhat complicates this straightforward analysis is that the Illinois Supreme Court went farther in each of those cases, and held that -- unlike the case under Illinois law -- at least where the non-selling manufacturer provides an express warranty, privity is not required under the Act to create an implied warranty that will support a claim for economic loss damages. *Szajna, 503 N.E.2d at 768-770; Rothe, 518 N.E.2d at 1030-31*. Mr. Kutzler understandably hangs his hat on these portions of *Szajna* and *Rothe*.

In assessing [*17] the impact of *Szajna* and *Rothe* on the issue presented here, we begin with the proposition that this Court is bound to follow the Illinois Supreme Court's interpretation of Illinois law, *Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 442 (7th Cir. 1994)*, we are not obliged to follow the Illinois Supreme Court's interpretation of federal law. *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997)*. Thus, we must accept the Illinois Supreme Court's holding that privity is required in order for a plaintiff to assert an implied warranty claim for economic loss. However, we are not bound by the Illinois Supreme Court's assessment of whether privity is required to assert an implied warranty claim for economic loss under the Act, and thus will be guided by that assessment only to the extent we deem it persuasive.

The overwhelming weight of authority in this district has rejected the *Szajna* and *Rothe* analysis of the Act, and has held that privity is required under the Act, just as under Illinois law, in order to state an implied warranty claim for economic loss. *See, e.g., Diamond v. Porsche Cars North America, Inc.*, No. [*18] 2002 U.S. Dist. LEXIS 18392, 02 C 414, 2002 WL 31155064 (N.D. Ill. Sept. 26, 2002); *Kowalke v. Bernard Chevrolet, Inc., 2000 U.S. Dist. LEXIS 7154 , No. 99 C 7980, 2000 WL 656660 (N.D. Ill. Mar. 23, 2000); Larry J. Soldinger Assocs., Inc. v. Aston Martin Lagonda of North America, Inc., 1999 U.S. Dist. LEXIS 14765, No. 97 C 7792, 1999 WL 756174 (N.D. Ill. Sept. 13, 1999)*. In *Soldinger*, the district court carefully analyzed the statutory language as well as the analysis of the Illinois Supreme Court, and persuasively explained why the privity requirement should not be eliminated under the Act if it is required for

Case 1:07-cv-06509    Document 35-9    Filed 03/18/2008    Page 7 of 28

Page 6
2003 U.S. Dist. LEXIS 11886, *18; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141

an Illinois law implied warranty claim. *1999 U.S. Dist. LEXIS 14765, 1999 WL 756174, at \*7-10*. We see no need to repeat the thorough analysis of the *Soldinger* court; we adopt it here without modification. [5] Accordingly, we hold that privity is required for Mr. Kutzler to assert his implied warranty claim against Thor in this case.

> [5] The plaintiff does not discuss *Soldinger* or the other cases from this district that have declined to follow the Illinois Supreme Court's interpretation of the Act. Rather, the plaintiff cites to one court within this district that has followed the Illinois Supreme Court's interpretation of this federal law question: *Cohen v. Am Gen. Corp., 264 F. Supp. 2d 616, 2003 U.S. Dist. LEXIS 10541, No. 02 C 5327, 2003 WL 1203613 (N.D. Ill. Mar. 11, 2003)*. However, in *Cohen*, the parties had not specifically briefed the implied warranty question, and the court cited *Szajna* without analysis and without citation to or discussion of the cases within this district -- and from other courts -- that have reached a contrary conclusion. *2003 U.S. Dist. LEXIS 10541, 2003 WL 1203613, at \*4*. In these circumstances, we do not find *Cohen* to be persuasive authority for the position urged by the plaintiff.

[*19] Finally, we consider Mr. Kutzler's arguments that he has sufficiently alleged privity. *First*, Mr. Kutzler argues that Thor's advertising campaign for the Fun Mover is sufficient to create privity (Kutzler Mem. at 10-11). But, the complaint alleges nothing about Thor's "advertising campaign" for the Fun Mover, or its scope. Moreover, the plaintiff offers nothing to show that Illinois law would allow the privity requirement, which the Illinois Supreme Court only recently refused to eliminate in implied warranty cases, to be met merely by proof of an advertising campaign. For the many manufacturers who do not sell directly but who well may advertise, the rule urged by Mr. Kutzler would accomplish indirectly what the Illinois Supreme Court has refused to do directly -- eliminate the privity requirement in implied warranty cases.

*Second*, the plaintiff argues that he has sufficiently alleged privity under "general agency principles" (Kutzler Mem. at 11). However, the plaintiff does not allege the parameters of this alleged agency relationship between Thor and Bernard, which sold the Fun Mover to Mr.

Kutzler, and acknowledges that there is "no established authority on this issue" [*20] (*Id.*). In the absence of such authority, we decline to hold that Illinois law would recognize "general agency principles" as sufficient to supply privity between a purchaser and a non-selling manufacturer, as again such a rule would constitute an end run around the privity requirement that the Illinois Supreme Court recently has reaffirmed.

Accordingly, Thor's motion to dismiss Count II is granted.

**V.**

In Count III, Mr. Kutzler asserts a claim for revocation of acceptance under *15 U.S.C. § 2310(d)*. Thor argues that Mr. Kutzler cannot state a cognizable claim for revocation against a non-selling manufacturer. For the reasons that follow, we agree.

As discussed above, *Section 2310(d)* authorizes a consumer who is damaged by the failure to comply with a written or implied warranty to sue for damages and other legal and equitable relief Here, while the Court has dismissed Mr. Kutzler's implied warranty claim, his written limited warranty claim survives and provides a basis for Mr. Kutzler to invoke *Section 2310(d)*. However, that section does not create remedies, but instead provides a jurisdictional basis for "an aggrieved customer [to] sue on state-law [*21] claims in federal court, whether or not the parties are of diverse citizenship." *Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955, 956 (7th Cir. 1998)*. Thus, in order to determine whether revocation is an available remedy when, as here, an aggrieved customer sues a non-selling manufacturer, we must consult Illinois law.

We begin our analysis by considering Section 2-608 of the Uniform Commercial Code, codified in *Illinois at 810 ILCS 5/2-608*, which provides as follows:

> Revocation of Acceptance in Whole or in Part. (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him is he has accepted it
>
> (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

Page 7

2003 U.S. Dist. LEXIS 11886, *21; 51 U.C.C. Rep. Serv. 2d (Callaghan) 141

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance *or by the seller's assurances.*

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovery the ground for it and before any substantial change in condition of the goods which is not caused by [*22] their own defects. It is not effective *until the buyer notifies the seller of it.*

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

(Emphasis added). The language of Section 2-608 on its face contemplates that the remedy of revocation would be available against the seller, and not against a non-seller who manufactured the goods.

Unfortunately, the parties have not cited -- and our research has not located -- any Illinois state law decisions that reveal whether the Illinois courts have applied the language of Section 2-608 as written. Two courts within this district have addressed the question, reaching different results. Compare *Soldinger, 1999 U.S. Dist. LEXIS 14765, 1999 WL 756174, at *10-11* (denying defendant's motion for summary judgment on a claim for revocation asserted against a non-selling manufacturer) *and Kozon v. Volvo,* No. 97 C 7768 (N.D. Ill. Mar. 13, 1998) (unpublished order) (dismissing a claim for revocation against a non-selling manufacturer). Cases from other jurisdictions are split on this issue. [6]

> 6 Thor cites several cases in which a buyer was not allowed to assert a claim for revocation of acceptance against a non-selling manufacturer. *Hardy v. Winnebago Industries, Inc., 120 Md. App. 261, 706 A.2d 1086 (Md. Ct. Spec. App. 1998)* (revocation of acceptance is only available against an immediate seller, not a remote manufacturer); *Henderson v. Chrysler Corp., 191 Mich. App. 337, 477 N.W.2d 505 (Mich. Ct. App. 1991), app. den'd, 485 N.W.2d 501; Gasque v. Mooers Motor Car Co., 227 Va. 154, 313 S.E. 2d 384 (Va. 1984)* (revocation of acceptance cannot be sought from a non-selling manufacturer);

*Noice v. Paul's Marine & Camping Ctr. Inc., 5 Ohio App. 3d 232, 5 Ohio B. 518, 451 N.E.2d 528 (Ohio Ct. App. 1982)* (Section 2-608 of the UCC "creates a claim of relief against the seller of the goods but not the manufacturer"); *Royal Lincoln-Mercury Sales, Inc. v. Wallace, 415 So.2d 1024 (Miss. 1982)* (revocation is not available against a non-seller manufacturer).

For his part, Mr. Kutzler cites several cases where the courts have come to opposite conclusion regarding revocation of acceptance claims. *Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349 (Minn. 1977)* (a new car purchaser was allowed to revoke acceptance against the national distributor and recover the purchase price after numerous warranty repairs); *Volkswagen of America, Inc. v. Novak, 418 So.2d 801 (Miss. 1982)* (the purchasers of a new car revoked acceptance against the manufacturer that had extended a new car limited warranty at the time of the sale); *Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 433 A.2d 801 (N.J. Super. Ct. App. Div. 1981)* (the Act allows a buyer to rescind the transaction and receive the return of the purchase price from the manufacturer without the need for privity).

[*23] We find the analysis of the Virginia Supreme Court in *Gasque v. Mooers Motor Car Co., Inc., 227 Va. 154, 313 S.E.2d 384 (Va. 1984),* to be instructive. In that case, the court found that the remedy of revocation of acceptance provided by Section 2-608 of the UCC is unavailable against a non-selling manufacturer. The court explained that when applicable, the remedy of revocation "cancels a contract of sale, restores title to and possession of the goods to the seller, restores the purchase price to the buyer, and as fairly as possible, returns the contracting parties to the *status quo ante." Id. at 390.* The Virginia Supreme Court reasoned that because the remote manufacturer is not involved in the sale transaction, it should have no involvement in the unwinding of that transaction that is the purpose of the remedy of revocation. *Id.* Thus, the court held that "the remedy of revocation of acceptance under . . . [Section 2-608] is conceptually inapplicable to any persons other than the parties to the contract of sale sought to be rescinded." *Id.*

*Gasque* offers a interpretation of Section 2-608 that comports with the language of that provision and with

[*24] the underlying purpose of the remedy of revocation. Moreover, to the extent that this interpretation gives sway to the requirement of privity, that is consistent with Illinois law as recently reaffirmed by *Szajna* and *Rothe*, which hold that privity still has meaning in warranty cases.

