# Exhibit 1

RECEIVED

NOV 16 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

# 07C 6509

PAMELA STELLA, individually and
on behalf of all others similarly situated,           :

                                                                        :

Plaintiff,                          :

                                                                        :    *07 CV* _____          **JUDGE BUCKLO**

-against-                                :

                                                                        :    **CLASS ACTION COMPLAINT**

LVMH PERFUMES AND COSMETICS USA
INC., a New York Corporation,                              :    **JURY TRIAL DEMANDED**

                                                                        :

Defendant.                          :          **MAGISTRATE JUDGE KEYS**


        Plaintiff, Pamela Stella ("Plaintiff"), individually and on behalf of all others similarly

situated, by and through her undersigned counsel, alleges as follows:

### NATURE OF THE ACTION

        1.        Plaintiff brings this action as a Class Action pursuant to Rules 23(a), (b)(l), (b)(2)

and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased

lipstick that was manufactured, marketed, and/or distributed by LVMH Perfumes and Cosmetics

USA Inc. ("LVMH"), from the offering of sale of the concerned lipstick products to the present

(the "Relevant Period"), containing lead (the "concerned lipstick products").

        2.        LVMH manufactured, imported, and/or distributed the concerned lipstick

products that contain dangerous and harmful levels of lead, which is poisonous, especially if

ingested.

        3.        LVMH's marketing of the concerned lipstick products affirmatively and

impliedly represented the products as being suitable for ordinary use.

        4.        LVMH has manufactured or caused to be manufactured, marketed and/or

distributed millions of the concerned lipstick products designed for consumers of all ages for the

main purpose of applying said products to the user's lips, despite the fact that the concerned lipstick products contained lead. LVMH did so despite the clear and obvious dangers posed by the inclusion of lead in their lipstick products, and the fact that the ingestion of lead by consumers can cause serious long-term injury.

5.      Despite the presence of lead in the concerned lipstick products, LVMH failed to list lead as an ingredient in said products and, to date, LVMH has not recalled the concerned lipstick products, nor has it offered to reimburse Plaintiff or other members of Plaintiff Class for the costs of the concerned lipstick products, nor provided for any other relief.

6.      The concerned lipstick products manufactured or caused to be manufactured, marketed, and/or distributed by LVMH are not fit for their ordinary use. Consumers purchasing them, including Plaintiff, did not receive the benefit of their bargain.

7.      As a result of LVMH's negligent and reckless conduct, Plaintiff and other members of Plaintiff Class have been improperly exposed to a known hazardous substance, and have been sold a product not fit for its intended purpose. Due to such exposure, these individuals are at an increased risk of being poisoned by lead. Early detection of lead poisoning, through medical testing, is made advisable by LVMH's manufacturing, marketing, and distribution of its lead-containing lipstick products.

8.      Accordingly, Plaintiff brings this action to recover the actual and compensatory damages for the monies expended by herself and the Plaintiff Class for the concerned lipstick products and for the recovery of unjustly retained profits, as well as to recover the costs of diagnostic testing necessary to detect lead poisoning for her and other members of the Plaintiff Class resulting from LVMH's actions.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this nationwide class action

2

pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the

matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, includes more than

100 Class members, and is a class action in which at least one of the Class members is a citizen

of a different state than LVMH. *See* 28 U.S.C. § 1332(d)(2)(A). This Court also has personal

jurisdiction over LVMH because they are authorized to do business and in fact do business in

this state, and LVMH has sufficient minimum contacts with this state and otherwise intentionally

avails itself of the markets in this state through the promotion, marketing, and sale of its products

in this state, to render the exercise of jurisdiction by this Court permissible.

      10.    Venue is proper in the Northern District of Illinois because a substantial part of

the events detailed in Plaintiff's Complaint occurred in this District.

**PARTIES**

      11.    Plaintiff Pamela Stella is and has been a resident and citizen of Cook County,

Illinois during the Relevant Period. Specifically, Plaintiff purchased and personally used

Christian Dior "Addict Positive Red", which is manufactured, marketed, and/or distributed by

LVMH and is one of the concerned lipstick products known to contain dangerous levels of lead.

Plaintiff purchased this product at a Nordstrom department store in the month of June 2007.

During the Relevant Period, Plaintiff applied the Christian Dior "Addict Positive Red" directly to

her lips. Plaintiff was deceived by LVMH's material omissions in failing to disclose that the

concerned lipstick products contained harmful levels of lead, because LVMH could not have

represented the concerned lipstick products were safe had it truthfully disclosed that the products

contained the complained-of lead. Plaintiff would not have purchased, nor can other members of

the Class be reasonably presumed to have purchased, the concerned lipstick products had they

known that they would be exposed to said excessive quantities of lead.

3

12.    Defendant LVMH Perfumes and Cosmetics USA Inc. ("LVMH") is a New York Corporation doing business in the state of New York and throughout the United States. LVMH, an acronym for Louis Vuitton Moët Hennessy, is an American subsidiary of a French parent corporation. LVMH's worldwide revenues exceed €6 billion, of which more than €1 billion is for perfume and cosmetics. LVMH manufactures and distributes such products as Hennessy cognac, Dom Pérignon champagne, and Christian Dior perfumes and cosmetics. Websites are maintained by LVMH that reach out, *inter alia*, internationally throughout the United States, Europe, and most of the world.

### STATEMENT OF FACTS

### A.  LVMH MARKETED THE CONCERNED LIPSTICK PRODUCTS AS BEING SAFE FOR USE DESPITE THE FACT THAT THEY CONTAIN HARMFUL LEVELS OF LEAD.

13.    LVMH's marketing of the concerned lipstick products affirmatively and impliedly assures consumers that the concerned lipstick products are safe for use.

14.    Despite its representations, both affirmatively and impliedly, that the concerned lipstick products were safe for such use, LVMH distributed the concerned lipstick products that contained the complained-of lead.

15.    Plaintiff and other members of Plaintiff Class were deceived by LVMH's material omissions and failure to state that the concerned lipstick products contained lead, and purchased the concerned lipstick products believing that they were safe for application on their lips.

16.    The concerned lipstick products of LVMH include, but are not limited to, Christian Dior "Addict Positive Red," which is manufactured, distributed, and/or sold by LVMH.

17.    The concerned lipstick products were sold at various retailers throughout the United States for a number of years and continuing to the present day.

4

**B.  LVMH KNEW OR SHOULD HAVE KNOWN OF THE DANGERS OF THE CONCERNED LIPSTICK PRODUCTS.**

18.    Exposure to lead causes a wide range of adverse health effects.  Even low levels of exposure to lead can result in IQ deficits, learning disabilities, behavioral problems, stunted or slowed growth, and impaired hearing.

19.    At increasingly high levels of exposure, people may suffer kidney damage, become mentally retarded, fall into a coma, or even die from lead poisoning.

20.    Pregnant women and children are particularly vulnerable to lead exposure, as lead easily crosses the placenta and enters the fetal brain, where it can interfere with normal development.

21.    Lead has also been linked to infertility, miscarriage, hormonal changes, menstrual irregularities, and delays in the onset of puberty.

22.    Lead can build up in the body over time, and applying lead-containing lipstick several times a day, every day, can result in significant exposure levels.

23.    During a woman's lifespan, a typical woman can inadvertently ingest approximately 4 pounds of lipstick.

24.    It has been reported that 63% of girls aged 10 and younger use lipstick.

25.    Accordingly, LVMH knew or should have known that manufacturing and distributing lipstick products containing any amount of lead was dangerous to those individuals using them, and that such lipstick products were not safe as LVMH represented them to be.

26.    It is possible, and reasonable, to manufacture lipstick that does not contain lead, and such products are so manufactured and marketed.

**C.  THE CONCERNED LIPSTICK PRODUCTS.**

27.    On October 11, 2007, the Campaign for Safe Cosmetics ("CFS") made public a

5

report that revealed that LVMH's lipstick products contain dangerous levels of lead.

28.    The U.S. Food and Drug Administration ("FDA") has established a limit of 0.1 parts per million ("ppm") for levels of lead in candy, a standard that has been established to protect children from directly ingesting lead.

29.    Lipstick products, much like candy, are directly ingested into the body when an individual licks their lips, eats, etc.

30.    The tests conducted by the CFS revealed that LVMH's Christian Dior "Addict Positive Red" contained lead in the amount of .21 ppm, which is more than twice the accepted level of lead for products that are ingested.

31.    Plaintiff purchased and applied Christian Dior "Addict Positive Red" to her lips.

32.    Nordstrom sells Christian Dior "Addict Positive Red" for $24.99.

33.    To date, LVMH has not issued a recall of the concerned lipstick products or offered compensation, nor has it engaged in responsible marketing advising against the use of the concerned lipstick products.

34.    Moreover, as a result of LVMH's negligent and reckless conduct, Plaintiff and members of Plaintiff Class have been exposed to a known hazardous substance. As a result of such exposure, these individuals are at an increased risk of being poisoned by lead and may have already been so poisoned and adversely affected.  Accordingly, Plaintiff also seeks to recover the purchase price of the concerned lipstick products which, but for LVMH's conduct as described herein, would not have been paid, the costs of diagnostic testing necessary to detect lead poisoning for herself and the other members of the Plaintiff Class resulting from LVMH's actions, as well as injunctive relief correcting the false perception created in the public of LVMH's omissions as above stated.

6

## CLASS CERTIFICATION

35.     This action is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons throughout the United States and its territories who purchased lipstick products that contained the complained-of lead, which were marketed, manufactured, the lipstick products that contained the complained-of lead, which were marketed, manufactured, and/or distributed, or placed in commerce for sale, by LVMH, from the offering of sale of the concerned lipstick products to the present.

36.     Membership in the Class is so numerous as to make it impractical to bring all Class members before the Court. The identity and exact number of Class members is unknown but can likely be determined from information within the possession of LVMH. It is estimated to be in the millions.

37.     Plaintiff's claims are typical of those of other Plaintiff Class members, all of whom have suffered harm due to LVMH's uniform course of conduct.

38.     There are numerous and substantial questions of law and fact common to all members of Plaintiff Class which control this litigation and predominate over any individual issues pursuant to Rule 23(b)(3). These common issues include, but are not limited to:

   a)   Whether the concerned lipstick products are defective;

   b)   Whether the concerned lipstick products are inherently dangerous;

   c)   Whether, as a result of LVMH's conduct, Plaintiff and the other members of Plaintiff Class have been exposed to a known hazardous substance;

   d)   Whether early detection, through medical testing, of lead poisoning is made necessary and advisable by LVMH's manufacturing, marketing, and distribution of lipstick products containing lead;

   e)   Whether LVMH is refusing to pay for the costs of lead testing;

   f)   Whether Plaintiff and other members of Plaintiff Class are entitled to injunctive relief;

7

g) Whether LVMH has been unjustly enriched; and

h) Whether LVMH's conduct amounts to an unfair and deceptive practice under Illinois law and/or similar laws of other states.

39.     LVMH's conduct is such that it is appropriate that there be final injunctive relief to enjoin its conduct with respect to Plaintiff Class as a whole pursuant to Rule 23(b)(2).

