## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| PAMELA STELLA, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 07-CV-6509 Honorable Elaine E. Bucklo |
| vs. | ) ) | Magistrate Judge Arlander Keys |
| LVMH PERFUMES AND COSMETICS USA, INC., a New York Corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANT LVMH PERFUMES AND COSMETICS, INC.'S MOTION TO DISMISS

In its opening brief, defendant LVMH Perfumes and Cosmetics, Inc. ("LVMH") demonstrated that each of plaintiff's claims suffers from a variety of claim-specific defects. But far and away the greatest problem with plaintiff's entire complaint lies in two key assertions that form the linchpin of each of plaintiff's claims. These assertions, which are stated in the complaint as naked conclusions rather than proper allegations, are that: (1) the infinitesimally small amount of lead reportedly contained in the lipstick in this case makes the product dangerous; and (2) LVMH knew it.

Because many of plaintiff's claims sound in fraud, conclusions of this kind are insufficient under Fed. R. Civ. P. 9(b), which requires that each element of her fraud claims, of which these conclusions form a principal part, be pled with specificity. Even without fraud, the heightened pleading standards articulated by the U.S. Supreme Court in *Bell Atlantic, Inc. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (holding that a plaintiff's pleading obligation requires more than "labels, conclusions, and a formulaic recitation of the elements of a cause of action"), require much more than plaintiff provides.

The problem in this case, however, extends far beyond that of a plaintiff who seeks to plead by way of bare conclusions. It is that the conclusions themselves are untenable because they are refuted both by plaintiff's own complaint and by a wide variety of official governmental records of which this Court can properly take judicial notice. Together, these materials definitively show that the trace amount of lead reportedly detected in the lipstick is not dangerous and, in any event, LVMH cannot be imputed with knowledge to the contrary. In short, plaintiff's complaint lacks – and will always lack – the substantive support that Rule 9(b), *Twombly*, and common sense require. For this reason and the other claim-specific reasons established in LVMH's opening brief, plaintiff's complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

Rather than addressing head-on the obvious defects affecting her complaint, plaintiff relies in her response on bombast, repetition, and lots of italics. But repeating the same conclusion that a trace amount of lead in lipstick is dangerous over and over (and louder and louder) is no substitute for well-pled allegations under Rule 9(b) or *Twombly*. In fact, for all of her taunting and hyperbole, it is striking that plaintiff never even mentions, let alone refutes, the calculations set forth in Ex. D to LVMH's opening brief.

The calculations in Ex. D, which are based on facts gleaned from plaintiff's own complaint, flatly refute plaintiff's misguided invocation of the FDA's lead-in-candy standard to show that the lipstick in this case is unsafe. Specifically, the calculations demonstrate that a person ingests 100 times less lead from wearing the complained-of lipstick than from eating candy containing FDA-approved amounts of lead. Given that plaintiff's candy-lipstick comparison fails under the slightest inspection, plaintiff ultimately falls back on her assertion that *any* amount of lead would render the lipstick unsafe. Although plaintiff denies making any

such assertion and indeed states that any such allegation would be "outrageous" (Pl. Br., p. 4), the fact is that plaintiff did make that "outrageous" assertion at paragraph 25 of her complaint.

Equally untenable is the other prong of plaintiff's core assertion – *i.e.*, that LVMH supposedly knew that the slightest trace of lead would make the lipstick dangerous. Any proper consideration of the candy-lipstick comparison refutes any suggestion by plaintiff that culpable knowledge should be imputed to LVMH based on the FDA's lead-in-candy guideline. In addition, the materials offered by LVMH for judicial notice, which include the FDA guidance statement underlying plaintiff's misguided candy-lipstick comparison, demonstrate that plaintiff's assertion that the reported lead levels are actionable cannot be reconciled with the existing regulatory consensus and regime. As a result, plaintiff must offer something other than her own "because I said so" conclusions that LVMH must have known something about lead in lipstick that the FDA, the CDOJ, and every other regulatory body did not. Plaintiff, however, fails to do so.

In the end, plaintiff's drone-like repetition of her conclusions that "lead is dangerous" and "LVMH should have known it" cannot solve her Rule 9(b) and *Twombly* problem, any more than she can salvage the total collapse of her lead-in-candy comparison by ignoring it. Meanwhile, the other claim-specific reasons set out in LVMH's opening brief and discussed further below, also vitiate plaintiff's claims. For these reasons, the complaint is beyond repair and should be dismissed with prejudice.

## ARGUMENT

**I.  PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER THE ILLINOIS CONSUMER FRAUD ACT.**

In its opening brief, LVMH demonstrated that plaintiff's claim under the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* ("ICFA"), must be dismissed because plaintiff has

failed to plead four of the five essential elements of her claim with the specificity required by Fed. R. Civ. P. 9(b). Plaintiff's response does not refute any of LVMH's arguments.

### A.    Plaintiff Has Failed to Allege Any Deceptive Act or Practice by LVMH with Requisite Specificity.

As demonstrated in LVMH's opening brief, plaintiff's ICFA claim must be dismissed because plaintiff failed to properly plead any deceptive act or practice by LVMH. The requirement of a deceptive practice, critically, depends on the same two core assertions that LVMH has already demonstrated that plaintiff has not, and cannot, plead with the required particularity.

First, plaintiff failed to plead any specific facts in support of the bare assertion in her complaint that the trace amounts of lead reportedly detected in the lipstick rendered the product dangerous or defective. Obviously, to the extent the product is not actually dangerous or defective, there can be no ICFA liability for any deceptive act or practice. Second, plaintiff failed to plead any specific facts in support of her bare assertion not just that LVMH had actual knowledge of the presence of any lead in the lipstick, but that any such trace amount would render the product dangerous, defective, and unfit for its ordinary and intended use. Without such culpable knowledge, LVMH cannot be liable under ICFA.

In her response brief, plaintiff claims to have satisfied the first element of her claim merely by alleging that LVMH knew or should have known that the lipstick contains lead. There are numerous problems with this approach. To begin with, the relevant inquiry is *not* whether LVMH actually knew there were trace amounts of lead in Dior lipstick. Rather, it is whether LVMH actually knew such miniscule amounts would render the lipstick dangerous or otherwise defective, thereby making the presence of lead material to the consumer.

Second, even if plaintiff had correctly identified the relevant issue, she is nevertheless simply building one unwarranted conclusion on another. She has not alleged any specific facts sufficient to establish that (1) a trace amount of lead in lipstick is *per se* dangerous, and (2) even if it is, that LVMH had actual knowledge of the supposed danger. As a result, plaintiff's unsupported assertion that LVMH knew or should have known of the presence of lead (dangerous or otherwise) is insufficient as a matter of law to plead culpable knowledge with the specificity required by Rule 9(b). *See, e.g., White v. Daimler-Chrysler Corp.*, 368 Ill. App. 3d 278, 284-88, 856 N.E.2d 542, 548-51 (1st Dist. 2006) (affirming order granting motion to dismiss on the ground that plaintiff's unsupported allegations that defendant manufacturer had actual knowledge of the defect in its vehicle line and fraudulently concealed the defect from plaintiff and other members of the putative class were mere conclusions and, therefore, that plaintiff failed to plead culpable knowledge with the specificity required for his ICFA claim).

Third, as previously stressed, the absence of any specific factual allegations is no accident, because plaintiff's improperly-pled conclusions are actually refuted by the allegations of her own complaint, as well as the judicially noticeable facts presented and common sense. The only guidance plaintiff offers with respect to her conclusion that the lipstick contains dangerously high levels of lead is her invocation of the FDA lead-in-candy standard, while incongruously asserting elsewhere that the FDA's statements and regulations regarding lead in lipstick and other products are irrelevant. But, as the CDOJ determined and LVMH demonstrated in Ex. D to its opening brief, the comparison actually *refutes* plaintiff's claim because the level of lead exposure from FDA-approved candy at 0.1 ppm is more than 100 times greater than the level of lead exposure from wearing the lipstick at 0.21 ppm. *These calculations are based on plaintiff's own allegations.* It is worth noting, moreover, that the FDA's 0.1 ppm

standard is expressly directed at candy intended for ingestion by small children, not adults or the even a smaller category of adolescents who wear "mature" lipsticks like the one at issue here.

The second part of plaintiff's conclusion – *i.e.*, that LVMH knew that the lipstick was potentially harmful because of the presence of trace amounts of lead – also does not withstand scrutiny. Not only has plaintiff made no showing that the trace amounts of lead at issue are harmful, she has made no showing that LVMH had any reason to believe that the lipstick was harmful. Indeed, it is undisputed that the FDA evaluated previous claims regarding the presence of trace amounts of lead in lipstick and determined that there was no cause for concern. Plaintiff may disagree with the FDA, but that does not mean that she can sue LVMH or impute to LVMH knowledge of a supposed health risk that the FDA itself denies.

Plaintiff contends in Statement of Facts section of her response brief that the FDA has not evaluated lead levels since the 1990s and therefore cannot be said "currently" to be "fully aware of the presence of lead in some lipstick." Whatever semantic argument plaintiff may be trying to make, it is undisputed that the FDA has known since at least the 1990s that trace amounts of lead are present in some lipstick products. It is also undisputed that the FDA evaluated those products and thereafter publicly stated that trace amounts of lead in lipstick are not harmful and do not trigger any disclosure obligations. It is also undisputed that the FDA has not issued any guidance, statement, rule, or regulation either recommending or requiring the disclosure of trace amounts of lead in lipstick. Certainly, LVMH is entitled to have relied on the FDA's conclusion to determine to that a trace amount of lead, if any, in its lipstick would not pose a legitimate health concern. Notably, plaintiff does not allege that the level of lead in the lipstick here is higher than the levels previously evaluated by the FDA. Nor does plaintiff allege any other facts to suggest that the FDA's prior analysis is otherwise outdated or inapposite.