We are not persuaded by Mr. Kutzler's arguments in favor of a contrary interpretation of Section 2-608. *First*, Mr. Kutzler urges that the Court adopt a liberal interpretation of the Act so as to effectuate its purposes. A fundamental problem with the argument is that the Act does not create a distinct remedial structure that supplants or adds to state law, but directs us to look to Illinois law to determine the available remedies under the Act. We are therefore not at liberty to recast Illinois law so as to adopt the plaintiff's preferred remedial scheme for the Act.

*Second*, Mr. Kutzler urges that the Court follow the line of cases that has interpreted Section 2-608 to permit a buyer to assert the remedy of revocation against a non-seller. We do not find those cases persuasive. As a preliminary matter, the cases upon which the plaintiff relies do not come to grips with the plain language [*25] of Section 2-608. Indeed, one of the cases conceded that the relevant UCC provisions "seem to require a buyer-seller relationship," but nonetheless allowed a claim of revocation to be asserted against a non-selling manufacturer, plainly moved by the fact that the direct seller was insolvent. *Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 357 (Minn. 1978)*. Moreover, the cases cited by the plaintiff all employ an interpretation of Section 2-608 that disregards the privity requirement, which recent Illinois Supreme Court precedent strongly indicates that Illinois is not prepared to do. *Durfee, id.* ("the lack of privity does not relieve [the non-selling manufacturer] of liability); *Ventura v. Ford Motor Corp., 433 A.2d 801, 811 (N.J. Super. App. Div. 1981)* (applying strict liability in tort doctrine to eliminate a privity requirement for a party seeking recovery for economic loss, which is an application of the strict liability doctrine that the Illinois Supreme Court rejected in *Szajna); Volkswagen of America, Inc. v. Novak, 418 So.2d 801, 804 (Miss. 1982)* (found that privity was not was not required in a revocation claim [*26] under the law of Mississippi, which by statute had eliminated the requirement of privity in warranty actions).

*Third*, Mr. Kutzler argues that this Court should follow the ruling from this district in *Soldinger* stating that are vocation claim may proceed against a non-selling manufacturer, rather than the contrary ruling from this district in *Kozon*. We decline to do so. The *Kozon* ruling cites the line of cases from other jurisdictions that this Court finds persuasive on the point. By contrast, *Soldinger* does not cite the case law from other jurisdictions on the question, but relies on two Illinois decisions -- *Lytle v. Roto Lincoln Mercury & Subaru, Inc., 167 Ill. App. 3d 508, 521 N.E.2d 201, 207, 118 Ill. Dec. 133 (Ill. App. Ct. 2d Dist. 1988); Blankenship v. Northtown Ford, Inc., 95 Ill. App. 3d 303, 420 N.E.2d 167, 171, 50 Ill. Dec. 850 (Ill. App. Ct. 4th Dist. 1981)* for the proposition that "Illinois courts have recognized a claim for revocation of acceptance under the UCC where, as in this case, the plaintiff has no viable UCC breach of warranty claims." *Soldinger, 1999 U.S. Dist. LEXIS 14765, 1999 WL 756174, at *10*. However, in both [*27] *Lytle* and *Blankenship*, the plaintiff was allowed to pursue revocation claims against *direct* sellers. Neither of those cases involved, or authorized, revocation claims against non-selling manufacturers.

Accordingly, Thor's motion to dismiss Count III is granted.

## CONCLUSION

For the reasons given above, Thor's motion to dismiss portions of Count I is granted as to Paragraph 13bb, and is otherwise denied (doc. # 6). Thor's motion to strike portions of Count I, and for a more definite statement of the allegations in Count I is denied (doc. # 5). Defendant's motion to dismiss Counts II and III is granted (doc. # 6). Thor shall answer Count I by July 31, 2003.

**ENTER:**

**SIDNEY I. SCHENKIER**

**United States Magistrate Judge**

**Dated: July 11, 2003**

# EXHIBIT L

LEXSEE 2003 U.S. DIST. LEXIS 17036

**RICHARD J. STEPHENSON, STEPHENSON MASTER LP, STEPHENSON/ZION INSURANCE TRUST, MIDWESTERN REGIONAL MEDICAL CENTER, INC., and CANCER TREATMENT CENTERS OF AMERICA, INC., Plaintiffs, v. HARTFORD LIFE AND ANNUITY INSURANCE COMPANY, HARTFORD LIFE, INC., HARTFORD LIFE INSURANCE COMPANY, INC., ELAR PARTNERS LLC, OGILVIE SECURITY ADVISORS CORP., GERALD D. RICKEN, MICHAEL E. KOHN, and APPLIED INNOVATIVE MONETARY SOLUTIONS, LLC, Defendants.**

No. 02 C 3917

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 17036; Fed. Sec. L. Rep. (CCH) P92,512*

**September 25, 2003, Decided
September 26, 2003, Docketed**

**SUBSEQUENT HISTORY:** Motion denied by *Stephenson v. Hartford Life & Annuity Ins. Co., 2004 U.S. Dist. LEXIS 19828 (N.D. Ill., 2004)*

**DISPOSITION:** [*1] Defendants' motions to dismiss SAC in its entirety pursuant to *Rule 9(b)* and PSLRA was granted.

**COUNSEL:** For Richard J Stephenson, Stephenson Master LP, Ctca Limited Partnership, Stephenson/Zion Insurance Trust, Midwestern Regional Medical Center, Cancer Treatment Centers of America, PLAINTIFFS: Terri A Mazur, Mayer, Brown, Rowe & Maw, Chicago, IL USA. Jennifer Lynn Rakstad, Mayer, Brown, Rowe & Maw, Chicago, IL USA.

**JUDGES:** John F. Grady, United States District Judge.

**OPINION BY:** John F. Grady

**OPINION**

**MEMORANDUM OPINION**

Before the court are defendants' motions to dismiss the Second Amended Complaint ("SAC") pursuant to

*Federal Rules of Civil Procedure 9(b)and 12(b)(6)*, and the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. § 78u - 4(b)*. For the reasons set forth below, the motions are granted.

**BACKGROUND**

1

> 1  The following facts are drawn from the SAC. Because plaintiffs' allegations are presumptively true at this stage, our summary omits language such as "plaintiffs allege."

[*2] **A. The Parties**

This action arises out of plaintiffs' 2001 purchase of a variable life insurance policy (the "2001 Policy") insuring plaintiff Richard J. Stephenson ("Stephenson"). In addition to Stephenson, plaintiffs are Stephenson Master LP, an Illinois limited partnership of which Stephenson is the limited partner ("Stephenson Master"); Stephenson/Zion Insurance Trust, an Illinois trust that owns and is the beneficiary of an earlier life insurance policy covering Stephenson ("Stephenson Zion"); Midwestern Regional Medical Center, Inc. ("MRMC") and Cancer Treatment Centers of America, Inc.

("CTCA"), both Illinois corporations of which Stephenson is the Chairman and sole shareholder, and which were assigned or paid the premiums on earlier life insurance policies covering Stephenson.

Defendant Hartford Life and Annuity Insurance Co., a Connecticut company and subsidiary of defendants Hartford Life, Inc. and Hartford Life Insurance Co., Inc. (collectively, "Hartford"), is the insurer on the 2001 Policy. Defendant ELAR Partners LLC ("ELAR") is a Connecticut company that operates as a life insurance carrier, and, on information and belief, has an agreement with Hartford to [*3] use its best efforts to "enhance the profitability" of any Hartford life insurance policy sold by investors and/or members of ELAR. Defendant Gerald Ricken is an investor and member of ELAR. On information and belief, Ricken had an agreement with ELAR pursuant to which he invested a portion of his first year commission on Hartford life insurance policies in exchange for the right to share in potential profits on such policies over time and/or to sell a portion of his interest in such policies back to Hartford at some future time.

Defendant Ogilvie Security Advisors Corp. ("Ogilvie") is an Illinois broker-dealer and member firm of the National Association of Securities Dealers ("NASD"). Ricken was a NASD-registered representative and broker of Ogilvie. On information and belief, Ricken had a written agreement with Ogilvie which obligated him to follow Ogilvie's rules and regulations in his sale of securities - including variable life insurance policies - and Ogilvie had the right to terminate Ricken as its broker if Ricken failed to comply with such rules and regulations.

Kohn is a Missouri lawyer, specializing in tax law, and served as plaintiffs' tax lawyer from 1997 through May [*4] 2002. Ricken is an insurance salesman, licensed in Illinois and Colorado, who had an agency relationship with Hartford. Defendant Applied Innovative Monetary Solutions, LLC ("AIMS") is a Missouri limited liability company through which Kohn and Ricken conducted their business. On information and belief, Kohn was the Chairman and founder of AIMS, and Ricken was its President and CEO. On information and belief, Kohn and Ricken shared in both the costs of, and income generated by, their businesses, including AIMS. Kohn and Ricken are brothers-in-law and shared office space. Thus, Ricken conducted his business as a broker of Ogilvie, through AIMS, and contributed his commissions from the sale of Hartford variable life insurance policies

to AIMS.

## B. The 1998 Policies

In 1998, Stephenson Master, Stephenson/Zion, MRMC and CTCA purchased two variable life insurance policies insuring Stephenson. The first policy, issued by Hartford, insured Stephenson with a face value of $ 13 million (the "1998 Hartford Policy"). The second policy, issued by American General Life Insurance Company, insured Stephenson with a face amount of $ 27 million (the "American General Policy"). Together, [*5] then, the 1998 policies provided Stephenson with $ 40 million in coverage. Based on Kohn's advice, plaintiffs structured split-dollar and collateral assignment agreements for each of the 1998 policies, under which MRMC is the assignee of the 1998 policies and MRMC, CTCA, Stephenson/Zion and/or Stephenson Master pay the premiums.