40.     A class action is the appropriate method for the fair and efficient adjudication of this controversy for the following reasons:

a) Without a class action, Plaintiff Class will continue to suffer damage, LVMH's violations of the law or laws will continue without remedy, and LVMH will continue to enjoy the fruits and proceeds of its unlawful misconduct;

b) Given (i) the substantive complexity of this litigation; (ii) the size of individual Plaintiff Class members' claims; and (iii) the limited resources of the Plaintiff Class members, few, if any, Plaintiff Class members could afford to seek legal redress individually for the wrongs LVMH has committed against them;

c) This action will foster an orderly and expeditious administration of Plaintiff Class members' claims, economies of time, effort and expense, and uniformity of decision; and

d) Inferences and presumptions of materiality and reliance are available to obtain class-wide determinations of those elements within Plaintiff Class members' claims, as are accepted methodologies for class-wide proof of damages; alternatively, upon adjudication of LVMH's common liability, the Court can efficiently determine the claims of the individual Plaintiff Class members; and this action presents no difficulty that would impede the Court's management of it as a class action, and a class action is the best (if not the only) available means by which members of Plaintiff Class can seek legal redress for the harm caused them by LVMH.

## CLAIMS FOR RELIEF

## COUNT I

(Violations of Consumer Protection Laws)

41.     Plaintiff re-alleges paragraphs 1 through 40 as if fully set forth herein.

42.     This is a claim for violations of the Illinois Consumer Fraud and Deceptive

Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, and those other state consumer

protection statutes which are in all material respects similar to it.

43.     Section 2 of the ICFA, 815 ILCS 505/2, provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use or employment of
> any deception, fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact, or the
> use or employment of any practice described in Section 2 of the
> "Uniform Deceptive Trade Practices Act", approved August 5,
> 1965, in the conduct of any trade or commerce are hereby declared
> unlawful whether any person has in fact been misled, deceived or
> damaged thereby.  In construing this section consideration shall be
> given to the interpretations of the Federal Trade Commission and
> the federal courts relating to Section 5(a) of the Federal Trade
> Commission.  (footnotes omitted)

44.     Section 10a of the ICFA, 815 ILCS 505/10a, provides, in pertinent part:

> (a)     Any person who suffers actual damage as a result of a
> violation of this Act committed by any other person may bring an
> action against such person.  The court, in its discretion may award
> actual economic damages or any other relief which the court deems
> proper...

                                   *  *  *

> (b)     Except as provided in subsections (f), (g), and (h) of this
> Section, in any action brought by a person under this Section, the
> Court may grant injunctive relief where appropriate and may
> award, in addition to the relief provided in this Section, reasonable
> attorney's fees and costs to the prevailing party.

45.     Plaintiff and the other Plaintiff Class members are "consumers" or "persons," as

defined and construed under the ICFA, 815 ILCS 505/1, *et seq.*, and other states' similar

Consumer Protection Laws.

46.     LVMH's conduct as alleged herein occurred in the course of trade or commerce.

47.     LVMH's marketing through affirmative and implied representations of the

concerned lipstick products as being safe for use constitutes an unfair or deceptive trade practice.

48.    Upon information and belief, LVMH knew or should have known of the lead in its lipstick products and the dangers associated with the inclusion of lead, as well as the resulting lack of fitness for use, at all material times, but did not disclose the defect to consumers.

49.    Even though LVMH knew or should have known of the defective nature of the concerned lipstick products, it continued to sell said products to consumers without properly disclosing or correcting the defect, intending that consumers rely on their representation that the concerned lipstick products were safe for use.

50.    LVMH's sales practices were deceptive, misleading, and intended to increase its own profits to the detriment of consumers. LVMH has profited from the uniform deceptive practices and marketing campaigns, in that LVMH was able to sell hundreds of thousands of the concerned lipstick products that it could not have sold absent its deceptive practices, including affirmative and implied representations and omissions, causing Plaintiff and Plaintiff Class damages.

51.    Plaintiff and other members of Plaintiff Class were deceived by LVMH's failure to disclose the dangers of its the concerned lipstick products that contained improper levels of lead. LVMH would not have been able to sell the concerned lipstick products had it properly disclosed the fact that they contained lead.

52.    Plaintiff and other members of Plaintiff Class would not have purchased the concerned lipstick products if LVMH had disclosed the dangers of the concerned lipstick products, including that such products contained lead as aforestated.

53.    Plaintiff and other Plaintiff Class members suffered actual damages as a result of LVMH's deceptive and unfair trade practices. Specifically, as a result of LVMH's deceptive and

unfair trade practices, Plaintiff and other Plaintiff Class members suffered monetary losses, i.e., the purchase price of the concerned lipstick products, which themselves are unfit for their intended purpose, and further can be expected to suffer in the future the cost of medical monitoring necessitated by their exposure to the lead in LVMH's concerned lipstick products.

54.    By reason of the foregoing, LVMH is liable to Plaintiff and Plaintiff Class members in an amount to be proved at trial, including, but not limited to, treble damages or other penalties as may be appropriate under applicable law.

## COUNT II

### (Breach of Implied Warranty Pursuant to the U.C.C.)

55.    Plaintiff re-alleges paragraphs 1 through 40 as if fully set forth herein.

56.    Under the Uniform Commercial Code in Illinois and in other states, there exists an implied warranty of merchantability. *See* 810 ILCS 5/2-314.

57.    LVMH, in the manufacture, production, and sale of the concerned lipstick products impliedly warranted to Plaintiff and other members of the Plaintiff Class that the the concerned lipstick products were fit for their ordinary purpose, application on one's lips.

58.    LVMH breached the implied warranty of merchantability by selling the concerned lipstick products, which are dangerous and cannot safely be used for their ordinary purpose, because they contain the complained-of lead.

59.    LVMH's concerned lipstick products were in fact unmerchantable because they could not safely be used for their ordinary and intended purpose.

60.    LVMH knew or should have known that the concerned lipstick products did not meet the capabilities as represented and marketed.

61.    Plaintiff and other members of the Plaintiff Class have been and will be damaged, and have suffered and will suffer direct economic damage, including the cost of the concerned

lipstick product and the future cost of medical monitoring necessitated by their exposure to the lead in LVMH's concerned lipstick products.

62.    By reason of the foregoing, LVMH is liable to Plaintiff and the members of the Plaintiff Class in an amount to be proved at trial.

## COUNT III

(Breach of Implied Warranty Pursuant to the Magnuson-Moss Warranty Act)

63.    Plaintiff re-alleges paragraphs 1 through 40 as if fully set forth herein.

64.    The Magnuson-Moss Warranty Act provides for a civil action by consumers for failure to comply with implied warranties arising under state law. *See* 15 U.S.C. § 2310 (d)(1).

65.    LVMH, in the manufacture, production, and sale of the concerned lipstick products impliedly warranted to Plaintiff and other members of the Plaintiff Class that the concerned lipstick products were fit for their ordinary purpose, application on one's lips.

66.    LVMH breached the implied warranty of merchantability under Illinois law and other states' laws by selling the concerned lipstick products, which are dangerous and cannot safely be used for their ordinary purpose, because they contain the complained-of lead.

67.    LVMH's concerned lipstick products were in fact unmerchantable because they could not safely be used for their ordinary and intended purpose.

68.    LVMH knew or should have known that the concerned lipstick products did not meet the capabilities as represented and marketed.

69.    Plaintiff and members of the Plaintiff Class have been and will be damaged, and have suffered and will suffer direct economic damage, including the cost of the concerned lipstick product, and the future cost of medical monitoring necessitated by their exposure to the lead in LVMH's concerned lipstick products.

70.    By reason of the foregoing, LVMH is liable to Plaintiff and other members of the

12

Plaintiff Class in an amount to be proved at trial.

## COUNT IV

### (Strict Liability)

71.    Plaintiff re-alleges paragraphs 1 through 40 as if fully set forth herein.

72.    LVMH is strictly liable for damages because:

    a)  it placed the concerned lipstick products in the stream of commerce;

    b)  the condition of the concerned lipstick products—containing lead—rendered them unreasonably dangerous;

    c)  the inherently dangerous condition existed when the product left the control of LVMH; and

    d)  the condition was a proximate cause of injury.

73.    Plaintiff and other members of Plaintiff Class may recover for purely economic loss because their damages are proximately caused by LVMH's intentional, false representation that the concerned lipstick products are safe when, in fact, they are not.

74.    Plaintiff and other members of Plaintiff Class have been and will be damaged, and have suffered and will suffer direct economic loss, including both the cost of the concerned lipstick product and the future cost of medical monitoring necessitated by the presence of lead.

75.    By reason of the foregoing, LVMH is liable to Plaintiff and members of Plaintiff Class in an amount to be proved at trial.

## COUNT V

### (Negligence Per Se)

76.    Plaintiff realleges paragraphs 1 through 40 as if fully set forth herein.

77.    LVMH failed to comply with the applicable Federal statute on adulterated cosmetics, particularly the Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq.*).

13

78.    LVMH manufactured, distributed, delivered and/or sold cosmetics that contained a poisonous and deleterious substance, lead, and thus, said cosmetics were prohibited adulterated cosmetics under the Federal Food Drug and Cosmetics Act. LVMH was therefore negligent *per se.*

79.    As a direct and proximate result of LVMH's negligence *per se,* Plaintiff and other members of Plaintiff Class were damaged in an amount to be determined at trial.

### COUNT VI

### (Unjust Enrichment)

80.    Plaintiff realleges Paragraphs 1 through 40 as if fully set forth herein, and alleges this Count in the alternative.

81.    LVMH received from Plaintiff and other Plaintiff Class members certain monies from their purchase of the concerned lipstick products which are excessive and unreasonable, and are the result of LVMH's deceptive conduct.  The concerned lipstick products sold by LVMH were unreasonably dangerous and unfit for their intended purpose.

82.    As a result, Plaintiff and other members of Plaintiff Class have conferred a benefit on LVMH, and LVMH has knowledge of this benefit and has voluntarily accepted and retained the benefit conferred on it.

83.    LVMH will be unjustly enriched if it is allowed to retain such funds, and each Plaintiff Class member is entitled to an amount equal to the amount each Plaintiff Class member enriched LVMH and for which LVMH has been unjustly enriched.

84.    By reason of the foregoing, Plaintiff lacks an adequate remedy at law.

85.    By reason of the foregoing, LVMH is liable to disgorge to Plaintiffs and members of Plaintiff Class the amount by which each Plaintiff Class member enriched LVMH and for which LVMH has been unjustly enriched.

14

## COUNT VII

### (Injunctive Relief)

86.     Plaintiff realleges paragraphs 1 through 40 as if fully set forth herein

87.     By distributing, selling, and/or manufacturing lead containing lipstick products, LVMH is violating 21 U.S.C. § 331.

88.     Pursuant to 21 U.S.C. § 332, Congress has granted this Court specific jurisdiction to enjoin violations of 21 U.S.C. § 331.

89.     Upon information and belief, LVMH continues to sell, manufacture, and/or distribute the concerned lipstick products. LVMH is therefore currently violating 21 U.S.C. § 331, and upon information and belief will continue to do so, absent an injunction.

90.     Plaintiff and Plaintiff Class are entitled to a temporary restraining order, preliminary injunction, and permanent injunction, all enjoining LVMH from distributing, selling, and/or manufacturing the concerned lipstick products in violation of 21 U.S.C. § 331.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and other Plaintiff Class members request that the Court enter an order of judgment against LVMH, including the following:

a.     Certification of the action as a Class Action pursuant to Rule 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure, and appointment of Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel;

b.     Damages in the amount of monies paid for the concerned lipstick products;

c.     Damages in the amount of monies paid or to be paid for medical testing for lead poisoning of Plaintiff and other members of Plaintiff Class;

15

d.  Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

e.  Pre-judgment and post-judgment interest on such monetary relief;

f.  Injunctive relief enjoining LVMH from distributing, selling, and/or manufacturing adulterated cosmetics;

g.  The costs of bringing this suit, including reasonable attorneys' fees; and

h.  All other relief to which Plaintiff and members of Plaintiff Class may be entitled at law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which trial by jury is permitted by law.