Nor is it "irrelevant," as plaintiff contends, that the California Department of Justice ("CDOJ") has rejected as unfounded identical lead-in-lipstick claims under Proposition 65. Proposition 65 is an even more stringent regulatory scheme than exists under Illinois law or FDA regulations. As a result, the CDOJ's determination that the trace amount of lead reported here is not cause for concern bears on *both* whether plaintiff has offered or even can offer any rational basis for its claim that any amount of lead in lipstick is dangerous and whether LVMH knew that the trace amount of lead reported would render the lipstick dangerous and defective.[1]

Because plaintiff's candy comparison necessarily fails and the regulatory record flatly belies plaintiff's assertion that LVMH knew or should be imputed with knowledge that the lipstick presented a legitimate health risk, plaintiff had no choice but to assert in her complaint that *any* lead in ingestible products is *per se* dangerous, thus making even FDA-approved bottled

---

[1] Plaintiff contends in her Opposition Brief that "none" of the FDA and CDOJ documents (among others) attached to LVMH's motion to dismiss may be considered, because they are outside the pleadings (Pl. Br., p. 3), even though plaintiff relies on some of the very same materials in her complaint. But it is indisputable that the Court may also consider materials attached to the motion to dismiss pursuant to Fed. R. Civ. P. 10(c) and any judicially noticed facts. *See* Def. Br. at p. 4, n. 1 (*citing Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (judicial notice of historical documents, information in the public record, and records of administrative bodies is proper); *see also Hunt-Gulliday v. Water Reclamation Dist.*, No. 02-C-9199, 2004 U.S. Dist. Lexis 3385, *9 (N.D. Ill. Mar. 8, 2004) (on a motion to dismiss, "the court need not accept as true allegations that are contradicted by judicially noticed facts," *citing In re Woodmar Realty Co.*, 294 F.2d 785 (7th Cir. 1961)); *Kraft Holdings, Inc. v. Helm*, No. 02-C-2171, 2002 U.S. Dist. Lexis 21317, *17 (N.D. Ill. Nov. 1, 2002) (court may take notice of any adjudicative fact that is not subject to reasonable dispute and is either generally known in the territory of the court or capable of accurate and ready determination by resort to sources whose authority cannot reasonably be questioned). Both the FDA's "Lipstick and Lead: Questions and Answers" ("Lipstick and Lead Q&A") (Def. Br., Ex. B) and the FDA's "Lead in Candy Guidance Statement" ("Guidance Statement") (Def. Br., Ex. C) are official agency records posted on the FDA website. Their mere existence refutes plaintiff's conclusion that LVMH must have known that the presence of trace amounts of lead would render the lipstick unsafe and defective. Likewise, this Court may properly take judicial notice of the undisputed, FDA-determined, Provisional Total Tolerable Intake Levels ("PTTIL") for lead set forth in the Human Health Consultation Exposure Investigation report attached as Ex. F to Def. Br. and the letters by the CDOJ, an administrative body charged with evaluating claims such as those presented here, whose determination in an almost identical context that trace levels of lead in lipstick do not present health risks or trigger disclosure obligations is directly applicable. *See Sigafus v. Trost*, 1992 U.S. Dist. Lexis 20282, *4-5 (N.D. Ill. 1992) (federal courts can take judicial notice of proceedings in other courts, both within and outside the federal judicial system, if the proceedings have a direct relation to matters at issue).

water and candy a health hazard.  Apparently unaware of the contents of her own complaint, plaintiff denies making this claim, declaring that any such allegation would be "outrageous."

While LVMH agrees with plaintiff that such an allegation is outrageous, plaintiff does in fact make that assertion in her complaint. Cmplt. ¶ 25 ("Accordingly, LVMH knew or should have known that manufacturing and distributing lipstick products containing *any amount of lead* was dangerous to those individuals using them, and that such lipstick products were not safe as LVMH represented them to be.") (Emphasis added.)  If the assertion is outrageous (as LVMH agrees it is), plaintiff is left with nothing at all to support the empty assertions in her complaint that LVMH has engaged in any deceptive or otherwise actionable conduct.

Plaintiff's attempt to excuse her failure to plead any factual basis for her conclusions by mischaracterizing relevant case law also fails.  For example, plaintiff attempts to distinguish *White v. DaimlerChrysler* (*see, supra*, p. 4) on the grounds that the plaintiff in that case failed to allege facts in support of the "intent to rely" element of his ICFA claim. But plaintiff conspicuously omits the appellate court's key holding that the trial court properly dismissed plaintiff's ICFA claim based on plaintiff's failure to plead actual knowledge of the alleged defect with the requisite specificity.  Moreover, given that the *White* court declined to charge the defendant car manufacturer with knowledge of the defects in its vehicle line, *White* also refutes plaintiff's unsupported assertion that a corporation is presumed to have culpable knowledge of its products in the fraud context.

Second, it is irrelevant that *Jensen v. Bayer AG*, 371 Ill. App. 3d 682, 689, 862 N.E.2d 1091, 1098 (1st Dist. 2007), in finding for a defendant drug manufacturer on consumer fraud, implied warranty, and medical monitoring claims arising from a plaintiff's purchase of a drug subsequently recalled due to health concerns, involved a motion for summary judgment.  LVMH

8

cited *Jensen* for the limited proposition that actual knowledge is an essential element of a fraudulent concealment claim.  The procedural posture of *Jensen* therefore makes no difference.

Likewise, plaintiff's assertion that "whether Defendant actually knew of the presence of lead in its lipstick products is a matter that can be dealt with through discovery" is inconsistent with Rule 9(b), *White,* and this Court's own recognition that "a complaint must do more than [leave] open the possibility that a plaintiff might later establish some 'set of undisclosed facts' to support recovery." *See In re McDonald's French Fry Litigation,* 503 F. Supp. 2d 953, 957 (N.D. Ill. May 30, 2007) (Bucklo, J.) (dismissing statutory consumer fraud, common law fraud, implied warranty, and injunctive relief claims in action in which allergy sensitive plaintiffs alleged that defendants misrepresented that their french fries did not contain milk, wheat or gluten).  Under Illinois law, claims sounding in fraud must be pled with specificity.

Finally, plaintiff cannot distance herself from *DiPirro v. J.C. Penney Company, Inc.*, No. 407150, mem. op. (Stmt. of Dec.) (Super. Ct. Cal. Feb. 9, 2005), which rejected plaintiff's false advertising and Proposition 65 claims on almost identical facts (Def. Br., Ex. J).  In *DiPirro*, after a lengthy trial, the court rejected the plaintiff's claim that trace amounts of lead in cosmetic products (including Dior lipstick) manufactured, marketed, and sold by the defendants rendered the products dangerous or otherwise defective.  In doing so, the court noted that the *DiPirro* plaintiff's false advertising and misrepresentation claims were predicated on the unsupported notion there is "no proven safe level of lead" – the very same assertion plaintiff simultaneously makes and deems "outrageous" here without any support. (Cmplt. ¶ 25).

As set forth above, plaintiff has utterly failed to provide anything other than naked conclusions in support of the all-important "deceptive act" element of her ICFA claim and her conclusions are, in any event, refuted by plaintiff's own complaint and the judicially noticeable

facts identified by LVMH. Plaintiff also cannot escape the insufficiency of her pleadings by manipulating the way in which she characterizes her baseline assertion that any lead makes lipstick dangerous. To be sure, plaintiff sometimes asserts that LVMH "impliedly represented" that the lipstick was safe, other times that LVMH was obligated to disclose the presence of lead. But it does not matter. All of these assertions suffer from the same critical deficiency. Each requires plaintiff to properly plead that LVMH knew there was lead in the lipstick in the first place, that the lead made the lipstick unsafe, and that LVMH knew that the lead made the lipstick unsafe. Plaintiff has failed to plead, and cannot plead, facts in support of any such assertions. Accordingly, the complaint violates the heightened pleading requirements of Rule 9(b) and, for that matter, *Twombly*, and must be dismissed with prejudice.

### B.    Plaintiff Has Failed to Allege Intent to Rely with Requisite Specificity.

Because plaintiff failed to adequately allege that LVMH ever had culpable knowledge, plaintiff also cannot adequately allege that LVMH intended for plaintiff and other consumers to rely on an omission of a material fact of which LVMH was not aware.

Reliance goes to the materiality of the alleged omission. As noted above, the presence of lead would be material only if the lead levels were dangerous. Because plaintiff has failed to allege any specific facts indicating that the reported lead levels were dangerous, she has likewise failed to establish materiality. Similarly, because plaintiff has not sufficiently alleged that LVMH knew of this supposedly material fact, she has not sufficiently alleged that LVMH *intended* for consumers to rely on the omission of this supposedly material fact. Therefore, plaintiff also fails to satisfy the "intent to rely" element of her ICFA claim.

**C.      Plaintiff Has Failed to Allege Actual Injury with the Requisite Specificity.**

LVMH demonstrated in its opening brief that plaintiff's ICFA claim fails because plaintiff has failed to plead specific facts showing that she has suffered any cognizable injury, whether in the form of the purchase price or the cost of immediate diagnostic testing.  In her response brief, plaintiff claims that she did suffer economic injury in the form of the purchase price of the lipstick, but she cannot and does not point to a single allegation in her complaint in which she alleges that she discarded or discontinued use of the product, or that she tried unsuccessfully to return it for a refund.[2]

Likewise, contrary to the arguments in plaintiff's response, she has failed to allege any facts to suggest that immediate diagnostic testing or medical monitoring is appropriate or would detect any lead-related illness or condition actually attributable to her use of the lipstick. Plaintiff does not allege that she has actually suffered any injury.  Strikingly, she does not even allege that she has taken any steps to find out whether she has suffered any injury or that she would incur any out-of-pocket expense (damage) to obtain such testing, either because she is uninsured or a free test is otherwise not available.   Again, all plaintiff has offered is her unsupported assertion that immediate diagnostic testing is medically necessary.  *See Verb v. Motorola, Inc.* 284 Ill. App. 3d 460, 471-72, 672 N.E.2d 1287 (1st Dist. 2006) (plaintiffs' unsupported assertions regarding the possible health risks of their cell phones were insufficient to state a claim for medical monitoring absent any present physical injury).  That plaintiff and her counsel elected not to have plaintiff tested for lead poisoning prior to filing this lawsuit (or presumably since filing this lawsuit) speaks volumes about how "immediate" her need is.