## C. The 2001 Policy

On January 27, 2001, the Internal Revenue Service clarified its prior rulings regarding the taxation of split-dollar life insurance arrangements and provided taxpayers with interim guidance on the requirements for such tax treatment in *IRS Notice 2001-5 I.R.B. 459* (the "IRS Notice"). Shortly after issuance of the IRS Notice, Hartford, Kohn, Ricken and AIMS, "in both oral and written communications between February and June 2001," represented to plaintiffs that they needed a new policy to take advantage of the favorable tax treatment under the IRS Notice, and that plaintiffs could achieve substantial cost savings in Stephenson's life insurance coverage by replacing the 1998 policies with a new universal variable life insurance policy.

In May 2001, Kohn, Ricken and AIMS arranged with Hartford and Ogilvie for the issuance [*6] and sale of the 2001 Policy, another Hartford policy, which insured Stephenson in the amount of $ 42 million. Hartford issued the 2001 Policy as a Colorado policy on or about May 22, 2001. Ricken sold the 2001 Policy to plaintiffs through AIMS as a registered representative and broker of Ogilvie, and signed Hartford's Policy Application for the 2001 Policy as Hartford's "Licensed Agent."

Hartford legal representatives provided Kohn, Ricken and/or AIMS with an analysis performed by Arthur Andersen concerning the 2001 Policy and the IRS

Notice. Hartford represented that it would require plaintiffs to reduce the life insurance coverage on Stephenson under the 1998 American General Policy from $ 27 million to $ 3 million as a condition of issuing the 2001 Policy.

### D. Alleged Misrepresentations

Between January and June 2001, Hartford representatives - including "one or more high level executives," product designers, internal actuaries, and attorneys - represented to "Kohn, Ricken and/or AIMS" that plaintiffs had to purchase a *new* universal variable life insurance policy with $ 42 million in coverage to meet their "investment and life insurance objectives" under the IRS Notice. [*7] Hartford also represented to Kohn, Ricken and/or AIMS that the total costs of purchasing the 2001 Hartford Policy would be 60% less than the costs that plaintiffs were incurring under the 1998 policies; that although Hartford required plaintiffs to cancel the 1998 Hartford Policy, it would not impose surrender charges for the cancellation and would exchange the 1998 Hartford Policy for the 2001 Policy; that plaintiffs could make up to $ 4 million in annual "unscheduled premium payments" and then withdraw $ 4 million without payment of any costs under the 2001 Policy. In addition, Hartford knew or should have known that Kohn, Ricken, and/or AIMS would communicate its representations to Plaintiffs. Alternatively, Hartford directed Kohn, Ricken and/or AIMS to communicate these representations to Plaintiffs.

Each of these allegations attributing misrepresentations to Hartford are "made on information and belief," and "based on written and oral communications between and among Defendants Hartford, Kohn, Ricken and AIMS, on the one hand, and Plaintiff Stephenson and the other plaintiffs, on the other hand, which took place from February through June 2001."

In addition to conveying Hartford's [*8] misrepresentations, set forth above, Kohn, Ricken and/or AIMS, again, "in face-to-face meetings and in numerous other written and oral communications between February and June 2001," made further misrepresentations to plaintiffs, namely, that the IRS Notice *required* plaintiffs to purchase a new life insurance policy - one issued *after* the date on which the IRS Notice was issued, January 27, 2001 - with $ 42 million in coverage in order for plaintiffs to achieve their investment and life insurance

objectives, and that plaintiffs could not use their existing 1998 policies under the IRS Notice. Kohn also represented to plaintiffs that they could reduce the life insurance coverage under the American General Policy without any additional charges. On or about June 1, 2001, Ricken and Kohn provided plaintiffs with a "Hartford Policy illustration" which demonstrated that plaintiffs' costs and expenses under the 2001 Policy would be substantially lower than their costs and expenses under the 1998 Policies.

Plaintiffs also plead the following "omissions": defendants failed to inform plaintiffs that the IRS Notice did not require that plaintiffs replace their 1998 Policies with a new [*9] policy to take advantage of the Notice's favorable tax treatment; defendants failed to inform plaintiffs that the costs on the 2001 Policy would exceed those charged under the 1998 Policies; defendants failed to inform plaintiffs that Hartford would impose surrender charges on the cancellation of the 1998 Hartford Policy and on withdrawals under the 2001 Policy.

All misrepresentations by all defendants were made with knowledge that they were false and/or in reckless disregard of their falsity, and with the intent that plaintiffs rely upon such representations. Further, plaintiffs relied on these representations and omissions in deciding to purchase the 2001 Policy. Had plaintiffs known that the IRS Notice did not require the purchase of a new policy and that the costs of the new policy would exceed those associated with the 1998 policies, they would not have purchased the 2001 Policy.

Contrary to defendants' representations, the IRS Notice did not require plaintiffs to purchase a new policy to take advantage of the tax treatment authorized by the Notice; the 1998 policies were sufficient. Further, the total costs of the 2001 Hartford Policy were, in fact, higher than the costs under [*10] the 1998 policies. The surrender charges are still in effect on the 1998 Hartford Policy, which has not been cancelled. Finally, Hartford has imposed commissions, costs, loads and surrender charges on the withdrawals plaintiffs have made on the 2001 Policy.

Plaintiffs have paid more than $ 8 million in premiums, commissions, costs and expenses to date for the 2001 Policy. Plaintiffs have incurred costs in excess of $ 1.3 million more than what they would have incurred under one or both of the 1998 policies.

2003 U.S. Dist. LEXIS 17036, *10; Fed. Sec. L. Rep. (CCH) P92,512

Kohn and Ricken were motivated to induce plaintiffs to purchase the 2001 Policy because they stood to receive substantial commissions for themselves, AIMS and Ogilvie. On information and belief, the commissions paid by Hartford to the other defendants for the sale and first year premiums on the 2001 Policy were in excess of $ 500,000. On information and belief, pursuant to its agency agreement with Ricken, Hartford paid Ricken substantial commissions for the sale of the 2001 Policy, at least some of which Ricken contributed to AIMS.

On information and belief, in making these representations, Kohn acted not only as plaintiffs' tax attorney, but also as an "undisclosed agent" of [*11] Hartford. On information and belief, Hartford authorized Kohn to act on its behalf in selling the 2001 Hartford Policy. Kohn also acted as an agent of Hartford by working with Ricken - who was an "exclusive agent" of Hartford - to facilitate plaintiff's purchase of the 2001 Policy. On information and belief, Kohn received substantial commissions from Hartford, and through AIMS, for his work in selling the 2001 Policy.

**E. Plaintiffs' Claims**

Plaintiffs filed their original complaint on May 31, 2002. Less than one week later, prior to defendants' filing a response, plaintiffs filed an amended complaint. Subsequent to defendants' filing of motions to dismiss, plaintiffs, with leave of court, filed its SAC. Plaintiffs' nine-count SAC added one defendant, Kohn, and contains the following allegations: a "false statement" claim for violation of *§ 10(b) of the Securities Exchange Act of 1934* ("§ 10(b)") and *SEC Rule 10b-5* against Hartford, Ogilvie, ELAR, AIMS and Ricken (Count I); an "unsuitable security" claim for violation of *§ 10(b)* and NASD Rule 2310 against Hartford, Ogilvie, ELAR, AIMS and Ricken (Count II); a "churning" claim for violation of *§ 10(b)* against Ogilvie, [*12] Ricken and AIMS (Count III); a "control person" claim for violation of *§ 20(a) of the Securities Exchange Act* against Hartford, ELAR and Ogilvie (Count IV); a common law fraud claim against all defendants (Count V); an Illinois Consumer Fraud and Deceptive Practices Act (*815 ILCS § 505/2*) claim against all defendants (Count VI); a Colorado Consumer Protection Act (*Colo. Rev. Stat. § 6-1-105*) claim against all defendants (Count VII); a legal malpractice claim against Kohn (Count VIII); and a breach of fiduciary duty claim against Kohn (Count IX).

Defendants have moved to dismiss the SAC in its

entirety through four separate motions filed by Hartford and ELAR, Ogilvie, Ricken and AIMS, and Kohn, respectively.

**DISCUSSION**

**A. Standard of Review**

Defendants' arguments require application of *Rules 12(b)(6)and 9(b)* of the Federal Rules of Civil Procedure, as well as the PSLRA pleading requirements, *15 U.S.C. § 78u-4(b)*.

The familiar standard of review under *Rule 12(b)(6)* requires the Court to assume the truth of all facts alleged in the complaint, construe all allegations [*13] liberally, and view them in the light most favorable to the plaintiff. *Hickey v. O'Bannon, 287 F.3d 656, 657-58 (7th Cir. 2002)*. Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. *Id. at 657*. In other words, if it is possible to hypothesize a set of facts that would entitle a plaintiff to relief consistent with the complaint's allegations, dismissal of the plaintiff's claims under *Rule 12(b)(6)* is not warranted. *Graehling v. Village of Lombard, 58 F.3d 295, 297 (7th Cir. 1995)*.

The standard of review under *Rule 9(b)* is more stringent. *Rule 9(b)* requires a plaintiff to plead with particularity the factual basis for averments of fraud, including: "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997)* (citation omitted). Put simply, *Rule 9(b)* particularity "means the who, [*14] what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)*.

In addition, plaintiffs' allegations brought under the federal securities laws are subject to the strictures of the PSLRA. The PSLRA requires the complaint to "specify each statement alleged to have been misleading," and the "reason or reasons why the statement is misleading." *15 U.S.C. § 78u-4(b)(1)*. Further, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. *§ 78u-4(b)(2)*.

With these standards in mind, we address the merits of defendants' motions.