Dated: November 16, 2007

Pamela Stella, individually and on behalf of all others similarly situated,

By: _____

Ben Barnow
Sharon Harris
Erich Schork
Barnow and Associates, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

*Attorneys for Plaintiff*

Kevin Rogers
Law Offices of Kevin Rogers
307 N. Michigan Avenue, Suite 305
Chicago, IL 60601
Telephone: (312) 332-1188
Facsimile: (312) 332-0192

16

Aron D. Robinson
The Law Office of Aron D. Robinson
19 S. LaSalle Street, Suite 1300
Chicago, IL 60603
Telephone: (312) 857-9050
Facsimile: (312) 857-9054


*Of Counsel:*

Lance A. Harke, P.A.
Sarah Clasby Engel, P.A.
Harke & Clasby LLP
155 South Miami Ave., Suite 600
Miami, Florida 33130
Telephone: (305) 536-8220
Facsimile: (305) 536-8229

Exhibit 2

Slip Copy                                                                    Page 1

Slip Copy, 2006 WL 1519571 (N.D.Ill.)
**(Cite as: Slip Copy, 2006 WL 1519571)**

**H**

Muniz v. Rexnord Corp.

N.D.Ill.,2006.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern
Division.

Ann MUNIZ and Ed Muniz and Joseph Shroka and
Diane Shroka, individually and on behalf of all oth-
ers similarly situated, Plaintiffs,

v.

REXNORD CORPORATION, et al., Defendants.

REXNORD CORPORATION, et al., Third-Party
Plaintiffs,

v.

ARROW GEAR COMPANY, et al., Third-Party
Defendants.

LOVEJOY, INC., Fourth-Party Plaintiff,

v.

CORNING INCORPORATED, Fourth-Party De-
fendant.

**No. 04 C 2405.**

May 26, 2006.

Myron Milton Cherry, Myron M. Cherry & Asso-
ciates, Bill Robins, III, Heard, Robins, Cloud, Lub-
el & Greenwald, James D. Brusslan, Levenfield
Pearlstein, LLC, Patrick J. Sherlock, Attorney at
Law, Chicago, IL, Andrew Sher, The Sher Law
Firm PLLC, Houston, TX, for Plaintiffs.

Steven P. Handler, David Joseph Scriven-Young,
Mark Alan Bilut, Todd Richard Wiener, Mcder-
mott, Will & Emery LLP, Alan P. Bielawski, J. An-
drew Schlickman, Joan Radovich, Roshna Balasub-
ramanian, Susan Vavra Harris, William Gust Dick-
ett, Sidley Austin LLP, Scott Gene Early, Catherine
L. Doyle, Charles M. Gering, Gary S Rovner, Foley
& Lardner, Edward V. Walsh, III, Gary Steven Ca-
plan, Randall D. Lehner, Sachnoff & Weaver, Ltd.,
Pamela Reasor Hanebutt, Linda P. Kurtos, William
S Booth, Eimer Stahl Klevorn & Solberg, LLP,
Alan Bruce White, John William Kalich, Mark D.
Erzen, Karaganis, White & Magel Ltd., Carol Ma-
honey Douglas, Antonio Caldarone, Kevin Patrick

Shea, Ungaretti & Harris, Michael John Maher,
Elizabeth Schroer Harvey, James Christopher
Adamson, John Paul Arranz, Swanson, Martin &
Bell, Daniel Charles Murray, Frederick S. Mueller,
Garrett L Boehm, Jr., Johnson & Bell, Ltd., Bruce
C. Nelson, Jeffery Michael Heftman, Vedder, Price
Kaufman & Kammholz, P.C., Chicago, IL, Adam
Bottner, Law Offices Of Carey S. Rosemarin,
Northbrook, IL, Brenda N. Broderick, Scholz,
Loos, Palmer & Siebers, Quincy, IL, for Defend-
ants/Third-Party Plaintiffs.

Eric L. Samore, Molly Anne Arranz, O'Hagan,
Smith & Amundsen, L.L.C., Peter Vincent
Baugher, Jennifer A. Waters, Schopf & Weiss LLP,
Joseph A. Strubbe, Vedder, Price Kaufman &
Kammholz, P.C., Lawrence W. Falbe, Wildman,
Harrold, Allen & Dixon, Mark Anthony Latham,
Sasha Marie Reyes, Sheila H. Deely, Annapurna
Singh, Gardner Carton & Douglas LLP, Brett David
Heinrich, Matthew E. Cohn, Megan Elyse Garvey,
Peter Petrakis, Meckler, Bulger & Tilson LLP,
Douglas W. Michaud, Fognani, Guibord Homsey &
Roberts, Soo Jin Kim, Taylor, Miller, Sprowl,
Hoffnagle & Merletti, Jeremiah P. Connolly, Gena
Romagnoli, Michelle Ann Bacher, Bollinger, Ru-
berry and Garvey, Emily A Springston, Sidley Aus-
tin LLP, Michael Sean Mostow, Monica Maria
Tynan, Quarles & Brady LLP, John William
Kalich, Karaganis, White & Magel Ltd., Chicago,
IL, Bryan G. Selander, Charles D. Schlueter,
Schlueter Eckland, Rockford, IL, John P. Cooney,
Avenue, Inc., Orland Park, IL, Carey S. Rosemarin,
Law Offices of Carey S. Rosemarin, Northbrook,
IL, Thomas S. Yu, Michael S. Blazer, Tracey A.
Dillon, Jeep & Blazer, L.L.C., Hillside, IL, Donald
S. Rothschild, Brian Michael Dougherty, Heather
W Brown, Goldstine, Skrodzki, Russian, Nemec &
Hoff, Ltd., Burr Ridge, IL, for Third-Party Defend-
ants.

Nancy J. Rich, Albert M Bower, Bradley S. Roch-
len, Jon Preston Sanders, Monica J Mosby, Paul J.
Stroka, Russell B. Selman, Katten Muchin Rosen-
man LLP, Chicago, IL, Laura A. O'Connell, Picha

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1519571 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 1519571)

& Salisbury, Rockford, IL, for Fourth-Party Plaintiff.

Brent Ian Clark, Jeryl L. Olson, Lindsay Ann Wolter, Meagan Noel Newman, Seyfarth Shaw, Chicago, IL, for Fourth-Party Defendant.

*MEMORANDUM OPINION AND ORDER*

DARRAH, J.

**\*1** Class Action Plaintiffs filed suit against Defendants, seeking recovery under Section 107 of the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended ("CERCLA"), and pendent claims under Illinois common law. In their Complaint, Muniz alleged release of chemicals, including trichloroethylene ("TCE") and perchloroethylene ("PCE"), in and around the industrial facilities located in the Ellsworth Industrial Park in Downers Grove, IL. These chemicals subsequently migrated into the groundwater, were released in airborne vapor, and have contaminated the Muniz's property and water supply. Plaintiffs allege that Defendants' businesses operating within the Ellsworth Industrial Park are liable for these injuries.

Defendants filed third-party contribution claims against multiple Third-Party Defendants, all of whom also operate or operated facilities in the Ellsworth Industrial Park that allegedly generated and so disposed of the toxic chemicals. Third-Party Defendant, Lovejoy, Inc., subsequently filed a fourth-party contribution claim against Fourth-Party Defendant, Corning Incorporated.

Presently before the Court is Defendant Precision Brand Products, Inc.'s Motion for Judgment Denying Plaintiffs' Claim for Medical Monitoring pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(b) and Local Rule 56.1(b).

## BACKGROUND

The Class Action Plaintiffs in this action are Ann Muniz, Ed Muniz, Joseph Shroka, and Diane Shroka. (Def.'s 56.1(a)(3) Statement ¶ 1). Each of the Plaintiffs have obtained the age of 21 since 1999 and have resided in their respective houses in the affected area since 1999. (Id., ¶¶ 6-8).

Precision Brands Products, Inc. and DuPage Manufacturing shared a building located at 2400 Curtiss Street within the Ellsworth Industrial Park from 1967 or 1968 until, approximately, 1979. (Def.'s 56.1(a)(3) Statement ¶ 26). DuPage Manufacturing used trichloroethylene ("TCE") and tetrachloroethylene ("TTCE") in its operations at 2400 Curtiss Street from approximately 1970 to 1979.(Id., ¶ 27). DuPage Manufacturing discontinued all operations in 1979 or 1980. (Id., ¶ 28). After DuPage Manufacturing discontinued operations in 1979 or 1980, DuPage Manufacturing's assets were acquired by Precision.(Id., ¶ 29). Precision purchased certain assets and assumed certain liabilities of DuPage Manufacturing Company. (Plaints.' 56.1(b)(3) Statement ¶ 9).

In 2001, the Illinois Environmental Protection Agency, in conjunction with the Illinois Department of Public Health, tested private wells serving a number of homes in and near Downers Grove, Illinois, for the presence of volatile organic compounds. (Def.'s 56.1(a)(3) Statement ¶ 11). Plaintiffs' wells were included in the IEPA and IDPH testing. (Id., 12). Prior to October 1, 2001, Ann and Ed Muniz were informed, by telephone, of the results of the IEPA and IDPH's testing of their well. (Id., ¶ 13). Ann and Ed Muniz also received a letter dated September 28, 2001, from the IDPH, reporting, among other things, the results of the testing of their well. (Id., ¶ 14). Diane and Joseph Shroka were informed of the results of the testing of their well by a letter dated August 13, 2001. (Id., ¶ 15). Plaintiffs stopped drinking water from their well soon after being informed by the IDPH that solvents were found in their well. (Id., ¶ 17).

**\*2** In August 2001 and December 2001, the IEPA posted "Fact Sheet # 1" and "Fact Sheet # 3" on its web site. (Def.'s 56.1(a)(3) Statement ¶ 21). In the August 2001 Fact Sheet, the IEPA stated that it did not have enough information to know the source of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 3

Slip Copy, 2006 WL 1519571 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 1519571)

the contamination (Def.'s Exh. 7a). The December 2001 Fact Sheet did not identify any source of the contamination but did warn individuals that there were possible health effects of long-term use of well water with low levels of TCE and PCE, including a slightly increased cancer risk and impairments to immune system function or kidney or liver damage. (Def.'s Exh. 7b). In a letter dated December 6, 2001, five persons, including Ann Muniz, wrote to Thomas V. Skinner, the Director of the IEPA, seeking assistance to obtain safe water. The letter states that it appeared that the safety of their water was "questionable" for at least ten years and that the parties were told that the contamination was coming from a local Downers Grove industrial park. (Def.'s 56.1(a)(3) Statement ¶ 20; Def.'s Exh. 9).

In December 2001, the *Downers Grove Sun* published an article concerning groundwater contamination in which Anne Muniz stated, "It's a health issue." (Def.'s Exh. 8a). In March 2001, an article in the *Downers Grove Sun* concerning the well-water contamination stated, "Muniz has entered into discussions with lawyers regarding the possibility of litigation."(Def.'s Exh. 8b). On June 5 and July 14, 2002, the *Chicago Tribune* published articles that discussed the contaminated wells but did not yet identify the source of the contamination. (Plaints' 56.1(b)(3) Statement ¶¶ 4-5). In August 2002, IEPA published Ellsworth Industrial Park Fact Sheet # 4 addressing the contaminated wells.(Id., ¶ 6). Also in August 2002, the United States Environmental Protection Agency made available to the public for the first time the "Phase II, Site Assessment Report, Ellsworth Industrial Park, Downers Grove, DuPage County, Illinois."(Id., ¶ 7). On July 6, 2002, Ann Muniz retained counsel for purposes of filing a lawsuit for damages or injunctive relief relating to the contaminated groundwater. (Id., ¶ 8).