---

[2] Although Plaintiff asserts in her response brief that the lipstick is "of no use to her," she does not make any such allegation in her complaint.  She does not allege that she discarded the lipstick and she does not allege that she has stopped using the lipstick.  In short, plaintiff cannot rely on her attorney's arguments in a brief to supplement or otherwise amend the deficient allegations of her complaint.

Plaintiff's attempt to distinguish *Verb* on the ground that plaintiff alleges that the lipstick "is" dangerous, whereas the plaintiff in *Verb* alleged that the defendant's cell phones "may" be dangerous fails. Pursuant to Rule 9(b), plaintiffs asserting fraud claims must plead each element of their claim with specificity – mere conclusions that parrot the elements of the claim or offer base speculation and conjecture are not enough. The question in both *Verb* and this case is whether plaintiff has alleged a sufficient factual basis, consistent with applicable pleading standards, to create some reasonable likelihood that plaintiff is entitled to relief. In this case, as in *Verb*, plaintiff has not.

### D.    Plaintiff Has Failed to Allege Proximate Cause with Requisite Specificity.

Finally, as demonstrated in LVMH's opening brief, plaintiff has failed to plead the causation element of her ICFA claim with the required specificity. Among other things, (1) she does not allege that she had any communications with LVMH in connection with her purchase; (2) she does not allege that she reviewed any LVMH advertising or marketing materials in connection with her purchase, or that she reviewed any ingredient label or other packaging materials in connection with her purchase; and (3) she does not allege any facts that would enable the finder-of-fact to distinguish between lead exposure from the lipstick and lead exposure from any of the other innumerable environmental or consumer product sources of lead.

In her response, plaintiff does not dispute that her complaint does not include such allegations. Instead, plaintiff merely contends that she is not required to allege that she reviewed the product packaging, because this is an omission (not a misrepresentation) case. Plaintiff is mistaken. Without some allegation that she reviewed the ingredients label, plaintiff cannot claim to have been deceived by the fact that lead was not disclosed on the ingredient label. Indeed, without such allegation, the only reasonable inference is that plaintiff would have purchased the

lipstick whether the presence of lead was disclosed or not. Thus, plaintiff has not sufficiently pled that any supposed misrepresentation or omission by LVMH proximately caused her to purchase the lipstick or to otherwise suffer any injury or damage.

Plaintiff attempts to distinguish *Oliveira v. Amoco Oil*, 201 Ill. 2d 134, 154-55, 776 N.E.2d 151, 163 (2002), and *Zekman v. Direct Am. Marketers, Inc.*, 182 Ill. 2d 359, 695 N.E.2d 853 (1998), which both required plaintiffs to allege that they actually saw the supposedly deceptive material to establish deception for purposes of an ICFA claim, on the ground that they involved misrepresentation, not omission, claims. To begin with, plaintiff's assertion that this is strictly an omission case is surprising given that her complaint is replete with allegations (albeit generic and inadequate) that LVMH affirmatively and impliedly represented and warranted that the lipstick is safe. *See, e.g.,* Cmplt. ¶¶ 3, 13, 14, 47, 57, 65.

More important, the rationale of *Avery* and *Zekman* applies to both misrepresentation and omission claims. If plaintiff does not allege that she reviewed, considered, or was otherwise exposed to the allegedly deceptive material, she cannot even claim to have been interested in, let alone deceived by, the information contained in or omitted from that description. In short, plaintiff has failed to plead that the information was material. In addition, because plaintiff does not allege that she reviewed the ingredient label on the lipstick before making her purchase, she cannot claim that the lack of any lead disclosure on the label proximately caused her to make a purchase she would not otherwise have made.

Plaintiff also does not respond at all to LVMH's argument that she has failed to plead any basis upon which the finder-of-fact could distinguish between the infinitesimally small lead exposure from the lipstick and lead exposure from any other source for purposes of plaintiff's claim for economic damage in the form of immediate diagnostic testing. Instead, plaintiff cites

several toxic tort cases for the generic proposition that a claim for medical monitoring (even in the absence of a present physical injury) may be cognizable under Illinois law under appropriate circumstances.

This case does not fall within any of those circumstances, however, not least because those cases involved medical monitoring claims by plaintiffs who had suffered decades-long exposure to toxic chemicals that had contaminated the local groundwater supply from defendants' industrial activities. *See Muniz v. Rexnord Corp.*, 2006 WL 1519571, *5 (N.D. Ill. 2006) (where plaintiffs allegedly had suffered prolonged exposure (more than 10 years) to toxic chemicals that had migrated from defendant's industrial park into local groundwater supply and plaintiffs' well-water, finding diagnostic testing to determine whether plaintiffs suffered a present physical injury necessary to a reasonable degree of medical certainty); *Allgood v. General Motors Corp.*, 2005 WL 2218371 (S.D. Ind. Sept. 12, 2005) (same under Indiana law, except that exposure was over a 40-year period and the alleged contamination included ground water, surface water, and the air).[3]

One of the cases relied upon by plaintiff, *Carey v. Kerr-McGee*, 999 F. Supp. 1109, 1118 (N.D. Ill. 1998), is one of the most notorious and well-publicized toxic tort cases on record. In that case, the plaintiffs (residents of West Chicago) alleged that they had endured decades-long exposure to radioactive waste in the form of thorium tailings from the property owned and operated by defendant and its predecessor. The defendant moved to dismiss the complaint for personal injury on the ground that none of the plaintiffs alleged any present physical injury. In

---

[3] As the *Allgood* court noted, the elements of cause of action for medical monitoring are (1) significant exposure to a proven hazardous substance, (2) significantly increased risk of contracting a serious latent disease, (3) increased risk which makes periodic diagnostic medical examinations reasonably necessary, and (4) monitoring and testing procedures exist that make early detection and treatment possible and beneficial. Plaintiff does not allege any significant exposure to lead, nor does she allege that she has a significantly increased risk of contracting a serious lead-related disease, nor does she allege that diagnostic testing is reasonably necessary.

denying the defendant's motion to dismiss, the district court opined that a medical monitoring claim might be cognizable under Illinois law where, as in *Carey*, the necessity of such expenditures could be established to a reasonable degree of medical certainty. Needless to say, exposure to extremely low levels of lead from wearing lipstick for a period of no more than a few months (even assuming plaintiff used the lipstick regularly) is a far cry from the claims of plaintiffs who seek medical monitoring as a result of being exposed to radioactive waste and toxic chemicals for decades as a result of dumping by their industrial park neighbors.

The other two medical monitoring cases relied upon by plaintiff are also readily distinguishable. In *Lewis v. Lead Indus. Assoc., Inc.* (1st Dist. 2003), the parents of children exposed to lead paint filed suit against certain lead industry defendants seeking medical screening, assessment, and medical monitoring for latent diseases arising out of children's prolonged exposure to lead paint. Based on those facts, the court speculated that the Illinois Supreme Court would permit a plaintiff to recover the cost of diagnostic testing if defendant's breach of duty made it necessary for the plaintiff to incur medical expenses to determine whether some actual physical injury has been sustained. Critical to the *Lewis* opinion is the plaintiff's ability to demonstrate that diagnostic testing is medically necessary. Notably, the appellate court ultimately affirmed the trial court's dismissal of plaintiff's product liability, fraud, unjust enrichment, and public nuisance claims, leaving only plaintiff's civil conspiracy claim.

In *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 976-78 (Utah 1993), a construction worker sued his employer, alleging that he was exposed to dangerous levels of asbestos for several months on the job and required medical monitoring. Among other things, plaintiff alleged that there were periods when the ventilation in his work area was so poor that he had to take periodic breaks to clean the airborne asbestos dust out of his nose and mouth. *Id.* at

15

972. In *Hansen*, the Supreme Court of Utah found as a matter of first impression that the level and duration of the exposure must be such that a reasonable physician would prescribe as medically necessary some monitoring regime different than that for a patient who had no such exposure. *Id*. at 979-80.

Significantly, the *Hansen* court ultimately held that the plaintiff's medical monitoring allegations were insufficient as a matter of law. Because it was an issue of first impression, however, the court remanded with instructions that the plaintiff be allowed to replead to meet the court's newly articulated "medically necessary" standard. *Id*. at 981-82. Notably, the plaintiff in this case has alleged even less than the plaintiff in *Hansen* to suggest that immediate diagnostic testing or medical monitoring is medically necessary. Accordingly, plaintiff has no right to any such testing and cannot rely on such testing to satisfy the damage element of any of her claims.

Finally, plaintiff notes that whether medical monitoring is necessary may be a factual issue. Even so, where the level of exposure is lower by several orders of magnitude than the exposure the FDA deems reasonably safe for candy intended for ingestion by small children, and the plaintiff has otherwise failed to allege any rationale basis for finding any likelihood of harm, this court may comfortably rule as a matter of law that special diagnostic testing is not necessary to a reasonable degree of medical certainty.

## II.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF IMPLIED WARRANTY UNDER THE UCC OR THE MAGNUSON MOSS WARRANTY ACT.