## B. Sufficiency of the Fraud Allegations

Defendants argue that each of plaintiffs' claims - securities fraud, common law fraud, statutory consumer fraud, legal malpractice, and breach of fiduciary duty - fail to meet the heightened pleading requirements of *Rule 9(b)*. In addition, defendants contend that the securities fraud claims pled in Counts I through IV fail to comply with the added requirements of the PSLRA.

### 1. *Rule 9(b)*

As a threshold matter, [*15] we find that all of plaintiffs' claims, each premised on fraud, are subject to *Rule 9(b)*'s pleading requirements. See *Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990)* ("*Rule 9(b)* governs claims based on fraud and made pursuant to the federal securities laws.") (Counts I through IV); *Underwriters Laboratories Inc. v. Solarcom LLC, 2002 U.S. Dist. LEXIS 18278, No. 02 C 3933, 2002 WL 31103476, at *3 n.5 (N.D. Ill. Sept. 18, 2002)* ("Claims brought under the ICFA must meet the same heightened pleading requirements of *Rule 9(b)* as common law fraud claims.") (citation omitted) (Counts V and VI); *Duran v. Clover Club Foods Co., 616 F. Supp. 790, 793 (D. Colo. 1985)* ("Allegations of deceptive trade practices under the [Colorado Consumer Protection] Act are subject to *Rule 9(b)*'s requirement of particularity.") (alterations added) (Count VII); *Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 311 (Bankr. S.D.N.Y. 1999)* ("Claims traditionally not perceived to be grounded in fraud" nonetheless must be pleaded with particularity when the "complaint incorporates by reference prior allegations of fraud.") (Counts VIII and IX). In addition, [*16] Counts I through IV, all federal securities law claims, must comply with the PSLRA. See *Sutton v. Bernard, 2001 U.S. Dist. LEXIS 11610, No. 00 C 6676, 2001 WL 897593, at *3 (N.D. Ill. Aug. 9, 2001)*.

Each of plaintiffs' claims, though framed under distinct legal theories and brought against different defendants, all emanate from the same factual allegations - that defendants fraudulently induced them to purchase the 2001 Policy by knowingly making false representations regarding both the need for the policy for tax purposes and the costs of the policy. Plaintiffs plead two separate tiers of alleged misrepresentations. First, plaintiffs aver that "Kohn, Ricken and/or AIMS" made

multiple misrepresentations to plaintiffs regarding the 2001 Policy. Second, plaintiffs allege, on information and belief, that many of the misrepresentations made by Kohn, Ricken and/or AIMS originally were conveyed to Kohn, Ricken and/or AIMS by Hartford, and that Hartford had the expectation that those misrepresentations would, in turn, be relayed to plaintiffs.

We first address the alleged misrepresentations conveyed directly to plaintiffs by Kohn, Ricken and/or AIMS. Plaintiffs have sufficiently pled the crux [*17] of the misrepresentations to give plaintiffs ample notice as to their alleged content. (SAC PP26, 27, 29, 30, 31.) [2] Yet, the misrepresentations are not moored, even loosely, in any particulars - the "who, when, where and how" - which would allow each defendant to prepare a meaningful response. *DiLeo, 901 F.2d at 627*. The only allegation relating to the specifics of the alleged fraud is that "Kohn, Ricken and/or AIMS" made the representations to plaintiffs in "face-to-face meetings and in numerous other written and oral communications between February and June 2001." (SAC P29.) In effect, then, plaintiffs have alleged that at some time (over a six month span), someone (among three or more persons, including AIMS agents), conveyed somehow (either in person, written or otherwise orally), somewhere, to another someone (among four or more plaintiffs, including agents of Stephenson's related entities) one or more of the multiple alleged misrepresentations. Most fundamentally, plaintiffs fail to link a particular misrepresentation *either* to a particular defendant or to a particular plaintiff. See *Goren v. New Vision Int'l, Inc., 156 F.3d 721, 730 (7th Cir. 1998)* [*18] ("*Rule 9(b)* is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *A.I. Credit Corp. v. Hartford Computer Group, Inc., 847 F. Supp. 588, 598 (N.D. Ill. 1994)* (One of the "particulars" which must be pleaded is the identity of the individual to whom the alleged misrepresentation was made.)

2 The "omissions" alleged in paragraph 33 of the SAC - that the IRS Notice did *not* require the purchase of a new policy, that the 2001 Policy *would* carry more costs than the 1998 policies, and that Hartford *would* impose charges for the cancellation of the 1998 Hartford Policy and for withdrawals under the 2001 Policy - add nothing to plaintiffs' allegations. Each one is merely the flip-side of one of the alleged misrepresentations.

2003 U.S. Dist. LEXIS 17036, *18; Fed. Sec. L. Rep. (CCH) P92,512

Although there is no mystery as to the nature of the allegations, plaintiffs' failure to specifically plead the date, place, method, speaker or recipient of the alleged misrepresentations leave defendants with far [*19] too much guess-work. See *General Electric Capital Corp., 128 F.3d at 1078.* Had plaintiffs faltered on only one or two of these particulars, we might reasonably expect defendants to be in a position to complete the picture. However, plaintiffs' pleading delicts cannot be characterized as anything other than a wholesale failure to plead with particularity.

The lone exception to the SAC's vague generalities is plaintiffs' allegation that, on or about June 1, 2001, Ricken and Kohn provided plaintiffs with a "Hartford Policy illustration," which purportedly demonstrated that plaintiffs' costs under the 2001 Policy would be substantially lower than their costs under the 1998 policies. (SAC P38.) Even though the SAC does not specify to whom or where the illustration was presented, or that plaintiffs relied on it, the allegation survives *Rule 9(b)* scrutiny. [3] It cannot, however, standing alone, cure the inadequacy of plaintiffs' remaining averments.

> 3 Although we do not make any comment at this juncture on the merits of plaintiffs' claims, we note that the "policy illustration," the only proffered misrepresentation to pass muster under *Rule 9(b)*, was presented *after* the issuance of the 2001 Policy.

[*20] We turn now to the allegations attributed, on information and belief, to Hartford. As noted above, plaintiffs do not allege that Hartford made any misrepresentations directly to plaintiffs. Rather, it is alleged that Hartford made its misrepresentations to Kohn, Ricken and/or AIMS with the knowledge that such misrepresentations would be passed on to plaintiffs. That Hartford's alleged misrepresentations were, in a sense, "indirect" does not pose a problem for plaintiffs. A defendant who makes no direct misrepresentation may still expose himself to primary liability under *§ 10(b)* if: (i) he makes a misrepresentation and knows, or reasonably should know, that it will be communicated to the plaintiff, and (ii) the party communicating the misrepresentation attributes the misrepresentation to the defendant. See *Gabriel Capital, LP v. Natwest Finance, Inc., 94 F. Supp. 2d 491, 508-09 (S.D.N.Y. 2000)*. The second prong - here, that the misrepresentations were attributed to Hartford - is borne of *§ 10(b)*'s reliance

requirement. See *id.* ("[A] secondary actor cannot incur primary liability . . . for a statement not attributed to that actor at the time of its dissemination. [*21] . . . Reliance only on representations made by others cannot itself form the basis of liability.") (quoting *Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998))*. Simply, had plaintiffs failed to allege that Kohn, Ricken and/or AIMS expressly attributed the misrepresentations to Hartford, plaintiffs could only claim to have relied on statements by Kohn, Ricken, and/or AIMS, *not* Hartford. Such is not the case, however, and plaintiffs have sufficiently pled both prongs of their "indirect" liability theory as to Hartford.

Further, we are unpersuaded by defendants' position that plaintiffs have failed to plead with sufficient particularity the misrepresentations allegedly made by Hartford. Rather, it appears that information which might allow a more particularized pleading is exclusively within defendants' possession. Plaintiffs cannot be expected to know the "who, what, when, where and how" of Hartford's agents' communications with Kohn, Ricken and/or AIMS. Thus, plaintiffs' allegations seem to fall within the exception to *Rule 9(b)* that allows further particulars of the alleged fraud to be obtained by discovery. See *Emery v. American General Finance, 134 F.2d 1321, 1323 (7th Cir. 1998)*; [*22] *Petri v. Gatlin, 997 F. Supp. 956, 974 (N.D.Ill. 1997)*. However, this only gets plaintiffs halfway home. Plaintiffs still must plead the particulars of how the misrepresentations allegedly originating with Hartford were conveyed *to them* by Kohn, Ricken and/or AIMS. Plaintiffs have not done so, and to that extent have failed to comply with *Rule 9(b)* with regard to Hartford.

Because plaintiffs have not pled sufficient particulars to apprise each defendant of the fraud allegations to which each must respond, plaintiffs' claims must be dismissed pursuant to *Rule 9(b)*.

## 2. The PSLRA

In addition, Counts I through IV are subject to the pleading standards of the PSLRA. See *15 U.S.C. § 78u - 4(b)*. Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. *§ 78u-4(b)(2)*. Defendants submit that plaintiffs' allegations fall short here as well.