Until 2003, the water entering the plumbing system at Plaintiffs' residences was supplied by a single-home private well. (Def.'s 56.1(a)(3) Statement ¶ 9). In 2003, Plaintiffs' residences were connected to the Downers Grove municipal water supply. (Id., ¶

10).

## ANALYSIS

Precision seeks summary judgment on Plaintiffs' claim for medical monitoring, contending that the claim is barred by the statute of limitations and that the claim is not legally cognizable.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact."Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(*Celotex* ). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.,* 203 F.3d 997, 1003 (7th Cir.2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the non-moving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(*Anderson* ). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago,* 267 F.3d 723, 729 (7th Cir.2001)(*Greer* ).

*3 Medical monitoring is a form of personal injury covered by the applicable Illinois two-year statute of limitations. *See*735 ILCS 5/13-202; *Carey v. Kerr-McGee Chemical Corp.,* 999 F.Supp. 1109, 1120 (N.D.Ill.1998)(*Carey* ). The application of the statute of limitations generally involves a question of fact. However, the running of the statute of limitations can be decided by the court as a question of law when the existence of the bar is clear from the pleadings. *See Clay v. Kuhl,* 189 Ill.2d 603, 609-10, 244 Ill.Dec. 918, 727 N.E.2d 217 (2000)(*Clay* ).

Plaintiffs contend that their Complaint was timely filed under the discovery rule. Under the discovery rule, a cause of action accrues when the party knows or reasonably should have known of an in-

Slip Copy, 2006 WL 1519571 (N.D.Ill.)
**(Cite as: Slip Copy, 2006 WL 1519571)**

jury and that the injury was wrongfully caused. *See Knox College v. Celotex Corp.*, 88 Ill.2d 407, 415, 58 Ill.Dec. 725, 430 N.E.2d 976 (1982)(*Knox* ). "Injury," for purposes of the discovery rule, "denotes that damage has been done to one by another."*Roper v. Markle*, 59 Ill.App.3d 706, 713, 16 Ill.Dec. 827, 375 N.E.2d 934 (1978)(*Roper* );*see also Hoffman v. Orthopedic Sys., Inc.*, 327 Ill.App.3d 1004, 1010-11, 262 Ill.Dec. 290, 765 N.E.2d 116 (2002)(*Hoffman* ) (plaintiff need not know the full extent of her injuries for statute of limitations to begin running); *Carey*, 999 F.Supp. at 1120 (plaintiffs knew or should have known of injury-potential health hazards-from thorium tailings). "Wrongfully caused" does not mean that a plaintiff must have knowledge of the defendant's negligent conduct before the statute of limitations is triggered. *See Knox*, 88 Ill.2d at 415, 58 Ill.Dec. 725, 430 N.E.2d 976. Instead, "[a]t some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point ... the running of the limitations period commences."*Knox*, 88 Ill.2d at 416, 58 Ill.Dec. 725, 430 N.E.2d 976;*see also Hoffman*, 327 Ill.App.3d at 1010-11, 262 Ill.Dec. 290, 765 N.E.2d 116 (plaintiff need not know a specific defendant's negligent act for statute of limitations to begin running); *Roper*, 59 Ill.App.3d at 710, 16 Ill.Dec. 827, 375 N.E.2d 934 ("statute begins to run when there is concurrence of the actual or constructive knowledge of both the physical problem and the possibility that someone is at fault for its existence.").

Plaintiffs filed suit on April 2, 2004. The undisputed facts here demonstrate that genuine issues of material fact exist as to whether Plaintiffs knew or reasonably should have known that they had been injured by wrongfully being exposed to PCE and/or TCE in the well water by April 2, 2002. While the Plaintiffs were informed in the Fall of 2001 that their well water tested positive for the presence of volatile organic compounds and that they should cease drinking the water because of *possible* ad-

verse health effects, the extent of the contamination and, more importantly, the source of the contamination were not known until after April 2, 2002.

Precision cites to IEPA Fact Sheet # 3, dated December 2001, in support of its motion. However, that Fact Sheet merely notifies the public of the IEPA's preliminary investigation. The Fact Sheet states, in pertinent part, that the Illinois EPA was still gathering information from "several different areas in our investigation of potential sources of the solvent contamination," and that it had sent informational requests to "area businesses in and near the Ellsworth Industrial Park to learn about previous and current solvent use and disposal."The Fact Sheet further warns that "[f]inding a potentially responsible party to past, non-reported environmental contamination usually takes a long time. In some cases, it is not possible to know with certainty the source of an old spill or release."Nowhere does the Fact Sheet disclose any actionable conduct or identify a responsible party. The December 20, 2001, *Downers Grove Sun* quoted Maggie Carson of the IEPA that "it was very important to find the source, but realistically that may not be possible."As late as June 5, 2002, a *Chicago Tribune* article stated that "[o]fficials have yet to find the source of the contamination near Downers Grove."Over a month later, on July 14, 2002, the *Chicago Tribune* quoted an EPA official as stating "[t]he data is just coming in ... We have no conclusions yet."

**\*4** It was not until August 2002 that the IEPA Fact Sheet # 4 identified the source area of the investigation as the Ellsworth Industrial Park. The Phase II report of the IEPA in August 2002, for the first time, made a preliminary conclusion as to the source of the contamination and identified Precision as one of the "Probable Source Facilities."

In support of its argument that the statute of limitations has run, Precision also refers to *Hoffman v. Orthopedic Sys., Inc.*, 327 Ill.App.3d 1004, 1010-11, 262 Ill.Dec. 290, 765 N.E.2d 116 (2002)(*Hoffman* ), and a March 2002 *Downers*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 5
Slip Copy, 2006 WL 1519571 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 1519571)

*Grove Sun* article in which Ann Muniz reportedly entered into discussions with lawyers regarding possible litigation. However, unlike Ann Muniz, the *Hoffman* plaintiff had retained counsel, demonstrating that plaintiff was "on inquiry" as to her injury, thereby commencing the two-year limitation period. Accordingly, *Hoffman* is readily distinguishable from the instant case; Muniz retained counsel in July 2002.

It is noted that Plaintiffs contend that their medical monitoring claim is not barred by the statute of limitations because their claim is within two years of Defendants' tortious conduct. However, although not controlling here, for the reasons stated above, this theory would not avoid the application of the statute of limitations to bar Plaintiffs' claim. When a tort involves continuing or repeated conduct, the limitation period does not begin to run until the date of the last injury or when the tortious conduct ceased. *See Johnson v. Tipton,* 103 Ill.App.3d 291, 300, 59 Ill.Dec. 179, 431 N.E.2d 464 (1982). A continuing tort "is occasioned by continuing unlawful acts and conduct."*Hyon Waste Mgmt. Serv., Inc. v. City of Chicago,* 214 Ill.App.3d 757, 763, 158 Ill.Dec. 335, 574 N.E.2d 129 (1991)(*Hyon* ). The continuing tort rule is generally applied to nuisance and trespass cases. *See, e.g., Meyers v. Kissner,* 149 Ill.2d 1, 171 Ill.Dec. 484, 594 N.E.2d 336 (1992) (uninterrupted flooding of downstream landowner by upstream landowner). A continuing tort is distinguished from a continuing injury, or "continuing ill effects from an initial violation."*Hyon,* 214 Ill.App.3d at 763, 158 Ill.Dec. 335, 574 N.E.2d 129. In the case of a continuing injury, a plaintiff's cause of action accrues when the effects of the injury first become known to the property owner, notwithstanding the fact that these effects are continuing. *See Powell v. City of Danville,* 253 Ill.App.3d 667, 669, 192 Ill.Dec. 675, 625 N.E.2d 830 (1993)(*Powell* ). In cases where the tortious activity ceased at a certain date, the courts have not applied the continuing tort theory because to do so would be "to confuse the concept of a continuing tort with that of a continuing injury."*Powell,* 253 Ill.App.3d

at 669, 192 Ill.Dec. 675, 625 N.E.2d 830. Put another way, a continuing tort "is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation."*Feltmeier v. Feltmeier,* 207 Ill.2d 263, 278, 278 Ill.Dec. 228, 798 N.E.2d 75 (2003)(*Feltmeier* ).

In *Powell,* the court held that the statute of limitations began to run at the time of the last tortious conduct-dumping toxic waste. The tortious act of dumping ended on a certain date; and while the effects may have continued because of leaching, the tortious act ceased when the dumping ceased. The *Powell* court rejected the plaintiff's theory of continuing torts, finding that the theory conflicted with the "policy expressed by limitation provisions-that liability for past actions must end at some time."*Powell,* 253 Ill.App.3d at 670, 192 Ill.Dec. 675, 625 N.E.2d 830. Similarly, in *Soo Line R.R. Co. v. Tang Indus.,* 998 F.Supp. 889, 897 (N.D.Ill.1998)(*Soo Line* ), the court held that since the tortious activity-dumping of toxic waste-ceased on a certain date, the continuing tort theory would not apply.

*5 In the instant case, DuPage Manufacturing used (and allegedly dumped) TCE and PCE in its operations at 2400 Curtiss Street until 1979 or 1980. Plaintiffs contend that although the dumping of TCE and PCE ceased in 1979 or 1980, they were "subjected to continuing and repeated injury until 2003" when they were connected to Lake Michigan water. Plaintiffs' argument is not one of continuing tort; instead, it is based on a continuing injury. Accordingly, Plaintiffs' cause of action accrued when the effects of the injury first became known to the property owner, notwithstanding the fact that these effects are continuing. *See Powell,* 253 Ill.App.3d at 669, 192 Ill.Dec. 675, 625 N.E.2d 830;*Soo Line,* 998 F.Supp. at 897;*Feltmeier,* 207 Ill.2d at 278, 278 Ill.Dec. 228, 798 N.E.2d 75;*cf. Leckrone v. City of Salem,* 152 Ill.App.3d 126, 105 Ill.Dec. 87, 503 N.E.2d 1093 (1987) (continuing tort theory applied where defendant *continued* to dump sewage into a stream, polluting that stream).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1519571 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 1519571)

Page 6

However, as discussed above, genuine issues of material fact exist as to when the source and effects of the injury first became known to the Plaintiffs; accordingly, Precision's Motion for Judgment as barred by the statute of limitations is denied.

Precision also argues that Plaintiffs' medical monitoring claim, without a present physical injury, is not cognizable under Illinois common law.

As part of their prayer for relief in Counts II through VIII, Plaintiffs seek a court-supervised fund to pay for medical monitoring. Precision argues that Illinois common law does not recognize a claim for medical monitoring because Plaintiffs have no present injury.

The Illinois Supreme Court has not decided whether a claim of medical monitoring is cognizable under Illinois common law. Consequently, the Court must predict how the Illinois Supreme Court would decide the issue. *See Mindgames, Inc. v. Western Pub'l Co.,* 218 F.3d 652, 655-56 (7th Cir.2000).

Because diseases and injuries caused by the exposure of toxic substances are often latent, relief in the form of medical monitoring has developed as a means to compensate plaintiffs that have been wrongfully exposed to various toxic substances and require medical testing because of that exposure. *See In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 849-50 (3rd Cir.1990)(*Paoli* );*Lewis v. Lead Indus. Assoc., Inc.,* 342 Ill.App.3d 95, 101, 276 Ill.Dec. 110, 793 N.E.2d 869 (2003)(*Lewis* );*Carey,* 999 F.Supp. at 1118;*Allgood v. General Motors Corp.,* 2005 WL 2218371 (S.D.Ind. Sept.12, 2005)(*Allgood* );*Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 976-78 (Utah 1993)(*Hansen* ). The latent nature of such diseases and injuries can present problems when the claims are analyzed under the traditional common law tort doctrine because, generally, a present injury needs to manifest before it is compensable. *See Paoli,* 916 F.2d at 850;*Lewis,* 342 Ill.App.3d at 100-01, 276 Ill.Dec. 110, 793 N.E.2d 869. For example, in Illinois, an increased risk of future harm, without more, is insufficient to

support an award of damages under the theories of strict liability, negligence, or willful and wanton misconduct. *See Dillon v. Evanston Hosp.,* 199 Ill.2d 496-507 (2002)(*Dillon* ).