While LVMH recognizes that plaintiffs' non-fraud claims are not subject to the heightened pleading requirements of Rule 9(b), they must nevertheless satisfy the pleading standards articulated in *Twombly*. Plaintiff has failed to adequately plead the elements of her implied fraud claims under these standards.

**A.    Plaintiff Has Failed to Plead that the Complained-of Lipstick Is Unmerchantable or that She Suffered Any Cognizable Injury.**

As demonstrated in LVMH's opening brief, plaintiff has failed to allege any facts demonstrating the miniscule amount of lead reportedly contained in the lipstick renders the product either unsafe or unmerchantable. To the contrary, the pleadings and other known facts lead to only one conclusion – that the exposure level is 100 times less than chocolate approved for consumption by small children and well within the FDA's PTTIL for lead in adults.

In response, plaintiff simply restates her conclusion that the lipstick is not fit for ordinary or intended use because the lead levels are unreasonably and dangerously high. Other than pointing to the inapposite candy standard (which has been rejected by the FDA as invalid and demonstrated to be invalid in Ex. D), plaintiff has done nothing to support her bare conclusions that the lead levels in the lipstick are unsafe or that the product is not fit for its intended use. Because plaintiff has failed in the face of overwhelming judicially noticeable evidence to the contrary to plead any factual basis for her bare assertion that the lipstick is unsafe, defective, or unfit for its ordinary or intended use, she has not adequately alleged that the lipstick was unmerchantable or that she suffered any cognizable damage as a result of her purchase. *See Twombly*, 127 S. Ct. at 1964-65 (finding that a fact subject to both an innocent and a sinister interpretation was insufficiently pled).

**B.    Plaintiff Has Failed to Satisfy the Notice Requirement of Her Breach of Implied Warranty Claims.**

LVMH also demonstrated in its opening brief that plaintiff has failed to plead notice as required under the UCC § 2-607 for her implied warranty claims. In response, plaintiff contends that no notice is required because (1) LVMH had actual knowledge of the presence of lead in the lipstick and (2) plaintiff's complaint satisfied the notice requirement by seeking diagnostic testing to determine whether plaintiff has any lead-related illness. Plaintiff is wrong.

First, as demonstrated above, plaintiff does not plead any facts in support of her bare refuted conclusion that LVMH had actual knowledge of any alleged defect – specifically, that the presence of trace amounts of lead would render the product unsafe and defective. LVMH further submits that plaintiff's reliance on the decision in the *McDonald's French Fry Litigation* is misplaced given that this Court actually found that the plaintiffs' breach of implied warranty claims in that case were factually deficient.

Plaintiff's reliance on *Gershengorin v. Vienna Beef*, No. 06-C-6820, 2007 WL 2840476, *4 (N.D. Ill. 2007), for the proposition that sellers are charged with knowledge of the ingredients in their products is also misplaced. To begin with, the relevant inquiry is not whether LVMH knew there was lead in the lipstick, it is whether LVMH knew that the presence of lead, no matter how tiny the amount, would render the product unmerchantable.[4]

In any event, *Gershengorin* does not support the proposition for which plaintiff cites it. In *Gershengorin*, the plaintiffs alleged that the defendant hot dog manufacturer failed to disclose that the casings it used for the hot dogs it marketed and advertised as 100% beef were actually pork intestines. Whether the defendant knew the casings were pork was never really in dispute in *Gershengorin* – the defendant listed pork on the ingredient labels on its wholesale containers of the hot dogs. There is no valid comparison between a hot dog manufacturer charged with knowing that the casings for its hot dogs are made from pork, not beef, and a cosmetics manufacturer who is charged with knowing that one of its lipsticks contain trace amounts of lead (levels so low that specialized testing methods have to be used to accurately detect it). In short, nothing in *Gershengorin* stands for the proposition that a manufacturer is charged with knowledge on a microscopic level of every trace element in its product, let alone that those trace

---

[4] Here, as in so many other places in her brief, plaintiff implicitly falls back on the "outrageous" idea that she otherwise disavows – *i.e.*, that any amount of lead is dangerous and makes a product unmerchantable.

elements render the product unfit for its intended use *and* dangerous (a notion contravened by all government bodies responsible for monitoring such issues).

Plaintiff's argument that no notice was required because LVMH was aware of health concerns regarding lead in lipstick from other sources, including the CSC report, is meritless. As a preliminary matter, plaintiff's assertion that the October 2007 CSC report – a single, unofficial, inflammatory report immediately rejected by the FDA and controverted by all other relevant authorities – constitutes notice to LVMH for purposes of her implied warranty claim that arose earlier is baseless. Moreover, as the Illinois Supreme Court held in *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 493-95 (1996), generalized knowledge of safety concerns with the product are not sufficient to satisfy UCC 2-607(3)(A). Rather, the defendant must be on notice of the *particular plaintiff's* concerns regarding the *particular* transaction. *Connick*, 174 Ill. 2d at 493-95 (even if a manufacturer is aware of problems with a particular product line, the UCC's notice requirement is satisfied only where the manufacturer is somehow apprised of the trouble with the *particular* product purchased by a *particular* buyer). No such notice was provided here.

Plaintiff's half-hearted attempt to invoke the "personal injury" exception to the direct notice rule also fails. As set forth above, plaintiff does not allege that she has suffered any personal injury as a result of the lipstick. Diagnostic testing is not itself a personal injury. Indeed, plaintiff claims to want the testing because she does not know whether or not she has suffered any personal injury. LVMH respectfully submits that if a plaintiff could avoid the UCC notice requirement by simply asserting a claim (however frivolous) for diagnostic testing, the "personal injury" exception would quickly swallow the direct notice rule.

**C.    Plaintiff Has Failed to Satisfy the Privity Requirement of Her UCC Implied Warranty Claim.**

LVMH demonstrates in its opening brief that plaintiff's implied warranty claims should be dismissed for lack of privity, because plaintiff purchased the lipstick from a Nordstrom department store, not LVMH.    In her response brief, plaintiff contends that the privity requirement of the UCC is met because she "purchased the lipstick through Nordstrom as LVMH's agent." (Pl. Br., p. 23.)   Plaintiff has not, however, alleged any agency relationship between LVMH and Nordstrom in its complaint (and none exists).   Indeed, the complaint does not so much as mention the word agent or any variation thereof.

While the existence of any agency relationship may generally be a question of fact, appropriate pleading of an agency relationship is required in the first instance, and there has been no such pleading in this case.  *Kutzler v. Thor Indust., Inc.*, No. 03-C-2389, 2003 WL 21654260, *4 (N.D. Ill. 2003).   The complaint, for example, does not allege that Nordstrom was not the legal owner of the lipstick or that it otherwise was not simply selling its own property when it sold the lipstick to plaintiff.   The complaint also does not allege any facts to suggest that Nordstrom's department store was authorized to act for or under the direction of LVMH or authorized to enter into binding agreements on LVMH's behalf (all essential elements of an agency relationship).   The complaint does not even allege that Nordstrom acquired the lipstick from LVMH.   Nor is it reasonable to assume for purposes of plaintiff's new-found agency theory that Nordstrom acquired the lipstick from LVMH simply because it happened to have the lipstick in its inventory.   In short, like the plaintiff in *Kutzler*, this plaintiff has failed to allege an agency relationship and thus cannot invoke any "agency" exception to the requirement of vertical privity for implied warranty claims.

Plaintiff's reliance on *Gershengorin v. Vienna Beef* in support of its agency theory is also misplaced. In *Gershengorin*, the alleged "agents," co-defendants in the lawsuit, were among the 182 "Authentic Vienna Beef Hot Dog Stands" identified on Vienna Beef's website. They were also the entities to which Vienna Beef allegedly provided signage and related marketing materials containing the alleged misrepresentations regarding the 100% beef content of the hot dogs at issue. *See Gershengorin Amended Complaint*, ¶¶ 11 and 24, a copy of which is attached hereto as Ex. A.) Plaintiff makes no such "agency" allegations in this case.

Finally, plaintiff invites the Court to apply some unspecified public policy exception to the requirement of vertical privity. In so doing, plaintiff relies on cases that pre-date the UCC or are otherwise inapposite. *See, Patargias v. Coca-Cola Bottling Co.*, 332 Ill. App. 117, 133, 74 N.E.2d 162, 169 (1st Dist. 1947) (60-year old case pre-dating the UCC); *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965) (50-year old case pre-dating the UCC that applied only to the manufacturers of food products); *Reed v. City of Chicago*, 263 F. Supp. 2d 11123 (N.D. Ill. 2003) (horizontal privity is not an absolute requirement if plaintiff suffered personal injury and seller's implied warranties were intended to extend to third-party beneficiaries).

Plaintiff's reliance on *Whitaker v. Lian Feng Machine Co.*, 156 Ill. App. 3d 316, 323 (1st Dist. 1987), is likewise misplaced. In that case, the employee of the purchaser of a bandsaw from defendant was injured by the bandsaw. The court found that the seller's implied warranty extends to employees of immediate purchasers as an extension of UCC 2-318, which provides that a lack of horizontal privity is not a bar where an intended beneficiary suffers a personal injury as a result of the seller's alleged breach. In short, none of the cases cited by plaintiff

supports any exception to the requirement that plaintiff satisfy the vertical privity requirement applicable to her UCC implied warranty claim.[5]

### III. PLAINTIFF'S NO-INJURY PRODUCT LIABILITY CLAIMS (STRICT LIABILITY AND NEGLIGENCE *PER SE*) FAIL AS A MATTER OF LAW.

LVMH demonstrated in its opening brief that plaintiff's no-injury product liability claims fail for lack of any wrongful act by LVMH and lack of any personal injury. They are also barred by the economic loss doctrine.