Scienter, in the context of a securities fraud claim,

2003 U.S. Dist. LEXIS 17036, *22; Fed. Sec. L. Rep. (CCH) P92,512

refers to a mental state embracing the intent to deceive, manipulate or defraud. See *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976).* [*23] The Seventh Circuit has consistently held that "reckless disregard for the truth counts as intent" for the purpose of the *§ 10(b)* scienter requirement. *SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir. 1998).*

Although the Seventh Circuit has made clear that, when pleading a securities fraud claim, the particularity requirements of *Rule 9(b)* have been "stiffened" by the PSLRA (see *Law v. Medco Research, Inc., 113 F.3d 781, 785 (7th Cir. 1997)),* it has not yet addressed just how "stiff" the standard is for the scienter requirement. Absent such guidance, other judges of this district generally have generally applied the Second Circuit's test, which requires plaintiffs to allege facts either (i) showing that the defendant had both the motive and opportunity to commit fraud; *or* (ii) constituting strong circumstantial evidence of conscious misbehavior or recklessness. See, e.g., *Fishman v. Meinen, 2003 U.S. Dist. LEXIS 2527, No. 02 C 3433, 2003 WL 444223, at *5 (N.D. Ill. Feb. 24, 2003); In re Hartmarx Securities Litigation, 2002 U.S. Dist. LEXIS 6983, No. 01 C 7832, 2002 WL 653892, at *2 (N.D. Ill. April 19, 2002); Sutton, 2001 U.S. Dist. LEXIS 11610, 2001 WL 897593, at *6.*

Plaintiffs [*24] in this case have framed their allegations to make a "motive and opportunity" showing. Specifically, plaintiffs allege that Hartford was motivated to induce plaintiffs to purchase the 2001 Policy because of the substantial premiums it would receive, and that Kohn and Ricken were similarly motivated because they stood to receive substantial commissions for themselves, AIMS and Ogilvie. Plaintiffs further allege, on information and belief, that Hartford paid commissions in excess of $ 500,000 to the other defendants for the sale and first year premiums on the 2001 Policy. From these allegations, plaintiffs conclude that they have more than satisfied the PSLRA's "scienter" pleading requirements by alleging not only that defendants had a motive and opportunity to induce plaintiffs to purchase the 2001 Policy, but that defendants actually *did* profit from the alleged fraud. See *Sutton, 2001 U.S. Dist. LEXIS 11610, 2001 WL 897593, at *6.*

But the analysis is not as simple as plaintiffs suggest. Motive and opportunity, though usually accompanying "scienter," do not carry talismanic significance. The complaint may plead facts showing motive and opportunity, but there still must be *specific* facts [*25] supporting a *strong* inference that the defendant acted with at least a "reckless" state of mind. See *15 U.S.C. § 78u-4(b)(2); Chu v. Sabratek, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).*

Here, each of plaintiffs' scienter-based claims consist of boilerplate assertions -- that defendants "knew that their material misrepresentations were false" -- which merely parrot the language of *SEC Rule 10b-5*. In the securities fraud context, "assertions that [a defendant] had knowledge that [a representation] was false and misleading . . . are nothing more than rote conclusions." *Robin v. Arthur Young & Co., 915 F.2d 1120, 1127 (7th Cir. 1990)* (alterations added).

Moreover, commonplace allegations of financial motive cannot alone satisfy plaintiff's burden of pleading scienter. See *In re Brightpoint, Inc. Sec. Lit., 2001 U.S. Dist. LEXIS 5023, No. IP 99-0870, 2001 WL 395752, at *13-14 (S.D. Ind. Mar. 29, 2001)* ("Under the standard of any circuit that finds evidence of 'motive and opportunity' at least relevant to defendants' scienter, a plaintiff cannot allege scienter based merely upon . . . a desire to increase incentive compensation, [*26] or similar factors that would be true for nearly all corporate executives."). Accordingly, because plaintiffs have not pled specific facts to support a strong inference of "scienter," their securities fraud claims must also be dismissed under the PSLRA.

In addition to their arguments regarding the SAC's shortcomings under *Rule 9(b)* and the PSLRA, defendants raise several other substantive arguments in support of their motions to dismiss. However, because each of these arguments rests, in whole or in part, on the nature and specifics of the misrepresentations alleged in the SAC, we will not address those arguments unless and until the challenged allegations reappear in an amended complaint.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the SAC in its entirety pursuant to *Rule 9(b)* and the PSLRA are granted. Plaintiffs may have until October 16, 2003 to file an amended complaint consistent with this order and with counsel's obligations under *Federal Rule of Civil Procedure 11*.

DATE: September 25, 2003

2003 U.S. Dist. LEXIS 17036, *26; Fed. Sec. L. Rep. (CCH) P92,512

John F. Grady, United States District Judge

# EXHIBIT M

LEXSEE 1997 US DIST LEXIS 8331

**LAMAR CHAPMAN, III, and similarly situated, Plaintiff, v. ONTRA, INCORPORATED, a Texas corporation, and ROBERT STARNES, individually, Defendants.**

**No. 96 C 0019**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1997 U.S. Dist. LEXIS 8331*

**June 3, 1997, Decided**
**June 6, 1997, DOCKETED**

**DISPOSITION:**     [*1] Defendants' motion to dismiss granted.

**COUNSEL:** LAMAR CHAPMAN, III, on behalf of himself and all others similarly situated, plaintiff, Pro se, Matteson, IL.

For ONTRA, INCORPORATED, a Texas corporation, ROBERT STERNEN, individually, defendants: Monica L. Thompson, Marianne C Holzhall, Deborah Lynn Kuhn, Keck, Mahin & Cate, Chicago, IL. Mitchell Aaron Lieberman, Steven R. Rappin, Martin F. Hauselman, Rhoda Markovitz, Hauselman & Rappin, Ltd., Chicago, IL.

**JUDGES:** John F. Grady, United States District Judge

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

Before the court is defendants' motion to dismiss the plaintiff's first amended verified complaint, pursuant to *Rules 8, 9(b)*, and *12(b)(6) of the Federal Rules of Civil Procedure*. For the reasons stated in this opinion, the motion is granted.

*BACKGROUND*

Lamar Chapman III, a prolific *pro se* litigator in this district [1], now sues defendants Ontra, Incorporated ("Ontra") and Robert Starnes ("Starnes") for alleged violations of the Fair Debt Collection Practices Act, *15 U.S.C. §§ 1692-1692o* ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961-1968* ("RICO"), and on state law claims of [*2] negligence, negligent infliction of emotional distress, and violation of fifty unfair business practices statutes, including the Illinois Consumer Fraud Act, *815 ILCS 505/1 et seq.* ("the Act"). Chapman also seeks to bring this action on behalf of a class of similarly situated individuals who received debt collection notices from the defendants within one year prior to the filing of this lawsuit. [2]

1    *See Chapman v. Village of Homewood, 1997 U.S. Dist. LEXIS 3482, 1997 WL 139477*, at *5 n.1 (N.D. Ill. March 21, 1997) (collecting reported and unreported decisions in federal cases brought by Chapman).

2    While Chapman is not before the court on a motion for class certification, we note that courts usually will not certify a class represented by a *pro se* litigant. *See Rhoden v. Detella, 1996 WL 556975*, at *2, (N.D. Ill. Sept. 27, 1996) (Grady, J.) (collecting cases). Chapman can sue on his own behalf, but not both as a member of the class and class representative, because of the potential conflicts of interest between himself and the class. *See Wagner v. Taylor, 266 U.S. App. D.C. 414, 836 F.2d 578, 586-96 (D.C. Cir. 1987).*

[*3] Chapman resides in Matteson, Illinois, and this action arises out of a series of debt collection letters sent to him by Ontra concerning his alleged default on his home mortgage. [3] Chapman claims that Ontra, under the direction of Starnes, sent him a collection letter dated June 21, 1995, "demanding payment on an alleged account that was past due. . . ." First Amended Verified Complaint, P 8; Exhibit A. [4] On July 19, 1995, Chapman responded to Ontra with a letter disputing the debt, accusing Ontra of violating the FDCPA with its letter, threatening Ontra with suit, and requesting "an amiable offer in final settlement of this cause" within 21 days of his letter. Amended Complaint, Exhibit B. In a one-paragraph letter dated July 31, 1995, Ontra Cash Recovery Manager Jerry D. Voyles acknowledged Chapman's letter and requested that the Chapmans contact him by telephone. Exhibit C.

> 3  In his complaint, Chapman states that he owns his home "in co-ownership" with his spouse, Vanessa M. Chapman, but he does not make clear whether his wife was also a mortgagor. While her name appears on many of the letters and notices from Ontra attached to the complaint, Vanessa Chapman is not a named plaintiff.

[*4]

> 4  We note that although Chapman's amended complaint alleges that Ontra sent the letter on July 27, 1995, the letter itself, Exhibit A, is dated June 21, 1995. We also note that Chapman's reply letter, Exhibit B, is dated July 19, 1995.

On July 22, 1995, Ontra's Workout Department sent a letter to Chapman offering a "settlement proposal" in which he could buy back his mortgage. Exhibit D. On November 1, 1996, Ontra's Loan Servicing Department sent Chapman a "Notice of Assignment, Sale or Transfer of Servicing Rights," indicating that it transferred its right to collect payments on Chapman's mortgage to Wilshire Credit Corporation ("Wilshire"). Exhibit E. The final attachment to the amended complaint is a copy of a letter dated November 20, 1996, from Wilshire, indicating that it will service Chapman's mortgage loan, which it says that Citibank has sold to Girard Savings Bank, F.S.B. Exhibit F.

The complaint alleges that the foregoing letters constitute several violations of the FDCPA, RICO, the Illinois Consumer Fraud Act and various state unfair and deceptive business practices statutes, as [*5] well as state common law torts of negligence and negligent infliction of emotional distress. Defendants Ontra and Starnes move to dismiss all claims for failure to state a claim for which relief can be granted, and, as to some claims, for failure to allege fraud with particularity.

## DISCUSSION

In deciding a motion to dismiss, the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co., 87 F.3d 209, 211* (7th Cir.), *cert. denied, 136 L. Ed. 2d 400, 117 S. Ct. 510 (1996)*; *Wilson v. Formigoni, 42 F.3d 1060, 1062 (7th Cir. 1994)*. Dismissal is properly granted "'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Cushing v. City of Chicago, 3 F.3d 1156, 1159 (7th Cir. 1993)* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984))*. Where a plaintiff is proceeding pro se, courts have an obligation to construe the pleadings liberally, however inartfully drawn. *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed.* [*6] *2d 652, 92 S. Ct. 594 (1972)*. However, as we indicate later in this opinion, we doubt that this rule has much application to this case.