*6 However, that is not what is sought in this case. "There is a fundamental difference between a claim seeking damages for an increased risk of future harm and one which seeks compensation for the cost of medical examination."*Lewis,* 342 Ill.App.3d at 101, 276 Ill.Dec. 110, 793 N.E.2d 869. In a claim seeking damages for an increased risk of harm, the injury is the anticipated harm itself. To the contrary, here in their prayer for medical monitoring, the Plaintiffs are seeking damages, which are costs of the examination, for a medical examination to detect a possible physical injury. Contrary to a claim seeking damages for an anticipated increased risk of future harm, "a claim seeking damages for the costs of medical examinations is not speculative and the necessity for such examination is capable of proof within a reasonable degree of medical certainty."*Lewis,* 342 Ill.App.3d at 101, 276 Ill.Dec. 110, 793 N.E.2d 869;*see also Carey,* 999 F.Supp. at 1119;*Paoli,* 916 F.2d at 851;*see also, Dillon,* 199 Ill.2d at 497-504, 264 Ill.Dec. 653, 771 N.E.2d 357 ("a plaintiff must be permitted to recover for *all* demonstrated injuries"). The *Lewis* court explained:

If a defendant's breach of duty makes it necessary for a plaintiff to incur expenses to determine if he or she has been physically injured, we find no reason why the expense of such an examination is any less a present injury compensable in a tort action than the medical expenses that might be incurred to treat an actual physical injury caused by such a breach of duty.

*Lewis,* 342 Ill.App.3d at 101-02, 276 Ill.Dec. 110, 793 N.E.2d 869.

Precision argues that the medical monitoring claim in *Lewis* is distinguishable because that claim did not involve a demand, as here, for long-term medical monitoring of persons alleging no present injury. Precision reads *Lewis* too narrowly. The *Lewis*

plaintiffs sought to compel the defendants to reimburse and pay the plaintiffs and the class members "for the costs of all medical screenings, assessments, and monitoring of their minor children."*Lewis,* 342 Ill.App.3d at 99, 276 Ill.Dec. 110, 793 N.E.2d 869. The *Lewis* plaintiffs' allegations and the *Lewis* court's holding do not indicate that the costs of medical monitoring were sought only to detect a present physical injury.

A Federal Court in this district has also held that a claim for medical monitoring was cognizable in Illinois. *Carey,* 999 F.Supp. at 1119. Precision first argues that the *Carey* decision is of no weight because that court permitted an interlocutory appeal because the medical monitoring issue involved a controlling question of law as to which there was substantial ground for difference of opinion and an immediate appeal may materially advance the ultimate termination of the litigation, *see*18 U.S.C. § 1292(b).[FN1] However, the recognition of the debatable nature of the issue does not diminish the precedential value of the *Carey* court's careful and persuasive analysis of the issue.

> FN1. The Seventh Circuit Court of Appeals declined to hear the appeal, and the case was later settled.

Precision also cites two decisions, subsequent to *Carey,* holding that medical monitoring claims were not cognizable under Michigan and Texas law. *See Henry v. Dow Chem. Co.,* 473 Mich. 63 (2005)(*Henry* );*Norwood v. Raytheon Co.,* 414 F.Supp.2d 659 (W.D.Texas 2006)(*Norwood* ). Both the *Henry* and *Norwood* courts emphasized that no court in Michigan or Texas had ever authorized a medical monitoring claim in the absence of a physical injury. *See Henry,* 473 Mich. at 80-83, 701 N.W.2d 684;*Norwood,* 414 F.Supp.2d at 664. Here, both an Illinois appellate court and a federal court interpreting Illinois law have found that a medical monitoring claim is cognizable in Illinois. Furthermore, numerous other state and federal courts have recognized medical monitoring claims in the absence of a physical injury. *See, e.g., Allgood,* 2005

WL 2218371 at \*8 (Indiana); *Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28 (1987) (Arizona); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993) (California); *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287 (1987) (New Jersey); *Redland Soccer Club, Inc. v. Department of the Army,* 548 Pa. 178, 696 A.2d 137 (1997) (Pennsylvania); *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970 (1993) (Utah); *Bower v. Westinghouse Elec. Corp.,* 206 W.Va. 133, 522 S.E.2d 424 (1999) (West Virginia).

\*7 Lastly, Precision cites *Metro-North Commuter R.R. Co. v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997)(*Buckley* ). That Court held that a plaintiff, who filed suit under the Federal Employers' Liability Act ("FELA"), was not entitled to a lump-sum payment of damages for medical monitoring after being exposed to asbestos-laden insulation. *Buckley,* 521 U.S. at 438-441. However, the broad remedy sought in *Buckley* is readily distinguishable to the remedy prayed for in the instant case. The *Buckley* plaintiff sought a lump-sum payment for "the *extra* monitoring costs, over and above those otherwise recommended...."*Buckley,* 521 U.S. at 441 (emphasis in original). Furthermore, the Supreme Court in *Buckley,* after canvassing state law cases that had considered this issue, specifically limited its ruling to the matter before the Court. It did not "express any view ... about the extent of which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than the rule [the Court] considered."*Buckley,* 521 U.S. at 444.

Based on the above, relief in the form of medical monitoring as sought by Plaintiffs is cognizable under Illinois law.

CONCLUSION

For the foregoing reasons, Precision's Motion for Judgment Denying Plaintiffs' Claim for Medical

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1519571 (N.D.Ill.)
**(Cite as: Slip Copy, 2006 WL 1519571)**

Monitoring is denied.

N.D.Ill.,2006.
Muniz v. Rexnord Corp.
Slip Copy, 2006 WL 1519571 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3

Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)**

**H**
Allgood v. General Motors Corp.
S.D.Ind.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana, Indiana-
polis Division.
Darren ALLGOOD, et al, Plaintiffs,
v.
GENERAL MOTORS CORPORATION, Defend-
ant.
**No. 102CV1077DFHTAB.**

Sept. 12, 2005.

James A. Knauer, William Bock, III, Gregory P.
Cafouros, Jay P. Kennedy, David E. Wright, Reyn-
olds B. Brissenden, Kroger Gardis & Regas, LLP,
Indianapolis, IN, Brian J. Leinbach, Elizabeth L.
Crooke, Walter J. Lack, Engstrom Lipscomb &
Lack, Carrie J. Rognlien, Robert William Finnerty,
Thomas Vincent Girardi, Girardi & Keese, Los
Angeles, CA, for Plaintiffs.
Bruce A. Featherstone, Frank C. Porada, Feather-
stone Desisto LLP, Denver, CO, Lee B. McTurnan,
John F. McCauley, McTurnan & Turner, Indiana-
polis, IN, Martin Czinczel Calhoun, Frank Leone,
Ignacia S. Moreno, Katharine R. Latimer, Traci
Meakem Richmond, Spriggs & Hollingsworth,
Washington, DC, for Defendant.

ENTRY ON MEDICAL MONITORING MOTION

HAMILTON, J.
*1 Defendant General Motors Corporation has
moved to dismiss plaintiffs' demands for medical
monitoring damages. The motion is cast as a mo-
tion pursuant to Rule 12(b)(6), Rule 12(c), and/or
Rule 56 of the Federal Rules of Civil Procedure.
Docket No. 170.For reasons stated below, the mo-
tion is denied.

*Plaintiffs' Allegations*

Plaintiffs are residents of Lawrence County, Indi-
ana. The adult plaintiffs own property along or near
a creek called Bailey's Branch, which is a tributary
of Pleasant Run Creek. For many years, defendant
General Motors has owned and operated an alumin-
um casting facility called the Bedford Foundry up-
stream of Bailey's Branch and Pleasant Run Creek.

Plaintiffs allege that over a period of years since
1965, General Motors has polluted plaintiffs' prop-
erty, including the surface water and ground water,
with polychlorinated biphenyls ("PCBs"). Plaintiffs
allege that soil samples from their properties show
abnormally high levels of PCBs. Plaintiffs'
amended complaint identifies several specific spills
and floods in which PCBs were released into
ground and surface waters. All plaintiffs allege that
PCBs have contaminated their soil and their
groundwater, as well as fish and wildlife in the
area. Several plaintiffs allege that their wells for
drinking water were contaminated by the PCBs re-
leased by General Motors. Plaintiffs also allege that
they have been exposed to PCBs discharged into
the air and borne by winds and dust onto their prop-
erty and into the air they have breathed.

Plaintiffs have alleged claims for negligence, nuis-
ance, trespass, and unjust enrichment. They have
also included an allegation of wanton and willful
conduct aimed at recovering punitive damages. No
plaintiff alleges that he or she is currently suffering
any specific illness or adverse physical effects res-
ulting from exposure to PCBs. In their prayer for
relief, plaintiffs ask that the court "award Plaintiffs
the reasonable and necessary costs of medical mon-
itoring of the Plaintiffs' health over their lifetimes,
due to Plaintiffs' exposure to PCBs on their prop-
erty."

General Motors' pending motion is aimed at this
prayer for relief. General Motors contends that such
medical monitoring relief cannot possibly be avail-
able to a plaintiff under Indiana law in the absence
of proof that the plaintiff has suffered some present
bodily injury as a result of the PCB contamination.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)
Page 2

This question of tort law is one that has divided state and federal courts in recent decades. See, *e.g., Metro-North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 438-44, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (collecting cases, declining to recognize broad tort action for lump sum award of damages for medical monitoring for asbestos exposure under Federal Employers' Liability Act, but leaving open possibility of a narrower action); *id.* at 449-52 (Ginsburg, J., dissenting in part) (arguing that FELA should recognize claim to reflect the difference in cost between medical tests a reasonable physician would prescribe for unexposed persons and reasonable monitoring regime for person with plaintiff's exposure).

*2 In considering a motion to dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c), the court must treat as true all factual allegations in the complaint and must give the plaintiffs the benefit of factual assertions that are not inconsistent with the complaint's allegations. See, *e.g., Olson v. Wexford Clearing Servs. Corp.,* 397 F.3d 488, 490 (7th Cir.2005) (same standard under both provisions); *Trevino v. Union Pacific Railroad Co.,* 916 F.2d 1230, 1239 (7th Cir.1990) (reversing dismissal). In considering a motion for summary judgment under Rule 56, the court must consider evidence, but must consider the evidence in the light reasonably most favorable to the non-moving parties. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this particular case, General Motors seeks summary judgment based solely on the plaintiffs' statements that they do not intend to offer evidence at trial of any present physical injury, so the legal issue is essentially identical under any of the three procedural routes General Motors has sought to use.

For purposes of General Motors' pending motion, the court therefore must assume the following: PCBs are persistent and highly toxic carcinogens that accumulate in the body. Exposure to PCBs above background levels in the environment can greatly increase a person's risk for a number of serious and even life-threatening diseases. Exposure to PCBs does not typically result in immediate manifestation of disease or injury. Instead, cumulative harmful effects can include immune suppression, liver damage, thyroid disease, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer, diabetes, and reproductive disorders.

The court must also assume that periodic medical testing and diagnostic procedures-beyond those that would be recommended for someone without plaintiffs' exposure to PCBs-can identify many of the illnesses caused by PCB exposure. Early detection can greatly increase the cure rates and mitigate the harm caused by the exposure. The court also assumes that plaintiffs can prove that regular medical monitoring is a reasonable and medically necessary response to the exposure they have experienced as a result of General Motors' actions.