Not addressing separately the lack of any wrongful or personal injury, plaintiff contends that the economic loss doctrine does not apply where the plaintiff's damages are proximately caused by a defendant's intentional, false representation (*i.e.*, fraud). As shown above, plaintiff has failed to plead fraud (misrepresentation or omission) with the specificity required by Rule 9(b) and, thus, cannot effectively invoke the fraud exception to the economic loss doctrine. LVMH further notes that plaintiff has expressly disavowed that this is a false representation case, insisting that it is an omission only case.

Plaintiff also contends that the economic loss doctrine is inapplicable because, according to plaintiff, LVMH's duty to plaintiff is extracontractual (Pl. Br., p. 27, *citing Golf v. Henderson*, 376 Ill. App. 3d 271, 279 (1st Dist. 2007)). Specifically, plaintiff claims that, like the plaintiff in *Golf*, LVMH's duty to plaintiff arises from her statutory consumer fraud claim (ICFA). For the

---

[5] Relying on the plain language of section 2310(d)(1)-(3) of the Magnuson Moss Act ("MMA"), LVMH argued in its opening brief that plaintiff failed to satisfy the jurisdictional requirements of the MMA because there were fewer than 100 named plaintiffs. Plaintiff contends in her response that the federal Class Action Fairness Act ("CAFA") provides an alternative jurisdictional basis for her MMA claims. Plaintiff failed to cite any cases in this District or Circuit in support of her argument, but, on further review, LVMH has identified authority, *Clark v. Wynn's Extended Care*, No. 06-C-2933, 2007 U.S. Dist. LEXIS 27386, *11-15 (N.D. Ill. March 23, 2007) supporting plaintiff's position. Finding no authority to the contrary, LVMH withdraws this part (and only this part) of its objection to plaintiff's MMA claim.

reasons stated above, however, plaintiff has failed to plead a viable ICFA claim and, therefore, cannot rely on ICFA to invoke any exception to the economic loss doctrine.

Plaintiff also contends that her request for immediate diagnostic testing somehow satisfies the personal injury exception to the economic loss doctrine. As demonstrated above, diagnostic testing is not itself a personal injury. In addition, plaintiff has failed to make a threshold showing of any entitlement to either immediate diagnostic testing or future medical monitoring and, therefore, has not pled any cognizable personal injury for purposes of any exception to the economic loss doctrine.

Finally, as to plaintiff's negligence *per se* claim, plaintiff simply asserts without support her oft-repeated conclusion that the level of lead in defendant's product is harmful and sufficient to state a claim for violation of the FDC Act. For the reasons stated above, plaintiff's bare assertion that the trace amounts of lead reportedly detected in the lipstick are dangerous because they exceed the FDA's recommendation for lead in candy is insufficient to establish any violation of the Food Drug and Cosmetic Act. Accordingly, plaintiff's negligence *per se* claim must also be dismissed with prejudice.

## IV.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS INADEQUATELY PLED.

For the reasons stated above in connection with plaintiff's other claims, plaintiff has failed to sufficiently allege that the lipstick was dangerous, defective, or otherwise unfit. Accordingly, plaintiff has failed to allege any facts indicating that she did not get what she paid for. Therefore, there is no legal basis for this Court or any finder-of-fact to determine that LVMH improperly retained any derivative benefit conferred on it by virtue of plaintiff's purchase of the lipstick from Nordstrom's department store. Nothing in plaintiff's response brief is to the contrary.

## V.    PLAINTIFF CONCEDES THAT HER CLAIM FOR INJUNCTIVE RELIEF MUST BE DISMISSED.

In its opening brief, LVMH demonstrated that plaintiff's injunctive relief claim is subject to dismissal on several grounds, including that (1) plaintiff has failed to adequately allege any violation by LVMH, (2) injunctive relief is a remedy, not a substantive claim, and all of plaintiff's substantive claims fail as a matter of law, and (3) plaintiff does not have standing pursuant to 21 U.S.C. § 332 *et seq.* to bring an action to enjoin or otherwise restrain any alleged violation of the FDC Act.

Plaintiff fails to respond to any of the foregoing arguments in her response brief, stating instead that she "does not seek to pursue the injunctive relief count *at this time* and, accordingly, hereby withdraws it."  (Pl. Br., p. 28 (emphasis added).)  LVMH submits that by failing to respond to its arguments regarding the injunctive relief count of her complaint, plaintiff must be deemed to concede those arguments and, therefore, that the injunctive relief count must be dismissed with prejudice.

## CONCLUSION

For all of these reasons, defendant LVMH Perfumes and Cosmetics, Inc. asks the Court to grant its motion and dismiss the complaint in its entirety with prejudice.

Date:  June 3, 2008                    Respectfully submitted,

                                       **LVMH PERFUMES AND COSMETICS, INC.**

                                       By: s/ Robert E. Shapiro
                                             One of Its Attorneys

Peter J. Barack (ARDC No. 108367)
Robert E. Shapiro (ARDC No. 3125180)
Rachael M. Trummel (ARDC No. 6274278)
BARACK FERRAZZANO KIRSCHBAUM
   & NAGELBERG LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606

24

Ph: 312.984.3100
Email: rob.shapiro@bfkn.com
Email: rachael.trummel@bfkn.com

Francis A. Citera (ARDC No. 6185263)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
Ph: 312.856.8413
Email: citeraf@gtlaw.com

## CERTIFICATE OF SERVICE

I, Robert E. Shapiro, an attorney, hereby certify that I caused a true and correct copy of the foregoing **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT LVMH PERFUMES AND COSMETICS, INC.'S MOTION TO DISMISS** to be served upon the following on this date, June 3, 2008, by ECF/PACER electronic notice and by U.S. Mail as indicated:

**By ECF/PACER Electronic Notice**

Ben Barnow
Sharon Harris
Erich Paul Schork
BARNOW & ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, Illinois 60602
(312) 621-2000
Email: b.barnow@barnowlaw.com
Email: s.harris@barnowlaw.com
Email: e.schork@barnowlaw.com
*ATTORNEYS TO BE NOTICED*

Aron David Robinson
LAW OFFICE OF ARON D. ROBINSON
19 South LaSalle Street, Suite 1300
Chicago, Illinois 60603
(312) 857-9050
Email: adroblaw@aol.com
*ATTORNEY TO BE NOTICED*

**By U.S. Mail, Proper Postage Prepaid**

Kevin Rogers
LAW OFFICES OF KEVIN ROGERS
307 North Michigan Avenue, Suite 305
Chicago, Illinois 60602
(312) 621-2000
*COURTESY COPY*

Lance A. Harke, P.A.
Sarah Clasby Engel, P.A.
HARKE & CLASBY LLP
155 South Miami Avenue, Suite 600
Miami, Florida 33130
(305) 536-8220
*COURTESY COPY*

_____ s/ Robert E. Shapiro _____

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| Morris Gershengorin, Michael Smolyansky, and Marina Bartashnik, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Vienna Beef, Ltd. individually and on behalf of a defendant class of all Authentic Vienna Beef Hot Dog stands<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 06 C 6820<br><br><br>Judge Hart<br>Magistrate Judge Brown |

### FIRST AMENDED CLASS ACTION COMPLAINT

1.     Plaintiffs Morris Gershengorin, Michael Smolyansky, and Marina Bartashnik, both individually and on behalf of all others similarly situated, bring this action against Vienna Beef, Ltd. ("Vienna Beef"), to secure redress for Vienna Beef's deceptive and unfair practice of marketing its hotdogs as "all beef."

### Parties

2.     Plaintiff Morris Gershengorin, who does not eat pork, currently resides in Illinois and bought the product at issue in Cook County, IL.

3.     On July 23, 2006, Mr. Gershengorin purchased a Vienna Beef Natural Casing Hot Dog at the Charter One Pavilion, Northerly Island, in Chicago, Illinois. He also purchased jumbo-sized Vienna Beef Natural Casing Hot Dogs at Vienna Beef's factory store in Chicago, Illinois on many occasions. For instance, in the summer of 2006, Mr. Gershengorin purchased a natural casing hot dog from such factory store.

4.     Michael Smolyansky, who does not eat pork, currently resides in Illinois and bought the product at issue in Cook County, IL.

1

EXHIBIT
A

5.      On July 24, 2006, Mr. Smolyansky purchased a Vienna Beef Natural
Casing Hot Dog at Love's Yogurt on Chicago Avenue in Chicago, Illinois. Additionally,
in the summer of 2006, as well as on other occasions, Mr. Smolyansky also purchased a
jumbo-size natural casing hot dog at the Vienna Beef factory store.

6.      Plaintiff Marina Bartashnik, who does not eat pork, currently resides in
Illinois and bought the product at issue in Cook County, IL.

7.      In the summer of 2006, Ms. Bartashnik purchased Vienna Beef Natural
Casing Hot Dogs at Ira's on Sanders Road in Northbrook, Illinois.

8.      Defendant Vienna Beef is a corporation with its principal place of
business located in Chicago, IL.

## Jurisdiction

9.      Plaintiffs originally brought this action in the Circuit Court of Cook
County, Illinois. Defendant removed this action to the United States District Court for
the Northern District of Illinois pursuant to 28 U.S.C.§§ 1332(d)(2), 1441, 1446, and
1453(b).

## Defendants

10.     Vienna Beef is headquartered here in Chicago, Illinois and is a producer
and seller of beef products, with locations throughout the United States.

11.     Up and until the time of this lawsuit, on its website, Vienna Beef stated the
following: "Looking for an authentic Vienna Beef Hot Dog stand outside of Chicago?
Then you've come to the right place! Select a state and check out our list of Authentic
Vienna Beef Hot Dog stands for your state." *See* Exhibit A, *available at*
http://www.viennabeef.com/dogfinder/. Vienna Beef therefore cloaks its authorized
sellers in authority.