### Counts I-VIII: Fair Debt Collection Practices Act (FDCPA)

In Counts I through VIII of his first amended verified complaint, Chapman alleges that Ontra and Starnes have committed several violations of the FDCPA in their letters to him. Counts I-IV allege violations that arise out of the first letter from the defendants that is attached to the complaint, Exhibit A. Counts V-VII allege violations in subsequent letters from the defendants and others. The Seventh Circuit instructs us to view claims under the FDCPA through the eyes of the "unsophisticated consumer," but with reasonableness to prevent finding liability for unrealistic or peculiar interpretations of collection letters. *Gammon v. GC Services Ltd. Partnership, 27 F.3d 1254, 1257 (7th Cir. 1994)*.

In the first attached letter from the defendants, dated June 21, 1995, under a headline of "Immediate Response Requested!", Ontra Cash Recovery Manager Jerry Voyles told the Chapmans that they "are in default," and "to correct this serious situation, you must pay the past due amount [*7] of $ 3,938.72, plus any additional monthly

1997 U.S. Dist. LEXIS 8331, *7

payments that fall due." Exhibit A. The letter further stated that if Ontra did not receive payment within 30 days of June 21, 1995, the Chapmans' loan would accelerate, meaning "the entire unpaid balance will be due." *Id.* After discussing additional terms and conditions, Voyles ended the letter by asking the Chapmans to call to discuss the matter. *Id.*

In Count I, Chapman alleges that the defendants violated *§ 1692g* of the FDCPA by mailing this letter without a notice providing a 30-day validation period. *Section 1692g(a)* requires that letters seeking to collect a debt contain a "validation notice," which recites the amount, the name of the creditor, and other required information. The validation notice should inform the debtor that he has 30 days to dispute the validity of the debt, either in whole or in part. *Avila v. Rubin, 84 F.3d 222, 226 (7th Cir. 1996).* The remainder of the letter containing the validation notice must not contradict or overshadow the notice, and language in letters sent during the validation period must not overshadow or contradict the notice. *See Young v. Meyer & Njus, P.A., 953 F. Supp. 238, 240* [*8] *(N.D. Ill. 1997); Robinson v. Transworld Systems, Inc., 876 F. Supp. 385, 391 (N.D.N.Y. 1995)* (collecting cases).

Based on our examination of Exhibit A, we cannot find any validation notice. However, the defendants point out that *§ 1692g(a)* only requires the validation notice to appear on an "initial communication" from the collector, or on letters sent during the validation period following an initial communication. Defendants' Memorandum, at 4. The defendants contend that Chapman has not alleged that this first letter was an initial communication from them, or was otherwise covered by *§ 1692g(a)*'s requirements. *Id.* The text of *§ 1692g(a)* is clear that a debt collector's letter must have a validation notice if it is the initial communication from the collector or if it is sent within the validation period. We agree that Chapman has not alleged that this first letter from defendants was an initial communication or was sent within the validation period. We grant defendants' motion to dismiss Count I, with leave to amend to plead facts showing: (1) this letter was an initial communication, or (2) the date of the initial communication, so that it appears this letter was sent [*9] during the validation period. If Chapman fails to amend his complaint by June 27, 1997, this count will be dismissed with prejudice for failure to state a claim.

In Count II, also based on Exhibit A, Chapman alleges that the defendants violated *§ 1692e*, which prohibits false or misleading representations in the collection of a debt. Chapman does not specify which of the 16 subsections of *§ 1692e* the defendants have violated with this letter. He alleges generally that by being in violation of *§ 1692g(a)*, this letter was a false, deceptive, and misleading means to collect a debt. But, in addition to the fact that we have dismissed his *§ 1692g(a)* claim in Count I, there is nothing about a *§ 1692g(a)* violation that, of itself, constitutes a false, misleading or deceptive representation under *§ 1692e*. We dismiss Count II, with leave to amend by June 27, 1997, if Chapman can specify wherein Exhibit A is false or misleading in violation of *§ 1692e*.

In Count III, Chapman alleges that the defendants committed a violation of *§ 1692e(5)* in Exhibit A by their reference to accelerating the unpaid debt on his mortgage, which he claims was a threat by Ontra and Starnes to take action that [*10] they did not intended to take. *Section 1692e(5)* of the FDCPA prohibits debt collectors from making a "threat to take any action that cannot legally be taken or that is not intended to be taken." Defendants contend any acceleration statement in Exhibit A was true, as Ontra was "speaking on behalf" of the noteholder on Chapman's mortgage, Bristol Oaks, L.P., which could accelerate payments and later did. Defendants' Reply Memorandum, at 2-3; *see also Bristol Oaks, L.P. v. Chapman, 1996 U.S. Dist. LEXIS 1804, 1996 WL 73654,* at *1 (Feb. 16, 1996). We note that the statement which Chapman alleges is actionable is contained nowhere in Exhibit A. The complaint alleges that the letter states: "In event that you fail to remedy your default by paying the past due sums, plus all amounts due hereafter, the entire balance of your obligation, in the sum of $ 57,000.00 plus interest and charges will be accelerated and due in full in thirty days." First Amended Verified Complaint, § 32. Nowhere does this exact statement, or any reference to $ 57,000.00, appear in Exhibit A or in any of the letters attached to Chapman's complaint. However, Exhibit A does contain a general reference to the possibility of acceleration of the [*11] loan or sale of the property if Chapman does not make his past due payment. We agree with the defendants that such a reference was not a threat to take action that could not legally have been taken or was not intended to be taken. The defendants as collectors were acting as agents for the noteholder Bristol Oaks, which did accelerate Chapman's loan and foreclose on the property. The letter did not present any threat to

Chapman or the unsophisticated consumer like that of the amorphous "legal review process" mentioned in *Drennan v. Van Ru Credit Corp., 950 F. Supp. 858, 860 (N.D. Ill. 1996)*, and we do not find our holding inconsistent with that case. Therefore, we dismiss Count III with prejudice for failure to state a claim for which relief can be granted.

In Count IV, Chapman alleges that the defendants violated § 1692d by harassing him with Exhibit A, a letter which violated § *1692g(a)*. In essence, Chapman's claim is that by violating § *1692g(a)*, the first letter was inherently harassing and abusive, and thus in violation of § 1692d. Chapman's attempt to create yet another claim out of this first letter is unavailing. Even assuming that he can successfully amend Count I [*12] to allege a violation of § *1692g(a)*, Exhibit A does not provide the basis for a claim under § 1692d. Section 1692d prohibits harassing or abusive conduct by debt collectors, such as threats of violence, the use of abusive language, or annoying phone calls. *See Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507 (9th Cir. 1994)* (holding threatening and intimidating phone calls actionable as harassing conduct under § 1692d); *Herbert v. Wexler & Wexler, 1995 U.S. Dist. LEXIS 12888, 1995 WL 535107,* at *3, (N.D. Ill. Sept. 5, 1995) (plaintiff stated § 1692d claim when defendants' collection letter threatened, "You cannot even begin to know the trouble and expense that is about to come into your life over this matter . . ."). We are not aware of any FDCPA cases holding that collection letters are actionable as abusive or harassing under § 1692d merely for lacking a validation notice or being in violation of other sections of the FDCPA. This Ontra letter is not otherwise actionable under § 1692d, as the letter is not harassing or abusive in its tone or language. *See Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1178-79 (11th Cir. 1985)* (holding that language threatening legal action not harassing under [*13] § 1692d). We can think of no amendment to Chapman's complaint that would correct this defect. Therefore, we dismiss Count IV with prejudice for failure to state a claim for which relief can be granted.

Chapman claims one statutory violation for each of the remaining letters attached to his first amended complaint. Counts V through VII allege violations of § *1692g(a)*, and Count VIII alleges a violation of "*Section 1692, et seq.*" These counts are premised on the theory that the initial letter violated § *1692g(a)* for lack of a validation notice and that subsequent communications after Chapman's letter disputing the debt, Exhibit B, are

actionable because the defendants continued their collection efforts without providing Chapman with a copy of the verification of the debt or the judgment against him. *See Jang v. A.M. Miller and Associates, Inc., 1996 U.S. Dist. LEXIS 10883, 1996 WL 435096,* at *3 (N.D. Ill. July 31, 1996). But because Chapman has not stated a claim for the initial letter, we dismiss these dependent claims. Counts VI and Count VII are dismissed with leave to refile them if Chapman amends Count I. [5]

> 5    In Count VI, Chapman alleges that the "settlement offer" letter, Exhibit D, was in violation of § *1692g(a)*, for being harassing and lacking the required validation notice. In Count VII, Chapman alleges that Ontra's "Notice of Assignment" letter, Exhibit E, was harassing and lacked the required validation notice, in violation of § *1692g(a)*.

[*14] Count V stands on a different footing. This count alleges that Ontra's one-line letter of July 31, 1995, Exhibit C, was in violation of § *1692g(a)*, as the letter was harassing and lacked the required validation notice. [6] Regardless of whether this letter followed an actionable initial letter in Count I, we dismiss this claim because the one-line letter could not be found to contradict a validation notice. *See Terran v. Kaplan, 109 F.3d 1428, 1434 (9th Cir. 1997)* (holding that collection letter's request for contact, not payment, did not overshadow or contradict the validation notice and was not a § *1692g(a)* violation). In determining whether a subsequent communication contradicts the validation notice, courts have found no contradiction when a letter merely requests contact or communication from the debtor. *Id.; Severson v. Transworld Systems, Inc.,* 1994 WL 779763, (W.D. Wis. April 12, 1994) (granting summary judgment for defendant on § *1692g(a)* claim for letter requesting the debtor contact the creditor). This letter merely requests that the Chapmans contact Ontra's representative to discuss the matter; it does not demand payment in contradiction of the 30-day validation [*15] period, or attempt to induce Chapman to forego his right to challenge the debt. Accordingly, we dismiss Count V with prejudice.

> 6    The complete text of the Count V letter reads: "I am in receipt of your letter dated July 19, 1995. Please contact me at (512) 703-2131. Thank you." Exhibit C.