In other words, the court must assume for purposes of General Motors' motion that plaintiffs would be able to satisfy the elements of a claim for medical monitoring as set forth by the Third Circuit in applying Pennsylvania law in *In re Paoli Railroad Yard PCB Litigation:*

We ... predict that the Supreme Court of Pennsylvania would follow the weight of authority and recognize a cause of action for medical monitoring established by proving that:

1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant.

2. As a proximate result of exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.

3. That increased risk makes periodic diagnostic medical examinations reasonably necessary.

*3 4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)

916 F.2d 829, 852 (3d Cir.1990); see also *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 785-87 (3d Cir.1994) (reversing summary judgment for defendants and adhering to view of Pennsylvania law on appeal after remand).

For purposes of General Motors' motion, the court also assumes that General Motors actually knew of the dangers of PCBs, knew it was contaminating plaintiffs' property, and knew it was exposing the plaintiffs to increased dangers. That is, the court must assume that plaintiffs will be able to prove not only that General Motors was negligent but that General Motors acted deliberately, knowingly, willfully, and/or wantonly in subjecting plaintiffs to this contamination over a period of decades.

### Discussion

Plaintiffs' requests for medical monitoring damages are governed by Indiana law. "Where state law provides the rule of decision, the federal courts must predict how the highest court of the state would decide the case if presented with the case today."*Klunk v. County of St. Joseph,* 170 F.3d 772, 777 (7th Cir.1999); *McGeshick v. Choucair,* 72 F.3d 62, 65 (7th Cir.1995); *Konradi v. United States,* 919 F.2d 1207, 1213 (7th Cir.1990). Where the state's highest court has not addressed an issue, the federal courts examine the decisions of the lower state courts. *E.g., Klunk,* 170 F.3d at 777;*King v. Damiron Corp.,* 113 F.3d 93, 95 (7th Cir.1997). The Seventh Circuit reads decisions of the Indiana Court of Appeals as providing "strong indication of how it believes the Supreme Court would decide a similar question, unless there is a persuasive reason to believe otherwise."*General Accident Ins. Co. of America v. Gonzales,* 86 F.3d 673, 675 (7th Cir.1996); accord, *Fidelity Union Trust Co. v. Field,* 311 U.S. 169, 177, 61 S.Ct. 176, 85 L.Ed. 109 (1941) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court

in deciding a state question."); *cf. Rodrigue v. Olin Employees Credit Union,* 406 F.3d 434, 442-43 (7th Cir.2005) (predicting that state supreme court would not follow a particular decision by an intermediate appellate court).

Plaintiffs rely on *Gray v. Westinghouse Electric Corp.,* 624 N.E.2d 49 (Ind.App.1993), another case involving PCB contamination. Plaintiffs in that case lived adjacent to a city dump. They alleged that Westinghouse had hired contractors to dispose of PCBs at the dump over a period of years. The lead plaintiff Gray's claims were dismissed and dismissal was affirmed on procedural grounds. The substantive decision concerned plaintiff Griffin, who sued for nuisance alleging that the contamination of his property had made it unmarketable. He also alleged that the contamination had put his health at risk. He sought "compensation ... for medical monitoring to diagnose health problems caused by latent disease processes."624 N.E.2d at 52.

*4 The trial court dismissed Griffin's claim for failure to state a claim upon which relief can be granted. The Court of Appeals reversed. The Court of Appeals held that Westinghouse could be held liable under a nuisance theory for contamination from a city dump it did not own, and based on activities of independent contractors it had hired to dispose of the PCBs it had generated.

Another issue was whether Griffin had adequately pled damages under his nuisance theory. Because the passage is critical to the current motion, the court quotes the discussion in full:

Finally, Griffin argues that because his property is unmarketable and his health is at risk from PCB contamination, the issue of damages is sufficiently pled. Westinghouse maintains that Griffin's contentions are insufficient to entitle him to damages for medical monitoring or loss in the fair market value of his property. Whether Griffin is entitled to damages, and how much, is a question of fact. However, the nuisance statute does require a plaintiff to plead that the situation is injurious to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)

health or offensive to senses or obstructive of free use of property, so as to interfere with comfortable enjoyment of life or property. But, actual physical damage to person or property need not be alleged. *Friendship Farms Camps, Inc. v. Parson* (1977), 172 Ind.App. 73, 359 N.E.2d 280, 282 (physical illness need not be shown); *Muehlman v. Keilman* (1971), 257 Ind. 100, 272 N.E.2d 591, 593 (damage to property not required). Evidence of inconvenience, annoyance and discomfort can all be grounds for recovery of damages in a nuisance action. *E.g., Id.;Cox,* 147 Ind.App. 530, 262 N.E.2d 550;*Keane v. Pachter* (1992), Ind.App., 598 N.E.2d 1067. Additionally, a plaintiff's fear for his safety or that of his property is sufficient to constitute a nuisance if the evidence shows that fear was reasonably justified. *Hays v. Hartfield L-P Gas* (1974), 159 Ind.App. 297, 306 N.E.2d 373, 376.

Generally, when determining what constitutes a nuisance, the question is whether it is reasonable to believe that the situation would naturally produce physical discomfort to persons of ordinary sensibilities, tastes and habits.*Wendt v. Kerkhof,* (1992), Ind.App., 594 N.E.2d 795, 797. Taken as true, Griffin's allegations that his property is unmarketable and his health is at risk due to PCB contamination are sufficient to sustain a nuisance claim. We think it is reasonable to believe that a substantial financial loss, combined with whatever health risks and consternation Griffin may have suffered due to the possible contamination of his property with a carcinogen, would cause physical discomfort. Griffin's proof of these allegations will determine whether a nuisance in fact exists and the damages to which he is entitled.*Hays,* 306 N.E.2d at 376. We hold that Griffin has stated a claim upon which relief can be granted and, therefore, find that the trial court improperly dismissed Griffin's complaint and remand for action consistent with this opinion.

*5 624 N.E.2d at 54.

What does this passage tell us? First, Griffin's nuisance claim cannot be distinguished from plaintiffs' nuisance claims in this case on any relevant ground.

Like the plaintiffs in this case, he was alleging PCB contamination of his property caused by activity at a nearby property. Like the plaintiffs in this case, he sought compensation for both the harm to his property value and for medical monitoring to address enhanced risks from exposure to the same carcinogen. Second, the dismissal of the claim for medical monitoring damages was reversed. These aspects of the case support plaintiffs' request for medical monitoring damages.

The passage in *Gray* also illustrates a point that can be obscured when lawyers and courts write of "claims" for medical monitoring costs. The *Gray* court did not treat medical monitoring costs as an independent cause of action, but simply as one form of relief that could be available under the traditional common law tort of nuisance. Accord, *e.g., Badillo v. American Brands,* 117 Nev. 34, 16 P.3d 435, 441 (Nev.2001) (declining to recognize independent cause of action for medical monitoring costs from exposure to second-hand tobacco smoke, but holding open the possibility of allowing medical monitoring costs as elements of damage for established cause of action); *Verbryke v. Owens-Corning Fiberglas Corp.,* 84 Ohio App.3d 388, 616 N.E.2d 1162, 1167 (Ohio App.1992) (reversing summary judgment for defendant where asbestos exposure made it medically prudent to monitor plaintiff's condition, and where "required medical surveillance supports pecuniary harm" to plaintiff).

At the same time, some aspects of the *Gray* decision weaken its support for plaintiffs. The court's treatment of the issue as a factual one does not give clear guidance on what might be required in terms of proof to obtain such relief. Also, the court's opinion does not indicate that the court intended to choose sides in the national debate among state courts on the medical monitoring issue. Still, the step of allowing medical monitoring damages is less radical than General Motors suggests here. As then-Judge Starr explained in a decision affirming an interim award of the costs of diagnostic testing:

To aid our analysis of whether tort law should en-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)

compass a cause of action for diagnostic examinations without proof of actual injury, it is useful to step back from the complex, multi-party setting of the present case and hypothesize a simple, everyday accident involving two individuals, whom we shall identify simply as Smith and Jones:

Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

*6 From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action. A cause of action allowing recovery for the expense of diagnostic examinations recommended by competent physicians will, in theory, deter misconduct, whether it be negligent motorbike riding or negligent aircraft manufacture. The cause of action also accords with commonly shared intuitions of normative justice which underlie the common law of tort. The motorbike rider, through his negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services-a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life. Under these principles of tort law, the motorbiker should pay.

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 746 F.2d 816, 825 (D.C.Cir.1984). In *Friends for All Children,* a plane crash had caused all of the plaintiffs to suffer from oxygen deprivation. There was a medical need for prompt, comprehensive, and expensive diagnostic examinations for potential brain damage, so that effective treatment could begin for those with brain injuries. It was also clear that the crash had been the proximate cause of the need for those examinations. Accordingly, the

costs of the diagnostic examinations were simply part of the damages proximately caused by the tort.

By reinstating the complaint and its allegations of damage in the form of the need for medical monitoring, the *Gray* court appears to have accepted essentially the same theory in the context of exposure to PCBs, though obviously without much explanation. The court relied on prior cases teaching that fear for safety could support a nuisance action if the fear was "reasonably justified." 624 N.E.2d at 54, citing *Hays v. Hartfield L-P Gas,* 159 Ind.App. 297, 306 N.E.2d 373, 376 (Ind.App.1974) (affirming trial court ruling that storage of liquid propane gas was not a nuisance where there was no evidence to show neighbors' fears for safety were "reasonably justified"). For present purposes, this court must assume that plaintiffs will be able to prove that their concerns about their future health are reasonably justified. The question then would become whether they could prove that the expenses of medical monitoring are reasonably necessary and that tortious acts by General Motors were a proximate cause of those expenses.

General Motors relies on two decisions by Judge McKinney of this court. In *Baker v. Westinghouse Electric Corp.,* No. IP 90-2036-C (S.D. Ind. June 25, 1991), the lead plaintiff alleged that he had worked for Westinghouse and that the company had allowed him to remove for his own use some insulation contaminated with PCBs. After the contaminated insulation was removed from the residence, the lead plaintiff and his family sued for the reduced value of the property and for the costs of medical monitoring. Plaintiffs relied on the Third Circuit decision in *Paoli Railroad Yards* to support their claim. Judge McKinney predicted that the Indiana Supreme Court would not follow that decision. Judge McKinney cited Indiana precedent holding that a plaintiff must have sustained injuries to recover damages in tort, and he observed that the defendant's "finite resources" should be "preserved to provide a remedy for the presently physically injured plaintiff."Slip op. at 9-10. More recently,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)

Judge McKinney adhered to that view in a short decision that observed without further discussion or citation that a medical monitoring claim "is not cognizable in the State of Indiana."*Hunt v. American Wood Preservers Institute*, No. IP 02-389-C (S.D.Ind. July 31, 2002) (granting motion to dismiss medical monitoring claim).