2

19.     Moreover, as of the date of the filing of Plaintiffs' Complaint, Vienna

Beef stated the following on its website:

Q:     **Why are Vienna Beef products different from the rest?**

A:     · Fresh domestic beef, never frozen

       · Highest quality raw ingredients

       · No fillers, artificial flavorings or binders

       · Never sacrifice quality and taste

See Exhibit B, *available at* http://www.viennabeef.com/about/faq/.

20.     In fact, Vienna Beef made a number of representations regarding quality

on its website, including, but not limited to, the following:

> At Vienna® Beef, we're extremely proud of the quality of our products.
> **We use only premium cuts of grain-fed domestic beef from a carefully
> selected group of suppliers.**
>
> We're equally proud of how we make our products. After all, as USDA
> Establishment #1, we have a reputation to maintain. From the moment a
> shipment of USDA-inspected **beef** arrives at our Chicago plant—and even
> before—we adhere to the highest standards of cleanliness and food safety.
> At Vienna we follow the very latest governmental regulations for
> sanitation and food handling practices. Our facilities are inspected before
> every shift, and we have a USDA inspector on site throughout our
> production. **You can be sure that everything we make—and the way
> we make it—is backed by our unwavering commitment to quality.**

See Exhibit C, *available at* http://www.viennabeef.com/about/safety.asp. (Emphasis
added).

21.     On its website, Vienna Beef further represented that it has sold this

product to Chicagoans for over 100 years by stating: **"The same all-beef dogs**

**Chicagoans have loved for more than 100 years.** See Exhibit D, *available at*

http://secure .imtco.com/viennastore/shoppingV2.php?menu_level_idnum=18026.

22.     Finally, Vienna Beef stated:

**Vienna® Beef Franks and Sausages**

4

### Link Up With Famous Vienna® Quality

All Vienna Beef franks and sausages are made from our original family
recipes dating back to 1893. **We use only 100%, lean, grain-fed
domestic Beef and beef trimmings** with no fillers, artificial colors or
flavorings. Our time-honored blend of seasonings and old fashioned
hickory smoking give all of our franks and sausages that unique, genuine
Vienna flavor that folks crave.

*See* Exhibit E, *available at* http://www.viennabeef.com/products/category.asp?
CATEGORY_ID=2. (Emphasis added)

23.    Vienna Beef sells its product directly to the public, both in Chicago and

throughout the United States via its website, which offers, for instance:

Chicago Style Hot Dog Kit
Our famous **pure beef franks**, topped the traditional Chicago way with all of the
authentic stuff. Add your own tomato, onions and pickle spears for the complete
experience.

Vienna Natural Casing Hot Dog Pack
The same **all-beef dogs** Chicagoans have loved for more than 100 years, with
extra snap to the bite, thanks to our natural casings. The way sausages used to be!

*See* Exhibit F, *available at* http://secure.imtco.com/viennastore/shopping
V2.php?menu_level_idnum=18026. (Emphasis added)

24.    Vienna Beef also sells its Natural Casing hot dogs through a national

network of 182 Authentic Vienna Beef Hot Dog stands across the country.

25.    Vienna Beef directly sells these "all-beef" or "pure-beef" hotdogs through

its own factory locations and website stating:

You won't find a fresher dog than at our very own Vienna Beef® Factory
Store and Café. Our hot dogs, sausages, sandwiches and soups come
straight from the plant and are served up by seasoned deli pros. You can
even buy dogs by the case! So stop by for lunch, or let us cater your next
Chicago affair. We'll make you feel at home!

*See* Exhibit G, *available at* www.viennabeef.com/cafemenu/.

26.    The Vienna Beef Café, which sells the product directly to the public, is

located at 2501 North Damen Avenue, Chicago, Illinois  60647.

5

27.    In fact, Plaintiffs Morris Gershengorin and Michael Smolyansky

purchased Vienna Beef Natural Casing Hot Dogs at the Vienna Beef Café over the years,

including in the summer of 2006.

28.    The Vienna Beef Café and other Vienna Beef resellers, including but not

limited to the network of 182 Authentic Vienna Beef Hot Dog stands, sell, among other

things:

| Chicago Style Hot Dog | Vienna Beef Hot Dog topped with mustard, relish, onion, pickle, tomato, sport peppers & celery salt. | $2.25 |
| Chicago Style Double Dog | Two Vienna Beef Hot Dogs in One Bun and topped with mustard, relish, onion, pickle, tomato, sport peppers & celery salt. Served with a small side of fries. | $3.45 |

*See* Exhibit H, *available at* http://www.viennabeef.com/cafemenu/.

29.    According to Vienna Beef website, the "Chicago Style Hot Dog"

described in ¶ 23 requires a "100% Pure Vienna Beef Hot Dog."

*See* Exhibit I, *available at* http://www.viennabeef.com/culture/chicagostyle.asp

30.    Moreover, up to the date of the filing of Plaintiffs' Complaint, Vienna

Beef advertised on its website that its products are different from other hot dogs by

stating:

Q: Why are Vienna Beef products different from the rest?

A:
- **Fresh domestic beef**; never frozen
- Highest quality raw ingredients
- No fillers, artificial flavorings or binders
- Never sacrifice quality and taste

http://www.viennabeef.com/about/faq/#FAQ53 (Emphasis added)

31.    Prior to the date that Plaintiffs filed their Complaint, Vienna Beef also

represented on its website that Vienna Beef also never used pork, lamb or mutton as

follows:

6

Q:  What methods are used to ensure product safety at Vienna Beef?

A:    · Vienna beef uses fresh domestic, grain-fed **beef** (**never pork**, lamb, or mutton), processed from healthly animals.  The USDA e-coli program is used, verifying that the animals are slaughtered correctly.

See Exhibit B, *available at* http://www.vienna beef.com/about/faq. (Emphasis added)

32.  Vienna Beef even compared its products and its products' taste to <u>kosher</u>

<u>hotdogs</u>, thus admitting that it is virtually impossible for a consumer to distinguish the

Vienna Beef product from a kosher hotdog by stating:

Q:    Are Vienna Beef products kosher?

A:    · Historically, **kosher products have a flavor profile which duplicates** Vienna's flavor. However, while Vienna Beef products are **beef**, they are not produced with koshered meat.  Kosher refers to the ritual beef slaughter and the salting of the meat.  Like kosher meat products, Vienna Beef products are manufactured under the supervision of the United States Dept. of Agriculture.

See Exhibit B, *available at* http://www.vienna beef.com/about/faq. (Emphasis added)

33.  In Vienna Beef's representations of its product, it extensively discussed

the fact that such products do <u>not</u> contain pork, let alone pork intestines.  For instance,

Vienna Beef stated the following on its website:

Q:    How do I get ingredient statements and nutritional information on your products?

A:    <u>Products</u> link on this website to obtain detailed product information such as ingredients, nutritionals, sizes, case pack, etc...

See Exhibit B, *available at* http://www.vienna beef.com/about/faq (Emphasis added)

34.  When reviewing the Vienna Beef's "Natural Casing Beef" franks pictured

on the Vienna Beef's website at the time Plaintiffs filed their Complaint, the advertising

stated:

7



**Get Your Dog On**

There's no mistaking that famous "snap" when you bite into a Vienna® Beef
frank. Always firm and juicy, our franks are made with nothing but the good
stuff-pure, lean, domestic beef and beef trimmings. We've got a frank for every
taste, too, with a variety of widths, lengths and casings, from party-size Cocktail
Franks to Footlong and Jumbo Franks. They're all fully cooked; just steam, boil,
grill, deep fry or microwave, then enjoy.

*See* Exhibit J, *available at* http://viennabeef.com/products/item.asp?PRODUCT_ID=2
(Emphasis added).

    35.    Up and until the date the Plaintiffs filed this lawsuit, the listed ingredients

linked to the Vienna Beef "Natural Casing Beef" franks at

http://viennabeef.com/products/item.asp?PRODUCT_ID=2 stated that its product is

comprised of the following:

> Nutrition Info
> Ingredients:
> Beef, Water, Salt, Corn Syrup, Dextrose, Mustard, Flavorings and Color,
> Garlic Juice (Garlic Juice, Salt), Sodium Erythorbate, Sodium Nitrate,
> Extractives of Paprika.
>
> Nutrition Facts:
> Serving Size 1 Frank (57g)
> Servings Per Container: 80
> Amount Per Serving:
> Calories - 130
> Calories from Fat - 100
> % Daily Value*
> Total Fat 11g - 17%
> Saturated Fat 4.5g - 22%
> Cholesterol 25mg - 9%
> Sodium 700mg - 29%
> Total Carbohydrate 2g - 1%
> Dietary Fiber 0g - 0%
> Sugars - 1g

Protein - 6g
Vitamin A - 0%
Vitamin C - 0%
Calcium - 0%
Iron - 4%
*Percent Daily Values are based on a 2,000 calorie diet.

See Exhibit J, *available at* http://viennabeef.com/products/item.asp?PRODUCT_ID=2.

### *In Reality "Vienna Beef," Uses Pork Intestine Casings*

36.     After Plaintiffs' purchase and consumption of the natural casing hot dogs,

they learned that the products were not "100% pure beef" or "all beef" as represented.

The list of ingredients on a wholesale box for Vienna Beef's "Natural Casing Beef"

franks is identical to that on Vienna Beef's website at the time Plaintiffs filed this

Complaint - with one material exception. The ingredient list from the wholesale box is as

follows:

> Beef, Water, Salt, Corn Syrup, Dextrose, Mustard, Flavorings and Color,
> Garlic Juice (Garlic Juice, Salt), Sodium Erythorbate, Sodium Nitrate,
> Extractives of Paprika, **Pork Casing**.