In Count VIII, Chapman alleges that the defendants caused the Wilshire letter, Exhibit F, to be sent to him, and that the letter was harassing and lacked the required validation notice; this time, however, Chapman pleads that the letter violates " *15 U.S.C. § 1692 et seq.*" He states that this letter "has the natural effect and consequence of harassing Plaintiff in connection with *Section 1692, et seq.* of the federal Fair Debt Collection Practices Act." Even under the liberal reading that we give to a *pro se* plaintiff's pleadings, this count does not state a claim. It gives no indication what section of the FDCPA this letter violates, and thus we cannot determine whether relief is possible under any set of facts [*16] that Chapman could establish. Given Chapman's considerable experience in drafting complaints and his ability to specify his FDCPA claims in the other counts, he should be able to replead this claim in a manner that will enable us to understand it. However, we caution Chapman that this letter appears on its face to have been sent by Wilshire, and not the defendants; we advise him to investigate before he refiles a claim against the defendants based on this letter. Count VIII is dismissed without prejudice.

### Count IX: Illinois Consumer Fraud Act and Other State Unfair and Deceptive Business Practices Acts

In Count IX, Chapman alleges that he and his putative class members were damaged by the defendants' violations of the unfair and deceptive business practices statutes of the 50 states and the District of Columbia. Defendants have moved to dismiss this count under *Rule 12(b)(6)* and *Rule 9(b) of the Federal Rules of Civil Procedure*.

We must address some procedural issues created by Chapman's multiple deceptive business practices allegations. First, because this case has not been certified as a class action, Chapman's allegations are overinclusive, and we will consider [*17] his claim only under the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Act"), *815 ILCS 505/1 et seq.* [7] *See Fitzgerald v. Chrysler Corp.*, 1996 WL 473456, at *7 (N.D. Ill. Aug. 16, 1996); *Jefferson v. Security Pacific Fin. Services, Inc.*, 1995 U.S. Dist. LEXIS 14226, 1995 WL 579305, at *1 (N.D. Ill. Oct. 2, 1995). Second, violations of the FDCPA are not *per se* violations of the Illinois Act, and thus Chapman must independently state a claim under the Act. *See Perperas v. United Recovery Systems, Inc., 1997 U.S. Dist. LEXIS*

*3371, 1997 WL 136326*, at *4 (N.D. Ill. March 19, 1997). [8]

[7] Illinois choice of law rules would require that we apply Illinois law to Chapman's own claim. A federal district court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)*. Illinois courts apply the law of the state where the fraud occurred, unless Illinois has a more significant relationship with the occurrence and the parties. *Fitzgerald*, 1996 WL 473456, at *7. Either way, Illinois law should apply to Chapman's claims. Illinois has the most significant relationship with Chapman, and all allegedly fraudulent correspondence was sent to Chapman in Illinois.

[*18]

[8] We note that courts in this district are split over whether *Rule 9(b)*'s requirement that fraud must be pled with particularity applies to Illinois Consumer Fraud Act claims. *See Perperas, 1997 U.S. Dist. LEXIS 3371, 1997 WL 136326*, at *2 (*Rule 9(b)* applicable); *Gallagher Corp. v. Massachusetts Mutual Life Ins. Co., 940 F. Supp. 176, 180 (N.D. Ill. 1996)*; *compare Recreation Services v. Odyssey Fun World, Inc., 952 F. Supp. 594, 597 (N.D. Ill. 1997)* (*Rule 9(b)* not applicable when plaintiff alleging deceptive conduct); *Cobb v. Monarch Finance Corp., 913 F. Supp. 1164, 1180 (N.D. Ill. 1995)*. Because we dismiss this claim under 12(b)(6), we need not reach this issue today, but we note that we have previously reviewed claims under the Act against the particularity requirements of *Rule 9(b)*. *See Budget Rent A Car Corp. v. Genesys Software Sys., Inc., 1996 U.S. Dist. LEXIS 12123, 1996 WL 480388*, at *3, (N.D. Ill. Aug. 22, 1996) (Grady, J.).

To state a claim under the Act, a plaintiff must allege (1) a deceptive act or practice, (2) intent on the part of the defendants that the plaintiff rely on the deception, (3) that the deception occurred [*19] in the course of conduct involving trade or commerce, and (4) damages. *Siegel v. Levy Organization Dev. Co., Inc., 153 Ill. 2d 534, 607 N.E.2d 194, 198, 180 Ill. Dec. 300 (Ill. 1992)*. Chapman's boilerplate allegations merely state that the defendants "on information and belief violated all of the following

statutes prohibiting unfair and/or deceptive business practices," followed by a list of citations. *See* First Amended Verified Complaint, P 47. Chapman identifies the five letters sent to him as deceptive acts by the defendants, but he has not alleged in what way any of them was deceptive. Neither has he pled any intent on the part of the defendants that he rely on any misrepresentations, nor that he was damaged by any misrepresentations. Chapman does not state a claim under the Act, and, for these reasons, Count IX is dismissed. We will allow leave to amend, but advise Chapman to consider carefully whether he can in good faith allege facts showing deception and resulting damage. Mere conclusory allegations will not suffice.

### Counts X-XI: Civil RICO

In Counts X and XI, Chapman alleges that the defendants committed civil RICO violations of *18 U.S.C. § 1962(c)* [*20] (Count X), and of *§ 1962(a)* and *§ 1962(d)* (Count XI) in their debt collection activities. Defendants have moved to dismiss these claims under *Rules 8, 9(b)* and *12(b)(6)* of the Federal Rules of Civil Procedure.

In Count X, Chapman alleges that the defendants conducted the affairs of an enterprise -- which was an association-in-fact of defendants Ontra and Starnes -- through a pattern of racketeering activity. Chapman alleges that the defendants "aided and abetted the violations of the RICO statute alleged herein as well as the primary acts of mail fraud and wire fraud." First Amended Verified Complaint, P 52. The defendants have moved to dismiss Count X on two primary grounds: (1) it does not allege the predicate acts of mail and wire fraud; and (2) it does not allege the "enterprise" element of *§ 1962(c)*. Defendants' Memorandum at 10-12.

To state a claim under *§ 1962(c)*, a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992)*. A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year [*21] period. *18 U.S.C. § 1961(5)*. The definition of predicate acts of "racketeering" provided in *§ 1961(a)* includes various state and federal offenses, among which are wire and mail fraud. *Richards v. Combined Ins. Co. of America, 55 F.3d 247, 249-50 (7th Cir. 1995)*. Chapman alleges that the defendants' "repeated and continuous acts of wire fraud and mail

fraud" formed a pattern of racketeering activity. [9] To adequately plead predicate acts of wire and mail fraud in a RICO complaint, the plaintiff must allege that the defendant intended to implement and participated in a scheme to defraud the plaintiff of his property, and used the mails or wires in furtherance of the scheme. *Richards, 55 F.3d at 250*. A pattern of racketeering activity is established by proving a relationship between the predicate acts coupled with the threat of continued criminal activity. *McDonald v. Schencker, 18 F.3d 491, 497-98 (7th Cir. 1994)*. These factors are referred to as relationship and continuity. There are two kinds of continuity. Closed-ended continuity exists when there are repeated predicate acts involving multiple victims or schemes extending over a substantial period of time. *Id.* ( [*22] *citing Morgan v. Bank of Waukegan, 804 F.2d 970 (7th Cir. 1986))*. Open-ended continuity occurs when the predicate acts, by their nature, pose "a threat of repetition extending indefinitely" or are part "of an ongoing entity's regular way of doing business." *Id.* (*citing H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989))*.

> 9  Chapman erroneously alleges that "aiding and abetting" mail and wire fraud is another predicate act of the defendants. *See 18 U.S.C. § 2*. Aiding and abetting the commission of another federal crime is not a RICO predicate act within the scope of *18 U.S.C. § 1961. See Jennings v. Emry, 910 F.2d 1434, 1438 n.7 (7th Cir. 1990)*.

Nowhere in his first amended complaint does Chapman allege any facts tending to show that the defendants engaged in wire fraud, so we must consider whether he has properly alleged mail fraud. The complaint does make frequent reference to the five attached letters. The scheme alleged appears to be one [*23] to defraud him and putative class members of "money expended to pay undue debt collections." First Amended Verified Complaint, P 55. Read liberally, this allegation may mean that the defendants engaged in predicate acts of mail fraud by sending Chapman these five letters that requested payment of a non-existent debt. *See Emery v. American General Finance, Inc., 71 F.3d 1343, 1347-48 (7th Cir. 1995)* (holding bare allegations of defendants' concealment of material facts in debt refinancing letters were sufficient to state claim of mail fraud for *§ 1962(c)* civil RICO claim). However, this interpretation would be purely speculative, and we would prefer to have Chapman himself plead specifically what

was false about the letter.

In addition to this failure to state what was false or fraudulent about the letter, Chapman's allegations do not describe a pattern of racketeering activity, because he does not meet the tests for relationship and continuity. Closed-ended continuity is not shown by a short series of predicate acts over a period of a few months against a single victim. *See McDonald, 18 F.3d at 497*. Open-ended continuity applies when the predicate acts, by their nature, pose [*24] "a threat of repetition extending indefinitely." *Id.* Chapman has not alleged any predicate acts that pose a threat of indefinite repetition. We cannot see how the allegedly offending letters would extend beyond the collection of any balance owed by Chapman or foreclosure of the mortgage. Indeed, as the Seventh Circuit has indicated, where there is one victim, one scheme, and one injury, there is no pattern. *See Brandt v. Schal Associates, Inc., 854 F.2d 948, 953 (7th Cir. 1988)*. In *Brandt*, the plaintiff construction company accused the client of filing several fraudulent "backcharge" letters to avoid payment for the building project. *Id. at 952*. The Seventh Circuit affirmed the dismissal of the plaintiff's RICO claims because the alleged multiple acts of fraud were in furtherance of a single scheme against a single victim. *Id.* In this case, Chapman alleges at most several mailings to him alone in furtherance of a single scheme to defraud him of his money. This is not a pattern of racketeering activity. For this reason, we dismiss Count X, with leave to amend by June 27, 1997. Because we dismiss this claim for failure to allege a pattern of racketeering [*25] activity, we need not address whether Chapman has sufficiently alleged the enterprise element of *§ 1962(c)*.