**\*7** Courts and counsel have made respectable arguments for both approaches to medical monitoring remedies in the absence of a present injury. The opinions of Justices Breyer and Ginsburg in *Metro-North Commuter Railroad Co. v. Buckley* provide a good starting point, see 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560, but there are numerous opinions from around the nation. In support of plaintiffs, see, *e.g., In re Paoli Railroad Yards PCB Litig.*, 935 F.2d at 849-52;*Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (Ariz.App.1987); *Potter v. Firestone Tire and Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 822-23 (Cal.1993); *Bourgeois v. A.P. Green Indus., Inc.*, 716 So.2d 355 (La.1998);[FN1] *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287, 311-12 (N.J.1987); *Redland Soccer Club, Inc. v. Dep't of the Army*, 548 Pa. 178, 696 A.2d 137, 145 (Pa.1997); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979-80 (Utah 1993); *Bower v. Westinghouse Electric Corp.*, 206 W.Va. 133, 522 S.E.2d 424, 429-34 (W.Va.1999). In support of defendant, see, *e.g., Henry v. Dow Chemical Co.*, 473 Mich. 63, 701 N.W.2d 684 (Mich.2005); *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849 (Ky.2002); *Hinton v. Monsanto Co.*, 813 So.2d 827, 831 (Ala.2001); *Trimble v. Asarco, Inc.*, 232 F.3d 946, 963 (8th Cir.2000) (applying Nebraska law), overruled on jurisdictional issue, *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); *Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir.1991) (applying Virginia and West Virginia law before West Virginia Supreme Court's decision in *Bower* ).

> FN1. The decision in *Bourgeois* was superseded on this point by a statute excluding

future medical monitoring as damages in tort cases. See *Edwards v. State ex. rel. Dep't of Health and Hospitals*, 804 So.2d 886 (La.App.2001) (discussing 1999 amendment to Louisiana Civil Code article 2315).

In terms of pronouncements from the Indiana courts, *Gray* provides the clearest available guidance, and it supports plaintiffs. If medical monitoring were not an available remedy under these circumstances, after all, the *Gray* court could have affirmed the trial court to the extent it had dismissed that request for relief. Judge McKinney's earlier prediction in *Baker* did not have the benefit of *Gray.*General Motors has reported that *Gray* was discussed in the briefs presented in the 2002 case of *Hunt*, but Judge McKinney's short entry did not address the case and therefore offers little additional guidance on this question.[FN2]

> FN2. The Indiana Supreme Court has summarily affirmed a Court of Appeals holding that medical monitoring of human beings is not a "corrective action" or an "exposure assessment" under the Indiana Underground Storage Tank Act. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 981 (Ind.1998), affirming in relevant part*Shell Oil Co. v. Meyer*, 684 N.E.2d 504, 521-22 (Ind.App.1997). That statutory determination does not guide resolution of the common law issue now before this court.

General Motors points out that *Gray* leaves unanswered questions as to the exact standards a plaintiff would need to meet to win medical monitoring damages as part of a tort recovery. Nevertheless, the decision left the door open to such claims. This court need not try to map or predict the exact boundaries of such claims for relief at this stage of this case. If plaintiffs are able to prove the elements of a recognized tort such as nuisance, then the court will need to craft jury instructions to provide more specific guidance as to available remedies. For now, it is enough to say that the limited evidence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2218371)

from *Gray* supports a provisional prediction that the Indiana courts are likely to recognize a claim for medical monitoring damages as part of the remedy for a nuisance claim even if there is no evidence of a present physical injury.

**\*8** Plaintiffs have suggested that the court should consider certifying a question of law to the Indiana Supreme Court concerning the availability of medical monitoring damages. There may come a time in this case when that step should be taken, either by this court or perhaps the Seventh Circuit. If the issue is presented to the state court in that manner, however, it would probably make most sense to do so only when it is crystal clear that the question of law will in fact be decisive, and to give the state court a full factual record. At the present time, for example, it is easy to imagine the prospect of a series of certified questions at preliminary stages of the case. The state court is unlikely to be receptive to such an approach. Instead, the case will develop in this trial court, and questions of law can be decided once the facts have been developed and found. Cf. *Konradi v. United States,* 919 F.2d 1207, 1213 (7th Cir.1990) ("The more nebulous or unsettled the legal standard, the more difficult it should be to exclude contested facts from consideration on the ground that they are immaterial.").

Accordingly, defendant General Motors' motion to dismiss plaintiffs' prayers for the costs of medical monitoring and for summary judgment on the same issue is hereby denied.

So ordered.

S.D.Ind.,2005.
Allgood v. General Motors Corp.
Not Reported in F.Supp.2d, 2005 WL 2218371 (S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4

Westlaw.

Slip Copy                                                                                              Page 1
Slip Copy, 2007 WL 2840476 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2840476)**

**C**
Gershengorin v. Vienna Beef, Ltd.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Morris GERSHENGORIN, Michael Smolyansky,
and Marina Bartashnik, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
VIENNA BEEF, LTD., individually and on behalf
of a defendant class of all Authentic Vienna Beef
Hot Dog Stands, Defendants.
No. 06 C 6820.

Sept. 28, 2007.

Allison Amy Krumhorn, Lance A. Raphael, Stacy
Michelle Bardo, Chicago, IL, Brian Lewis
Bromberg, Bromberg Law Office, P.C., New York,
NY, for Plaintiffs.
Michael D. Hayes, Varga, Berger, Ledsky, Hayes &
Casey, Thomas John Verticchio, Swanson, Martin
& Bell, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

HART, J.
*1 In this putative class action, named plaintiffs
Morris Gershengorin, Michael Smolyansky, and
Marina Bartashnik allege they were deceived and
contract warranties were breached by named de-
fendant [FN1] Vienna Beef Ltd.'s representations that
its Vienna Beef Natural Casing Hot Dogs ("Casing
Dogs") were all beef despite the fact that they were
made with pork casings. All the named plaintiffs
purchased Casing Dogs at Authorized Stands. Ger-
shengorin and Smolyansky also purchased Casing
Dogs at a Vienna Beef factory store (Vienna Beef
Cafe). It is alleged that the representations were
contained in Vienna Beef supplied signs displayed
at Authorized Stands and in Vienna Beef advert-
ising. It is also alleged that the representations were
on Vienna Beef's website, but none of the named

plaintiffs allege that they visited that website prior
to purchasing any Casing Dog. Presently pending is
named defendant's motion to dismiss all claims, or,
alternatively, to strike the allegations regarding the
website.

> FN1. A putative class of defendants is also
> alleged consisting of all Authentic Vienna
> Beef Hot Dog stands ("Authorized
> Stands").

This action was originally filed in state court, but
removed based on there being diversity jurisdiction
in accordance with the Class Action Fairness Act of
2005. *See*28 U.S.C. §§ 1332(d), 1453. After remov-
al, plaintiffs filed their Corrected First Amended
Class Action Complaint ("CFAC"). The CFAC
contains five counts. Count I is a breach of express
warranty claim based on the Illinois Uniform Com-
mercial Code, [FN2] specifically 810 ILCS 5/2-313.
Count II is a UCC nonconformity of goods claim
based on 810 ILCS 5/2-301. Count III is a
"Consumer Fraud (Deception)" claim for violation
of the Illinois Consumer Fraud and Deceptive Busi-
ness Practices Act ("ICFA"), [FN3] 815 ILCS 505/2,
510/2(5), (7), (12). Count IV is a "Consumer Fraud
(Unfairness)" claim for violation of the ICFA, 915
ILCS 505/2. Count V is a common law unjust en-
richment claim.

> FN2. The putative class is national in
> scope. It is generally alleged that other
> states have similar UCC provisions.

> FN3. It is generally alleged that other
> states have similar statutory provisions.

Defendant contends the consumer fraud counts fail
because not pleaded with the specificity required by
Fed.R.Civ.P. 9(b). Plaintiffs concede that Rule 9(b)
applies to ICFA claims. *Davis v. G.N. Mortgage
Corp.,* 396 F.3d 869, 883 (7th Cir.2005); *Brown v.
SBC Communications, Inc.,* 2007 WL 684133 *5
(S.D.Ill. March 1, 2007); *United States v. All Meat*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 2
Slip Copy, 2007 WL 2840476 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2840476)

*& Poultry Products Stored at Lagrou Cold Storage,*
470 F.Supp.2d 823, 830 (N.D.Ill.2007).

To satisfy the requirements of Rule 9(b), a plaintiff
must "identi[f]y ... the person making the misrep-
resentation, the time, place, and content of the mis-
representation, and the method by which the mis-
representation was communicated."*Uni*Quality,
Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th
Cir.1992) (quoting *Bankers Trust Co. v. Old Repub-
lic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)). In
other words, the plaintiff must plead "the who,
what, when, where, and how: the first paragraph of
any newspaper story."*Crichton v. Golden Rule Ins.
Co.,* Civil No. 06-264-GPM, 2006 WL 2349961, at
*4 (S.D.Ill. Aug.11, 2006) (quoting *DiLeo v. Ernst
& Young,* 901 F.2d 624, 627 (7th Cir.1990)). The
purpose of Rule 9(b) is "to ensure that the party ac-
cused of fraud ... is given adequate notice of the
specific activity that the plaintiff claims constituted
the fraud so that the accused party may file an ef-
fective responsive pleading,"*Lachmund v. ADM In-
vestor Servs., Inc.,* 191 F.3d 777, 783 (7th
Cir.1999), and to compel plaintiffs to undertake ad-
equate pre-filing investigation of claims of fraud, so
that defendants are not injured by groundless
charges of deceit. *SeeAckerman v. Northwestern
Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999)
("The purpose ... of the heightened pleading re-
quirement in fraud cases is to force the plaintiff to
do more than the usual investigation before filing
his complaint. Greater precomplaint investigation is
warranted in fraud cases because public charges of
fraud can do great harm to the reputation of a busi-
ness firm or other enterprise (or individual).").

**2** *Brown,* 2007 WL 684133 at *5. Fair notice is the
most basic consideration. *Vicom, Inc. v. Harbridge
Merchant Services, Inc.,* 20 F.3d 771, 777-78 (7th
Cir.1994); *United States ex rel. Salmeron v. Enter-
prise Recovery Systems, Inc.,* 464 F.Supp.2d 766,
768 (N.D.Ill.2006); *S.E.C. v. Black,* 2005 WL
1498893 *3 (N.D.Ill. June 17, 2005); *ABN AMRO
Mortgage Group, Inc. v. Maximum Mortgage, Inc.,*
2005 WL 1162889 *1 (N.D.Ind. May 16, 2005).

As to named plaintiffs themselves,[FN4] the repres-
entations at issue allegedly appeared in advertising
and on signage found at Authorized Stands and the
factory store. Plaintiffs do not describe or identify
any of the advertising, so any claim based on mis-
representations in advertising is not alleged with
sufficient particularity. *SeeIn re McDonald's
French Fries Litigation,* --- F.Supp.2d ----, 2007
WL 1576550 *2 (N.D.Ill. May 30, 2007); *All Meat,*
470 F.Supp.2d at 830.

> FN4. It is alleged that some members of
> the putative class also saw the representa-
> tions contained on named defendant's web-
> site.

As to signage, plaintiffs allege:

On information and belief, up and until the time
that this lawsuit was filed, Vienna Beef provided its
authorized sellers with signage and various advert-
isements stating that its products are "beef," "pure
beef," and/or "all-beef." Neither this signage nor
any advertisements disclosed that the Natural Cas-
ing products were made with pork casing.

CFAC ¶ 16. It is also alleged that some signs stated
"100% beef." *Id.* ¶ 55.

In another paragraph, not containing the informa-
tion and belief limitation, it is alleged that all the
Authorized Stands and the factory store,[FN5] use
the same processes for selling the Casing Dogs. *Id.*
¶ 42.It is alleged that the advertising materials used
by these stores are materially identical and
provided by Vienna Beef. *Id.* As used in this para-
graph, advertising materials would include store
signage. No photograph or copy of a particular sign
is provided as an exhibit to the CFAC. There is no
allegation in the CFAC describing any particular
sign. The only description of the signage is that it
contains one of the words or phrases listed above
and does not contain any mention of the casing be-
ing pork.