See Exhibit K (Emphasis added)

37.     The material ingredient, "Pork Casing," otherwise known as pork intestine

casing, is never mentioned in any retail advertising or retail ingredient list that the public

would see with regard to Vienna Beef's "beef," "all-beef" or "pure-beef" hotdogs.

Therefore, Vienna Beef knowingly omits informing the consumer public that Vienna

Beef is using pork intestine as a casing for its Natural Casing Beef hotdogs.

38.     Such ingredient list is not made known to consumers at the time they

purchase the Natural Casing hot dogs from Defendant and its authorized sellers.

### *Unknowing Consumption of Pork Intestine Casings*

39.     Due to Vienna Beef's material omissions regarding its Natural Casing Beef hotdogs, Plaintiffs and others have been eating Vienna Beef "Natural Casing Beef" hot dogs without knowing that these hot dogs contain pork intestine casings.

40.     This pork intestine casing ingredient is not advertised in any way on Vienna Beef's website or in any of its retail marketing materials directed to consumers.

41.     Many of the Authentic Vienna Beef Hot Dog stands, as well as other hot dog stands, sell Vienna Beef's "Natural Casing Beef" hot dogs to a large population with religious, moral, health, or ethical objections to the consumption of pork, including the Plaintiffs and the class members, who were unaware that Vienna Beef hot dogs contained pork intestines.

### *Pattern of Omission of Material Fact*

42.     The process through which these Natural Casing Beef hot dogs are sold by Vienna Beef, the Authentic Vienna Beef Hot Dog stands, and Vienna Beef's resellers is the same.  The advertising materials used by the resellers of Vienna Beef products are supplied by Vienna Beef and are materially identical in that none of them disclose that the product contains pork intestine casings.

43.     Vienna Beef, Authentic Vienna Beef Hot Dog stands, and Vienna Beef's resellers all intentionally failed to publicly disclose on its advertising that its beef hot dogs contain pork products.

44.     In Vienna Beef's advertising, marketing materials, and website, Vienna Beef concealed the fact that its all beef hot dogs contained pork products.

45.    Plaintiffs would not have purchased such product had they known that they contained pork intestines because, based on Vienna Beef's representations, they believed such products to consist of only beef.

46.    By and through Vienna Beef's omissions, Plaintiffs have suffered damages including, but not limited to, emotional distress caused by the fact they were misled into purchasing and ingesting food that contained pork intestines. Vienna Beef, by and through its knowingly fraudulent advertising campaign, as well as the continued misinformation distributed through its website and its agents, deliberately and willfully caused harm to Plaintiffs and the members of the class in an attempt to enrich itself.

## CLASS ALLEGATIONS

47.    Plaintiffs bring this action on behalf of all persons resident in the United States who: 1) consumed a "Natural Casing Beef" hot dog; 2) manufactured by Vienna Beef; and 3) which "Natural Casing Beef" hot dog contained pork intestine casing.[1]

48.    The class is so numerous that joinder of all members is impracticable. For instance, according to Vienna Beef's website, it produced over 250,000,000 hot dogs in the last year alone. *See* Vienna Beef's Website, *available at*
http://www.viennabeef.com/about/faq/.

49.    There are questions of law and fact common to the members of the class, which questions predominate over any questions affecting only individual class members. These questions include, but are not limited to, the following:

> a.    Whether Vienna Beef engaged in a pattern or practice of selling Vienna Natural Casing Hot Dogs as "beef," "all beef," or "pure beef" hotdogs without disclosing that it used pork intestines as the casing for such product;

---

[1]    Plaintiffs reserve the right to modify their class definition at any time prior to the Court granting certification of class.

11

b.   Whether Vienna Beef concealed the material fact that it was selling Vienna Natural Casing Hot Dogs as "beef," "all beef," or "pure beef" hotdogs without disclosing that they used pork intestines as the casing;

c.   Whether Vienna Beef advertised and sold Vienna Natural Casing Hot Dogs as "beef," "all beef," or "pure beef" hotdogs and whether this was a false and/or misleading statement or representation; and

d.   Whether Vienna Beef engaged in consumer fraud, deceptive trade practices, or other unlawful acts;

50.    Plaintiffs will fairly and adequately represent the members of the class. Plaintiffs have retained counsel experienced in the prosecution of class actions and consumer fraud claims.

51.    A class action is appropriate for the fair and efficient adjudication of this matter in that the Defendants have inflicted similar injuries to a large number of persons through a single course of conduct and individual actions are not economical.

## COUNT I – BREACH OF EXPRESS WARRANTY

52.    Plaintiffs adopt and reallege all previous paragraphs of this Complaint into this Count I as if set forth fully herein.

53.    Plaintiffs Morris Gershengorin and Michael Smolyansky purchased Vienna Beef's jumbo-sized Natural Casing Hot Dogs at the Vienna Beef factory store in the summer of 2006.

54.    All Plaintiffs purchased Vienna Beef's Natural Casing Hot Dogs at venues that posted Vienna Beef's advertisements and signage in the summer of 2006.

55.    Vienna Beef's advertisements and signage stated that its hot dogs were "beef," "pure beef," and/or "100% beef."

56.    Vienna Beef's advertisements and signage gave rise to an express warranty.

12

57.    By virtue of its advertisements, website, and overall media reach, Vienna

Beef, Authentic Vienna Beef Hot Dog stands, and other sellers of Vienna Beef products,

expressly warranted the Vienna Natural Casing Hot Dogs as being "beef," "all beef," or

"pure beef" hotdogs when they actually contained pork intestine casings.

58.    At all relevant times there was in full force and effect the Illinois Uniform

Commercial Code, 810 ILL. COMP. STAT. 5/1-101, *et seq.* (the "UCC").

59.    Section 2-313 of the UCC (815 ILL. COMP. STAT. 5/2-313) provides, in

pertinent part:

> Express Warranties by Affirmation, Promise, Description, and Sample.
>
> > (1) Express warranties by the seller are created as follows:
> >
> > (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> >
> > (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> >
> > (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he has a specific intention to make a warranty.

60.    Similar statutes, identical in material respects, are in effect in most other

jurisdictions within the United States.

61.    The descriptions and representations that the product was "all beef" or

"pure beef" or "beef" were the bases of the bargains between Plaintiffs, Plaintiffs' Class,

and Vienna Beef and its resellers when Plaintiffs and the class members purchased the

product.

13

62.    Vienna Beef failed to deliver on the basis of the bargain between it, the Plaintiffs, and the class members as the product sold by Vienna Beef is not all beef or pure beef or even just beef, but instead, contains pig intestine casing.

63.    There was a defect in the products warranted because they were in not in fact all beef or pure beef.

64.    Vienna Beef had actual knowledge of its breach of this warranty since the time the warranty was made.

65.    Vienna Beef was notified of its breach via the notice of revocation letter.

66.    However, in this case, it would be impossible for Vienna Beef to repair or replace the product because the products were already consumed.

67.    An ingredient list located on Vienna Beef's wholesale cases of its "Natural Casing Hot Dogs" admits that Vienna Beef's representations to the consumer public in its marketing and advertising materials, its website, and in its signage are false.

68.    Plaintiffs would not have purchased the product had they been advised that such product actually contained pig intestines.

69.    Plaintiffs have made a demand on Vienna Beef revoking acceptance on behalf of themselves and all others similarly situated and demanding Vienna Beef to refund the entire purchase price to the class.

70.    Vienna Beef's failure to refund the entire purchase price to Plaintiffs and members of the class has caused Plaintiffs and the class members' damage in the full amount of the purchase price.

Wherefore, Plaintiffs request that the Court enter judgment in favor of the Plaintiffs and the class and against the Vienna Beef and a Defendant class of its Authentic Vienna Beef Hot Dog stands and enter an order:

14

A) Certifying this action as a Class Action with Plaintiffs as Class representatives and Plaintiffs' counsel as Class Counsel;

B) Awarding Plaintiffs and the members of the class damages as appropriate for Vienna Beef's breach of express warranty;

C) Award Plaintiffs' attorneys fees and costs arising out of bringing this action; and

D) Any other relief this Court deems equitable and just.

## COUNT II – UNIFORM COMMERCIAL CODE NONCONFORMITY OF GOODS

71.     Plaintiffs adopt and reallege all previous paragraphs of this Complaint into this Count II as if set forth fully herein.

72.     Section 2-301 of the UCC provides that the seller is obligated to transfer and deliver the contracted goods in accordance with the contract. According to the UCC's Official Comments under §2-301, in order 'to determine what is in 'accordance with the contract' under this Article usage of trade, course of dealing and performance, and the general background of circumstances must be given due consideration in conjunction with the lay meaning of the words used to define the scope of the conditions and duties." 810 ILL. COMP. STAT. 5/2-301, *Official Comments*.

73.     "Contract" is defined under UCC § 1-201(11) as the total legal obligation which results from the parties' agreement as affected by the UCC and other applicable rules of law. 810 ILL. COMP. STAT.  5/1-301.

74.     "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing and usage of trade or course of performance as provided in the UCC. 810 ILL. COMP. STAT. 5/1-201(3).

15

75.    Under the conditions that Plaintiffs and the members of the class purchased Vienna Beef's Natural Casing Hot Dogs as set forth herein, the general background and implication from the circumstances was (and continues to be) that the Vienna Beef Natural Casing Hot Dogs contained only beef.

76.    Vienna Beef failed to sell Plaintiffs and members of the class pure beef hot dogs, and thus, Vienna Beef failed to transfer or deliver conforming goods as required by the UCC.