In Count XI, Chapman alleges that the defendants invested proceeds of their racketeering activity into their association-in-fact enterprise in violation of *§ 1962(a)* of RICO. Chapman also alleges that the defendants violated *§ 1962(d)* by conspiring to violate *§ 1962(a)*. First Amended Verified Complaint, PP 58-66. Defendants have moved to dismiss this count because Chapman has not alleged the injury element of *§ 1692(a)*, and because he does not state a claim of *§ 1692(d)* conspiracy absent a viable RICO claim. [10]

> [10] We note that *Rule 10(b) of the Federal Rules of Civil Procedure* requires that separate claims be pled in separate counts. *See Fed. R. Civ. P. 10(b)*. However, this error is not a ground for

dismissal of a *pro se* complaint.

To state a claim under *§ 1962(a)*, the plaintiff must allege that the defendants received income from a pattern of racketeering activity and used or invested [*26] that income in the operation of an enterprise. *Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 778 (7th Cir. 1994)*. Most courts of appeals and a majority of decisions in this district hold that the plaintiff must allege that the use or investment of the racketeering income has proximately caused his injury; alleging injury by the predicate acts is insufficient. *Id.* (discussing, but not adopting, this standard; collecting cases); *Francis v. Bankcard America, Inc., 1994 U.S. Dist. LEXIS 19226, 1995 WL 23030*, at *4 (N.D. Ill. Jan. 14, 1995) (denying motion to reconsider dismissal of *§ 1962(a)* claim for failure to allege injury from use or investment of racketeering income); *see also Pinski v. Adelman, 1995 U.S. Dist. LEXIS 16550, 1995 WL 669101*, at *8-9, (N.D. Ill. Nov. 7, 1995) (collecting cases). Assuming that Chapman alleges injury caused by the defendants' predicate acts of racketeering, Count XI gives no indication how the defendants' use or reinvestment of their racketeering income injured him, and for this reason we dismiss Count XI.

Count XI further alleges that the defendants conspired to commit acts which violated *§ 1962(a)*, and that the conspiracy was in violation of *§ 1962(d)*. Section *§ 1962(d)*'s [*27] target is the agreement to violate *§ 1962(a), (b)*, or *(c)* through a pattern of racketeering activity, not the predicate acts or the substantive RICO violations themselves. *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 62 F.3d 967, 979 (7th Cir. 1995)*. A plaintiff has standing to sue under *§ 1962(d)* if his complaint alleges an injury caused by an overt act in furtherance of a conspiracy to violate RICO, even if the overt act is not a predicate act. *Schiffels v. Kemper Financial Services, Inc., 978 F.2d 344, 351 (7th Cir. 1992)*. Conclusory allegations of a conspiracy are not sufficient to state a claim under *§ 1962(d)*; rather, the plaintiff must allege facts from which each defendant's agreement to violate RICO can be inferred. *Id. at 352*. Chapman's boilerplate allegations of a *§ 1692(d)* conspiracy fail to plead any facts showing an agreement between Ontra and Starnes to violate RICO through a pattern of racketeering activity. Nor does Chapman allege the commission of an overt act in furtherance of this conspiracy. Furthermore, we question whether, as a matter of law, Ontra and Starnes, its president and

controlling shareholder, can conspire under § 1962(d) [*28] to violate RICO, but the parties have not explored this issue in their memoranda, and we need not decide it at this time.

A fundamental problem with both Counts X and XI is that they fail to allege fraud with the particularity required by *Rule 9(b) of the Federal Rules of Civil Procedure. See Uni* Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992).* As noted already, Chapman's complaint contains no allegations stating the specifics of Starnes or Ontra's alleged fraudulent conduct. *See Johnson v. Aronson Furniture Co., 1997 U.S. Dist. LEXIS 3979, 1997 WL 160690,* at *2-3 (N.D. Ill. March 31, 1997) (dismissing RICO claim for failure to plead fraud with particularity).

Counts X and XI are dismissed for failure to state claims upon which relief could be granted and for failure to plead fraud with particularity, pursuant to *Rules 9(b)* and *12(b)(6)*.

### Count XII: Negligence

In Count XII, [11] Chapman alleges that defendants Ontra and Starnes breached a duty to him and potential class members to comply with the FDCPA and state statutes, and to prevent and correct adverse credit ratings. Chapman alleges that he has been injured as a direct and proximate result of defendants' negligence. [*29] Defendants move to dismiss this negligence count for failure to state a claim. Chapman only alleges that he has suffered economic loss, and the *Moorman* doctrine bars tort recovery in negligence for economic loss. *See Moorman Mfg. Co. v. National Tank Co., 91 Ill. 2d 69, 435 N.E.2d 443, 450, 61 Ill. Dec. 746 (Ill. 1982).* Where the transactions and damages involved in the case are financial in nature, the relationship is ordinarily considered commercial and the *Moorman* doctrine precludes a claim. *Ohio Casualty Ins. Co. v. Bank One, 1996 U.S. Dist. LEXIS 12933, 1996 WL 507292,* at *9 (N.D. Ill. Sept. 5, 1996) (Grady, J.) (*citing Great Lakes Higher Education Corp. v. Austin Bank, 837 F. Supp. 892, 896 (N.D. Ill. 1993)).* Because Chapman has only alleged economic loss, we dismiss Count XII with prejudice.

[11] This count is incorrectly captioned as "Count X"; for clarity, we will refer to it as Count XII.

### Count XIII: Negligent Infliction of Emotional

### Distress

In Count XIII, [12] Chapman alleges that defendants Ontra [*30] and Starnes have committed the tort of negligent infliction of emotional distress by sending their "unreasonably flawed" and "legally prohibited" debt collection letters to him and other members of his putative class. Defendants move to dismiss this claim because Illinois law requires that the plaintiff suffer a "contemporaneous physical injury or impact" as a result of the negligent infliction of emotional distress, and Chapman has not alleged he has suffered a physical injury or impact. *See Kapoulas v. Williams Ins. Agency, Inc., 11 F.3d 1380, 1382 (7th Cir. 1993); Hirn v. Teledyne Continental Motors,* 1994 WL 685071, at *2 (N.D. Ill. Dec. 7, 1994) (Grady, J.). We agree that Chapman has not alleged he suffered a physical injury or impact in conjunction with the debt collection letters he received. Accordingly, we dismiss Count XIII with prejudice.

[12] This count is incorrectly captioned as "Count XI"; for clarity, we will refer to it as Count XIII.

Finally, our review of this complaint and our familiarity [*31] with the plaintiff's prolific recent history with *pro se* complaints in this district prompt us to make a few remarks about *Haines v. Kerner* and *Rule 11.* [13] The traditional rationale for holding *pro se* litigants to less stringent pleading standards than lawyers comes from the Supreme Court's *per curiam* opinion in *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972).* We acknowledge the many difficulties that face most *pro se* plaintiffs, whose only encounter with the judicial system in their lifetime may be through a single, or at most infrequent *pro se* complaint, and we understand *Haines* to counsel leeway for these plaintiffs' untutored pleadings. However, we have growing reservations about extending this same solicitude to the pleadings of repeated litigants such as Chapman. *See Antonelli v. Burnham, 582 F. Supp. 1067, 1069 n.4 (N.D. Ill. 1984)* (questioning whether repeated *pro se* plaintiff who referred to himself as "sophisticated" litigant should be "entitled to the benefits of *Haines v. Kerner*"). Moreover, it is one thing to construe an ambiguous or inartfully drawn pleading in a way that will sustain it when it [*32] appears that plaintiff may possibly have a claim. It is something else to sustain a pleading when there is simply no way of construing it to state a possible claim. We think that *Haines* will usually have no

application to the latter situation.

13   On May 21, 1997, our review of the clerk's office docket revealed that Chapman has filed 8 *pro se* complaints in this district since December 26, 1996, of which 6 cases are still pending. All of these cases except for this case involve § 1983 claims.

One approach to the problem of the prolific, frivolous *pro se* litigant is to utilize sanctions under *Rule 11 of the Federal Rules of Civil Procedure* or to impose a regulatory injunction against further filings by the litigant, pursuant to the court's inherent power to prevent abuse of the judicial process. *See Sassower v. American Bar Association, 33 F.3d 733, 735 (7th Cir. 1994)* (use of injunction); *Perry v. Pogemiller, 16 F.3d 138, 140 (7th Cir. 1994)* (warning of injunction); *Sato v. Plunkett,* [*33] *154 F.R.D. 189, 191 (N.D. Ill. 1994)* (*Rule 11* sanctions); *Zahran v. Frankenmuth Mut. Ins. Co., 1997 U.S. Dist. LEXIS 1182, 1997 WL 53107,* at *3 (N.D. Ill. Feb. 6, 1997) (Grady, J.) (*Rule 11* sanctions). *Rule 11(b)* cautions both attorneys and unrepresented parties against making frivolous, harassing and improper representations to the court, and *Rule 11(c)* allows the court to impose sanctions for violations, either on motion by another party or on the court's own initiative. *Fed. R. Civ. P. 11.* We encourage Chapman to read *Rule 11* before filing a

second amended complaint. Should he file a second amended complaint that includes counts which disregard the holdings of this opinion, or which otherwise fail to allege claims that could entitle him to relief, he may be called upon to explain why he should not be subject to sanctions, an injunction or both.

### CONCLUSION

For the foregoing reasons, the motion to dismiss of defendants Ontra and Starnes is granted.

We dismiss Counts I, II, VI, VII, VIII, IX, X and XI with leave granted to Chapman to amend as indicated in the opinion. If Chapman fails to amend his complaint by June 27, 1997, these counts will be dismissed with prejudice for failure to state [*34] a claim upon which relief can be granted.

We dismiss with prejudice Counts III, IV, V, XII and XIII for failure to state a claim upon which relief can be granted.

DATED: June 3, 1997

ENTER:

John F. Grady, United States District Judge