> FN5. Plaintiffs do not expressly refer to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the factory store in this paragraph, but the reference to Vienna Beef itself would necessarily include the factory store.

Named plaintiffs do identify the particular stores at which they purchased Casing Dogs. They do not identify specific dates for purchases, but do allege that they made purchases in Summer 2006 and that these stores had the signage at issue during that time period. When widespread, multiple acts of fraud are alleged, it generally will suffice to outline the scheme and allege some specific examples of the fraudulent acts. *See United States v. Cancer Treatment Centers of America,* 2003 WL 21504998 *1 (N.D.Ill. June 30, 2003); *Pressalite Corp. v. Matsushita Electric Corp. of America,* 2003 WL 1811530 *8 (N.D.Ill. April 4, 2003). If plaintiffs had provided some concrete examples of the signage at issue, it would be clear that they satisfied the Rule 9(b) requirement. Even without such concrete examples, however, it is held that named plaintiffs have provided named defendant with fair notice of the fraud supporting their ICFA claims. The representations at issue are not complex. Plaintiffs simply contend that describing the Casing Dogs as all, pure, or 100% beef without any disclosure of the pork casing is a misrepresentation. Whether the sign also lists a price or other information or contains a picture of a hot dog or some other graphics is not material. All that is material is that the sign contains the pertinent phrase, does not mention pork,[FN6] and is noticed by the customer. Plaintiffs' allegations that the signage contains such contents, that they saw such signs at the particular stores they visited in Summer 2006, and that all Authorized Stands and the factory store contain such signs constitute sufficient notice to named defendant to prepare a defense to the fraud claims. The consumer fraud claims will not be dismissed for failure to satisfy Rule 9(b).

> FN6. Plaintiffs do not simply allege that the signs themselves do not mention pork; they allege that Vienna Beef does not otherwise disclose to retail customers that the

casings contain pork. It is alleged by plaintiffs that the use of pork casings is only disclosed on an ingredient label that is placed on the wholesale boxes of Casing Dogs that are provided to stands. CFAC ¶ 36. Apparently, the types of packaged hot dogs sold at retail stores do not include Casing Dogs, only other types of hot dogs that have no separate casing made from pork intestines.

*3 Defendant also contends that the consumer fraud claims are preempted by federal law concerning the labeling of food.[FN7] Defendant contends that the label placed on the wholesale boxes satisfies Department of Agriculture labeling requirements so any claim based on failure to otherwise disclose the use of pork casings is preempted. Plaintiffs contend any preemptive effect is limited to labeling and does not apply to claims of fraudulent statements in marketing communications.

> FN7. Defendant contends the unjust enrichment claim would also be preempted to the extent it is not based on a contract. Defendant does not contend that the UCC warranty claims, which are based on a private contract, would be preempted.

Meat and meat foods, such as Casing Dogs, are governed by the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 601-95, and the regulations promulgated thereunder by the Department of Agriculture. Section 678 provides in part: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State ... with respect to articles prepared at any establishment under inspection...." The parties agree that Vienna Beef's production facilities are an "establishment under inspection" as that term is used in § 678. The FMIA defines "label" as "a display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article," 21 U.S.C. § 601(o), and "labeling" as "all labels and other written, printed or graphic

Slip Copy                                                                                     Page 4
Slip Copy, 2007 WL 2840476 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2840476)

matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."*Id.* § 601(p).

In order to be preempted by the provision relied upon by defendant, state statutory or common law must (1) affect marking, labeling, packaging, or ingredient requirements (2) in a manner in addition to or different from the FMIA requirements on those subjects. Plaintiffs are not complaining that the labeling or marking on Casing Dog wholesale packages is deficient or misleading, nor do they contend that additional ingredients should be listed. Instead, they are complaining about fraudulent misrepresentations contained in signage at the stands where Casing Dogs are sold. The FMIA does not preempt regulation of signage separate from the marking or labeling on meat packaging itself. *See United States v. Stanko,* 491 F.3d 408, 418 (8th Cir.2007) (this provision of § 678 does not preempt state unfair-trade-practices laws).*See also Cavel International, Inc. v. Madigan,* --- F.3d ----, 2007 WL 2736624 *3 (7th Cir. Sept.21, 2007) (FMIA inspection provision is not applied literally).*Cf.Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 125 S.Ct. 1788, 1798-99, 161 L.Ed.2d 687 (2005) (similarly worded labeling or packaging preemption provision of Federal Insecticide, Fungicide, and Rodenticide Act, 7U.S.C. § 136v(b), does not preempt fraud claim based on oral statements made by the salesperson). Plaintiffs' consumer fraud claims are not preempted. Counts III and IV will not be dismissed.

Next to be considered are the warranty claims. Rule 9(b) does not apply to these claims. Therefore, plaintiffs need not plead particularized facts. They need only plead facts sufficient to raise a right to relief above the speculative level, providing fair notice and an appearance of plausibility. *See Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, ---- - ---- & n. 14, 127 S.Ct. 1955, 1965, 1973-74 & n. 14, 167 L.Ed.2d 929 (2007); *Erickson v. Pardus,* --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); *St. John's United Church of Christ v. City of Chicago,* --- F.3d ----, 2007 WL 2669403 *7

(7th Cir. Sept.13, 2007); *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC.,* --- F.3d ----, 2007 WL 2406859 *4 (7th Cir. Aug.24, 2007); *Pisciotta v. Old National Bancoro,* --- F.3d ----, 2007 WL 2389770 *3 (7th Cir. Aug.23, 2007). A complaint should be dismissed if "the factual detail ... [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."*St. John's,* 2007 WL 2669403 at *7 (quoting *Airborne,* 2007 WL 2406859 at *4). The well-pleaded allegations of the complaint must be taken as true and all reasonable inferences drawn in plaintiffs' favor. *Twombly,* 127 S.Ct. at 1965;*Erickson,* 127 S.Ct. at 2200;*Pisciotta,* 2007 WL 2389770 at *3;*Caldwell v. Jones,* --- F.Supp.2d ----, 2007 WL 2745702 *2 (N.D.Ind. Sept.19, 2007)."[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."*Twombly,* 127 S.Ct. at 1969;*Caldwell,* 2007 WL 2745702 at *2. As long as they are consistent with the allegations of the CFAC, plaintiffs may assert additional facts in their response to the motion to dismiss. *Brokaw v. Mercer County,* 235 F.3d 1000, 1006 (7th Cir.2000); *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000).

*4 Defendant contends the warranty claims fail because plaintiffs fail to allege the terms of the warranty. Plaintiffs, however, allege that Vienna Beef FN8 has warranted that Casing Dogs are all or pure beef. *See, e.g.,* CFAC ¶ 57. These warranties are alleged to have been contained in signage and advertising of Vienna Beef. *See Wheeler v. Sunbelt Tool Co.,* 181 Ill.App.3d 1088, 130 Ill.Dec. 863, 537 N.E.2d 1332, 1340-41 (4th Dist.), *appeal denied,*127 Ill.2d 644, 136 Ill.Dec. 610, 545 N.E.2d 134 (1989). Unlike the fraud claims, this allegation must be assumed to be true regardless of whether it is alleged with particularity. Plaintiffs have alleged the existence of an express warranty.

> FN8. It is also alleged that the Authorized Stands made the same warranties.

Defendant also contends that the warranty claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2840476 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2840476)**

Page 5

fail because plaintiffs did not provide the pre-litigation notice required by 810 ILCS 5/2-607(3)(a) ( "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"). Plaintiffs allege that they notified Vienna Beef of the breach through a "notice of revocation letter" and that they demanded the Vienna Beef revoke acceptance, but Vienna Beef did not provide a refund. CFAC ¶¶ 65, 69-70. Defendant contends this allegation is insufficient because it does not allege when the notice was given so it cannot satisfy the requirement that it be given within a reasonable period of time.

Plaintiffs allege they purchased Casing Dogs in Summer 2006 and learned thereafter that they contained pork. Although the CFAC does not expressly allege notice was given before the original complaint was filed, the original complaint (which was filed in November 2006) also alleges notice was given. Therefore, at most, the notice was given five months after the defect was discovered. Defendants cite no cases and make no argument regarding what constitutes timely notice. In any event, plaintiffs also expressly allege that defendant was aware that Casing Dogs contained pork, a fact that is also apparent from the allegation that defendant listed it on the ingredient label for Casing Dogs. No separate notice is required when the defendant is aware of the specific defect. *Arcor, Inc. v. Textron, Inc.,* 960 F.2d 710, 715 (7th Cir.1992); *McDonald's French Fries,* 2007 WL 1576550 at *2; *Hays v. General Electric Co.,* 151 F.Supp.2d 1001, 1010 (N.D.Ill.2001). The warranty claims will not be dismissed for failure to adequately plead notice.

As to Bartashnik only, it is argued that her warranty claims fail because she was not in privity with Vienna Beef. Unlike the other two named plaintiffs, Bartashnik only purchased a Casing Dog at an Authorized Stand, not at the factory store. Under notice pleading requirements, however, plaintiffs sufficiently allege both that Vienna Beef provided the signage and advertising at the Authorized Stands

and that Authorized Stands were Vienna Beef's agents. Bartashnik's warranty claims will not be dismissed for lack of privity. *See McDonald's French Fries,* 2007 WL 1576550 at *3-4.

*5 The warranty claims in Counts I and II will not be dismissed.

As to the unjust enrichment claim, defendant contends such a claim is not appropriate since a contract is alleged. Plaintiffs contend it is appropriate to plead in the alternative. Defendant does not dispute that pleading in the alternative is permitted, but contends that plaintiffs' unjust enrichment claim necessarily relies on a contract because all the allegations of Counts I through IV are incorporated in Count V. While the facts alleged in the prior counts are incorporated in Count V, that does not mean the legal conclusions are also incorporated. Plaintiffs may proceed on the alternative theory of unjust enrichment. As to Bartashnik, defendant also contends she cannot succeed on an unjust enrichment claim because she did not purchase a Casing Dog directly from Vienna Beef. Vienna Beef, however, is still alleged to have received benefits from wrongful conduct directed to Bartashnik. The unjust enrichment claim will not be dismissed. *See Oshana v. Coca-Cola Co.,* 472 F.3d 506, 515 (7th Cir.2006), *cert. denied,*--- U.S. ----, 127 S.Ct. 2952, 168 L.Ed.2d 264 (2007). Count V will not be dismissed.

Alternatively, Vienna Beef moves to strike the allegations regarding information on its website, on the ground that named plaintiffs do not allege that they viewed the website. These allegations, however, do not simply allege additional representations, they also include background information about how Vienna Beef functions. Also, as plaintiffs contend, these allegations of additional misrepresentations could support awarding punitive damages. Furthermore, it is alleged that putative class members viewed the website. This aspect of the motion to strike will be denied.

Defendant also contends that the class definition in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2840476 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2840476)

the CFAC should be stricken because it contains an inappropriate class definition. That is a class certification issue, not a pleading issue. This aspect of the motion to strike will be denied. No opinion is expressed regarding whether the definition alleged is an appropriate class to certify.

The motion to strike and dismiss will be denied. Named plaintiffs must promptly move for class certification. On or before October 31, 2007, named plaintiffs shall present a motion for class certification supported by a brief. If no motion is presented by that date, class certification will be denied.

IT IS THEREFORE ORDERED that defendant's motion to strike and dismiss [25] is denied. Within two weeks, defendant shall answer the Corrected First Amended Class Action Complaint. On or before October 31, 2007, named plaintiffs shall present a motion for class certification. A status hearing will be held on October 31, 2007 at 11:00 a.m.

N.D.Ill.,2007.
Gershengorin v. Vienna Beef, Ltd.
Slip Copy, 2007 WL 2840476 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.