77.    Vienna Beef's breach proximately caused damage to Plaintiff and the members of the class.

Wherefore, Plaintiffs request that the Court enter judgment in favor of the Plaintiffs and the class and against the Vienna Beef and a Defendant class of its Authentic Vienna Beef Hot Dog stands for:

A)    Actual and punitive damages;

B)    An injunction restraining future non-disclosures;

C)    Restitution, disgorgement, and other equitable monetary relief;

D)    Attorney's fees, litigation expenses and costs of suit; and

E)    Such other relief as is appropriate.

## COUNT III – CONSUMER FRAUD (DECEPTION) FOR ACTUAL DAMAGES AND INJUNCTIVE RELIEF

78.    Plaintiffs adopt and reallege all previous paragraphs of this Complaint into this Count III as if set forth fully herein.

79.    At all relevant times, there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1, *et seq.* (the "Consumer Fraud Act") and similar deceptive practice acts in other states.

16

80.     Section 2 of the Consumer Fraud Act, 815 ILL. COMP. STAT. 505/2,

provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices,
> including but not limited to the use or employment of any deception,
> fraud, false pretense, false promise, misrepresentation or the concealment,
> suppression or omission of any material fact, with intent that others rely
> upon the concealment, suppression or omission of such material fact, or
> the use or employment of any practice described in Section 2 of the
> "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in
> the conduct of any trade or commerce are hereby declared unlawful
> whether any person has in fact been misled, deceived or damaged thereby.
> In construing this section consideration shall be given to the
> interpretations of the Federal Trade Commission and the federal courts
> relating to Section 5(a) of the Federal Trade Commission Act. (footnotes
> omitted)

81.     The Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*

provides at 815 ILCS 510/2, in pertinent part:

> A person engages in a deceptive trade practice when, in the course of his business,
> vocation or occupation, he:
>
> * * *
>
> (5) represents that goods or services have sponsorship, approval, characteristics,
> ingredients, uses, benefits or quantities that they do not have or that a person has a
> sponsorship, approval, status, affiliation or connection that he does not have;
>
> * * *
>
> (7) represents that goods or services are a particular standard, quality or grade or
> that goods are a particular style or model, if they are of another;
>
> * * *
>
> (12) engages in any other conduct which similarly creates a likelihood of
> confusion or of misunderstanding.

(Emphasis added)

82.     In order to prevail in an action under this Act, Plaintiffs need not prove

competition between the parties or actual confusion or misunderstanding.

83.     Similar statutes, identical in their material respects, are in effect in most

other jurisdictions within the United States.

17

84.    Plaintiffs and members of the class are consumers of Vienna Beef Natural Casing Hot Dogs.

85.    Prior to Plaintiffs' purchase of the Natural Casing hot dogs, Vienna Beef represented, in its advertisements, signage, and on its website, to Plaintiffs and the members of the class that its Natural Casing Beef franks were comprised of only "beef," "all beef" and/or "pure beef."

86.    Vienna Beef's statements of material facts regarding the ingredients of the Natural Casing Beef franks were made to induce Plaintiffs and the class members to purchase its product.

87.    After seeing such advertisements, Plaintiffs purchased and consumed such product. All Plaintiffs purchased and consumed such products on several occasions, including in the summer of 2006.

88.    However, Vienna Beef's representations contained in its signage and various other advertisements methods were false as its Natural Casing Hot Dogs contained pork intestines.

89.    Vienna Beef therefore engaged in an unfair and deceptive practice, in violation of the consumer fraud statutes of each state, by material omissions of fact regarding its sale of Vienna Beef Natural Casing Hot Dogs which it sells as "all beef" or "pure beef" hotdogs when they actually contained pork intestine casings.

90.    Vienna Beef engaged in its deceptive and unfair conduct in the course of trade and commerce.

91.    Vienna Beef knew its statements of material fact to be false when it made such representations in both its advertisements and on its website to Plaintiffs and the class members.

92.    Upon information and belief, Vienna Beef's marketing and advertising decisions that resulted in the deceptive omissions concerning Vienna Natural Casing Hot Dogs being sold as "beef," "all beef," or "pure beef" hotdogs took place at Vienna Beef's corporate headquarters located at 2501 North Damen Avenue, Chicago, IL 60647.

93.    Vienna Beef and its "Authentic Vienna Beef Hot Dog stands" intended that Plaintiffs and class members rely on and be affected by their deceptive and unfair acts and practices.

94.    As a proximate result of Vienna Beef's and its Authentic Vienna Beef Hot Dog stands' wrongful conduct, Plaintiffs and the class members sustained actual damages. For instance, Plaintiffs would not have purchased the Natural Casing hot dog had they known that such product contained pork intestines.

95.    Vienna Beef's conduct was intentionally fraudulent and knowingly done in that it knew that the product contained pork intestine casing but represented to the public that the product was 100% beef without disclosing the pork intestine casings. This warrants the imposition of substantial punitive damages.

Wherefore, Plaintiffs request that the Court enter judgment in favor of the Plaintiffs and the class and against the Vienna Beef and a Defendant class of its Authentic Vienna Beef Hot Dog stands for:

A)    Actual and punitive damages;

B)    An injunction restraining future non-disclosures, and compelling Vienna Beef to affirmatively disclose to the public, in a widespread fashion, that its products contain pork, or products other than beef;

C)    Restitution, disgorgement, and other equitable monetary relief;

D)    Attorney's fees, litigation expenses and costs of suit; and

E)    Such other relief as is appropriate.

19

## COUNT IV – CONSUMER FRAUD (UNFAIRNESS)
## FOR ACTUAL DAMAGES AND INJUNCTIVE RELIEF

96.    Plaintiffs adopt and reallege all previous paragraphs of this Complaint

into this Count IV as if set forth fully herein.

97.    At all relevant times, there was in full force and effect the Illinois

Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT.  505/1, *et*

*seq.* (the "Consumer Fraud Act") and similar acts in other states.

98.    The Illinois Consumer Fraud Act, 815 ILL. COMP. STAT. 505/2, states in

relevant part that:

> . . . *unfair or deceptive acts or practices, including but not limited
> to the use or employment of any deception, fraud, false pretense,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact . . . in
> the conduct of any trade or commerce are hereby declared
> unlawful . . . .*

99.    Vienna Beef acted unfairly in its representations on its website and in its

signage and other advertisements regarding the contents of its Natural Casing hot dogs.

More specifically, Defendant unfairly omitted that such products contained pork

intestines.

100.    Such unfair actions occurred in the course of trade and commerce.

101.    Vienna Beef's unfair conduct of misdisclosure and/or lack of disclosure

over the contents of its Natural Casing hot dogs violates both state and federal laws that

require Vienna Beef to be truthful in its representations regarding its products. *See, e.g.*,

815 ILL. COMP. STAT. 505/2, 15 U.S.C. §§ 45, 52.

102.    Vienna Beef's unfair conduct is unethical, immoral, and unscrupulous as

Vienna Beef misleads consumers and omits material facts to consumers as to the contents

of its Natural Casing hot dog.

103.    Vienna Beef's unfair conduct related to the contents of its Natural Casing hot dogs proximately caused the Plaintiffs and the class members substantial damage in that, among other things, they were lied to about the ingredients of the product they purchased and consumed.

Wherefore, Plaintiffs request that the Court enter judgment in favor of the Plaintiffs and the class and against the Vienna Beef and a Defendant class of its Authentic Vienna Beef Hot Dog stands for:

A)    Actual and punitive damages;

B)    An injunction restraining future non-disclosures and compelling Vienna Beef to affirmatively disclose to the public, in a widespread fashion, that its products contain pork, or products other than beef;

C)    Restitution, disgorgement, and other equitable monetary relief;

D)    Attorney's fees, litigation expenses and costs of suit; and

E)    Such other relief as is appropriate.

## COUNT V – UNJUST ENRICHMENT

104.    Plaintiffs adopt and reallege all previous paragraphs of this Complaint into this Count V as if set forth fully herein.

105.    A party is unjustly enriched when it retains a benefit to the detriment of another party against fundamental principals of justice, equity, and good conscience.

106.    Vienna Beef represented to a class of consumers that its Natural Casing hot dogs contained only beef. Vienna Beef made such representations in order to increase the sales of its products.

107.    Vienna Beef's representation was false in that its Natural Casing hot dogs do not consist of all beef and in fact, contain pork intestines.

21

108.   Consumers are shown an advertising campaign that does not inform them that such product contains pork intestines.

109.   Vienna Beef has reaped millions of dollars in profits as a result of its collection of money from consumers based on its false advertising campaign. That Vienna Beef amassed such earnings, and retains such benefit to the detriment of Plaintiffs and the class members, violates the fundamental principles of justice, equity, and good conscience.

110.   Vienna Beef has been and continues to be unjustly enriched through its above-described conduct.

111.   Vienna Beef should be required to disgorge the monies it has unjustly obtained to the detriment of Plaintiffs and the class members.

Wherefore, Plaintiffs request that the Court enter judgment in favor of the Plaintiffs and the class and against the Vienna Beef and a Defendant class of its Authentic Vienna Beef Hot Dog stands for:

A)   An order that Vienna Beef disgorge all monies unjustly enriched through its false representations regarding the ingredients of its products for the benefit of Plaintiffs and the class members;

B)   Such other relief as is appropriate.

### *JURY DEMAND*

Plaintiffs demand trial by jury.

Respectfully Submitted,

By: /s/ Lance A. Raphael
One of Plaintiffs' Attorneys

Lance A. Raphael

22

Stacy M. Bardo
Allison Krumhorn
The Consumer Advocacy Center, P.C.
180 West Washington, Suite 700
Chicago, IL  60602-2318
(312) 782-5808
Firm No. 36667

Brian L. Bromberg (BLB: 6264)
Brian L. Bromberg, P.C.
40 Exchange Place, Suite 2010
New York, NY  10005
(212) 248-7906